FILED

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA

2015 DEC 11  P 1: 24

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| SAADIQ LONG, aka Paul Anderson, **JUANGJAN DAVES,** **LESHAUNA DAVES,** <br><br> Plaintiffs, <br><br> v. <br><br> **LORETAA LYNCH,** Attorney General of the United States; in her official capacity, only; <br><br> **JAMES B. COMEY,** Director of the Federal Bureau of Investigation, in his official capacity, only; <br><br> **TIMOTHY J. HEALY,** Director of the Terrorist Screening Center, in his official capacity, only; <br><br> **MATTHEW G. OLSEN,** Director of the National Counterterrorism Center, in his official capacity, only; <br><br> **JEH JOHNSON,** Director of the Department of Homeland Security, in his official capacity, only; and, <br><br> **PETER NEFFENGER,** Administrator of the United States Transportation Security Administration, in his official capacity, only; <br><br> **UNKNOWN TSC AGENTS,** in their individual capacity, only; <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Case No. 1:15CV1642 <br> Hon. LOG \ MSN <br><br> **\*\* EXPEDITED HEARING REQUESTED \*\*** |

## COMPLAINT

1

Plaintiffs, through their undersigned counsel, state as follows:

## Introduction

1.     Our federal government is imposing an injustice of historic proportions upon the Americans who have filed this action, as well as thousands of others. Through extra-judicial and secret means, the federal government is ensnaring individuals into an invisible web of consequences that are imposed indefinitely and without recourse as a result of the shockingly large federal watch lists that now include hundreds of thousands of individuals.

2.     These consequences include the inability to fly on airplanes, to go through security without having all screeners receive a message for the remainder of your life that you are a "known or suspected terrorist," to obtain licenses, to exercise your Second Amendment right to own a firearm, and to be free from the unimaginable indignity and real- life danger of having your own government communicate to hundreds of thousands of federal agents, private contractors, state and local police, the captains of sea-faring vessels, and foreign governments all across the world that you are a violent menace.

3.     And unfortunately, the federal government has designed its federal watch list to be accountability-free. Persons placed on the federal watch list have no means of removing themselves or challenging the basis for their inclusion. Indeed, people on the federal watch lists only learn of their placement when they feel the web of consequences burdening their lives and aspirations, and they never learn why.

4.     Leaked government documents, which are now publicly available, have made clear that the secret federal watch list, of which the No Fly List is a subset, is the

product of bigotry and misguided, counterproductive zeal. Americans are designated onto the watch list without being charged, convicted, or in some stomach-churning cases, even subject to an ongoing investigation.

5.    Instead, we now know—because of two recently leaked government documents and a governmental report, which include the March 2013 Watchlisting Guidance, the Directorate of Terrorist Identities (DTI): Strategic Accomplishments 2013, and the Department of Justice's March 2014 Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist—that the care the federal government takes in creating its federal watch list would be laughable if not for the tragic, life-altering consequences that flow from these illegal actions.

6.    We now know that Dearborn, a city of less than 100,000 and a place Arab Americans and Muslim Americans have called home for generations, contains the second highest concentration of Americans on the federal government's watch list. We know that there have been more than 1.5 million nominations to the federal watch list since 2009 and that, in 2013 for example, the Terrorist Screening Center converted 98.96 percent of those nominations into watch list placements.

7.    Evidence shows that the federal government uses guilt-by-association presumptions to place family members and friends of listed persons on the watch list.

8.    Moreover, travel to Muslim majority countries—travel that American Muslims are very likely to engage in—is also a basis for watch list placement.

9.    In 2009, the federal government made 227,932 nominations to its federal watch list. In 2013, that number more than doubled to 468,749. If this Court does not temper

the federal government's watch listing obsession, by 2018, Defendants may be nominating more than a million individuals a year to its watch list.

## Parties

10.     Plaintiff Saadiq Long is a United States Citizen and a Muslim. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watchlist is compiled.

11.     Plaintiff [wife] is a United States Citizen and a Muslim.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watchlist is compiled.

12.     Plaintiff [daughter] is a United States Citizen and a Muslim.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watchlist is compiled.

13.     Defendant Loretta Lynch is Attorney General of the United States. Defendant Holder is being sued in his official capacity, only.

14.     Defendant James B. Comey is Director of the Federal Bureau of Investigation ("FBI"). Defendant Comey is being sued in his official capacity, only.

15.     Defendant Timothy J. Healy is Director of the Terrorist Screening Center ("TSC"). Defendant Healy is being sued in his official capacity, only.

16.     Defendant Matthew G. Olsen is Director of the National Counterterrorism Center ("NCTC"). Defendant Olsen is being sued in his official capacity, only.

17.     Defendant Jeh Johnson is Director of the Department of Homeland Security. Defendant Johnson is being sued in his official capacity, only.

18.     Defendant Peter Nefenger is Administrator of the United States Transportation Security Administration ("TSA"). Defendant Nefenger is being sued in his official capacity, only.

19.     Unknown TSC Agents are the TSC officials who placed plaintiffs on the No Fly List and/or caused the list with their names on it to be disseminated to foreign countries, including Turkey. Unknown TSC Agents are sued in their individual capacity.

### Jurisdiction and Venue

20.     Under U.S. Const. Art. III §2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution. Jurisdiction is proper pursuant to 28 U.S.C. § 1331, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), *et seq.*, 5 U.S.C. § 702, 5 U.S.C. § 706, the United States Constitution, and federal common law.

21.     This action seeks declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, Rules 57 and 65 of the Federal Rules of Civil Procedure, and pursuant to the general, legal, and equitable powers of this Court.

22.     This action also seeks damages pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1357.

23.     A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Eastern District of Virginia, because that is where the No Fly List is compiled.

24.     Venue is proper under 42 U.S.C. § 1391(e) as to all Defendants because Defendants are officers or employees of agencies of the United States sued in their official capacity and because this judicial district is where all Defendants have substantial

contacts and where a substantial part of the events or omissions giving rise to the claims occurred.

## Factual Background

### The Federal Government's Terrorist Watch List

25.    In September, 2003, Attorney General John Ashcroft established the Terrorist Screening Center to consolidate the government's approach to terrorism screening. The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Database (the "watch list"). TSC's consolidated watch list is the federal government's master repository for suspected international and domestic terrorist records used for watch list related screening.

26.    The watch list has two primary components: the Selectee List and the No-Fly List. Persons on the Selectee List are systematically subject to extra screening at airports and land border crossings, and often find "SSSS" on their boarding passes which is marked to indicate a passenger's watch list status to screeners. Persons on the No-Fly List are prevented from boarding flights that fly into, out of, or even through United States airspace.

27.    TSC sends records from its terrorist watch list to other government agencies that in turn use those records to identify suspected terrorists. For example, applicable TSC records are provided to TSA for use by airlines in pre-screening passengers and to CBP for use in screening travelers entering the United States. Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA that carry out the screening function.  In the context of air travel,              when              individuals              make              airline

reservations and check in at airports, the front-line screening agency, like TSA and CBP, conducts a name-based search of the individual to determine whether he or she is on a watch list.

28. While agencies throughout the federal government utilizes the federal watch list to conduct screening, listed persons are subject to a comprehensive portfolio of consequences that cover large aspects of their lives.

29. Indeed, the federal government disseminates its federal watch list to state and local authorities, foreign governments, corporations, private contractors, the captains of sea- faring vessels, among others in order to encourage these entities to impose consequences on those individuals Defendants have listed.

30. Because the federal government disseminates its federal watch list to foreign governments, listed persons are often not allowed to enter other nations. This is because the United States is telling other nations, without any modicum of due process, that thousands of its own citizens are "known or suspected terrorists."

31. The federal government disseminates its federal watch list to state and local police officers, which allows those officers to query the names of persons, if for example, the listed individual is pulled over for routine traffic violations.

32. Disseminating the federal watch list to state and local police officers creates a dangerous situation insofar as the federal watch list effectively direct state and local officers to treat thousands of Americans charged or convicted with no crime yet listed as a "known or suspected terrorist" and as extremely dangerous.

33. With the advent and deployment of automatic license plate readers by police departments across the country, being listed on the federal watch list can be the

basis of a traffic stop.

34. Being on the federal watch list can prevent listed persons from purchasing a gun. For example, Connecticut's governor just issued an executive order banning persons on the federal watch list from buying guns.

35. Because the federal government conducts a security risk assessment that includes querying the federal watch list prior to issuing a license to commercial drivers to transport hazardous materials, being on the federal watch list can prevent listed persons from obtaining or renewing their Hazmat license.

36. Being on the federal watch list can also prevent listed persons from accompanying minors or passengers with disabilities to their gate, from working at an airport, or working for an airline insofar as listed persons are not allowed to enter so-called "sterile areas" of airports.

37. Although TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the database of suspected terrorists.

38. Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watch list—the NCTC and the FBI. The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watch list. TIDE is the main source of all international terrorist information included in the watch list.

39. The FBI, in turn, nominates to the watch list individuals with what it

12

characterizes as suspected ties to domestic terrorism. TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watch list as a known or suspected terrorist. TSC also decides which screening systems will receive the information about that individual.

40.     Defendant Healy has testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watch list, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism. According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

41.     Defendants have not stated publicly what standards or criteria are applied to determine whether an individual on the consolidated watch list will be placed on the No-Fly List, Selectee List ("SSSS") or other list that is distributed to the TSA, CBP or other screening agencies.

42.     The standards for watch list inclusion do not evince even internal logic. Defendants define a "suspected terrorist" as an "individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to terrorism and terrorist activities based on articulable and reasonable suspicion." In other words, Defendants place individuals on the federal watch list based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities. This "reasonable suspicion" based on a "reasonable suspicion" standard does not even contain internal logic.

13

43. The federal government utilizes guilt-by-association as a basis for watch list inclusion. For example, the immediate relative of listed persons can be listed without any derogatory information—other than the bonds of family. Nonetheless, such designation suggests that the immediate relative is him or herself engaged in nefarious activities.

44. Being a known associate—a friend, colleague, fellow community member, etc.—of a listed individual can also provide a basis for watch list inclusion.

45. Even if an individual is acquitted of terrorism charges or those charges are otherwise dismissed, the federal government retains for itself the authority to continue to include them in the watch list.

46. For reasons unknown, Defendants also place what they call "non-investigatory subjects" on the federal watch list, people that they have chosen not to investigate.

47. Under these practices and standards, the number of records in the consolidated watch list has swelled. Over 1.5 million nominations to the watch list have been submitted by federal agencies since fiscal 2009.

48. In 2013, Defendant TSC accepted 98.96 percent of all nominations made.

49. Because of these loose standards and practices, the federal watch list's rate of growth has increased. In fiscal 2009, there were 227,932 nominations to the watch list. In fiscal 2013, there were 468,749 nominations.

50. In 2001, there were 16 people who the federal government systematically prevented from flying. In 2013, that number increased to 47,000.

51. Once an individual has been placed on the watch list, the individual

14

remains on the list until the agency that supplied the initial information in support of the nomination determines the individual should be removed.

52.     A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watch list.[1] As such, the watch list is growing at a rate of approximately 20,000 entries per year.

53.     At a March 10, 2010 Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watch list is "getting bigger, and it will get even bigger."

54.     The federal watch list also disproportionately targets American Muslims.

55.     Defendants have utilized the watch list, not as a tool to enhance aviation and border security, but as a bludgeon to coerce American Muslims into becoming informants or forgoing the exercise of their rights, such as the right to have an attorney present during law enforcement questioning.

56.     Public examples of this phenomenon abound. *See Latif v. Holder,* 2014 U.S. Dist. LEXIS 85450, *19 (D. Or. June 24, 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI"); *Id.* at *21-22 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant."): *Id* at *22-23 (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-

---

[1] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist*

*Watch List Screening: Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110, October 2007, at 22.

Fly List."). *See also Fikre v. FBI,* 2014 U.S. Dist. LEXIS 73174 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on the No-Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him] from the No-Fly List if he agreed to be an informant."); *Tanveer v. Holder, et. al.,* No. 13-cv- 6951, Dkt. 15 (April 22, 2014) (Naveed Shinwari "declined to act as an informant for the Federal Bureau of Investigation and to spy on [his] own American Muslim communities and other innocent people.").

57. Almost all publicly known instances of Americans being placed on the watch list regard Muslims or persons who could be mistaken for Muslims.

58. Additionally, government records show that Dearborn, Michigan—which is 40 percent Arab—is disproportionately represented on the federal watch list. In fact, Dearborn is among the top five cities in the country, alongside Chicago, Houston, New York, and San Diego, represented on the federal watch list.

59. Defendants' 2013 Watchlisting Guidance also indicates that "[t]ravel for no known lawful or legitimate purpose to a locus of terrorist activity" can be a basis for being listed. While a "locus of Terrorist Activity" is not defined by the document, upon information and belief, it likely includes any place where many Muslims reside.

### The 2012-2013 Incidents

60. Saadiq Long has been on the No Fly List since at least 2012.

61. Long learned that he was on the No Fly List when he tried to visit his mother in 2012 after learning that she had developed a life threatening condition.

62. In 2012, Long was living with the other plaintiffs—his wife and daughter—in Qatar. When he tried to fly home to Oklahoma, where he was born and where is

parents and siblings still live, he was told that he would be unable to board a plane to fly to see his mother.

63.   After several months and substantial local, national, and international media coverage, Long was allowed fly to Oklahoma.

64.   Prior to being allowed to board that plane, the FBI visited his gravely ill mother and demanded to see her prescription medications.  Shocked, Long's mother showed the FBI agents her medications.

65.   Subsequent to returning to Oklahoma, the FBI followed him and his sister around in unmarked vehicles. On one occasion, Long and his sister were alarmed that an unmarked vehicle was tailing them.  Not knowing who was following them, they drove to a police station in Oklahoma.

66.   When they got to the station's parking lot, they were greeted by officers with guns drawn, yanked out of their car, handcuffed and thrown to the ground.  The driver vehicle that had been following Saadiq and his sister approached them, introduced himself as the FBI, and sarcastically apologized for how difficult it was for Saadiq to return to the US.

67.   Neither Saadiq nor his sister were arrested that day.  In fact, the records make clear that the reason local police drew their guns and handcuffed them was because the FBI agent misled the officers by claiming that he was trying to detain "fleeing felons."

68.   Months after his return to Oklahoma, Saadiq had to go back to his family and his livelihood in Qatar.  However, despite letting the FBI know when he wanted to fly ahead of time, the FBI refused to allow him to board a plane to return to Qatar.

69.    In March 2013, with the federal government continuing to prevent Saadiq from flying home, he decided to return by taking a bus to Mexico, flying from Mexico to South America, and then from South American to Qatar.

### Plaintiffs' Current Predicament

70.    On or about the end of October 2015, Plaintiffs travelled to Turkey to explore work opportunities there and to also see the country where Saadiq Long served the Air Force for a decade.

71.    On or about the end of October 2015, the Turkish government detained plaintiffs because the United States had flagged their passports.

72.    Upon information and belief, the United States exports its No Fly List to foreign government across the world with the hope that those countries will either detain listees or not allow listees free movement.

73.    Upon information and belief, Plaintiffs' passport was flagged as a result of Defendants placing their names on the No Fly List.  They are currently not free to leave Turkish custody, because Defendants have placed them on the No Fly List.

74.    The Turkish government, the US government, a Pulitzer Prize winning journalist, and a Turkish attorney working with the undersigned counsel and the family of the plaintiffs have all confirmed that there are no charges against Plaintiffs in Turkey.

75.    Plaintiffs were detained because the United States placed them on their No Fly List.

76.    Currently, the United States has indicated that it will issue a one-time waiver for Plaintiffs to fly from Turkey to the United States.

77.    However, a one-time waiver that allows a listed person to fly still means

that the person is on the No Fly List.

78.     The Plaintiffs cannot make a responsible decision about whether to return to the United States by plane without knowing that they will be able to later leave the United States by plane.

79.     Because Defendants' No Fly List is disseminated to foreign governments across the world, it is dangerous for Plaintiffs to travel through the many third-party countries they would have to move through if they cannot simply fly—like almost all other American citizens can—through US airspace.

**COUNT I**
**DEPRIVATION OF PROTECTED LIBERTIES IN VIOLATION OF FIFTH**
**AMENDMENT RIGHT TO SUBSTANTIVE DUE PROCESS**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

80.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

81.     Plaintiffs are alleging a narrow as-applied substantive due process claim based on facts specific to them, a broad as-applied substantive due process claim not based on facts specific to them, and a facial challenge to the No Fly List.

82.     Because Plaintiffs do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiffs on a watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the United States at land border crossings, are arbitrary, lack even a rational relationship to any legitimate government interest, and have unreasonably deprived Plaintiffs of constitutionally protected rights, including their liberty interests in travel, freedom from false stigmatization, and nonattainder.

83.     By placing Plaintiffs on the federal watch list, Defendants have placed an undue burden on their fundamental right of movement.

84.     By keeping Plaintiffs on the No Fly List and offering only a one-time waiver to fly back to the United States, Defendants are deterring them from exercising their right to undertake the movement required to return to the United States.

85.     By keeping Plaintiffs on the No Fly List, Defendants have unlawfully diluted their citizenship rights.  Simply put, without the ability to return to the US by plane and then leave by plane, Defendants are denying Plaintiffs the ability to benefit from many of the rights and privileges of citizenship.

86.     Defendants' watch list lack a compelling interest insofar as their true purpose is to provide law enforcement with a tool to coerce American Muslims into becoming informants.

87.     Defendants' watch list are also not narrowly tailored insofar as the federal watch list are entirely and demonstrably ineffectual and obvious alternatives exist.

88.     Defendants have thus violated Plaintiffs' constitutional rights without affording them due process of law and will continue to do so into the future if Plaintiffs are not afforded the relief demanded below.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

<u>**COUNT II**</u>
**UNLAWFUL AGENCY ACTION IN VIOLATION OF THE ADMNIISTRATIVE**
**PROCEDURE ACT, 5 U.S.C. §§ 702, 706**
<u>**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**</u>

89.     Plaintiffs hereby reallege and incorporate by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

90.     Defendants' actions described herein were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

91.     Defendants' use of the No Fly List against citizens is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.   Specifically, the No Fly List is a violation of Plaintiffs' substantive due process rights.

92.     Because Plaintiffs do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiffs on the federal watch list that unreasonably burdens or prevents them from boarding commercial flights or entering the United States across the border, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## Prayer for Relief

WHEREFORE, Plaintiffs respectfully request:

1.   A declaratory judgment that Defendants' policies, practices, and customs violate the Fifth Amendment to the United States Constitution and the Administrative Procedure Act;

2.   An injunction that requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiffs from any watch list or database that burdens or prevents them from flying or entering the United States across the border;

3.   An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412; and,

4.   All such other and further relief as the Court may deem just and proper.

## **CONCLUSION**

For the reasons specified above, Plaintiffs respectfully ask that this Court grant the relief requested.

Respectfully submitted,

/s/

GADEIR I. ABBAS
THE LAW OFFICE OF GADEIR ABBAS
1155 F Street NW, Suite 1050
Washington, D.C. 20004
Telephone: (720) 251-0425
Fax: (202) 204-0253
Email: gadeir@abbaslawfirm.com
*Licensed in Virginia, not in D.C.  -Practice limited to federal matters*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2015, I filed the foregoing document with the Court and served to counsel for Defendants, both at the US Attorneys' Office as well as at the Department of Justice, via electronic mail:

Respectfully submitted,

_/s/_

GADEIR I. ABBAS
THE LAW OFFICE OF GADEIR ABBAS
1155 F Street NW, Suite 1050
Washington, D.C. 20004
Telephone: (720) 251-0425
Fax: (202) 204-0253
Email: gadeir@abbaslawfirm.com
*Licensed in Virginia, not in D.C.  -Practice limited to federal matters*