IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division



| | |
|---|---|
| SAADIQ LONG, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> LORETTA LYNCH, in her official capacity as Attorney General of the United States, *et al.*, <br><br> *Defendants*. | Civil Action No. 1:15-cv-1642 |

## ORDER

This matter comes before the Court on Plaintiffs' Emergency Motion for a Temporary Restraining Order, Dkt. No. 2, and Emergency Motion for Preliminary Injunction, Dkt. No. 3.[1] The Court held a hearing on the Motions on December 21, 2015. For the reasons stated in Court, and as outlined below, the Court finds Plaintiffs have not met their burden in seeking a Temporary Restraining Order ("TRO") or a Preliminary Injunction. The Motions are, therefore, DENIED.

### I. Background

This case involves a dispute over Defendants' alleged placement of Plaintiffs Saadiq Long, Juangjan Daves, and Leshauna Daves on the United States Government's "No Fly List." The No Fly List is "a list of persons who are prohibited from boarding an aircraft" because they are suspected terrorists and a threat to civil aviation and national security. *Mohamed v. Holder*,

---

[1] Plaintiffs filed two identical documents entitled "Emergency Motion for Temporary Restraining Order and/or Preliminary Injunction" that appear as Documents 2 and 3 on the docket. Although the documents are identical, the docket identifies Document 2 as an "Emergency Motion for Temporary Restraining Order" and Document 3 as an "Emergency Motion for Preliminary Injunction." The Court treat these documents as two separate motions as identified by their docket entries.

1

995 F. Supp. 2d 520, 526 (E.D. Va. 2014). Plaintiffs, an American Muslim family of three, are United States citizens who are currently in the custody of the Government of Turkey. Plaintiffs allege that their inclusion on the No Fly List caused them to be detained and is preventing them from freely traveling internationally.

*A. The No Fly List*

The No Fly List is a subset of individuals in the Terrorist Screening Database (TSDB), a consolidated "watchlist" of suspected terrorists. *Latif v. Holder*, 969 F. Supp. 2d, 1293, 1296-97 (D. Or. 2013). The Terrorist Screening Center (TSC), an entity administered by the FBI, maintains the TSDB. *Id.* The TSC receives nominations for inclusion in the TSDB from the National Counterterrorism Center and the FBI. *Mohamed*, 995 F. Supp. 2d at 526. The Government has a "minimum substantive derogatory criteria" that must be met in order for a nominated individual to be placed in the TSDB. *Id.* "[A]dditional derogatory requirements" must be met for the TSC to place an individual on the No Fly List. *Id.* TSC gives the maintained No Fly List to the Transportation Security Administration (TSA) "for use in pre-screening airline passengers." *Latif*, 969 F. Supp. 2d at 1297.

Congress charged the Department of Homeland Security with providing individuals with a mechanism for challenging, among other things, their inclusion in the TSDB or on the No Fly List. 49 U.S.C. § 44926(a) ("The Secretary of Homeland Security shall establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration, United States Customs and Border Protection, or any other office or component of the Department of Homeland Security."). In response to this charge, the DHS Traveler Redress Inquiry Program ("DHS TRIP") was established. *Mohamed*,

995 F. Supp. 2d at 527. To initiate the DHS TRIP, a traveler must send a Traveler Inquiry Form to DHS TRIP. Initially, an individual who submitted a Traveler Inquiry Form to DHS TRIP generally received a letter "that neither confirmed nor denied their No Fly status." *See Mohamed v. Holder*, Case No. 1:11-cv-50, Dkt. No. 188 (E.D. Va. April 13, 2015). However, DHS TRIP was revised in early 2015. *Id.* Now, an individual who submits an inquiry to DHS TRIP will "receive a letter providing his or her status on the No Fly List and the option to receive and/or submit additional information." *Id.* At the individual's request, DHS TRIP will provide a second, more detailed letter that identifies why the individual was placed on the No Fly List and providing that individual "an opportunity to be heard further concerning their status." *Id.* If the individual continues to seek redress, the Administrator of the TSA will review the individual's submissions and issue a final determination on the individual's status. *Id.* The individual may seek judicial review of this final determination under 49 U.S.C. § 46110. *Id.*

### B. The 2012-2013 Incidents

Plaintiff Long alleges that he first learned that he was on the No Fly List when he tried to fly from Qatar to Oklahoma to visit his ailing mother in 2012. Compl. Dkt. 1, ¶¶61-62. At that time, Long was told that he was not allowed to fly to the United States. However, "[a]fter several months and substantial local, national, and international media coverage," Long was finally permitted to fly to Oklahoma. *Id.* at ¶ 63. Several months later, Long attempted to fly back to Qatar, but the FBI refused to allow Long to board the plane. *Id.* Long then took a bus to Mexico and flew back to Qatar via an unidentified country in South America. *Id.* at ¶ 69. Long asserts that he challenged his inclusion on the No Fly List through DHS TRIP in 2012. Long, however, did not seek judicial review of the final administrative decision and has not submitted an inquiry to DHS TRIP after the revised policies were put into place.

3

*C. Plaintiffs' Detention in Turkey*

There is no dispute that the Plaintiffs are currently being held in Turkey by the Turkish Government. However, the parties have presented two differing set of facts that led up to the Turkish Government taking Plaintiffs into custody. According to Plaintiffs, in October of 2015, they traveled from Qatar, where they were living, to Turkey, "to explore work opportunities." *Id.* at ¶ 70. Shortly after arriving in Turkey, "the Turkish government detained Plaintiffs because the United States had flagged their passports." *Id.* at ¶ 71. Plaintiffs believe their passports were flagged and they were taken into custody because their names are on the No Fly List. *Id.* at ¶¶ 73, 75.

The Defendants, in contrast, assert that Plaintiffs were taken into custody after the Turkish National Police ("TNP") received a tip on a hotline the TNP had established for reporting suspicious behavior following the October 10, 2015, suicide bombing in Ankara, Turkey. Decl. John B. Phillips, III, Def. Ex. 1, Dkt. No. 9-2, ¶ 7. When the TNP received that call, Plaintiffs were staying in Gaziantep, Turkey, which is near the border with Syria. After the Ankara bombing, the TNP had increased its authority to detain and deport foreigners in this Syrian border region. *Id.* Based on the hotline tip, the TNP located Plaintiffs and detained them. *Id.* The TNP determined Plaintiffs had neither legal residence nor legal employment in Turkey and could not locate a record of Plaintiffs entering Turkey legally. *Id.* at ¶¶ 8-9.

On November 3, 2015, The Turkish Government notified the U.S. Embassy in Ankara, that the TNP had detained Plaintiffs. Decl. Rachel Crawford, Def. Ex. 2, Dkt. No. 9-1, ¶ 2. After transferring Plaintiffs to immigration detention, the Turkish Government informed both the U.S. Embassy and Plaintiffs that Plaintiffs would be deported to the United States. *Id.* at ¶¶ 2-4. The Turkish Government also told Plaintiffs that they could be released to return to the United

4

States at any time provided that they paid for their plane tickets. *Id.* at ¶ 7. On December 3, 2015, a friend of the Plaintiffs contacted the U.S. Embassy and informed the staff there that he had arranged for the Plaintiffs to travel to the United States. *Id.* at ¶ 6. The US Embassy did not object to the proposed travel plans. *Id.* Not wanting to travel to the United States, Plaintiffs rejected the proposed plans. *Id.* Plaintiffs apparently do not want to leave Turkey because they fear their inclusion on the No Fly List will prevent them from leaving, and returning to their home in Qatar, once they have arrived in the United States. Compl., Dkt. 1, ¶ 78.

Instead of obtaining release from the Turkish Government by flying to the United States, Plaintiffs sought assistance from this Court. Plaintiffs filed the current action in this Court on December 11, 2015. Plaintiffs simultaneously filed an Emergency Motion for a Temporary Restraining Order and an Emergency Motion for a Preliminary Injunction. These Motions for preliminary relief ask this Court to "order Defendants to remove plaintiffs from the No Fly List so that they can travel to the United States by plane and know that they will be able to leave by plane as well." *Id.*

## II. Legal Standard

The legal standard for granting a temporary restraining order is the same as that for granting a preliminary injunction. *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006). To obtain a preliminary injunction, and thus a TRO, a plaintiff must establish that (1) he is likely to ultimately succeed on the merits of his claims; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that granting the requested interim relief is in the public interest. *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 24 (2008). Prior to *Winter*, the Fourth Circuit used a "balance of hardships test," under which only some of the above four factors needed to be satisfied.

*Pashyby v. Delia*, 709 F.3d 307, 320-21. In light of *Winter*, the Fourth Circuit now requires that each of the four preliminary injunction factors be satisfied. *Id.* The Fourth Circuit has also recognized that interim relief is an "extraordinary remedy involving the exercise of a very far-reaching power," which should be utilized only in the rare circumstances "which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991) (citation omitted).

### III. Discussion

*A. Whether Plaintiffs Have Established That They Are Likely To Ultimately Succeed on the Merits of Their Claims*

In order to obtain a TRO, Plaintiffs must first establish that they are likely to succeed on the merits of their claims. *Winter*, 555 U.S. at 20. Plaintiffs have brought two causes of action: (1) deprivation of protected liberties in violation of their Fifth Amendment right to due process; and (2) unlawful agency action in violation of the administrative procedure act. Dkt. 1, 16-18. However, Plaintiffs' memorandum focuses solely on the substantive due process challenge. Plaintiffs are asserting a broad constitutional challenge to the use of the No Fly List in any and all circumstances.

The Court need not weigh in on the constitutionality of the No Fly List at this time. As explained below, Plaintiffs have not established the other three elements required to obtain a TRO or a preliminary injunction. Further, the complexity of the legal issues is better addressed when the parties have more fully briefed the issue and the Court has had more time to carefully consider the legal questions at hand.

*B. Whether Plaintiffs are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief*

Plaintiffs next must demonstrate that they are likely to suffer irreparable injury if interim relief is not provided. *Winter*, 555 U.S. at 20. Irreparable injury must be "likely," not merely possible. *Id.* at 22. Granting interim relief "based only on a possibility of irreparable harm" would be inconsistent with the "characterization of injunctive relief as an extraordinary remedy." *Id.* Further, irreparable harm cannot be "remote nor speculative;" rather, for a preliminary injunction to issue, irreparable harm must be "actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991).

Plaintiffs argue that they have already suffered irreparable injury in the form of "involuntary exile from their country of citizenship" in violation of their constitutional rights. Dkt. 4, at 21. Plaintiffs maintain that they will continue to suffer this injury in the absence of preliminary relief. *Id.* Plaintiffs also assert that the "psychological stress of being in the custody of the Turkish government" is an irreparable injury that they continue to endure. *Id.* at 22.

Plaintiffs' claim of irreparable injury in the form of "involuntary exile" is not persuasive. Turkish authorities have told Plaintiffs and the U.S. Embassy that Plaintiffs may return to the United States at any time they desire, so long as they purchase their plane tickets. Def. Ex. 2, ¶ 7. Plaintiffs could obtain a loan from the United States Government to purchase such plane tickets. *See* 22 U.S.C § 2671(b)(2)(B). In addition, in early December, 2015, Plaintiffs rejected an opportunity to travel to the United States that had been arranged by a family friend and cleared by the U.S. Embassy. Considering these facts, this Court cannot conclude that Plaintiffs are "exiled" when the reality is that Plaintiffs have consciously and affirmatively chosen to remain in Turkey.

Plaintiffs' Complaint also asserts that without immediate relief they "cannot make a responsible decision about whether to return to the United States by plane without knowing that they will be able to later leave the United States by plane." Compl., Dkt. 1, ¶ 78. Being unable to "make a responsible decision" is not an irreparable injury that justifies the extreme remedy of issuing a TRO or a preliminary injunction. While being immediately unable to leave the United States might constitute irreparable injury as an encroachment on the freedom of movement possessed by every citizen, that is not what Plaintiffs are asserting. Rather, at best Plaintiffs are asserting that they may not be permitted to leave the United States at some unspecified point in the future if they first choose to return to the United States and then chose to leave. This alleged injury lacks both the certainty and immediacy required at the TRO stage. *See Direx Israel*, 952 F.2d at 812. Further, while the Complaint asserts that Long has experienced difficulty traveling to and from the United States, the Complaint is free of concrete facts that indicate Juangjan Daves or Leshauva Daves will have similar experiences if they return to the United States.

Finally, this Court finds Long's delay in challenging his placement on the No Fly List significant. Long alleges that he has been on the No Fly List since 2012. As made clear at oral argument, Long challenged his inclusion on the List through DHS TRIP in 2012. However, Long did not seek judicial review of the outcome of that administrative action, nor did he seek redress under the revised DHS TRIP procedures announced earlier this year. *See Mohamed v. Holder*, 1:11-cv-50, Dkt. No. 188 (April 13, 2015). Instead of going through the proper channels, Long waited until he found himself in this predicament to seek relief. Plaintiffs' ability to make a "responsible decision about whether to return to the United States by plane" is just as cognizable now as it was a few months ago. Considering this delay in seeking relief the Court cannot conclude that this is an irreparable harm which demands immediate action.

*C. Whether the Balance of Equities and the Public Interest Weigh in Plaintiffs' Favor*

The third and fourth factors this Court must consider is whether the balance of equities tips in Plaintiffs' favor and whether it is in the public's interest to grant the requested interim relief. Plaintiffs have completely omitted any discussion of the balance of equities while Defendants have addressed these two factors together. The Court will thus similarly consider these factors collectively.

Plaintiffs' only argument on these factors is that it is in the public's best interests to prohibit the government from implementing a policy whereby fundamental rights are deprived. Defendants, in response, argue that removing someone from the No Fly List without robust administrative and judicial review, could render U.S. aviation vulnerable and place the public in danger. This Court has recognized that the U.S. Government has a "compelling" duty to "protect our country from its enemies, foreign and domestic." *Mohamed v. Holder*, 995 F. Supp. 2d 520, 527 (E.D. Va. 2014). The Government uses the No Fly List as a tool to help insure that "a commercial aircraft" is not used "as an instrument of mass murder." *Id.* The Defendants thus have an interest in the full and continued use of this List to fulfill their governmental duties. It is correlatively in the public's interest for this Court to deny preliminary relief because public safety is furthered by the use of the No Fly List. Plaintiffs' argument that they are being deprived of their fundamental rights is best addressed when a complete factual record is presented and the Court can give due consideration to the issues. Only then can the Court properly weight the competing national security and public safety issues against the fully developed constitutional claims brought by Plaintiff. Accordingly, the Court finds the third and fourth factor weigh in the Defendants' favor and against granting the present Motions.

## IV. Conclusion

For the reasons outlined above, the Court ORDERS that the Emergency Motion for a Temporary Restraining Order is DENIED. The Court further ORDERS that the Emergency Motion for Preliminary Injunction is DENIED.

December 22, 2015
Alexandria, VA

/s/
Liam O'Grady
United States District Judge