**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

_____ )
**SAADIQ LONG**, aka Paul Anderson,      )
**JUANGJAN DAVES,**                      )
**LESHAUNA DAVES,**                      )
                                         )
                    Plaintiffs,          )
                                         )
v.                                       )    Case No. 1:15-CV-1642
                                         )    Hon. Liam O'Grady
**WILLIAM P. BARR**, Attorney            )
General of the United States, in his     )    **AMENDED COMPLAINT**
official capacity, only;                 )
                                         )
**CHRISTOPHER A. WRAY**, Director of     )
the Federal Bureau of Investigation,     )
in his official capacity, only;          )
                                         )
**CHARLES H. KABLE, IV**, Director of    )
the Terrorism Screening Center, in       )
his official capacity, only;             )
                                         )
**JOSEPH MAGUIRE**, Director of the      )
National Counterterrorism Center,        )
Office of the Director of National       )
Intelligence, in his official capacity, only; )
                                         )
**KIRSTJEN NIELSON**, Secretary of       )
Homeland Security, United States         )
Department of Homeland Security, in      )
her official capacity, only;             )
                                         )
**DAVID P. PEKOSKE**, Administrator,     )
Transportation Security Administration,  )
United States Department of Homeland     )
Security, in his official capacity, only; )
                                         )
                    Defendants.          )
_____ )

## FIRST AMENDED COMPLAINT FOR
## INJUNCTIVE AND DECLARATORY RELIEF AND DAMAGES

### JURY TRIAL DEMANDED

Plaintiffs **SAADIQ LONG**, **JUANGJAN DAVES** and **LESHAUNA DAVES**, by and through

their attorneys, CAIR Legal Defense Fund ("CAIR"), state as follows:

### Introduction

1.      The federal government has imposed a kind of second-class citizenship on the

Plaintiffs.  Without charges, without arrests, without even an investigation sometimes—the

agency Defendants act in concert to deprive thousands of innocent Americans, mostly

Muslim, of their right to be free from a government that extrajudicially designates them as

worthy of permanent suspicion.

2.      That permanent suspicion, embodied in the federal government's watchlisting

enterprise, has sweeping consequences for the Plaintiffs as well as the more than one million

others who bear it.  They are separated from their children, denied employment

opportunities, prevented from traveling by air to attend weddings and funerals, and denied

or delayed immigration benefits.  The rights of Plaintiffs to purchase firearms, to wire money

and keep a bank account, to receive their passports and be granted visas are all constrained.

For Plaintiff Long, Defendants have also restricted his ability to travel by air.

3.      Through an interagency watchlisting system, led by Defendants' Watchlisting

Advisory Council, the Defendants have identified the Plaintiffs as worthy of permanent

suspicion, imposing burdens and disabilities on them in all aspects of their lives.

4.      In deciding to target the Plaintiffs, the watchlisting system behaves lawlessly,

acting absent Congressional approval and oversight, and even in direct opposition to

Congressional directives.

5.     To identify its targets, some parts of the watchlisting system, such as the Terrorism Screening Database ("TSDB"), utilize a nonsense-on-stilts inclusion standard that is always satisfied.  Other parts, such as the TSA's Quiet Skies initiative—a program that also behaves lawlessly and without Congressional approval and oversight—and other "rules-based" lists, do not use any standard and instead rely upon the inarticulate hunches of federal officials, rank profiling, and vulgar guilt-by-association practices.

6.     Through their watchlisting system, the federal government makes it known— to every law enforcement agency in the country, every part of the federal government, more than 60 foreign countries, an unknown number of private companies, international bodies, and other third parties—that the Plaintiffs should be treated as dangerous threats.  The Plaintiffs' friends, family, and others with whom the Plaintiffs associate are punished for their relationship with a watchlisting system's target.

7.     Plaintiffs and almost all others targeted by the watchlisting system have never been arrested, charged, or convicted of any type of terrorism-related offense.  Nonetheless, the federal government has designated them as "known or suspected terrorists," wreaking havoc on Plaintiffs' personal, religious and professional lives.

8.     The Defendants know that their watchlisting system has never prevented an act of terrorism inside the United States and that it is completely ineffective, but they continue to expand it anyways.  In the last 10 years alone, Defendant CBP reports that its encounters with individuals suspected of having terrorism-related or national security concerns has skyrocketed from 365 per year (in 2008) to more than 550,000 per year (in 2017).

9.      The federal government's watchlisting system uses secret and automated "rules" to monitor Americans' travel patterns and their associations.  Americans who travel to the Middle East, speak or study Arabic, donate to Muslim charities, are family members of already-watchlisted individuals, travel with already-watchlisted individuals, or communicate with already-watchlisted individuals are routinely flagged for heightened scrutiny.  The government designates these individuals as "unknown or partially known terrorists," monitors and investigates them, and then uses any information learned to nominate them as "known or suspected terrorists."   The Boston Globe unearthed one such "risk-based passenger targeting rules" program on July 28, 2018 called "Quiet Skies."

10.     The federal government uses guilt-by-association presumptions to place family members, friends, traveling companions, and associates of listed persons under intense surveillance and on the watchlist.  Many Americans, including children, end up targeted by the watchlisting system based on who their mother or father is, what mosque their family attends, how they exercise their constitutional rights, where they travel, with whom they associate, or their perceived religious beliefs.

11.     Speaking Arabic, traveling to Muslim-majority countries, and even undertaking religious pilgrimages—activities that American Muslims are likely to engage in—qualify as bases and factors for rules-based monitoring, Quiet Skies listing, watchlist nominations, and watchlist placements.

12.     The federal government adds many Americans to the watchlist or subjects them to terrorist-level scrutiny due to typos, coincidentally similar names and outright mistakes.  This happens because the government employs few checks or quality assurance standards before permitting names to be added.

13.     Leaked government documents as well as public governmental reports, reveal that the federal government's terrorist watchlisting system is discriminatory, standardless, and devoid of adequate procedures.  These documents include the March 2013 Watchlisting Guidance (Exhibit 1), the Directorate of Terrorist Identities (DTI): Strategic Accomplishments 2013 (Exhibit 2), the Department of Justice's March 2014 Audit of the Federal Bureau of Investigation's Management of Terrorist Watchlist (Exhibit 3), and a 2018 informational bulletin on the "Quiet Skies" program (Exhibit 4).

14.     The federal government's additions to the TSDB have dramatically increased over the last decade.  The number of individuals Defendants added to the TSDB in 2016 is more than triple the number added in 2009.  Approximately 99% of all proposed additions are accepted each year.  There are now more than one million people in the TSDB.

15.     Although the Department of Homeland Security operates the DHS Traveler Redress Inquiry Program ("DHS TRIP"), ostensibly to assist Americans in resolving travel complaints including those related to their watchlist status, the DHS TRIP is largely ineffective.  DHS TRIP refuses to discuss specific facts and refuses to even process many redress complaints related to watchlisted individuals or those subjected to rules-based "terrorist" monitoring.  Moreover, the DHS TRIP redress process often only affects air travel, not land border crossings or other watchlist consequences. Meanwhile, innocent Americans suffer paralyzing consequences.  Each of the Plaintiffs' injuries are directly attributable to Defendants' compilation, implementation and dissemination of the federal terrorist watchlisting system, including rules-based monitoring, Quiet Skies, and the TSDB.

## **Parties**

16.     Plaintiff Saadiq Long is a United States Citizen and a Muslim. Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watchlist is compiled.

17.     Plaintiff Juangan Daves is a United States Citizen, a Muslim and the wife of Plaintiff Saadiq Long.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watchlist is compiled.

18.     Plaintiff Leshauana Daves is a United States Citizen, a Muslim and the daughter of Plaintiff Saadiq Long.  Venue is proper because a substantial part of the events or omissions giving rise to his claims occurred within this district which is where the federal watchlist is compiled.

19.     Defendant William Barr is United States Attorney General of the U.S. Department of Justice ("DOJ").  The DOJ is a regular agency attendee of the Watchlisting Advisory Council ("WLAC"), a government agency that promulgates decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist, including, but not limited to: (1) watchlist nomination and removal procedures; (2) specific criteria used to nominate persons to the TSDB; (3) redress procedures; (4) vetting of information used to nominate persons to the TSDB; and, (5) dissemination of a person's designation in the TSDB to state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others.  The DOJ is represented at WLAC meetings by the Federal Bureau of Investigation ("FBI"); the Terrorism Screening Center ("TSC") (one of two cochairs

of the WLAC); and various USDOJ headquarters offices, including the National Security Division ("NSD"); the Office of Legal Policy ("OLP"); and the Office of Privacy and Civil Liberties ("OPCL"). Because the WLAC operates by consensus, the DOJ and/or its agency subcomponents have both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, the DOJ and/or its agency subcomponents accepted the nominations of some or all of the Plaintiffs and continues to accept the nominations of other similarly situated individuals to the federal terrorist watchlist. The DOJ and/or its agency subcomponents also oversee the dissemination of the "known or suspected terrorists" stigmatizing label attached to the Plaintiffs and other similarly situated individuals to state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others. Additionally, DOJ utilizes the TSDB to screen persons against it that are applying for security clearances or employment to work with DOJ and/or its agency subcomponents to deny them employment. Defendant Barr is being sued in his official capacity, only.

20. Defendant Christopher Wray is Director of the Federal Bureau of Investigation ("FBI"). The FBI is a regular agency attendee of the WLAC, a government agency described more fully in Paragraph 19. The FBI represents the DOJ at WLAC meetings. Because the WLAC operates by consensus, the FBI and/or its agency subcomponents have both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, the FBI and/or its agency subcomponents nominated some or all of the Plaintiffs, and continue to nominate other similarly situated American citizens, to the federal terrorist watchlist. Additionally, the FBI utilizes the TSDB to screen persons against it that are

applying for security clearances or for employment to work with the FBI and/or its agency subcomponents to deny them employment.  Defendant Wray is being sued in his official capacity, only.

21.     Defendant Charles H. Kable, IV is the Director of the Terrorist Screening Center ("TSC") of the Federal Bureau of Investigation ("FBI").  The TSC is one of two cochairs of the WLAC, a government agency described more fully in Paragraph 19.  The TSC represents the DOJ at WLAC meetings.  Because the WLAC operates by consensus, the TSC has both decision-making authority and veto power over all decisions made by the WLAC.  Upon information and belief, the TSC develops and maintains the federal government's consolidated Terrorism Screening Database ("TSDB"), accepted the nominations of some or all of the Plaintiffs, and continues to accept the nominations of other similarly situated American citizens, to the federal terrorist watchlist.  Additionally, the TSC utilizes the TSDB to screen persons against it that are applying for security clearances or for employment to work with the TSC to deny them employment.  Defendant Kable is being sued in his official capacity, only.

22.     Defendant Joseph Maguire is Director of the National Counterterrorism Center ("NCTC") of the Office of the Director of National Intelligence ("ODNI").  The NCTC is one of two cochairs of the WLAC, a government agency described more fully in Paragraph 19.  The NCTC represents the ODNI at WLAC meetings.  Because the WLAC operates by consensus, the NCTC has both decision-making authority and veto power over all decisions made by the WLAC.  Upon information and belief, the NCTC nominated some or all of the Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist.  Additionally, the NCTC utilizes the TSDB to screen persons against it that are applying for security clearances or for employment to work with the NCTC and/or its agency

subcomponents to deny them employment.  Defendant Maguire is being sued in his official capacity, only.

23.     Defendant Kirstjen M. Nielson is Secretary of U.S. Department of Homeland Security ("DHS").  DHS is a regular agency attendee of the WLAC, a government agency described more fully in Paragraph 19.  DHS is represented at WLAC meetings by U.S. Customs and Border Protection ("CBP"); Transportation and Security Administration ("TSA"); U.S. Citizenship and Immigration Services ("USCIS"); U.S. Immigration and Customs Enforcement ("ICE"); and various DHS headquarters offices, including the Office for Civil Rights & Civil Liberties ("OCRCL"); the Office of Intelligence & Analysis ("OIA"); the Office of the General Counsel ("OGC"); the Office of Strategy, Policy, and Plans ("DHS Policy"); and the Privacy Office.  Because the WLAC operates by consensus, DHS and/or its agency subcomponents have both decision-making authority and veto power over all decisions made by the WLAC. Upon information and belief, DHS and/or its agency subcomponents act as front-line agencies that utilize the TSDB to screen individuals against the TSDB, including the Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to:  (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits.  Additionally, DHS is responsible for overseeing and administering DHS TRIP, the only administrative complaint process by which the Plaintiffs and other similarly situated individuals may challenge their nominations to the TSDB.  DHS also utilizes the TSDB to screen persons against it that are applying for

security clearances or for employment to work with DHS and/or its agency subcomponents to deny them employment.  Defendant Nielson is being sued in her official capacity, only.

24.     Defendant David P. Pekoske is Administrator of the Transportation Security Administration ("TSA") of the United States Department of Homeland Security ("DHS").  TSA is a regular agency attendee of the WLAC, a government agency described more fully in Paragraph 19.  TSA represents DHS at WLAC meetings.  Because the WLAC operates by consensus, TSA has both decision-making authority and veto power over all decisions made by the WLAC.  Upon information and belief, TSA acts as a front-line agency that utilizes the TSDB to screen individuals against the TSDB, including the Plaintiffs and other similarly situated American citizens, in order to deny them government benefits and impose consequences upon them, including but not limited to:  (1) impeding air travel at airports; (2) burdening travel at land border crossings and other ports of entry; (3) denying participation in programs that allow for expedited screening at ports of entry; and (4) indefinitely delaying or denying immigration benefits.  Moreover, upon information and belief, TSA nominated some or all of the Plaintiffs, and continues to nominate other similarly situated American citizens, to the federal terrorist watchlist.  Additionally, TSA utilizes the TSDB to screen persons against it that are applying for security clearances or for employment to work with TSA to deny them employment.  The TSA also implements the "Quiet Skies" program, and its international counterpart, "Silent Partner."  The "Quiet Skies" program cross-references the TSDB as part of a system of targeting rules that identifies and then flags for investigation and surveillance "unknown or partially known terrorists." "Quiet Skies" scrutiny results in individuals being treated like TSDB Listees and may result in nomination to the TSDB.  The "Quiet Skies" program does this for flights originating from the

United States.  "Silent Partner" is similar, except it applies to flights originating from foreign destinations.  Defendant Pekoske is being sued in his official capacity, only.

## Jurisdiction and Venue

25.     Under U.S. Const. Art. III § 2, this Court has jurisdiction because the rights sought to be protected herein are secured by the United States Constitution.

26.     Jurisdiction is proper pursuant to 28 U.S.C. § 1331, 5 U.S.C. § 702, 5 U.S.C. § 706, *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), the United States Constitution, and federal common law.

27.     This Court has authority to grant the declaratory relief requested herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § § 2201-02, because the action presents an actual case or controversy within the Court's jurisdiction, and pursuant to the general, legal, and equitable powers of this Court.

28.     Nothing in 49 U.S. § 46110 eliminates that jurisdiction.  *See, e.g., Mohamed v. Holder*, No. 11-1924, 2013 U.S. App. LEXIS 26340, at *5-6 (4th Cir. May 28, 2013)[1]; *Ege v. United States Dep't of Homeland Sec.*, 784 F.3d 791, 796 (D.C. Cir. 2015); *Latif v. Holder*, 686 F.3d 1122, 1128-29 (9th Cir. 2012); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1304 (D. Minn. 2018); *Elhady v. Piehota*, 303 F. Supp. 3d 453, 461-62 (E.D. Va. 2017) (citing *Mohamed*).

29.     This action also seeks damages pursuant to The Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. 2000bb *et. seq*., 28 U.S.C. § 1343(a)(4), and 28 U.S.C. § 1357.  *See Tanvir v. Tanzin*, 894 F.3d 449 (2d Cir. 2018) ("RFRA, like Section 1983, authorizes a plaintiff to bring individual capacity claim" for damages).

---

[1] Also available at https://www.clearinghouse.net/chDocs/public/NS-VA-0004-0004.pdf.

30.     A substantial part of the unlawful acts alleged herein were committed within the jurisdiction of the United States District Court for the Eastern District of Virginia, because that is where the TSDB is compiled.

31.     Venue is proper under 42 U.S.C. § 1391(e) as to all Defendants because Defendants are officers or employees of agencies of the United States sued in their official capacity and because this judicial district is where all Defendants have substantial contacts and where a substantial part of the events or omissions giving rise to the claims occurred.

## Factual Background

**The Federal Government's Terrorist Watchlisting System and its Subcomponents**

32.     In September 2003, Attorney General John Ashcroft established the Terrorist Screening Center ("TSC") to consolidate the government's approach to terrorism screening. The TSC, which is administered by the FBI, develops and maintains the federal government's consolidated Terrorism Screening Database ("TSDB" or "federal terrorist watchlist").  TSC's consolidated watchlist is the federal government's master repository for suspected international and domestic terrorist records and is used for watchlist related screening.

33.     The Government publicly states that to be included in the TSDB, an individual must be reasonably suspected of being a known or suspected terrorist.  More specifically,  a government nominator "must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."  *See* January 2018 Overview of the U.S. Government's Watchlisting Process and Procedures (Exhibit 5).

34.     The "totality of the circumstances" analysis for TSDB inclusion may include assessment of an individual's race, ethnicity, country of origin, religion, religious practices, languages spoken, family, associations, travel history, social media history, and other activities protected by the First Amendment, Fifth Amendment, Fourteenth Amendment, and U.S. Constitution.[2]

35.     Anyone listed in the TSDB is a "TSDB Listee" subjected to varying forms of heightened scrutiny and adverse repercussions.  In addition, TSDB Listees may have their records annotated or categorized with additional sub-classifications subjecting them to differential treatment.

36.     One set of TSDB sub-classifications is utilized primarily by the TSA, DHS, and TSC as relates to air travel.  It includes the No Fly List, the Selectee List, and the Expanded Selectee List.

37.     Since April 2011, persons nominated and added to the TSDB are placed on the Expanded Selectee List by default, provided their records contain a minimum amount of name and birth date identifying information.

38.     TSDB Listees may also be categorized under the heightened Selectee List if their records contain additional "derogatory information."   According to the 2013 Watchlisting Guidance promulgated by the Watchlisting Advisory Council, TSDB Listees may

---

[2]     The TSA conducts a similar assessment of the family relationships, associations and travel patterns of individuals in order to flag them as "unknown or partially known terrorists" and place them on the "Quiet Skies (or Silent Partner) Selectee List" which operates in parallel to the TSDB.  Quiet Skies and Silent Partner may, however, cross-reference TSDB information and serve as a stepping stone in the process of identifying and investigating individuals which leads to TSDB nomination.

be designated as Selectees if the government suspects them of association or affiliation with a foreign or domestic terrorist organization, or other association with terrorist activities.

39.     TSDB Listees sub-classified on either the Expanded Selectee List or Selectee List are systematically subjected to extra screening at airports, and often find "SSSS" printed on their boarding passes.   "SSSS" indicates a passenger's watchlist status to airline employees, airport employees, and screeners.

40.     TSDB Listees may also be categorized under the heightened No Fly List if their records contain additional "derogatory information."  According to information released by the Government (following 2015 No Fly List litigation), TSDB Listees may be placed on the No Fly List if the government believes they pose a threat of committing an act of terrorism in the United States, against an international U.S. government facility, with respect to an aircraft, or if they are otherwise operationally capable of carrying out a violent act of terrorism.  *See* January 2018 Overview of the U.S. Government's Watchlisting Process and Procedures at 4 (Ex. 5.)

41.     Persons on the No Fly List, including Plaintiff Long, are prevented from boarding flights that fly into, out of, or even through United States airspace.

42.     TSDB Listees who are *not* on the No Fly List may also be blocked from crossing U.S. land borders or from boarding international flights headed to the United States.

43.     Other screening agencies, including CBP, screen TSDB Listees but do not regularly use the No Fly List, Selectee List, and Expanded Selectee classifications.  Instead, the CBP designates TSDB Listees as "Armed and Dangerous," refers them to secondary inspection, or otherwise automatically flags them as potential terrorists in automatic alerts sent to officers.

14

44.     Pursuant to official CBP policy adopted in January 2018 (CBP Directive No. 3340-049A) (Exhibit 6), the CBP conducts secondary inspection including advanced electronics searches of any electronics carried by TSDB Listees.  "An advanced search is any search in which an officer connects external equipment through a wired or wireless connection to an electronic device not merely to gain access to the device, but to review, copy, and analyze its contents."  "The presence of an individual on a government operated and government vetted terrorist watch list," alone constitutes grounds for the CBP to search, copy, and store the contents of laptops, tablets, and smartphones, etc. without requesting or obtaining consent.

45.     Another set of TSDB sub-classifications is utilized by DHS, NCIC, and other federal, state, and local law enforcement officers to determine operational responses to TSDB Listees.  The TSC distributes the "Known or Suspected Terrorist" or "KST" file to the NCIC for further dissemination to more than 18,000 law enforcement agencies and 100,000 law enforcement officers.  This KST file is then marked with "Handling Codes," which are set by the TSC and, upon information and belief, overseen by the Watchlisting Advisory Council and its participating agencies.  Four TSC handling codes have been published by Baltimore Police Department Policy 802, Handling Codes: Terrorist Response (Sept. 8, 2016) (Exhibit 7), as well as other federal, state, and local law enforcement guidebooks:

**"Handling Code 1:** The subject is confirmed to associate with terrorism, and there is a valid, outstanding arrest warrant.

**Handling Code 2:** The subject is of an "investigative interest" regarding their association with terrorism.

**Handling Code 3:** This individual may have possible ties with terrorism.

**Handling Code 4:** The identity provided by this individual may have possible ties with terrorism."

15

46.     In 2005, according to an analysis done by the DOJ's Office of the Inspector General, less than 1% of all TSDB Listees were designated under either Handling Code 1 or 2.  In other words, less than 1% of all TSDB Listees either had an outstanding arrest warrant or were under active investigation for terrorism.  The overwhelming majority of records, more than 96%, were designated under Handling Codes 3 or 4, as maybe having possible ties to terrorism.  A follow-up audit in 2007 confirmed the same general percentages: 1.5% of TSDB Listees were classified under Handling Code 1 or 2, with the remainder classified under a consolidated Handling Code 3 or 4, or "other."  Upon information and belief, these ratios continue to approximate the Handling Code subdivisions of TSDB Listees in 2018.

47.     In addition to the various "terrorist" sub-classifications of TSDB Listees, the TSDB also lists foreign individuals under an exception to the TSDB's ordinary 'reasonable suspicion of being a known or suspected terrorist' standard.  Pursuant to this exception, the TSDB includes identifying information of foreign individuals who may have espoused support for terrorist activities, or who are related to TSDB Listees.  The Department of Homeland Security and the Department of State use this TSDB exception to screen foreign individuals for admissibility, visas and immigration.  TSDB "Exceptions" are separately categorized by the TSC and disseminated to DHS and the State Department.

48.     Even though they are not TSDB Listees, airplane passengers occasionally receive boarding passes stamped with "SSSS".  These designations are commonly the product of the TSA's and CBP's secretive and automated "risk-based targeting rules."  These targeting rules examine passengers' itineraries, travel histories, travelling companions, associations with TSDB Listees, and numerous other undisclosed factors to flag passengers as "unknown or partially known terrorists."   Upon information and belief, the secretive and undisclosed

16

factors include "totality of the circumstances" analysis related to passengers' race, ethnic origin, national origin, sex, and religion.

49.     The designation of known or suspected terrorists with the marking "SSSS "has become commonplace in the Muslim community.  Coupled with witnessing the treatment they receive when traveling, many of the Plaintiffs' family members, friends, and associates recognize and understand "SSSS" to mean that the government has designated them as terrorists.

50.     Likewise, airline representatives and other airline personnel recognize the "SSSS" designation and marking as meaning that the individual so designated is a known or suspected terrorist.

51.     The TSA's Quiet Skies program assembles the results of these "risk-based targeting rules" onto a separate TSA watchlist known as the "Quiet Skies Selectee List," and then subjects the passengers to intense investigation and scrutiny.  Within the Quiet Skies program, Federal Air Marshalls and plainclothes TSA officers collect detailed behavioral and surveillance information on Quiet Skies Selectees, including passengers' bathroom usage, wardrobe changes, meals, conversations, whether they sleep on their flights, and reactions when they realize they are being stalked.  Based on their observations and investigations, the TSA may nominate Quiet Skies Selectees to the TSDB.

52.     The TSA's Silent Partner program is similar in form and function to Quiet Skies. The only significant difference is that Silent Partner applies to flights originating from outside the United States, while Quiet Skies applies only to flights originating in the United States (regardless of whether it is a domestic or international flight).

53.     The TSA's Quiet Skies and Silent Partner programs and/or the TSA's other rules-based programs target family members and traveling companions of TSDB Listees, including Plaintiffs, because of their relationships.  These family members and traveling companions are themselves then treated as known or suspected terrorists.

54.     TSA shares its Quiet Skies and Silent Partner list information with foreign carriers and governments to assist those carriers and governments identify targets for enhanced screening and interrogation.

55.     TSA has stated it has since "curtailed" the Quiet Skies program, but TSA has not claimed to end it and has not provided full details as to how much the program has been curtailed.   It is also unclear whether or to what degree Silent Partner has been curtailed.

56.     CBP employs comparable risk-based targeting rules to the TSA to single out individuals at ports of entry for secondary inspection, detention, investigation and deportation.  Upon information and belief, CBP also maintains separate "unknown or partially known terrorist" watchlists in parallel to the TSDB to label and treat individuals presenting themselves at land borders as terrorists.  Upon information and belief, CBP utilizes the results of high-risk targeting rules and resulting inspections and investigation as a factual predicate for nominating individuals to the TSDB.

57.     Watchlist policies, including all the watchlist policies described in this Complaint, and all guidance and rules as to how all individual watchlist-based determinations are made, are managed and controlled by Defendant WLAC, whose actions are in turn decided by the Defendants who, as described above, advise the WLAC.

58.     Upon information and belief, Plaintiffs are all TSDB Listees.  Upon information and belief and in addition, Plaintiffs and similarly-situated Americans have also been

designated by the TSA and/or CBP as potential terrorists because of the TSA and/or CBP's automated high-risk targeting rules and creation of separate "unknown or partially known terrorist" watchlists.

### Nominations to the Federal Terrorist Watchlisting System

59.     Although TSA, CBP, and other agencies may use the records provided by the TSC, it is the TSC that maintains and controls the TSDB database of suspected terrorists.

60.     Two government entities are primarily responsible for "nominating" individuals for inclusion in the terrorist watchlist—NCTC and FBI.  The NCTC, which is managed by the Office of the Director of National Intelligence, relies on information from other federal departments and agencies when including alleged known or suspected international terrorists in its Terrorist Identities Datamart Environment ("TIDE") database. The NCTC reviews TIDE entries and recommends specific entries to the TSC for inclusion in the watchlist.  TIDE is the main source of all international terrorist information included in the watchlist.   The FBI, in turn, nominates to the watchlist individuals with what it characterizes as suspected ties to domestic terrorism.

61.     Other government agencies, including DHS, TSA and CBP, are also able to nominate individuals for inclusion in the terrorist watchlist.

62.     For instance, FinCEN uses the TSDB to monitor watchlisted individuals' financial transactions, and then nominates associated parties with those financial transactions to the watchlist.  *See* Press Release, *FinCEN Awards Recognize Partnership*

*Between Law Enforcement Financial Institutions to Flight Financial Crime* (May 10, 2016) (Exhibit 8).[3]

63.     All nominations to the TSDB must be approved and implemented by the TSC. The TSC makes the final decision on whether a nominated individual meets the minimum requirements for inclusion into the watchlist as a known or suspected terrorist.  TSC also decides which screening systems will receive information about that individual.

64.     Former Director of the Terrorism Screening Center Timothy Healy testified that in evaluating whether an individual meets the criteria for inclusion on the consolidated watchlist, the TSC determines whether the nominated individual is "reasonably suspected" of having possible links to terrorism.  According to the TSC, "reasonable suspicion requires articulable facts which, taken together with rational inferences, reasonably warrant the determination that an individual is known or suspected to be or has been engaged in conduct constituting, in preparation for, in and of or related to terrorism and terrorist activities."

65.     Defendants have provided only limited information about and otherwise not stated publicly what standards or criteria are applied to determine whether an American citizen will be placed on the TSDB, No Fly List, Selectee List, Expanded Selectee List, Quiet Skies/Silent Partner Selectee List(s), or any other terrorist watchlist that is distributed to the TSA, CBP or other screening agencies.

66.     The standards for watchlist inclusion do not evince even internal logic. Defendants define a "suspected terrorist" as an "individual who is reasonably suspected to be, or have been, engaged in conduct constituting, in preparation for, in aid of, or related to

---

[3] Available at https://www.fincen.gov/news/news-releases/fincen-awards-recognize-partnership-between-law-enforcement-and-financial.

terrorism and terrorist activities based on articulable and reasonable suspicion."  In other words, Defendants place American citizens and other individuals on the federal terrorist watchlist based upon a "reasonable suspicion" that they are "reasonably suspected" of nefarious activities.  These standards fall far below the typical "reasonable suspicion" and "probable cause" standards required for criminal investigation.

67.     The federal government utilizes guilt-by-association as a basis for watchlist inclusion.  For example, immediate relatives of listed persons can become TSDB Listees without any derogatory information—other than the bonds of family.  Likewise, they can be subjected to TSA and CBP rules-based 'terrorist' monitoring on the basis of family alone. Such designation signals to screening agencies, officers, employers, and others that the immediate relative is a violent threat engaged in nefarious activities.

68.     Being a known associate—a friend, colleague, fellow community member, etc.—of a listed individual can also provide a basis for watchlist inclusion.

69.     Even if an American citizen is acquitted of terrorism charges or those charges are otherwise dismissed, the federal government retains for itself the authority to continue to include them in the watchlist.

70.     For reasons unknown, Defendants also place what they call "non-investigatory subjects" on the federal terrorist watchlist, i.e., American citizens and other individuals they have chosen not to investigate.

71.     Defendants place individuals on the federal terrorist watchlist without any information regarding an individual's intended target.

72.     Defendants place individuals on the Selectee List without any information that they pose a threat to aviation.

73.     Defendants place individuals on the No Fly List without any information that they pose a threat to aviation.

74.     Under these practices and standards, the number of records in the consolidated watchlist has swelled.  Over 1.1 million new names have been added to the watchlist since 2009.  More than 98% of the names nominated to the TSDB are accepted.  In 2013, TSC accepted 98.96 percent of all nominations made.  A 2007 GAO report found that TSC rejects only approximately one percent of all nominations to the watchlist.[4]

75.     Because of these loose standards and practices, the federal terrorist watchlist's rate of growth has dramatically increased.  In fiscal 2009, there were 58,999 new additions to the watchlist.  In fiscal 2016, there were 176,014 new additions.

76.     Upon information and belief, in 2001, there were 16 people who the federal government systematically prevented from flying.  By 2009, the number grew to approximately 3,400.  By 2016, that number increased to approximately 81,000.

77.     Once an American citizen has been placed on the watchlist, the individual remains on the list until the agency that supplied the initial information in support of the nomination determines the individual should be removed.

78.     At a March 10, 2010 Senate Homeland Security Committee hearing, Russel E. Travers, Deputy Director of the National Counterterrorism Center, stated that "[t]he entire federal government is leaning very far forward on putting people on list," and that the watchlist is "getting bigger, and it will get even bigger."

---

[4] *See* United States Government Accountability Office Report to Congressional Requesters entitled *Terrorist Watchlist Screening:  Opportunities Exist to Enhance Management Oversight, Reduce Vulnerabilities in Agency Screening Processes, and Expand Use of the List*, GAO-08-110, October 2007, at 22.

79.     The federal terrorist watchlist's and rules-based terror lists' inclusion standards are so permissive, pliable, and laden with discriminatory assessments of race, ethnicity, national origin, and religion, that they bear at best a fleetingly marginal connection to actual terrorist activities.   The inclusion standards themselves violate the Plaintiffs' procedural and substantive due process rights.

### Dissemination and Consequences of the Terrorist Watchlist

80.     Subsets of TSDB watchlist information are disseminated from the TSC across the federal government, to state and local governments, and to more than 60 foreign countries, including all Visa Waiver Program countries.   Upon information and belief, Defendants disseminated the records of the Plaintiffs from the TSDB to Turkey.

81.     TSC disseminates records from its terrorist watchlist to other government agencies that in turn use those records to identify suspected terrorists.   For example, applicable TSC records are provided to TSA for use by airlines in pre-screening passengers and to CBP for use in screening travelers entering the United States at land borders, seaports, airports, and other ports of entry.

82.     Upon information and belief, Defendants disseminated the records of the Plaintiffs from the TSDB to other government agencies, including TSA for use by airlines in pre-screening the Plaintiffs, and CBP for use in screening the Plaintiffs upon entering the United States.

83.     Upon information and belief, Defendants disseminated the records pertaining to the Plaintiffs from their terrorist watchlist to foreign governments with the purpose and hope that those foreign governments will constrain the movement of the Plaintiffs in some manner.

84.     Upon information and belief, Defendants' intention in disseminating watchlist records, including those of the Plaintiffs and similarly situated American citizens, as widely as possible is to constrain and monitor their movements and activities, both in the United States and abroad.  For example, some countries detain individuals listed on the federal terrorist watchlist who enter their borders, question those individuals at the behest of United States officials, or altogether prevent those individuals from entering those countries.

85.     Thus, while the TSC maintains and controls the database of suspected terrorists, it is the front-line agencies like the TSA, CBP, and law enforcement that carry out the screening function.  These agencies and law enforcement entities cross-reference the names and identities of individuals they encounter against the TSDB to determine whether they are on the TSDB or are a potential match to the TSDB.

86.     Agencies throughout the federal government utilize the federal terrorist watchlist to conduct and promote screening, subjecting listed persons to a comprehensive portfolio of consequences that cover large aspects of their lives.

87.     Government agencies routinely cross-reference the TSDB in connection with applications for or audits of a wide range of government benefits.  The TSDB is referenced in connection with and used as a basis to deny federal government employment, security clearances (regardless of whether the individual needs that clearance for either government or private contractor employment), travel benefit programs like TSA PreCheck and Global Entry, and a wide variety of government licenses and credentials used in both public and private employment, including FAA licenses, Hazmat licenses, Transportation Worker Identity Credentials, and security credentials needed for critical infrastructure projects like power plants.

88.     Indeed, Defendants disseminated the federal terrorist watchlist to government authorities, private corporations and individuals with the purpose and hope that these entities and/or individuals will impose consequences on those individuals Defendants have listed, including the Plaintiffs.

89.     Upon information and belief, the status of the Plaintiffs and similarly situated individuals as known or suspected terrorists on the federal terrorist watchlist diminishes and even imperils their ability to access and utilize the financial system.

90.     Defendants have provided information regarding TSDB Listees to banks, prompting banks to close the bank accounts of individuals listed on the federal terrorist watchlist.  Financial institutions have also declined to allow some watchlisted individuals to make wire transfers.

91.     Moreover, upon information and belief, family-based immigration applications filed by individuals listed on the federal terrorist watchlist are delayed indefinitely due to an "FBI name check" and not adjudicated, thereby denying and hindering the Plaintiffs and similarly situated individuals of the rights that flow from citizenship, including the ability to sponsor lawful permanent residency for immediate relatives living abroad.

92.     Among the entities and individuals to which the federal government disseminates its federal terrorist watchlist are state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, financial institutions, and captains of sea-faring vessels, among others.

93.     Upon information and belief, because the names of the Plaintiffs and similarly situated individuals are included on the federal terrorist watchlist, their names were

disseminated to state and local authorities, foreign governments, corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, among other official and private entities and individuals.

94.     In fact, in 2015, former Director of the Terrorist Screening Center Christopher Piehota gave an exclusive interview to CNN and stated the following, in relevant part:

> It's concerning that our partners don't use all of our data. We provide them with tools. We provide them with support, and I would find it concerning that they don't use these tools to help screen for their own aviation security, maritime security, border screening, visas, things like that for travel.[5]

95.     Former TSC Director Piehota went on to state that the United States shares its federal terrorist watchlist with the European Union, but that European Union countries don't systematically utilize it to identify suspected terrorists or screen migrants coming.

96.     Because the federal government disseminates its federal terrorist watchlist to foreign governments, listed persons, including the Plaintiffs and similarly situated American citizens, are often not allowed to enter other nations.  This is because the United States is telling other nations, without any modicum of due process, that thousands of its own citizens and residents are "known or suspected terrorists."

97.     The federal government, through Defendants, disseminates its federal terrorist watchlist to state and local police officers which allows those officers to query the names of persons, including the Plaintiffs, against the TSDB as disseminated through the NCIC.  Plaintiffs and similarly situated individuals are often identified and treated as terrorists during routine police encounters including traffic stops.

---

[5] First on CNN: Top U.S. intel official: Europe not taking advantage of terror tracking tools, CNN, *available at*:  http://www.cnn.com/2016/04/07/politics/christopher-piehota-us-intel-europe-terror-tracking/

98.     Disseminating the federal terrorist watchlist to state and local police officers creates a dangerous situation insofar as the federal terrorist watchlist effectively directs state and local officers to treat thousands of Americans, including the Plaintiffs, charged with or convicted of no crime yet who are listed as a "known or suspected terrorist" as extremely dangerous.

99.     The watchlist is also disseminated to approximately 1400 private entities, including airlines, universities, hospitals, private correctional facilities, private security services, and private city attorneys.  This does not include additional private entities that the Department of Homeland Security shares watchlist data to, including aircraft and airport companies for employment and other non-traveling purposes.

100.    With the advent and deployment of automatic license plate readers by police departments across the country, federal, local and state authorities have relied heavily upon a driver's (or a car associated with a driver's) watchlist status as the basis of a border or traffic stop.   Plaintiffs and similarly situated individuals have been subjected to this treatment.

101.    Being on the federal terrorist watchlist can prevent listed persons, including the Plaintiffs and similarly situated American citizens and lawful permanent residents, from purchasing a gun.  For example, New Jersey passed a law in 2013 that banned persons on the federal terrorist watchlist from owning guns.  Additionally, Connecticut is in the process of setting up an institutional mechanism to prevent individuals whose names are included on the federal terrorist watchlist, such as the Plaintiffs, from being able to buy a gun in the state of Connecticut.  Accordingly, the Plaintiffs and similarly situated individuals are unable to purchase guns in states that ban persons on the federal terrorist watchlist from owning guns.

27

102.    There are perennial federal proposals to ban all TSDB Listees from purchasing guns, although none has yet been formally adopted.   Nonetheless, upon information and belief, Defendants disseminate the TSDB (through the NCIC or otherwise) throughout the gun market.   The gun permit and gun sale process involves name cross-checks against the TSDB.   Gun permits and sales have been denied based on Plaintiffs' and similarly situated American citizens' status as TSDB Listees.   The GAO reported on March 7, 2016 that TSDB Listees are, as a matter of course, subjected to gun-purchase delays, and 212 TSDB Listees have been barred from purchasing guns altogether.

103.    Because the federal government conducts a security risk assessment that includes querying the federal terrorist watchlist prior to issuing a license to commercial drivers to transport hazardous materials, being on the federal terrorist watchlist can prevent listed persons, including the Plaintiffs and similarly situated American citizens, from obtaining or renewing their Hazmat license.

104.    The federal government conducts a security risk assessment for private and public transportation workers, including those who enter airports and maritime ports. Approved individuals are issued Transportation Worker Identity Credentials ("TWIC").   The TWIC credential process includes querying the federal terrorist watchlist.   On May 9, 2012, Assistant Administrator David Nicholson testified to Congress that the TSA vets more than 13 million transportation workers against the terrorist watchlist each week.   Defendants have prevented TSDB Listees from obtaining or renewing their TWICs, thus depriving them of a requirement for their employment.

105.    Being on the federal terrorist watchlist can also result in the denial or revocation of a Federal Aviation Administration (FAA) license of individuals listed on the federal terrorist watchlist, including the Plaintiffs and similarly situated American citizens.

106.    Being on the federal terrorist watchlist can also prevent listed persons, including the Plaintiffs and similarly situated American citizens, from accompanying minors or passengers with disabilities to their gate, from working at an airport, or working for an airline insofar as listed persons are not allowed to enter so-called "sterile areas" of airports.

107.    Being on the federal terrorist watchlist can also result in the listing of the false stigmatizing label of "known or suspected" terrorist on the criminal records of the Plaintiffs and similarly situated individuals.  Criminal record information is accessible to the general public.

108.    Defendants make the federal terrorist watchlist available to municipal courts, which may make bail determinations based on an individual's status on the watchlist.

109.    The federal terrorist watchlist diminishes, rather than enhances, our national security because the number of innocent Americans on the list is becoming so voluminous that the purpose of having a list is significantly undermined.

110.    The consequences of being on the federal terrorist watchlist are meted out publicly.  Members of the public can witness the extra and intrusive screening to which individuals on the federal terrorist watchlist are subject.  This screening oftentimes occurs in front of family and colleagues, including TSDB Listees being pulled out of their cars at gunpoint, being ordered to leave their vehicles with their hands held above their head, being handcuffed, being singled out and escorted first off a plane by law enforcement officers, being

subjected to lengthy detentions, and having their electronics confiscated and searched, among other stigmatizing measures.

111.   Because travel is regularly done with family, friends, community acquaintances, and professional contacts, a person's watchlist status is revealed to travel companions.  Travel companions come to learn of a person's watchlist status based on how screeners treat TSDB Listees.  Moreover, TSA and CBP screening and rules-based practices often flag travel companions as themselves being potential terrorists, causing them to be treated the same as TSDB Listees.

112.   In practice, frontline screeners disclose the status of individuals on the federal terrorist watchlist to federal, state, local, and foreign authorities, as well as private employees of airports, airlines, and other transportation employees.  The operation of the federal terrorist watchlist enlists air carriers to assist the federal government in tracking passengers on the federal terrorist watchlist.

113.   Defendants who contributed to the placement of the Plaintiffs and similarly situated individuals on the federal terrorist watchlist knew that their actions violated clearly established federal and constitutional law.

114.   Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred, and an opportunity to contest or correct it.

115.   Separately, TSA disseminates the Quiet Skies and/or Silent Partner watchlist to foreign governments and foreign airline carriers.

**The Federal Government's Terrorist Watchlist Is No More Effective Than a List of Randomly Selected Individuals**

116.    Defendants' ability to watchlist persons who actually pose a threat of terrorism can be measured and described using a quantitative analysis based on factual allegations made in this Amended Complaint as well as publicly available information describing the current operation of the federal terrorist watchlist.

117.    The federal government has added approximately 1.1 million persons to the federal terrorist watchlist over the last ten years.  These additions include thousands of U.S. citizens and lawful permanent residents.

118.    Moreover, based on the University of Maryland's Global Terrorism Database, a project funded in part by the Department of Homeland Security, there have been less than 250 terrorist acts inside the United States over the last decade.  These terrorist acts were perpetrated by less than 250 persons.

119.    Only one of these perpetrators was designated on the federal terrorist watchlist by the federal government prior to their criminal conduct.  This single person designated on the federal terrorist watchlist, however, was removed from the federal terrorist watchlist prior to perpetrating the terrorist attack.

120.    Upon information and belief, in order to designate a person on the federal terrorist watchlist, the federal government must first have information about that person. Because the federal government does not possess information on every person in the world, existing law enforcement and intelligence practices produce a subset of persons who the federal government can then screen against the federal terrorist watchlist's inclusion standards.

31

121.    The precise size of this subset is unknown; however, a survey of law enforcement and intelligence practices indicates that the size of this subset is greater than 50 million people.

122.    Upon information and belief, the practices that produce this subset exclude some persons who do pose a threat of terrorism and include some persons who do not pose a threat of terrorism.

123.    Upon further information and belief, the federal government does not screen the entire subset of people known to it.  Moreover, Defendants do not make individual determinations as to whether each person about whom they have information should be placed on the federal terrorist watchlist.  Defendants utilized automated algorithms and risk-based targeting rules to select individuals for scrutiny, investigation, and nomination to one or more terrorist watchlists.

124.    In order to designate a person on the federal terrorist watchlist, a federal government official must make a nomination and a TSC official must accept the nomination. TSC officials accept nominations at a rate above 98 percent.

125.    Based on the facts alleged in this Amended Complaint and the publicly known processes of the federal terrorist watchlist, a quantitative analysis can be constructed to measure and describe the performance and efficacy of the federal terrorist watchlist.

126.    A quantitative analysis requires that, in order to accomplish the federal terrorist watchlist's stated objectives, Defendants must have at least some greater-than-random ability to identify future terrorists.  This is due to the nature of the processes Defendants utilize to place persons on the federal terrorist watchlist and the size of the

population Defendants can—if they so choose—screen against the federal terrorist watchlist's inclusion standards.

127.    A quantitative analysis demonstrates that Defendants' watchlisting system would perform similarly if inclusion on the watchlist was done via random selection instead of the existing inclusion standards Defendants utilize.

128.    A quantitative analysis therefore indicates that Defendants have no ability to watchlist persons whose placement on the watchlist would further Defendants' stated objectives.

129.    The TSA has conceded that it cannot identify any terrorist plots which were foiled or deterred based on either the Quiet Skies or the Silent Partner programs.

**Watchlist Practices Target and Disproportionately Harm American Muslims**

130.    As of January 2018, the Pew Research Center estimates that there are 3.45 million Muslims living in the United States, accounting for 1.1% of the total U.S. population. Particularly robust Muslim populations live, *inter alia*, in Michigan, Illinois, Washington, D.C., New Jersey, New York, and California.

131.    Dearborn, Michigan is a suburb of Detroit with a large Arab-Muslim community, comprising 40% of its approximately 100,000-person population.   Due to Dearborn's significant Muslim population, it has earned a reputation as the "Muslim Capital of America."   As of 2013, Dearborn was second only to New York City (population: 8.5 million) for the total number of residents listed on the federal terrorist watchlist.   As of that same date, no Muslims from Dearborn had ever committed acts of terrorism against the United States.

132.    Defendants' over-eager practice of approving watchlist nominations of relatives or associates of already-listed individuals imposes overwhelming network effects in Muslim communities such as Dearborn.  One watchlist nomination, even if grounded in probable cause or a preexisting criminal conviction, can rapidly spiral into the government classifying nearly every member of an extended family or community mosque as a potential or suspected terrorist.

133.    The federal terrorist watchlist and its inclusion standards disproportionately target and affect American Muslims.  Defendants, knowingly, intentionally, and purposefully use impermissible and inaccurate religious profiles to nominate, accept, disseminate, and deploy the federal terrorist watchlist against American Muslims in a manner that is different from other faith backgrounds.

134.    Defendants consider origin from Muslim-majority countries, travel to Muslim-majority countries, travel on religious pilgrimages, learning Arabic, attending mosques, *zakat* donations to Muslim charities, the wearing of typical Muslim dress, the frequency of Muslim prayer, adherence to Islamic religious practices, affiliations with Muslim organizations, and associations with other Muslims as suspicious factors supporting inclusion in the TSDB, on the Quiet Skies/Silent Partner Selectee List(s), and on other high-risk-potential-terrorist watchlists.

135.    But while travel to Muslim-majority countries is more likely to land a Muslim on the watchlist, the same is not true of a non-Muslim.  Thus, Defendants treat otherwise similarly-situated individuals differently depending on their religion.

136.    In fact, almost all – if not, all – legal challenges regarding designations on the federal terrorist watchlist have been filed by Muslims nationwide.[6]

137.    Upon information and belief, when Defendants review lists of social networks and known associates of a currently watchlisted individual, they routinely chose to nominate Arab or Muslim names that cross their desk on the stereotyped basis of race, religion, or national origin alone.  Meanwhile, Defendants gloss over any stereotypically white, Christian, English, or Western-European names that may appear in the same network lists, such as classmates or colleagues.  This is true even when the only distinction between a nominated person and a non-nominated person are improper race, religion, or national origin criteria.

138.    Although most terrorist acts in the United States are committed by non-Muslims, and indeed in many cases are committed by anti-Muslim extremists, the overwhelming majority of U.S. citizens on the watchlist are Muslim.  This is a result of the Government's knowing, intentional, and purposeful use of religious, racial, and national origin criteria, including as described above.

---

[6] See *Rahman v. Chertoff*, No. 05-cv-3761 (N.D. Ill.); *Ibrahim v. U.S. Dep't of Homeland Sec.*, No. 06-cv-00545 (N.D. Cal.); *Scherfen v. U.S. Dep't of Homeland Security*, No. 3:08-cv-1554 (M.D. Pa.); *Latif v. Holder*, 3:10-cv-00750 (D. Or.); *Shearson v. Holder*, No. 1:10-cv-1492 (N.D. Ohio); *Mohamed v. Holder*, No. 1:11-cv-50 (E.D. Va.); *Abdallah v. JetBlue Airways Corp.*, No. 12-cv-1050 (D.N.J.); *Mokdad v. Holder*, 2:13-cv-12038 (E.D. Mich.); *Fikre v. FBI*, 3:13-cv-00899 (D. Or.); *Tarhuni v. Holder*, 3:13-cv-00001 (D. Or.); *Tanvir v. Tanzin,* No. 13-CV-6951 (S.D.N.Y.) ; *Ege v. U.S. Dep't of Homeland Security*, No. 13-1110 (10th Cir.); *Beydoun v. Lynch*, No. 14-cv-13812 (E.D. Mich.); *Kadura v. Lynch*, No. 14-cv-13128 (E.D. Mich.); *Long v. Lynch*, 1:15-cv-01642 (E.D. Va.); *Bazzi v. Lynch*, 16-cv-10123 (E.D. Mich.); *Elhady v. Piehota*, No. 1:16-cv-375 (E.D. Va.); *Amiri v. Kelly*, No. 17-cv-12188 (E.D. Mich.); *Abdi v. Wray*, No. 2:17-cv-622 (D. Utah); *Kovac v. Wray*, 3:18-cv-110 (N.D. Tx.).  Many of these legal challenges were filed by groups of multiple Muslim plaintiffs.

139.    Upon information and belief, Defendants dismiss mass violence perpetrated by white Christians as "lone wolf" events unconnected to "organized" terrorism, while reacting differently to comparable or even less serious events perpetrated by Muslims.

140.    Upon information and belief, even though they facially satisfy the same known associate watchlist criteria, close families and friends of convicted white-nationalist domestic terrorists are not routinely added to the federal terrorist watchlist, while distant families and friends of innocent Muslims often discover that their mere association with other watchlisted individuals has caused them to be labeled potential terrorists.   Thus, the Government does not treat similarly-situated groups the same, singling out Muslims for harsher treatment.

141.    By way of singular example, on February 20, 2019, federal prosecutors indicted Lieutenant Christopher Hasson for plotting a large-scale terrorist attack.  Despite significant evidence of Hasson's extremism and potential for terrorism, not only does it appear that was Hasson not on the terrorism watchlist, he held a Secret level security clearance.  Nor is there any reason to believe any of Hasson's friends or relatives have been added to the watchlist.

142.    Defendants' 2013 Watchlisting Guidance indicates that "[t]ravel for no known lawful or legitimate purpose to a locus of terrorist activity" can be a basis for being listed. While a "locus of Terrorist Activity" is not defined by the document, upon information and belief, it likely includes any place where many Muslims reside.

143.    By intentionally and purposefully emphasizing Arab origins or Islamic faith above all else, Defendants have utilized the watchlist far beyond its intended purpose. Instead of serving as a targeted tool to enhance aviation and border security, the watchlist

has become a bludgeon to coerce everyday American Muslims into spying on their neighbors and becoming government informants.   Presence on the watchlist is deployed as an intimidation tactic and used to coercively justify the denial of American-Muslims' civil rights, such as the right to have an attorney present during law enforcement questioning.

144.    Public examples of this phenomenon abound.  *See Latif v. Holder*, 28 F. Supp. 3d 1134, 1145 (D. Or. 2014) (an FBI agent told Steven Washburn that he "would help remove Washburn's name from the No-Fly List if he agreed to speak to the FBI")[7]; *Id.* at 1146 (FBI agents told Ibraheim Mashal that "his name would be removed from the No-Fly List and he would receive compensation if he helped the FBI by serving as an informant"): *Id.* (FBI agents offered Amir Meshal "the opportunity to serve as a government informant in exchange for assistance in removing his name from the No-Fly List").  *See also Fikre v. FBI*, 23 F. Supp. 3d 1268, 1278-79 (D. Or. May 29, 2014) (Emirati officials told Yonas Fikre that he "could not travel to the United States by air because he is on the No-Fly List" and an FBI agent told Fikre that "the FBI could take steps to remove [him] from the No-Fly List if he agreed to be an informant"); *Tanvir v Tanzin*, 894 F.3d 449 (2d Cir. 2018) (multiple Muslim Plaintiffs "asked to gather information on members of Muslim communities and report that information to the FBI" and "[i]n some instances, the FBI's request was accompanied with severe pressure, including threats of deportation or arrest; in others, the request was accompanied by promises of financial and other assistance").

145.    To American Muslims, the watchlist is an ever-present threat of increased scrutiny and adverse consequences which descends without notice, cannot be effectively redressed, and chills their constitutionally-protected exercise of speech and religion.

---

[7] Washburn, like every other individual described in this Paragraph, is Muslim.

**Inadequacy of the DHS Traveler Redress Inquiry Program Process**

146.   Defendants have not provided travelers, including the Plaintiffs and similarly situated American citizens and foreign nationals, with a clear, fair, timely, or effective mechanism through which they can challenge the TSC's decision to designate them as a potential terrorist and place them on the watchlist.  Nor can Plaintiffs and similarly situated American citizens and foreign nationals challenge DHS's inclusion of Plaintiffs on separate but related high-risk potential-terrorist lists such as Quiet Skies and Silent Partner.

147.   No single government entity is responsible for removing an individual from the TSDB.  The FBI administers the TSC and the watchlist but does not accept redress inquiries from the public.  The NCTC which manages the TIDE list (which in turn supplies names to the TSC watchlist) also does not accept redress inquiries from the public.  Neither entity directly provides final disposition letters to individuals who have submitted redress inquiries.

148.   The only redress "process" available to individuals included on the terrorist watchlist is the DHS Traveler Redress Inquiry Program.   Individuals who have been denied entry or boarding, subjected to additional screening, or who otherwise suspect that they may be on the watchlist, may seek redress by submitting an inquiry to DHS TRIP.  At that time, DHS TRIP provides individuals with a "Redress Control Number."

149.   The DHS TRIP Redress process primarily affects the TSA's screening of airport travelers and TSDB Listees; it has limited (if any) impact on TSDB Listees' overall TSDB status, including their screening at land borders by CBP, or their screening for immigration, visas, employment, security clearances, or credentialing by other federal agencies.

38

150.   DHS TRIP submits the traveler complaints of TSDB Listees to the TSC, which determines whether any action should be taken.  The TSC has not provided any publicly available information about how it evaluates complaints or makes that decision.  The TSC is the final arbiter of whether an individual's name is retained on or removed from the watchlist, including those of the Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals.  In 2009, the TSC testified to Congress that of the watchlist DHS TRIP cases "approximately 51 percent are appropriately watchlisted, 22 percent have been modified or reviewed prior to redress, 10 percent were similar names, and 15 percent were removed or downgraded due to the redress process."

151.   The TSA Administrator may provide input regarding whether a DHS TRIP Redress applicant listed on the TSDB should be removed, but as of December 2017, the TSA Administrator had taken no action regarding the removal of TSDB Listees in two years.

152.   Being removed from the No Fly List or the Selectee List does not mean that an individual is also removed from the TSDB.

153.   Being removed from the TSDB does not mean that an individual will cease to be treated as a terrorist, as they may continue to be subjected to terrorist-level scrutiny through the operation of the TSA and CBP's rules-based targeted terrorist monitoring lists.

154.   The Government does not provide an American citizen with a meaningful opportunity to confront, or to rebut, the grounds for his or her possible inclusion on the watchlist.  No information is available to the Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals about what specific facts the TSC considers during the redress process, and no meaningful opportunity is provided for the

Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to contest or correct those facts.

155.   Once the TSC makes a determination about a particular individual's status on the watchlist, it sends the result to DHS TRIP.  DHS TRIP in turn responds to the individual with a standard form letter that neither confirms nor denies the existence of any terrorist watchlist records relating to the individual.

156.  In response to prior litigation, DHS TRIP letters are now required to affirmatively state whether a U.S. complainant is presently on the No Fly List.  However, DHS TRIP does not disclose Selectee, Expanded Selectee, or Quiet Skies/Silent Partner Selectee list status.  The DHS TRIP letters continue to provide no information on historical watchlist status, no information as to whether a person is included in the TSDB generally, no meaningful factual basis for the individual's inclusion on the watchlist, and no information as to whether the government has resolved the specific complaint at issue.

157.   The DHS TRIP process as modified does nothing to resolve the fact that the standard for inclusion itself violates due process, a problem for which providing additional process related to that standard could cure.

158.   The DHS TRIP process does not provide any pre-deprivation process (whether on an ex parte basis or not), even though individuals on the Selectee, Expanded Selectee, or Quiet Skies/Silent Partner Selectee list face amorphous criteria for being placed on the list and the decision not to an individual on the No Fly List establishes that the Government does not have any reason to believe the individual is an imminent security threat.

159.   The DHS TRIP process does not provide a meaningful hearing in front of a neutral arbiter.

160.   The TSA Administrator has processed only one No Fly List determination arising out of DHS Trip since 2015 – that of Plaintiff Long, which was issued on April 23, 2019.

161.   The DHS TRIP process does not require the Government to consider exculpatory information in its possession.

162.   The DHS TRIP process does not consider lesser ways to ameliorate the deprivation of liberty caused by (wrongfully) being on the list such as the potential for an individual to submit to advance screening prior to a scheduled trip.

163.   As such, DHS TRIP offers no meaningful or substantive review of the watchlist designation and in effect shields the TSC's actions with respect to the individual nominations or classes of nominations from meaningful review by any independent authority, including the judiciary.

164.   Instead, DHS TRIP operates as a mere middleman, forwarding complaints to the TSC while shielding the TSC's substantive determinations from individual, independent, or judicial review.  Thus, the only "process" available to individuals caught up in the federal terrorist watchlisting system is to submit their names and other identifying information to DHS TRIP, a government entity that itself has no authority to provide redress, and then hope that some other unspecified government agency self-identifies an error or changes its mind.

165.   Individuals are justifiably skeptical of Defendants' willingness to engage in meaningful introspection or self-correction.  Famously, in *Ibrahim v. Department of Homeland Security*, 06-CV-00545, Dkt. No. 701-1 (N.D. Cal. Feb. 6, 2014), Defendants vigorously contested a Muslim graduate student's challenge to her No Fly List designation and subsequent revocation of her student visa.  Defendants' actions had stranded her in

Malaysia for *nine years*.  Following trial, it was ultimately revealed that her placement on the No Fly List was the result of an FBI agent's error in November 2004.  He had accidentally checked the wrong box.  Slip op. at 9.

166.  This case especially highlights the irregular, non-standardized and accountability-free manner in which listees are put in the position of bartering for administrative relief.

167.  Because Defendants have extensively surveilled Plaintiffs, Plaintiffs do not substantively communicate with their counsel, if such communications can be avoided. Instead, sensitive communications are had in person to shield them from Defendant FBI's persistent surveillance.

168.  On July 8, 2019, to finalize this Amended Complaint, Plaintiffs' counsel flew to Oklahoma City to meet Plaintiff Long.  On July 9, 2019, Defendant FBI's agent called Plaintiffs' counsel and requested a meeting with Plaintiff Long.   Plaintiffs' counsel did not return the call immediately.

169.  On July 16, 2019, Defendant FBI's agent, a supervising agent, spoke with an intermediary who again relayed Defendant FBI's request to speak with Plaintiff Long and made it clear that they were seeking a meeting with Plaintiff Long in connection with his DHS TRIP complaint.

170.  On July 17, 2019, Plaintiffs' counsel called Defendant FBI and its agent agreed to provide a list of questions that Defendant FBI would pose to Plaintiff Long.  Defendant FBI presented this questionnaire which was provided to Plaintiffs' counsel on July 18, 2019 as a way of resolving Plaintiff Long's DHS TRIP complaint.

171.   On July 23, 2019, Plaintiffs' counsel brought these interactions with Defendant FBI to Defendants' DOJ counsel.  Defendants' counsel confirmed that DHS TRIP had not been reopened.  Within hours, though Plaintiffs' counsel was considering meeting with the FBI just as Plaintiff Long had done in 2013, Defendant FBI withdrew its request for the interview as a result of the "pending litigation in this matter."

172.   Defendant FBI declined to reconsider the evidentiary basis for Plaintiff Long's TSDB status only because he sued the federal government.

173.   The government's own internal audits of the watchlist system point to serious flaws.  For example, a March 2008 DOJ Office of the Inspector General report entitled *Audit of the U.S. Department of Justice Terrorism Watchlist Nomination Processes* found significant problems with the nomination and removal process.  Rather than address those problems, Defendants' approach since 2008 has been to double-down on questionable nomination and redress practices, exponentially increasing the watchlist's size and adverse consequences.

174.   A federal judge observed in *Mohamed v. Holder*, 995 F. Supp. 2d 520, 532 (E.D. Va. 2014), that "[a] showing of past or ongoing unlawful conduct does not seem to be required, … But the Court has little, if any, ability to articulate what information is viewed by TSC as sufficiently 'derogatory' beyond the labels it has provided the Court.  In sum, the No Fly List assumes that there are some American citizens who are simply too dangerous to be permitted to fly, no matter the level of pre-flight screening or on-flight surveillance and restraint, even though those citizens cannot be legally arrested, detained, or otherwise restricted in their movements or conduct."

175.   The *Mohamed* court went on to find that "[i]nclusion on the No Fly List also labels an American citizen a disloyal American who is capable of, and disposed toward

committing war crimes, and one can easily imagine the broad range of consequences that might be visited upon such a person if that stigmatizing designation were known by the general public" and that  "[t]he process of nomination to the No Fly List is based on a suspected level of future dangerousness that is not necessarily related to any unlawful conduct." *See id.* at 529 and 531.

176.   Another federal case permitted a broad challenge to the federal terrorist watchlist to proceed.  In *Elhady v. Piehota*, 303 F. Supp. 3d 453, 465 (E.D. Va. 2016) the court held that the "central meaning of procedural due process" is that parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." (Cleaned up).  The Court went on to state that the "Government's 'trust us' approach is inconsistent with the fundamental procedural protections applicable to the deprivation of a protected liberty interest, including the right to be heard." *Id.*

**The Experiences of the Plaintiffs on the Federal Terrorist Watchlist Being Treated as "Known or Suspected Terrorists"**

177.   Plaintiffs are practicing Muslims and United States Citizens.  None have ever been arrested, charged or convicted of any type of terrorism-related offense.  Each have submitted DHS TRIP inquiries in connection with their designation as "known or suspected terrorists."

178.   Upon information and belief, the nomination and designation of Plaintiffs Juangjan Daves and Leshauna Daves were made based solely based upon their familial relationship and association with each other and Plaintiff Long, based upon a hunch, and/or based upon their race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities.  Each have received letters from DHS TRIP that

neither confirm nor deny their status on the TSDB.  Upon information and belief, Plaintiffs Juangian Daves and Leshauna Daves remain designated as "known or suspected terrorists" on the TSDB.

179.    Upon information and belief, irrespective of Plaintiffs Juangjan Daves and Leshauna Daves TSDB status, their connection to Plaintiff Long—whose TSDB status includes a flight ban annotation—ensures that Defendants will subject them to certain segregated processes and disfavored treatment based on association alone.

180.    Pursuant to a DHS TRIP determination in connection with a DHS TRIP inquiry submitted by Plaintiff Long dated April 23, 2019, the unclassified summary provides the reasons for Plaintiff Long's placement on the No Fly List:

> You are on the U.S. Government's No Fly list because the U.S. Government has received information that you have participated in training that may make you a threat to U.S. national security.  Additionally, your arrest in Gaziantep, Turkey (not far from the Syrian border) in November 2015 is of concern to the U.S. Government.

The DHS TRIP determination letter went on to state that "DHS TRIP withheld certain information and informed Mr. Long that factors limiting disclosure in this context included national security concerns…. I find that Mr. Long may be a threat to civil aviation or national security; in particular, I find that he is an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.  I therefore conclude that Mr. Long is properly placed on the No Fly List and no change in status is warranted."

181.    Defendants placed Mr. Long on the No Fly List, because he served in the US Air Force and despite the fact that Defendants—as official federal government spokespeople

confirmed to journalists—did not have information that Mr. Long was charged with a crime in Turkey.

182.    Because Mr. Long's placement on the No Fly List predates his detention in Turkey in 2015, his detention in Turkey is not the reason he was placed on the No Fly List.

183.    Upon information and belief, because the Plaintiffs are included on the federal terrorist watchlist, Defendants disseminated and are continuing to disseminate their designation as "known or suspected terrorists" to tens of thousands of governmental and private partners all over the world.

184.    At no time were any of the Plaintiffs given notice of their placement on the federal terrorist watchlist nor were they provided with a factual basis for their placement – with the exception of the vague unclassified summary provided to Plaintiff Long in his DHS TRIP determination letter.   Moreover, at no time were any of the Plaintiffs offered a meaningful opportunity to contest their designation.

185.    At no time were any of the Plaintiffs given notice of the deprivation of their liberty interests or violation of their constitutional rights.

186.    The experience of the Plaintiffs on the federal terrorist watchlist is indicative of government practice, policy, and the experiences of thousands of other Americans, particularly American Muslims, who have been deemed suspected terrorists without notice and without redress.

187.    Plaintiff Long has suffered monetary losses because of being designated and treated by the government as a "known or suspected terrorist" in the form of lost business opportunities, missed flights, among other things.  Because Defendants' Watchlisting System targeted him, he lost the ability to live and work in Qatar, where he taught English as a second

language to mostly Arab-speaking students. Because Defendants' Watchlisting System targeted him, Plaintiffs were detained in Turkey where authorities confiscated their money and where Plaintiffs had to pay Turkish and American lawyers to help free them. Because of Defendants' Watchlisting System, Plaintiff Long had to pay to be retrained as a semi-truck driver.

188.     Defendant FBI leveraged Plaintiff Long's watchlist status to interfere with his first job as a truck driver causing the termination of his employment.

189.     Plaintiffs experienced additional anxiety, shame and humiliation, and in some cases the loss of important associations, because of family members, friends and/or colleagues also being treated as "known or suspected terrorists" simply because they travelled together, described more fully below.

190.     Plaintiffs Juangjan Daves and Leshauna Daves have been discouraged from traveling because of the anxiety, shame and humiliation attached to their designation as "known or suspected terrorists" and knowledge of how their designation will impact them if they travel. Plaintiff Long is prohibited from flying altogether due to his placement on the No Fly List. But for the Watchlisting System targeting the Plaintiffs, all three would have traveled by plane domestically and internationally—as all three have throughout their lives.

191.     The practice of Islam of the Plaintiffs has been substantially burdened by Defendants.

192.     Upon information and belief, all of the Plaintiffs remain on the federal terrorist watchlist.

**Plaintiff Saadiq Long**

193.   Plaintiff Long is a decorated United States Air Force veteran that served honorably in the United States Air Force for approximately 11 years – from 1987 to 1998. He served in Travis Air Force Base in California, Rhein-Main Air Base in Germany, Incirlik Air Base in Turkey and Cannon Air Force Base in New Mexico as a fuel specialist and later a fuel supervisor.

194.   His responsibilities included managing every aspect of the refueling of every aircraft on the flight line, in addition to operating the vehicles, equipment and storage facilities that are essential to the refueling operation while also ensuring the compliance of all safety regulations while handling the volatile liquids.  Among the aircraft Plaintiff Long was responsible for refueling were fighter aircraft (including McDonnel Douglas F-15 Eagles, General Dynamics F-16 Fighting Falcons, Harrier Jump Jets, Lockheed F-117 Nighthawks), reconnaissance aircraft and cargo aircraft (including C-5 Galaxy transport aircraft and C-17 Globemaster III).

195.   On or about 1997, Plaintiff Long converted to Islam at the mosque located in the Incirlik Air Base while he was stationed in Turkey.  He was given a Turkish Certificate of Conversion by the Turkish Government.

196.   Immediately after converting to Islam, Plaintiff Long – formerly Paul Anderson – filed an application with the U.S. Air Force to formally change his name to Saadiq Long in accordance with his new Islamic identity.  He attached the Turkish Certificate of Conversion and an affidavit detailing his conversion to Islam as the reason for his requested name change.  His application to change his name was approved.

197.    Just prior to converting to Islam, Plaintiff Long applied to reenlist for four years in the U.S. Air Force.

198.    As Plaintiff Long learned about his faith, his beliefs evolved and he no longer could support U.S. Airforce operations because the killing of innocent civilians was an unavoidable consequence of the Air Force's operations.

199.    Upon being reassigned to Cannon Air Force Base, Plaintiff Long applied for conscientious objector status on the basis of his religious objection to supporting the killing of innocent civilians.

200.    Plaintiff Long's conscientious objector status was denied.  Instead, he was reassigned to provide refueling training.

201.    Soon after, Plaintiff Long was subjected to a random urinalysis and ordered to expose himself while providing the sample.  Upon information and belief, Plaintiff Long was ordered to expose himself during a random urinalysis in retaliation for filing for conscientious objector status.

202.    Plaintiff Long asked the officer assigned to monitor him to stand and watch him from behind, because his faith requires him to maintain his modesty.  The officer refused.

203.    As a result, Plaintiff Long was charged with refusing a direct order from the commander and received an "Other Than Honorable Discharge."

204.    Plaintiff Long has never received any military training other than the military training he received in connection with his service with the U.S. Air Force.

205.    The following year, in 1999, Plaintiff Long moved to Egypt with his wife and stepchildren where he taught English.  Later, in 2003, Plaintiff Long moved with his family to Qatar, where he also taught English.

206.   On or about approximately 2011, a friend of Plaintiff Long traveled to Kenya to teach English.

207.   Plaintiff Long's friend contacted him by phone and told him that he was being detained by Kenyan authorities on allegations related to terrorism and that FBI agents were on their way to interrogate him.

208.   Plaintiff Long received information that FBI agents attempted to coerce his friend to entrap Plaintiff Long in a fictitious, terrorism-related plot.

209.   Approximately one to two weeks later, an FBI agent wrote an email to Plaintiff Long requesting that they meet for an interview at the U.S. Embassy and Consulate in the United Arab Emirates.

210.   Also, around 2011 or 2012, FBI agents approached his two brothers-in-law and attempted to coerce them to fake a conversion to Islam, help them gather intelligence about Plaintiff Long, and help them entrap Plaintiff Long in a terrorism plot.  Each of them refused to cooperate.  One of his brothers-in-law was threatened with a criminal charge if he refused.

211.   Plaintiff Long feared for his safety and his life and decided to minimize his footprint in the hopes of avoiding Defendants' attention and ire.  To that end, Plaintiff Long did not renew his tourist and work visas in Qatar and let his U.S. passport expire.

**Plaintiff Long's Trip From Qatar to Oklahoma in 2012**

212.   In 2012, Plaintiff Long decided to fly back to the United States upon learning that his mother was critically ill.

213.   He applied online to renew his U.S. passport.  However, he received a response from a U.S. Embassy and Consulate in Qatar that his passport cannot be processed through

50

the normal routine process and that he needed to come in and speak with the FBI.  The Department of State chose to apply the segregated and unfavorable passport process because Plaintiff Long, by this time, was targeted by Defendants' Watchlisting System.

214.    After receiving that email, Plaintiff Long went to the Embassy and Consulate, where he was left in a room with an FBI agent to be interrogated.  He responded that he would not answer any questions without an attorney.  The FBI agent responded that he would not receive his passport, which had been taken from him at the Embassy and Consulate, unless he agreed to answer their questions.

215.    As soon as Plaintiff Long left the Embassy and Consulate, he was detained by Qatari law enforcement.  The timing of the detention, immediately upon leaving the US Embassy and Consulate, indicates that the detention was at the behest of Defendants' agents—a fact that was confirmed by the captain of the Qatari detention center.

216.    The Qatari official that detained Plaintiff Long told him that he received a call that Plaintiff Long "caused a commotion inside the embassy," an untrue fact that Defendant FBI passed on to the Qatari official as a pretextual basis for Plaintiff Long's detention.

217.    During his detention, the Qatari official told Plaintiff Long that the US Embassy had instructed Qatar to deport him and ban him from all Gulf Cooperation Council countries.

218.    Because Defendants' had refused to give back Plaintiff Long's expired passport or issue him a new one and his visa had expired[8], he was taken to a holding cell where he was held over the weekend in anticipation of being deported to the United States.  The Captain of the deportation center told Plaintiff Long that the FBI requested that the foreign

---

[8] In Qatar, visa overstays are civil matters that do not result generally result in detention and can be remedied by renewing the visa or, in some cases, paying a fine.

official deport him to the United States. He also told Plaintiff Long that he believed the FBI was requesting his deportation because he is Muslim. Based upon a criminal background check and a search of the Interpol databases – all of which came back clean – the Captain refused to place Plaintiff Long in deportation proceedings and released him. Thus, while the detention was at the behest of Defendants, Qatari officials refused to maintain the detention for the duration and purpose sought by Defendants.

219.    Afterwards, the Captain called the Embassy and Consulate on Plaintiff Long's behalf, learned that Plaintiff Long's passport had been processed two weeks prior, and demanded that Plaintiff Long be given his passport.

220.    Immediately upon receiving his passport, Plaintiff Long purchased a flight to the United States so that he could visit his ill mother.

221.    One day prior to his flight, a KLM representative contacted him and informed him he would not be permitted to fly to the United States because he was placed on the No Fly List and that he needed to follow-up with the US Embassy and Consulate.

222.    He went back to the Embassy and Consulate; however, they provided him with no additional information. They simply provided him with the link to the website where he can file a DHS TRIP inquiry.

223.    He immediately filed DHS TRIP.

224.    Several months later, after having heard nothing from DHS TRIP, Plaintiff Long retained a lawyer and provided a media interview with The Guardian where he explained that the U.S. Government was preventing him from flying home to visit his critically ill mother.[9]

---

[9] https://www.theguardian.com/commentisfree/2012/nov/05/muslim-no-fly-qatar

225.    Shortly after The Guardian published a story about Plaintiff Long's predicament, FBI agents visited Plaintiff Long's ill mother and demanded that she show them her medicine to confirm she was in fact ill.

226.    FBI agents interrogated Plaintiff Long's parents multiple times at their home about him before he was finally given a one-time waiver by Defendants to fly to the United States.  FBI agents also interrogated Plaintiff Long's father about him at his workplace.

227.    In response to extensive media coverage and litigation threats, Defendants allowed Plaintiff Long to fly from Qatar to Oklahoma in November 2012.  He was able to fly home.

228.    During his flight back to Oklahoma in November 2012, Plaintiff Long had a layover in Amsterdam where Dutch security agents, acting pursuant to Defendants' instructions, compelled him to strip down to his underwear during an invasive search of his person and property.

229.    During the layover, and after being forced to strip to his underwear, Defendant DHS's agent, who identified himself to Long as Defendant DHS's agent, approached Plaintiff Long at the terminal and asked to have a "little talk."  When Long informed Defendant DHS's agent that he was represented by counsel, Defendant DHS's agent responded with the following: "Let's cut the shit, Long.  I'm gonna ask you some questions and if you want to get on that plane, you'd better give me some answers."  In response to this threat, Plaintiff Long answered some but not all of the questions the agent posed.  The agent, ultimately, allowed Plaintiff Long to board his flight.

230.    During another layover on the same trip, this one in Detroit, about half a dozen CBP agents took Plaintiff Long into custody as he departed his plane.  After searching his

person and belongings and attempting to interrogate him, Plaintiff Long was handed off to FBI agents who also sought to interrogate him.  After answering some questions, the agents allowed Plaintiff Long to leave.

231.    After arriving to the United States, and in November or December 2012, Plaintiff Long and his sister drove from McAlester, Oklahoma to Oklahoma City and were followed by an unmarked car.  Unbeknownst to Plaintiff Long and his sister, Defendant FBI's agent was driving the unmarked vehicle and, in an attempt to intimidate Defendant Long, enlisted the armed assistance of a local police department to help Defendant FBI detain Plaintiff Long and his sister, who Defendant FBI deliberately and falsely identified to local police as "fleeing felons."

232.    As Plaintiff Long and his sister stopped at a police station to seek protection from the unmarked vehicle which, in their mind, may have been a member of the public wishing Plaintiff Long and his family harm, 5-6 police cars surrounded their car and the officers who exited their vehicles pointed guns at the vehicle Plaintiff Long and his sister were driving.

233.    Defendant FBI's agent then got out of the unmarked vehicle, approached Plaintiff Long and his sister and stated sarcastically and in a manner calculated to intimidate that he was just trying to get them to stop so he could apologize to Plaintiff Long and his family for what the agent called the "inconvenience" of Plaintiff Long not being able to board a flight to Oklahoma.

234.    During Plaintiff Long's 2012-2013 trip to Oklahoma, he applied for a gun, passed his background check, was told by the gun shop to come and pick up his gun, but when he arrives at the gun shop, the shop attendant informed Plaintiff Long that the

54

"authorities" called, told the attendant that Plaintiff Long was not authorized to purchase a weapon, and directed the gun shop to refrain from selling a weapon to Plaintiff Long despite the fact that Oklahoma allows the open carry of guns without a permit.

235.   In February or March 2013, when Plaintiff Long sought to return to his home, work, and family in Qatar, Defendants prevented him from boarding a flight to get there. Plaintiff Long and his attorney agreed to meet with the FBI to answer questions in order to allow Plaintiff Long to fly back home to Qatar.

236.   At the start of the interview, Defendant FBI's agents confirmed that they knew Plaintiff Long had attempted a gun purchase and made clear that they believed Plaintiff Long's interest in exercising his Second Amendment rights was a danger to them.  Indeed, Defendant FBI's agents brought a metal-detecting wand and searched Plaintiff Long and his attorney before beginning the interview.

237.   During that interview, which occurred by mutual agreement at a hotel in Oklahoma City, Plaintiff Long was questioned about his time with the U.S. military, about his conversion to Islam and about his request for conscientious objector status.  The FBI agent stated, "can't you see how that would be suspicious to us."  The manner and substance of the FBI agent's line of questioning and the answers elicited that regarded Plaintiff Long's conversion to Islam and request for conscientious objector status indicated that it was the bare facts regarding Plaintiff Long's time in the US Air Force that was a basis for his TSDB status.

238.    Because of his status on the No Fly List, in March 2013, Plaintiff Long was forced to ride a bus from Oklahoma across the U.S.-Mexico border, and fly to Qatar from Mexico.

**Plaintiffs' Trip to Turkey in 2015 and Their Detention There**

239.    In 2015, Plaintiffs traveled from Qatar to Turkey for vacation and entered on tourist visas.

240.    Defendants' information sharing practices disclosed to Turkey the TSDB status of Plaintiffs.  Defendants information sharing practices also informed Defendants about the Turkish government's "encounter" with Plaintiffs—including information about Plaintiffs' entry and detention in Turkey.

241.    Prior to Plaintiffs' entry and detention in Turkey in 2015, Defendants annotated Plaintiffs' passport records in a manner that disclosed to Turkey that the United States government believes Plaintiffs pose a threat of violence.

242.    Defendants view a listee's presence in a foreign country as an opportunity to enlist local intermediaries to detain and interrogate listees in a manner that would not be lawful in the United States.  Pursuant to practices between Defendants and foreign governments, Defendants understand and expect that a request to detain a listee will generally be honored.

243.    Upon information and belief, Turkish police detained Plaintiffs immediately upon arriving to Gaziantep after Plaintiffs had entered the country lawfully and toured parts of Turkey without incident.  The detention was at the behest of Defendants' agents. Defendants' agents were able to direct Turkish intermediaries to detain Plaintiffs because they had received encounter information from Turkey regarding Plaintiffs.

56

244.    After a weekend spent in detention, Plaintiffs were assigned a Turkish lawyer and given an interpreter and taken before a judge of some kind.  Plaintiffs did not understand the proceedings in full, and significant portions of it were in Turkish.  However, the judge, the Turkish lawyer, and the interpreter all made clear that Plaintiffs' detention was over and that, in accordance with Turkish law, Plaintiffs were free to continue their travels throughout Turkey as they please and to depart the country when they so choose.

245.    Immediately upon exiting the courthouse, however, Plaintiffs were handcuffed and kidnapped by Turkish police.  This detention was not pursuant to Turkish law but rather in accordance with Defendants' instructions to Turkish agents to keep Plaintiffs detained.  The unknown defendants' instructions to their Turkish agents to engage in a prescribed course of conduct with respect to a listee is consistent with Defendants' practices of requiring entities who receive TSDB information to collect encounter information from any interaction with a listee.

246.    Plaintiffs were held at various detention facilities for approximately two months, including facilities in Erzurum, Gazientep.  Throughout their detention, they were exposed to brutal treatment and poor conditions, including a bloody prison riot that left one detainee dead.

247.    In order to put pressure on the detention center officials to improve conditions and to release them, Plaintiff Long led a hunger strike that his family—the other two plaintiffs—joined.

248.    Throughout his detention, Plaintiffs communicated with the US Embassy on a few occasions.  Embassy officials indicated that Plaintiffs could only leave the detention facility if they returned to Turkey.  Plaintiffs, who had lived in the Middle East for more than

a decade, did not want to return to Turkey but to Qatar, Jordan, or the UAE—all places where Plaintiffs had status or could obtain status but for their TSDB status.

249.    Upon their release, a Turkish immigration official told Plaintiff Long that the United States was not happy that Turkey was allowing Plaintiff Long to return to Qatar.

250.    The Department of State confirmed its view that Plaintiff Long was not detained for joining ISIS.

251.    Defendants Unknown FBI Agents then provided false information to Patrick Poole, a virulently anti-Muslim blogger with Pajamas Media that Plaintiff Long was arrested in Turkey for joining ISIS for the purpose of discrediting prominent journalists they viewed as sympathetic to the plight of persons on the No Fly List.[10]

252.    Because of Defendants' actions in placing Plaintiffs on the federal terrorist watchlist, Plaintiffs were not afforded the typical protections from the embassy and consulate in Turkey that Americans who do not have a TSDB status receive.

**Plaintiffs Travel From Turkey To Qatar And UAE, And Are Denied Entry**

253.    After weeks of demands and protests, Turkish officials agreed to Plaintiffs' request that they be flown to Doha, Qatar against explicit efforts by federal government officials to prevent Plaintiffs from returning to Qatar.

254.    Upon arriving to Doha International, when customs officials scanned each of Plaintiffs' passports, red lights flashed and a siren sounded.

---

[10] https://pjmedia.com/homeland-security/2015/11/24/msnbcs-no-fly-list-is-islamophobia-poster-boy-arrested-in-turkey-as-part-of-isis-cell/ and https://theintercept.com/2016/01/25/u-s-air-force-veteran-saadiq-long-smeared-as-an-isis-fighter-just-returned-to-the-u-s/

255.    Upon information and belief, once customs officials scanned Plaintiffs' passports, they were then finger printed and were subject to retinal scans.  These identify-confirmation measures are consistent with Defendants' policies requiring recipients of TSDB information to confirm a listee's identity whenever the recipient entity encounters one.

256.    Plaintiffs were refused entry into Qatar and told that they were banned from entering Qatar.

257.    Qatari officials told Plaintiffs that they have to leave Qatar, and Plaintiffs decide to fly to UAE—a country they have lawfully entered and exited periodically, obtaining UAE visas without incident as they needed them, while they lived in Doha.

258.    When they landed in UAE and handed their passports to UAE customs officials, Plaintiffs observed flashing red lights and heard sirens again.  Just like they were in Qatar, Plaintiffs were again finger-printed and were subject to retinal scans.  These identity-confirmation measures are consistent with Defendants' policies requiring recipients of TSDB information to confirm a listee's identity whenever the recipient entity encounters one.

259.    A UAE official informed Plaintiffs that they have been banned from all Gulf Cooperation Council countries, which include Qatar and the UAE.

260.    Plaintiffs decide to try to fly from UAE to the United States, but while awaiting their flight, UAE officials offer to help them stay in the GCC if they answer a UAE official's questions.  Plaintiffs answer some of the questions, and at the conclusion of the three separate interrogations, are rushed onto a plan back to Doha—which is not where they planned to fly.

261.    After arriving in Doha, a US Embassy official calls to inform Plaintiffs that a Qatari official offered to buy their plane tickets back to the United States, an offer Plaintiffs ultimately accept.

### Plaintiffs Fly To The United States

262.    On January 20, 2016, Plaintiffs flew from Qatar to JFK International Airport. Upon information and belief, they were accompanied on their flight by two undercover air marshals who tracked their movements as the deplaned.

263.    Upon exiting the plane, Plaintiffs are taken by law enforcement to the front of the customs line, segregated from other travelers, and then individually interrogated and searched.  Law enforcement, due to Plaintiffs' TSDB status, demanded access to the family's phone and passwords to their email accounts and promised to confiscate the phone if they did not provide this information.

264.    Plaintiffs attempt to fly to Oklahoma City the following day, but the ticketing agent could not locate Plaintiff Long's reservation and, after she did, two of their three passports (Plaintiff Long and Plaintiff Juanjang Daves) cause sirens and alarms to go off when a TSA screener scans them.  Plaintiffs overhear a TSA agent inform colleagues on his radio that they have two "house guests" that need to be dealt with.  Plaintiffs are not able to board the flight to Oklahoma City

265.    On January 26, 2016, Plaintiffs are able to board a flight to Oklahoma City, subject to the same kind of invasive screening and onerous processes they just experienced.

266.    Since the filing of this lawsuit, Plaintiff Long was again denied the purchase of a gun.

267.     Plaintiff Long has since remained in the United States and obtained a job as a truck driver for approximately six months with a prior employer.

268.     Suddenly, the truck company terminated his employment as a truck driver after being contacted by Defendant FBI's agents, who told them that they should not let him drive.

269.     On or about 2017, another friend and his wife were detained in Jordan for two days.  Later, the friend was detained in Saudi Arabia and remains detained until this day.  Upon information and belief, that friend is currently being detained in Saudi Arabia due to his affiliation with Plaintiff Long and due to Plaintiff Long's status on the No Fly List.

270.     Since returning to the United States, Plaintiffs have had a bank account closed.  Upon information and belief, the closure was due to Plaintiffs' TSDB status.

## COUNT I
### VIOLATION OF THE FIFTH AMENDMENT – SUBSTANTIVE DUE PROCESS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

271.     The foregoing allegations are realleged and incorporated herein.

272.     Substantive due process protects Americans' freedom from government action which infringes upon their fundamental constitutional rights.  Government action that infringes upon these rights cannot be arbitrary and must be narrowly tailored to serve a compelling government interest.

273.     Defendants have placed Plaintiffs on the watchlist despite lacking any reasonable suspicion that Plaintiffs are known, suspected or potential terrorists.

274.     Plaintiffs' experience is substantially similar to thousands of other Americans and foreign nationals on the watchlist and reflects Defendants' current practices and policies.

275.    Defendants' actions in nominating Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to the federal terrorist watchlist blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." 49 U.S.C. § 114(h)(3).

276.    Even when a nomination is not "solely" based on guilt-by-association, race, ethnicity, national origin, religious affiliation, or First Amendment protected activities, Defendants consider and rely on those protected traits as factors supporting placement on the federal terrorist watchlist.  Defendants considered and relied upon one or more of these impermissible factors in placing Plaintiffs and similarly American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist.

277.    Defendants' consideration of and reliance on the suspect classifications of race, ethnicity, national origin, religious affiliation, as well as First Amendment protected activities, throughout the federal terrorist watchlisting system has placed an undue burden on Plaintiffs' fundamental rights to be free from discrimination.

278.    Defendants' dissemination of the watchlist to the gun market to hinder and preclude Plaintiff Long and similarly situated American citizens, lawful permanent residents, and foreign nationals from purchasing guns has placed an undue burden on Plaintiffs' fundamental right to keep and bear arms.  *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010).

279.    Defendants' policy of subjecting Plaintiffs' and similarly situated watchlisted American citizens, lawful permanent residents, and foreign nationals to has placed an undue burden on Plaintiffs' fundamental right to be free from unreasonable searches and seizures.

280.    By placing Plaintiffs and similarly situated individuals on the federal terrorist watchlist, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, Defendants have harmed them as explained in Count I, above.

281.    Defendants lack a compelling interest in placing innocent persons, particularly those with no prior terrorism related criminal record and no probable cause for suspicion of terrorism related crimes, on the federal terrorist watchlist.

282.    Defendants' watchlist lacks a compelling interest insofar as their true purpose is to provide law enforcement with a tool to harass and intimidate American Muslims, to track such persons, and coerce American Muslims into becoming informants.

283.    Defendants' watchlists are also not narrowly tailored insofar as the federal terrorist watchlists are entirely and demonstrably ineffectual and obvious alternatives exist. The Defendants, for example, have never placed a person who committed a violent act of terrorism inside the United States on the No Fly List prior to the terrorist act.

284.    Defendants' actions in placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, officially imposing on Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals the stigmatizing label of "known or suspected terrorists," and widely disseminating the stigmatizing label to numerous governmental and private partners, are arbitrary and capricious, shock the conscience, violate the decencies of civilized conduct and are so brutal and offensive that they do not comport with the traditional ideas of fair play and decency.

285.    Because Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have not been charged with any violent or terrorism-related

crimes and are United States citizens, Plaintiffs challenge their placement and the placement of others similarly situated individuals on the federal terrorist watchlist on a broad, as-applied basis.

286.    Plaintiffs' substantive due process challenge is also facial, as there are no circumstances where their placement or the placement of others similarly situated on the federal terrorist watchlist is narrowly tailored to achieve any compelling government interest.

287.    Defendants have thus violated Plaintiffs' constitutional rights and the constitutional rights of other similarly situated American citizens, lawful permanent residents and foreign nationals without affording them due process of law.  Defendants will continue to do so into the future if Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals are not afforded the relief demanded below.

288.    By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal watchlist, Defendants have caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

### COUNT II
### VIOLATION OF THE FIFTH AMENDMENT – PROCEDURAL DUE PROCESS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

289.    The foregoing allegations are realleged and incorporated herein.

290.    Defendants have placed Plaintiffs' names in the Terrorist Screening Database.

291.    Defendants have placed Plaintiffs' names in TSA and CBP watchlists generated by amorphous, unreliable, and high-risk targeting rules, such as the Quiet Skies or Silent Partner Selectee List.

292.    As described above, Plaintiffs have experienced economic, reputational, and liberty harms due to the "invasive additional screening and other liberty-constraining activities when they fly or reenter the country at a land border or port." *Elhady v. Piehota*, 303 F. Supp. 3d 453, 464 (E.D. Va. 2017).  Plaintiffs have been "detained for hours while they are searched and questioned." *Id.*  This "screening has caused them to avoid travel." *Id.*

293.    As described above, Plaintiffs have experienced economic, reputational, and liberty harms due to Defendants' placement of their names on the watchlist.  Plaintiffs' "status in the TSDB has been disseminated to third parties outside the relevant federal agencies and airlines, including state and local authorities, courts, foreign governments, gun sellers, banks, and car dealers." *Id.* at 465.  In fact, "[d]issemination of the Watch List may be so widespread that it is tantamount to public disclosure, even if only distributed to other government and private entities that need the information for official objectives." *Id.* at 465.

294.    As described above, the stigma caused by Plaintiffs being placed on the watchlist have caused Plaintiffs injury in the form of lost jobs and business opportunities, failure to get approval for regulatory and employment licenses, the inability to obtain approval to purchase a handgun, and injury to social and familial relationships.

295.    Each of the Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals only learned that he or she was placed on the federal terrorist watchlist after being added on the federal terrorist watchlist and suffering harm as a result.

296.    Plaintiffs' experiences are substantially similar to thousands of other Americans and foreign nationals on the No Fly, Selectee, Expanded Selectee, TSDB, Quiet Skies/Silent Partner Selectee, and other rules-based terrorist screening lists.  Plaintiffs experiences are indictive of Defendants' current practices and policies.  Accordingly, Plaintiffs bring this procedural due process challenge both as-applied to themselves, and facially to the category of watchlisted persons who have not been arrested, charged, or convicted of a terrorism-related offense.

297.    Defendants' actions as described above in refusing to provide Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals with any notice of their placement has deprived Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals of constitutionally protected liberty interests.

298.    Defendants' actions in nominating Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to the federal terrorist watchlist blatantly violate the requirement that "nominations must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

299.    Even when a nomination is not "solely" based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities, Defendants consider and rely on those protected traits as factors supporting placement on federal terrorist watchlists.  Defendants considered and relied upon one or more of these impermissible factors in placing Plaintiffs and similarly American citizens, lawful permanent residents, and foreign nationals on federal terrorist watchlists.

300.    Defendants who contributed to the placement of Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist knew that their actions violated clearly established federal and constitutional law.

301.    Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have a liberty interest in traveling free from unreasonable burdens within, to, and from the United States, including through land border crossings and over U.S. air space.  Defendants have deprived Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals of their right to travel on equal terms as other travelers.  Defendants have deprived Plaintiffs and other similarly situated individuals of their liberty interest in traveling free from unreasonable burdens.

302.    Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have a right to be free from false government stigmatization as individuals who are "known or suspected to be" terrorists, or who are otherwise associated with terrorist activity.   Defendants have officially imposed on Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals the stigmatizing label of "known or suspected terrorists" without a constitutionally adequate legal mechanism for doing so.  Defendants have then disseminated the stigmatizing label to foreign, state and local government entities and private partners.

303.    Even Plaintiffs who are neither United States citizens nor present in the United States have liberty rights.  *Ibrahim v. Dep't of Homeland Sec.*, 669 F.3d 983, 995 (9th Cir. 2012).  Likewise, United States citizens in the United States have a legally protected interest

in their immediate family's ability to freely travel to the United States. *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018).

304.    Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have a liberty interest in nonattainder (i.e. the interest against being singled out for punishment without trial).  Defendants' actions have singled out Plaintiffs and others similarly situated for punishments that include, but are not limited to, inability to travel by air, unreasonable burdens placed upon travel, false association with a list of individuals suspected of terrorism, handcuffing and detention as "prisoners," deprivation of the Second Amendment right to bear arms, unreasonable searches and seizures of electronic devices, and discriminatory targeting on the basis of race, ethnicity, national origin, and religion.

305.    Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals have been burdened or prevented from boarding commercial flights, have been burdened or prevented from entering the United States at land border crossings, have had their bank or Western Union accounts closed, have been prevented from making wire transfers at financial institutions, have had their citizenship applications delayed indefinitely due to an "FBI name check," and have lost lucrative economic opportunities, credentials, and employment.  Plaintiffs have suffered from other forms of financial harm.

306.    All citizens, lawful permanent residents, and foreign nationals adversely affected by the terrorist watchlist are entitled to a constitutionally adequate legal mechanism that affords them full notice of the reasons and bases for their placement and a meaningful opportunity to contest their continued inclusion.  Yet Defendants have failed to provide the

most basic ingredients of due process, which is notice and a meaningful opportunity to be heard.

307.    Defendants shield their watchlist decisions from review, and do not provide Plaintiffs or any similarly affected individuals an impartial tribunal which can substantively evaluate the propriety of (a) the Defendants' watchlist inclusion standards, (b) Defendants' adherence to their own standards, (c) the facts purportedly justifying Plaintiffs' placement on the TSDB, classification within the TSDB, or placement on other federal terrorist watchlists, (d) the lack of opportunity to offer any clarification or correction of those facts by Plaintiffs, or (e) the constitutionality of Defendants' nomination or redress processes.

308.    By imposing on Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals the stigmatizing label of "known or suspected terrorists" or "terrorists," and by failing to provide Plaintiffs and others similarly situated with a constitutionally adequate legal mechanism to challenge that designation, Defendants have deprived Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals of their protected liberty interests.

309.    These protected liberty interests include military base access, TWIC card access, and TSA Precheck and Global Entry Access.  Although the Government claims that these are non-reviewable security determinations, the reporting of information that informs the security determination is not unreviewable and is actionable if done in an illegal or discriminatory manner.  *Rattigan v. Holder*, 689 F.3d 764, 767 (D.C. Cir. 2012).  Moreover, the Supreme Court has stated that the power to exclude civilians from a military base is "limited by the Constitution and by the standard administrative requirement that '[the

Government] must not act in an arbitrary or capricious manner,'" *United States v. Albertini*, 472 U.S. 675, 694 (1985).

310.    Defendants knew at the time they acted unlawfully that Supreme Court precedent required that, whenever a citizen is deprived of a liberty interest, the federal government must at least provide the deprived with some form of notice that a deprivation occurred.

311.    Defendants have violated the constitutional rights of Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals without affording them due process of law.  Defendants will continue to do so into the future if Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals are not afforded the relief demanded below.

312.    By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, Defendants have caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

<u>**COUNT III**</u>
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706 – DHS TRIP**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

313.    The foregoing allegations are realleged and incorporated herein.

314.    Defendants' placement of Plaintiffs on the terrorist watchlist, placement of Plaintiffs on the Quiet Skies/Silent Partner Selectee List and other rules-based terror

70

targeting lists, and subsequent DHS TRIP and TSC determinations regarding Plaintiffs' watchlist status, constitute agency actions.

315.   Plaintiffs and other similarly situated individuals are not required to exhaust the DHS TRIP process in connection with any watchlist status, under the holding in *Darby v. Cisneros*, 509 U.S. 137 (1993).  *See Mohamed v. Holder*, 995 F. Supp. 2d 520, 533-35 (E.D. Va. 2014) (declining to require plaintiff to administratively exhaust the DHS TRIP process under Fourth Circuit standards for judicial imposition of administrative exhaustion in non-APA cases and noting that Congress did not mandate exhaustion of DHS TRIP process); *Crooker v. Transportation Sec. Admin.*, 323 F. Supp. 3d 148, 156 (D. Mass. 2018) (following *Mohamed*); *Kovac v. Wray*, 3:18-cv-110, Dkt. No. 12, --- F. Supp. 3d ----, 2019 WL 1057935, at *12-14 (N. D. Tex. Mar. 5, 2019).

316.   Defendants' actions in placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, officially imposing on Plaintiffs the stigmatizing label of "known or suspected terrorists," disseminating the stigmatizing label to governmental and private partners, and providing no constitutionally adequate avenue for redress, were and are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

317.   Defendants' actions in nominating Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to the federal terrorist watchlist blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

318.    Even when a nomination is not "solely" based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities, Defendants consider and rely on those protected traits as factors supporting placement on the federal terrorist watchlist.   Defendants considered and relied upon one or more of these impermissible factors in placing Plaintiffs and similarly American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist.

319.    Defendants have failed to provide Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals, who have been unreasonably burdened or denied boarding on commercial flights due to their placement on the federal terrorist watchlist, with a constitutionally adequate mechanism that (a) affords them notice of the reasons and bases for their placement on the federal terrorist watchlist and (b) provides a meaningful opportunity to contest their continued inclusion on the federal terrorist watchlist.   Defendants' action is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

320.    Because Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals do not present a security threat to commercial aviation, Defendants' actions as described above in including Plaintiffs and other similarly situated individuals on the federal terrorist watchlist unreasonably burdens or prevents them from boarding commercial flights or entering the United States across the border, are arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and contrary to constitutional rights, power, privilege, or immunity, and should be set aside as unlawful pursuant to 5 U.S.C. § 706.

321.    By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal watchlist, Defendants caused them an actual, imminent and irreparable injury that cannot be undone through monetary remedies.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT IV**
**VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. §, 706 – NCIC**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

322.    The foregoing allegations are realleged and incorporated herein.

323.    Defendants share watchlist information, including Plaintiffs' identities and personal information, through the National Criminal Information Center ("NCIC").  The Government's purported authority for doing so is 28 C.F.R. § 20.20 and 28 U.S.C. § 534.

324.    Neither 28 C.F.R. § 20.20 and 28 U.S.C. § 534, nor any other provision, allows sharing non-criminal information such as watchlist information.

325.    The Government lacks the statutory and regulatory authority to share Plaintiffs' information through the NCIC.

326.    The Government's sharing of Plaintiffs' information is contrary to rules promulgated through notice and comment.

327.    The Government's sharing of Plaintiffs' information is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of 5 U.S.C. § 706(2)(A).

328.    The Government's sharing of Plaintiffs' information is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," in violation of 5 U.S.C. § 706(2)(A).

329.    The Government's sharing of Plaintiffs' information is "without observance of procedure required by law," in violation of 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

### COUNT V
### VIOLATION OF THE FIFTH AMENDMENT – EQUAL PROTECTION
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

330.    The foregoing allegations are realleged and incorporated herein.

331.    Defendants' actions in placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on the federal terrorist watchlist, officially imposing on Plaintiffs the stigmatizing label of "known or suspected terrorists," disseminating the stigmatizing label to governmental and private partners, and providing no constitutionally adequate avenue for redress, are discriminatory and constitute actions that target individuals for distinctive and adverse treatment on the basis of constitutionally protected traits and activities.

332.    As a matter of policy and official practice, Defendants consider at least the following traits of Plaintiffs' and similarly situated American citizens, lawful permanent residents, and foreign nationals origin as factors for designation as terrorists and inclusion in the TSDB and throughout the watchlisting system: national origination from Muslim-majority countries, ethnic origination as Arab or Middle Eastern, travel to Muslim-majority

countries, travel on religious pilgrimages, learning Arabic, attending mosques, zakat donations to Muslim charities, the wearing of typical Muslim dress, the frequency of Muslim prayer, adherence to sharia law, affiliations with Muslim organizations, family relationships to other Muslims, and associations with other Muslims.

333.   Defendants selectively apply and enforce watchlist and screening policies to individuals who appear to be or who are known or suspected to be Muslim or Middle Eastern.

334.   The disparate treatment between Muslims and non-Muslims is the result of Defendants' intentional and purposeful discrimination.

335.   Plaintiffs' experiences are substantially similar to thousands of other Americans and foreign nationals on the watchlist and reflect Defendants' current practices and policies.  Accordingly, Plaintiffs brings this equal protection challenge both as-applied to themselves and facially.

336.   Defendants' actions in nominating Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals to the federal terrorist watchlist blatantly violate the requirement that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities."  49 U.S.C. § 114(h)(3).

337.   Even when a nomination is not "solely" based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities, Defendants consider and rely on those protected traits as factors supporting placement on federal terrorist watchlists.  Defendants considered and relied upon one or more of these impermissible factors in placing Plaintiffs and similarly American citizens, lawful permanent residents, and foreign nationals on federal terrorist watchlists.

338.    By placing Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals on federal terrorist watchlists, Defendants have treated them like second-class citizens.

339.    Defendants' above-described actions were motivated by the race, ethnicity, national origin, religious affiliation, religious exercise, gender, and associations of Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals.

340.    Defendants' above-described actions have had a discriminatory effect upon and have disparately impacted Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals who are or who are perceived as Muslim, Arab, Middle Eastern, or otherwise belonging to a racial, ethnic, or national origin class associated with Muslim-majority regions of the world.

341.    Defendants' above-described actions, policies, course of conduct, or pattern of practice that mandate, permit, or consider the above-described discriminatory treatment of Plaintiffs and similarly situated American citizens, lawful permanent residents, and foreign nationals does not serve a compelling state interest or a legitimate or public purpose, nor are they the least restrictive means or narrowly tailored to achieve any such interest.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

<u>**COUNT VI**</u>
**VIOLATION OF THE FIRST AMENDMENT**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

342.    The foregoing allegations are realleged and incorporated herein.

343.    The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble." U.S. Const. amend. I.  These rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Bates v. City of Little Rock*, 361 U.S. 516, 523 (1960).  As the Supreme Court has explained, "associational rights . . . can be abridged even by government actions that do not directly restrict individuals' ability to associate freely." *Lyng v. Int'l Union, UAW*, 485 U.S. 360, 367 n.5 (1988); *see AFL-CIO v. FEC*, 333 F.3d 168, 175 (D.C. Cir. 2003) (explaining that compulsory "disclosure of political affiliations and activities can impose just as substantial a burden on First Amendment rights as can direct regulation"); *Baird v. State Bar of Ariz.*, 401 U.S. 1, 6-7 (1971) (explaining that "[w]hen a State seeks to inquire about an individual's beliefs and associations a heavy burden lies upon it to show that the inquiry is necessary to protect a legitimate state interest").

344.    Defendants' actions in burdening Plaintiffs' and similarly situated watchlisted individuals' First Amendment rights to expression and association are not supported by a compelling or legitimate state interest.  Defendants lack reasonable suspicion, probable cause, or a warrant indicating that the watchlisted individuals are terrorist criminals. Indeed, Plaintiffs were not being investigated for any specific reasons concerning any specific threat or crime.

345.    Defendants have placed an undue burden on Plaintiffs' and similarly situated individuals' First Amendment rights to expression and association.

346.    Defendants actions in burdening Plaintiffs' and similarly situated watchlisted individuals' First Amendment rights to expression and association are not narrowly tailored,

not the least restrictive means, and not in furtherance of an appropriate form of means-end balancing to achieve a government interest.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

**COUNT VII**
**VIOLATION OF THE SECOND AMENDMENT**
**(Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)**

347.   The foregoing allegations are realleged and incorporated herein.

348.   The Second Amendment protects the fundamental individual right to bear arms.

349.   Defendants disseminate the federalist terrorist watchlist with the knowledge and intent that law enforcement agencies and providers of background checks will use the watchlist to screen gun purchasers, and thereafter block, hinder, or burden watchlisted individuals in their attempt to obtain guns.

350.   Even where a watchlisted individual possesses valid permits to possess and carry firearms, their watchlist status is used as a basis to deny the purchase of firearms.

351.   Multiple states and government entities have adopted or considered laws and policies which bar individuals listed on the federal terrorist watchlist from purchasing firearms.

352.   These laws and policies have been encouraged by Defendants.

353.   Because of their watchlist status, Plaintiffs and similarly situated individuals have been blocked, hindered, or burdened from exercising their right to bear arms.

354.    Defendants have placed an undue burden on Plaintiffs' and similarly situated individuals' Second Amendment right to own firearms.

355.    Defendants' actions in burdening Plaintiffs' and similarly situated watchlisted individuals' Second Amendment right to own firearms are not supported by a compelling or legitimate state interest, because Defendants lack reasonable suspicion, probable cause, or a warrant that watchlisted individuals are terrorist criminals.

356.    Defendants actions in burdening Plaintiffs' and similarly situated watchlisted individuals' Second Amendment right to own firearms are not narrowly tailored, not the least restrictive means, and not in furtherance of an appropriate form of means-end balancing to achieve a government interest.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

### COUNT VIII
### VIOLATION OF THE NON-DELEGATION DOCTRINE
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

357.    The foregoing allegations are realleged and incorporated herein.

358.    Congress has not provided the Executive Branch with intelligible principles from which the Executive can implement its watchlist schemes regarding civil aviation and national security.

359.    Congress has not directed the Executive Branch to create the watchlisting system, the Quiet Skies and Silent Partner initiatives, or any other rules-based lists.

360.    Congress has not directed the Executive Branch to utilize the watchlisting system, Quiet Skies and Silent Partner initiatives, or any other rules-based lists to impose

consequences upon innocent people, their family members, their colleagues or other associates.

361.    Congress has not authorized the Executive Branch to utilize the watchlisting system to encourage financial institutions to close bank accounts or ban wire transfers, to block or revoke security or employment credentials, to hinder or bar the purchase of guns, to recruit informants, or to instruct state and local law enforcement to detain individuals based on their watchlist status.

362.    Congress has not authorized the Executive Branch to disseminate the TSDB to governmental and private partners.

363.    Homeland Security Presidential Directive 6 is an illegal usurpation of Congress' legislative function and the executive order runs afoul of separation of powers principles.

364.    The Executive Branch's assignment of the watchlisting function to TSC violates Congress' directive that the TSA should determine who belongs on federal terrorist watchlists and the consequences that flow from being on those lists.

365.    Congress has not delegated to TSA the authority to create a process that can culminate in the removal of individuals from the TSDB.

366.    In the alternative, Congress's delegation to TSA to create a redress process is defective because the Executive Branch has allocated watchlist authority in a manner that prevents TSA from creating a meaningful redress process.

367.    Congress has not granted the WLAC or TSC with statutory authority to promulgate decisions regarding all policies, procedures, practices and instructions pertaining to the federal terrorist watchlist, including, but not limited to: (1) watchlist

nomination and removal procedures; (2) specific criteria used to nominate persons to the TSDB; (3) redress procedures; (4) vetting of information used to nominate persons to the TSDB; and, (5) dissemination of a person's designation in the TSDB to state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others.

368.     As a result, Defendants have illegally acted beyond their authority.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief, in addition to damages, in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## COUNT IX
### NOTICE-BASED VIOLATION OF PLAINTIFFS' PROCEDURAL DUE PROCESS RIGHTS
### (Jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. § 702)

369.     The foregoing allegations are realleged and incorporated herein.

370.     Defendants have placed Plaintiffs' names in the Terrorist Screening Database, not only without notice, but what disclosures they have provided about the process are incomplete and untruthful.

371.     In 2012, when Plaintiff Long first availed himself of DHS TRIP, Defendants did not inform him of the possibility of obtaining special permission to board a return flight to the United States via a secret, undisclosed process.  They only informed his legal team of this secret, disclosed only after Plaintiff Long's exile from the United States became a salient, national controversy.

372.    To date, Defendants maintain their policy of secrecy around the availability of special permission to board a return flight to the United States for United States persons stranded abroad by the Watchlisting System.

373.    When Plaintiffs again attempted to obtain relief via DHS TRIP in 2018 and 2019, Defendants knowingly provided false information to all of them.  Defendants, including Defendant DHS and Defendant TSA, indicated that the DHS TRIP letters were "reviewable by a United States Court of Appeals under 49 U.S.C. 46110."   The letters issued to Plaintiffs are not final orders, and the Fourth Circuit, the DC Circuit, along with others have held that there is no Section 46110 appeal for Watchlisting System targets.

374.    Procedural due process requires Defendants to provide Plaintiffs with truthful information and not with information that is deliberately false.

WHEREFORE, Plaintiffs request this Honorable Court grant declaratory and injunctive relief, in addition to damages, in the form described in the Prayer for Relief below, plus all such other relief this Court deems just and proper including costs and attorneys' fees incurred in this action.

## **Prayer for Relief**

WHEREFORE, Plaintiffs respectfully request:

1.    A declaratory judgment that Defendants' policies, practices, and customs related to the federal terrorist watchlisting system violate the First Amendment, Second Amendment, Fourth Amendment, and Fifth Amendment to the United States Constitution, as well as the Religious Freedom Restoration Act and the Administrative Procedure Act;

2.    A declaratory judgment that Defendants' policies, practices, and customs violate the non-delegation doctrine of the United States Constitution;

3.      An injunction that:

    a.      requires Defendants to remedy the constitutional and statutory violations identified above, including the removal of Plaintiffs from any watchlist or database that burdens or prevents them from flying or entering the United States across the border;

    b.      requires Defendants to provide individuals designated on the federal terrorist watchlist with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terrorist watchlist and a meaningful opportunity to contest their continued inclusion on the federal terrorist watchlist;

    c.      Requires Defendants to expunge all TSDB information pertaining to Plaintiffs; and

    d.      Prohibits the Government from sharing TSDB information through the National Criminal Information Center.

4.      A trial by jury;

5.      An award of attorneys' fees, costs, and expenses of all litigation, pursuant to 28 U.S.C. § 2412;

6.      Damages for Defendants' violations of their clearly established rights under the U.S. constitution and federal law; and,

7.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

NOW COME Plaintiffs, by and through their undersigned counsel, and hereby demand trial by jury of the above-referenced causes of action.

CAIR LEGAL DEFENSE FUND

BY:      /s/ Lena F. Masri
LENA F. MASRI (93291) ‡
GADEIR I. ABBAS (81161) ‡ *
453 New Jersey Ave, SE
Washington, DC 20003
Phone: (202) 488-8787

‡ Admitted to practice in this Court
*Mr. Abbas is licensed in VA, not in D.C. Practice
limited to federal matters.

*Attorneys for Plaintiffs*


Dated: August 13, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2019, I electronically filed the foregoing document with the Clerk of the Court for the Eastern District of Virginia using the ECF System, which will send notification to the registered participants of the ECF System as listed on the Court's Notice of Electronic Filing.

By:      /s/ Lena Masri