**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| SAADIQ LONG, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:15-CV-1642 (LO/MSN) |
| | ) | |
| WILLIAM P. BARR, in his official capacity as | ) | |
| Attorney General of the United States, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTIONS TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION
AND FOR FAILURE TO STATE A CLAIM**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATUTORY AND REGULATORY BACKGROUND ......................................................... 2

    A.    The Terrorist Screening Database, The No Fly List, and the Selectee List ............................ 4

    B.    TSA's Security Measures and Its Use of the TSDB and Other Watchlists to Secure Aviation ................................................................................................................................ 5

    C.    Redress Procedures for Travelers Who Allegedly Experience Delayed Boarding ................. 7

    D.    Enhanced Redress Procedures for U.S. Persons Who Are Denied Boarding ....................... 8

    E.    CBP's Border Search Authorities and Policies ................................................................... 9

FACTUAL BACKGROUND ............................................................................................... 10

PROCEDURAL BACKGROUND ....................................................................................... 12

LEGAL STANDARDS ........................................................................................................ 14

ARGUMENT ...................................................................................................................... 14

    I.    Challenges to the Adequacy of DHS TRIP and TSA Enhanced Screening Policies and Procedures Must Be Dismissed for Lack of Jurisdiction. .................................................... 14

    II.    Plaintiffs Juangjan and Leshauna Daves Lack Standing to Challenge the TSDB or Risk-Based Rules. ...................................................................................................................... 18

    III.    Count I (Substantive Due Process) Should Be Dismissed. ................................................ 20

    IV.    Counts II, III, and IX (Procedural Due Process) Should Be Dismissed. ........................... 23

        A.    Travel Delays Are Not A Deprivation of the Right to Travel. ................................... 24

        B.    Mr. Long Also Has Not Pled a Deprivation of the Right to Travel. .......................... 27

        C.    The Plaintiffs Have Not Pled a Protected Interest in Their Reputations. ................... 28

        D.    Plaintiffs Fail to Allege a "Plus" Factor. ................................................................... 31

        E.    The Redress Process Is Constitutionally Adequate. ................................................... 33

        F.    Count III (APA—DHS TRIP) Should Be Dismissed. ............................................. 35

        G.    Count IX Should Be Dismissed As Well. .................................................................. 36

V.      Count IV (APA—NCIC) Should Be Dismissed. ................................................ 36

      A.      Plaintiffs Lack Standing to Pursue the Relief They Seek In Count IV. ....................... 37

      B.      Count IV Also Fails to State a Claim. ........................................................ 38

VI.     Count V (Equal Protection) Should Be Dismissed. ........................................... 40

VII.    Count VI (First Amendment) Should Be Dismissed. .......................................... 42

VIII.   Plaintiffs' Second Amendment Claim (Count VII) Should Be Dismissed For Lack of
      Subject Matter Jurisdiction. ................................................................... 44

      A.      Neither Juangjan Daves nor Leshauna Daves Alleges Any "Particularized" Injury
              Related to Firearms. ...................................................................... 44

      B.      Plaintiff Long Also Lacks Standing as to Count VII. ........................................ 45

IX.     Count VIII (Non-Delegation) Should Be Dismissed. ......................................... 47

CONCLUSION ...................................................................................... 49

# TABLE OF AUTORITIES

## Cases

*Abdi v. Wray,*
　No. 2:17-CV-622-DB, 2018 WL 1940411 (D. Utah Apr. 23, 2018)................................*passim*

*ACLU v NSA,*
　493 F.3d 644 (6th Cir. 2007)................................................................................................39

*Adams v. Bain,*
　697 F.2d 1213 (4th Cir. 1982)............................................................................................14

*Aguilar v. United Floor Crew, Inc.,*
　No. 14-CIV-61605, 2015 WL 2415421 (S.D. Fla. May 21, 2015) ................................. 4, 5

*Albright v. Oliver,*
　510 U.S. 266 (1994)............................................................................................................14

*Al-Kidd v. Gonzales,*
　No. 05-093, 2007 WL 4391029 (D. Idaho Dec. 10, 2007)..................................................35

*Americopters, LLC v. FAA,*
　441 F.3d 726 (9th Cir. 2006)..............................................................................................18

*Ashcroft v. Iqbal,*
　556 U.S. 662 (2009)......................................................................................................22, 42

*Barber v. Obama,*
　No. CV RDB-12-2614, 2012 WL 12877388 (D. Md. Sept. 6, 2012), *aff'd,* 505 F. App'x 278 (4th
　Cir. 2013) ...........................................................................................................................43

*Bassiouni v. CIA,*
　392 F.3d 244 (7th Cir. 2004)..............................................................................................35

*Bazzi v. Lynch,*
　No. 16-10123, 2016 WL 4525240 (E.D. Mich. Aug. 30, 2016) .....................................*passim*

*Beck v. McDonald,*
　848 F.3d 262 (4th Cir. 2017)..............................................................................................14

*Bell Atl. Corp. v. Twombly,*
　550 U.S. 544 (2007) .....................................................................................................14, 33

*Bennett v. Spear,*
　520 U.S. 154 (1997)............................................................................................................38

*Berry v. Bean,*
　796 F.2d 713 (4th Cir. 1986)..............................................................................................32

*Beydoun v. Lynch*,
   No. 14-CV-13812, 2016 WL 3753561 (E.D. Mich. July 14, 2016) ................................................*passim*

*Beydoun v. Sessions*,
   871 F.3d 459 (6th Cir. 2017) ........................................................................ 17, 24, 25, 31

*Bibicheff v. Holder*,
   55 F. Supp. 3d 254 (E.D.N.Y. 2014) ...................................................................... 24, 27

*Blitz v. Napolitano*,
   700 F.3d 733 (4th Cir. 2012) ...........................................................................5, 15, 17, 18

*Brinkley v. Harbour Recreation Club*,
   180 F.3d 598 (4th Cir. 1999) ......................................................................................42

*Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy*,
   367 U.S. 886 (1961) ...................................................................................................32

*Califano v. Aznavorian*,
   439 U.S. 170 (1978) ...................................................................................................28

*Carroll v. U.S.*,
   267 U.S. 132 (1925) ...................................................................................................30

*Chen Zhou Chai v. Carroll*,
   48 F.3d 1331 (4th Cir. 1995) ......................................................................................49

*City of Houston v. FAA*,
   679 F.2d 1184 (5th Cir. 1982) ....................................................................................26

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983) .....................................................................................................19

*City of Los Angeles v. Patel*,
   135 S. Ct. 2443 (2015) ...............................................................................................21

*City of New York v. U.S. Dep't of Def.*,
   913 F.3d 423 (4th Cir. 2019) ......................................................................................38

*Clancy v. Office of Foreign Assets Control of U.S. Dep't of Treasury*,
   559 F.3d 595 (7th Cir. 2009) ......................................................................................28

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ............................................................................ 19, 37, 45, 46

*Corbett v. U.S.*,
   458 F. App'x 866 (11th Cir. 2012) .............................................................................18

*Cramer v. Skinner*,
   931 F.2d 1020 (5th Cir. 1991) ............................................................................ 24, 27

iv

*D.B. v. Cardall,*
No. 15-1993, 2016 WL 3387884 (4th Cir. June 20, 2016) ..................................21

*Davis v. Fed. Election Comm'n,*
554 U.S. 724 (2008) .........................................................................................19

*Dearth v. Lynch,*
791 F.3d 32 (D.C. Cir. 2015) ...........................................................................28

*Ekiu v. U.S.,*
142 U.S. 651 (1892) .........................................................................................30

*Elec. Privacy Info. Ctr. v. DHS,*
653 F.3d 1 (D.C. Cir. 2011).............................................................................33

*Elhady v. Kable,*
391 F. Supp. 3d 562 (E.D. Va. 2019) ......................................................... 26, 31

*Elhady v. Piehota,*
303 F. Supp. 3d 453 (E.D. Va. 2017).......................................................26, 42, 48

*Equity in Athletics, Inc. v. Dep't of Educ.,*
639 F.3d 91 (4th Cir. 2011) .............................................................................41

*Evans v. Chalmers,*
703 F.3d 636 (4th Cir. 2012) ...........................................................................28

*Ferrell v. My Life,*
No. CIV.A. TDC-15-1619, 2015 WL 4637784 (D. Md. July 31, 2015) ............43

*Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA.,*
313 F.3d 852 (4th Cir. 2002) ...........................................................................39

*Frank Krasner Enters., Ltd. v. Montgomery Cty. Md.,*
401 F.3d 230 (4th Cir. 2005) ..................................................................... 46, 47

*Gilbert v. Homar,*
520 U.S. 924 (1997) ................................................................................... 24, 34

*Gill v. Whitford,*
138 S. Ct. 1916 (2018) .....................................................................................20

*Gilmore v. Gonzales,*
435 F.3d 1125 (9th Cir. 2006) ........................................................ 15, 17, 18, 27

*Goldstein v. FDIC,*
No. CIV-ELH-11-1604, 2014 WL 69882 (D. Md. Jan. 8, 2014).........................3

*Graham v. Connor,*
490 U.S. 386 (1989) .........................................................................................20

*Green v. TSA,*
    351 F. Supp. 2d 1119 (W.D. Wash. 2005) .......................................................... 24, 29, 31, 33

*Greer v. Spock,*
    424 U.S. 828 (1976) ....................................................................................................32

*Haig v. Agee,*
    453 U.S. 280 (1981) ............................................................................................. 28, 34

*HHS v. FLRA,*
    844 F.2d 1087 (4th Cir. 1988) ..................................................................................49

*Howard v. City of New York,*
    No. 12-CIV-933 JMF, 2014 WL 84357 (S.D.N.Y. Jan. 6, 2014), *aff'd,* 602 F. App'x 545 (2d Cir. 2015) .......................................................................................................................42

*Ibrahim v. DHS,*
    538 F.3d 1250 (9th Cir. 2008) ..................................................................................18

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.,*
    448 U.S. 607 (1980) ....................................................................................................48

*Invention Submission Corp. v. Rogan,*
    357 F.3d 452 (4th Cir. 2004) ....................................................................................39

*Jama v. DHS,*
    760 F.3d 490 (6th Cir. 2014) ....................................................................................38

*Johnson v. Martin,*
    943 F.2d 15 (7th Cir. 1991) ......................................................................................30

*Jordan v. Fisher,*
    823 F.3d 805 (5th Cir. 2016) ....................................................................................21

*Joshi v. Nat'l Transp. Safety Bd.,*
    791 F.3d 8 (D.C. Cir. 2015) ......................................................................................39

*Kadura v. Lynch,*
    No. CV 14-13128, 2017 WL 914249 (E.D. Mich. Mar. 8, 2017) ...................................*passim*

*Kendall v. Balcerzak,*
    650 F.3d 515 (4th Cir. 2011) ....................................................................................23

*Kimberlin v. Quinlan,*
    774 F. Supp. 1 (D.D.C. 1991), *rev'd on other grounds,* 6 F.3d 789 (D.C. Cir. 1993)..............................20

*Kovac v. Wray,*
    363 F. Supp. 3d 721 (N.D. Tex. 2019) ............................................................. 29, 33, 42, 48

*Latif v. Holder,*
    686 F.3d 1122 (9th Cir. 2012) ............................................................................. 15

*Latif v. Lynch,*
    No. 3:10-cv-750 (BC), 2016 WL 1239925 (D. Or. Mar. 28, 2016) ......................... 8, 16, 34

*Latif v. Sessions,*
    No. 3:10-cv-750, 2017 WL 1434648 (D. Or. Apr. 21, 2017) ........................................ 15, 16

*League of United Latin Am. Citizens v. Bredesen,*
    500 F.3d 523 (6th Cir. 2007) ......................................................................... 24, 26, 27

*Lewis v. Casey,*
    518 U.S. 344 (1996) ............................................................................................ 20

*Libertarian Party of Va. v. Alcorn,*
    826 F.3d 708 (4th Cir. 2016) ................................................................................. 44

*Ligon v. LaHood,*
    614 F.3d 150 (5th Cir. 2010) ............................................................................. 15, 18

*Love v. Pepersack,*
    47 F.3d 120 (4th Cir. 1995) .................................................................................. 21

*Lujan v. Def. of Wildlife,*
    504 U.S. 555 (1992) ....................................................................... 19, 37, 44, 46

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ............................................................................................ 20

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ............................................................................................ 34

*McBurney v. Cuccinelli,*
    616 F.3d 393 (4th Cir. 2010) ................................................................................. 46

*Miller v. Reed,*
    176 F.3d 1202 (9th Cir. 1999) ............................................................................... 27

*Mistretta v. U.S.,*
    488 U.S. 361 (1989) ............................................................................................ 48

*Mohamed v. Holder,*
    266 F. Supp. 3d 868 (E.D. Va. 2017) .............................................................. 22, 23, 34

*Mohamed v. Holder,*
    No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958 (E.D. Va. July 16, 2015) ............ 16, 27, 34

*Mokdad v. Lynch,*
    804 F.3d 807 (6th Cir. 2015) ......................................................................... 15, 16, 17

*Moose Lodge No. 107 v. Irvis,*
    407 U.S. 163 (1972) ................................................................................. 45

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................... 35

*Myers v. U.S.,*
    272 U.S. 52 (1926) ................................................................................... 49

*National Council of La Raza v. Mukasey,*
    283 Fed. App'x 848 (2d Cir. 2007) ....................................................... 37

*Nat'l Broad. Co. v. U.S.,*
    319 U.S. 190 (1943) ................................................................................. 48

*Orgain v. City of Salisbury,*
    521 F. Supp. 2d 465 (D. Md. 2007) ...................................................... 42

*Papasan v. Allain,*
    478 U.S. 265 (1986) ................................................................................. 14

*Paul v. Davis,*
    424 U.S. 693 (1976) ...................................................................... 28, 29, 31

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.,*
    467 U.S. 717 (1984) ................................................................................. 35

*Prater v. Am. Heritage Fed. Credit Union,*
    351 F. Supp. 3d 912 (E.D. Pa. 2019) ................................................... 43

*Proctor v. DHS,*
    777 F. App'x 235 (9th Cir. 2019) ........................................... 18, 25, 35

*Rahman v. Chertoff,*
    530 F.3d 622 (7th Cir. 2008) ................................................................. 35

*Retail Indus. Leaders Ass'n v. Fielder,*
    475 F.3d 180 (4th Cir. 2007) ................................................................. 19

*Reynolds v. U.S.,*
    565 U.S. 432 (2012) ................................................................................. 24

*Roberts v. Napolitano,*
    792 F. Supp. 2d 67 (D.D.C. 2011) ........................................................ 18

*Rochester Tel. Corp. v. United States,*
    307 U.S. 125 (1939) ................................................................................. 38

*Rucker v. Harford Cty.,*
    946 F.2d 278 (4th Cir. 1991) ................................................................. 23

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*,
    547 U.S. 47 (2006) ......................................................................................................44

*Ruskai v. Pistole*,
    775 F.3d 61 (1st Cir. 2014) ..............................................................................18, 26, 30

*S. Blasting Servs., Inc. v. Wilkes Cnty.*,
    288 F.3d 584 (4th Cir. 2002) ......................................................................................45

*Salahuddin v. Cuomo*,
    861 F.2d 40 (2d Cir. 1988) ........................................................................................43

*Santosky v. Kramer*,
    455 U.S. 745 (1982) ....................................................................................................44

*Schattilly v. Daugharty*,
    No. 14-CV-11905, 2015 WL 1412502 (E.D. Mich. Mar. 20, 2015) ..........................44

*Scherfen v. DHS*,
    No. 3:08-1554, 2010 WL 456784 (M.D. Pa. Feb. 2, 2010) ............................ 19, 25, 29, 30

*Sec'y of State for Def. v. Trimble Navigation Ltd.*,
    484 F.3d 700 (4th Cir. 2007) ......................................................................................14

*Seegmiller v. LaVerkin City*,
    528 F.3d 762 (10th Cir. 2008) ....................................................................................21

*Seraji v. Gowadia*,
    No. 8:16-cv-01637, 2017 WL 2628545 (C.D. Cal. Apr. 28, 2017) ............................18

*Shirvinksi v. U.S. Coast Guard*,
    673 F.3d 308 (4th Cir. 2012) ................................................................................ 23, 28

*Siegert v. Gilley*,
    500 U.S. 226 (1991) ................................................................................................ 28, 33

*Simi Inv. Co. v. Harris Cty., Texas*,
    236 F.3d 240 (5th Cir. 2000) ......................................................................................21

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ......................................................................................................46

*Speet v. Schuette*,
    726 F.3d 867 (6th Cir. 2013) ......................................................................................23

*Stanley v. Illinois*,
    405 U.S. 645, (1972) ..................................................................................................44

*Swirkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002) ....................................................................................................43

*Sylvia Dev. Corp. v. Calvert Cty.*,
    48 F.3d 810 (4th Cir. 1995) ....................................................................41

*Tabbaa v. Chertoff*,
    509 F.3d 89 (2d Cir. 2007) .................................................................. 3, 27

*Tarhuni v. Holder*
    8 F. Supp. 3d 1253 (D. Or. 2014)..........................................................29

*The Collection, LLC v. Valley Bank*,
    No. 4:09-cv-00007, 2009 WL 2357145 (W.D. Va. July 31, 2009) ........43

*Tooley v. Bush*,
    No. 06-306, 2006 WL 3783142 (D.D.C. Dec. 21, 2006) .......................35

*Tooley v. Napolitano*,
    586 F.3d 1006 (D.C. Cir. 2009)…………………………………………………35

*Torraco v. Port Auth.*,
    615 F.3d 129 (2d Cir. 2010) ..................................................................26

*Touby v. U.S.*,
    500 U.S. 160 (1991) ......................................................................... 47, 48

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
    137 S. Ct. 1645 (2017).............................................................................19

*Town of Southold v. Town of E. Hampton*,
    477 F.3d 38 (2d Cir. 2007) ................................................................ 26, 27

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018)............................................................................20

*Turaani v. Sessions*,
    316 F. Supp. 3d 998 (E.D. Mich. 2018) .................................................47

*U.S. v. Decastro*,
    682 F.3d 160 (2d Cir. 2012) ..................................................................45

*U.S. v. Flores Montano*,
    541 U.S. 149 (2004) ...................................................................19, 26, 30

*U.S. v. Hartwell*,
    436 F.3d 174 (3d Cir. 2006) ..................................................................30

*U.S. v. Johnson*,
    122 F. Supp. 3d 272 (M.D.N.C. 2015) ..................................................42

*U.S. v. Montoya de Hernandez*,
    473 U.S. 531 (1985)................................................................................27

*U.S. v. Ramsey,*
    431 U.S. 606 (1977) ..................................................................30

*U.S. v. Salerno,*
    481 U.S. 739 (1987) ..................................................................33

*U.S. v. Shenandoah,*
    595 F.3d 151 (3d Cir. 2010) ....................................................24

*U.S. v. Skipwith,*
    482 F.2d 1272 (5th Cir. 1973) ................................................30

*U.S. v. Wehrli,*
    637 F.2d 408 (5th Cir. 1981) ..................................................30

*Van Atta v. Def. Intelligence Agency,*
    No. 87-1508, 1988 WL 73856 (D.D.C. July 6, 1988) ............30

*Veney v. Wyche,*
    293 F.3d 726 (4th Cir. 2002) ..................................................14

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ..................................................................21

*Wayte v. U.S.,*
    470 U.S. 598 (1985) ..................................................................34

*Whitman v. Am. Trucking Ass'ns Inc.,*
    531 U.S. 457 (2001) ..................................................................48

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ..........................................................19, 38

*Wikimedia Found. v. NSA,*
    857 F.3d 193 (4th Cir. 2017) ..................................................14

*Williams v. Hansen,*
    326 F.3d 569 (4th Cir. 2003) ............................................41, 42

*Winsness v. Yocom,*
    433 F.3d 727 (10th Cir. 2006) ................................................38

## Statutes

5 U.S.C. § 704 ..............................................................................38

5 U.S.C. § 706(2)(A) ....................................................................40

6 U.S.C. § 111 ........................................................................2, 3, 9

6 U.S.C. § 211 ....................................................................................................3, 9, 10

6 U.S.C. § 202 ......................................................................................................... 3, 9

8 U.S.C. § 1357 .......................................................................................................9, 19

18 U.S.C. § 922(g) ......................................................................................................46

19 U.S.C. § 482 ..................................................................................................3, 9, 19

19 U.S.C. § 1455 .................................................................................................... 3, 9

19 U.S.C. § 1459 ...............................................................................................3, 9, 19

19 U.S.C. § 1461 .................................................................................................... 3, 9

19 U.S.C. § 1467 .................................................................................................... 3, 9

19 U.S.C. § 1499 .................................................................................................... 3, 9

19 U.S.C. § 1581 .................................................................................................... 3, 9

19 U.S.C. § 1582 .................................................................................................... 3, 9

28 U.S.C. § 533 ............................................................................................................3

28 U.S.C. § 534 .................................................................................................. 36, 39

49 U.S.C. § 114 ....................................................................................................*passim*

49 U.S.C. § 44903(j) ......................................................................................5, 7, 48, 49

49 U.S.C. § 44904(a) ..................................................................................................48

49 U.S.C. § 44917(a) ...................................................................................................7

49 U.S.C. § 44926(a) ............................................................................................ 7, 49

49 U.S.C. § 46110 ..............................................................................................*passim*

**Rules**

Fed. R. Civ. P. 12(b)(1)..............................................................................................17

**Regulations**

8 C.F.R. § 235.12 ........................................................................................................18

28 C.F.R. Part 20 ............................................................................................... 37, 40

28 C.F.R. § 0.85(f)................................................................................................. 3, 39

28 C.F.R. § 20.20 ..........................................................................................................40

28 C.F.R. § 20.33 .....................................................................................................37, 40

28 C.F.R § 25.9(2) ......................................................................................................46

28 C.F.R § 25.11 .........................................................................................................46

49 C.F.R. Pt. 1560 ................................................................................................5, 6, 7

**<u>Adminstrative and Executive Materials</u>**

Protection of Sensitive Security Infromation,
    69 Fed. Reg. 28,066-01 (May 18, 2004) ...........................................................29

Secure Flight Program,
    73 Fed. Reg. 64,018 (Oct. 28, 2008) .................................................................25

**<u>Other Authorities</u>**

About NCIC,
    https://www.fbi.gov/services/cjis/ncic............................................................36, 37

Christopher M. Piehota, Statement before the House Homeland Security Committee, Subcommittee
on Transportation Security, "*Safeguarding Privacy and Civil Liberties While Keeping Our Skies Safe*" (Sept.
18, 2014)
    http://docs.house.gov/meetings/HM/HM07/20140918/102636/HHRG-113-HM07-Wstate-
    PiehotaC-20140918.pdf............................................................................................ 4

CJIS Security 2018 Policy,
    https://www.fbi.gov/file-repository/cjis-security-policy_v5-7_20180816.pdf/view.......................37

Homeland Security Presidential Directive 6 (Sept. 16, 2003),
    https://fas.org/irp/offdocs/nspd/hspd-6.html ..................................................................3

Press Release, FBI, Newly Signed Government-wide Watchlisting Redress MOU (Oct. 24, 2007),
    https://archives.fbi.gov/archives/news/pressrel/press-releases/newly-signed-government-
    wide-watchlisting-redress-mou....................................................................................8

Summary of Laws and Regulations Enforced by CBP (last modified March 8, 2014),
    https://www.cbp.gov/trade/rulings/summary-laws-enforced-us-code...............................................9

Nat'l Comm'n on Terrorist Attacks Upon the U.S., *The 9/11 Commission Report*,
    https://www.9-11commission.gov/report/.........................................................................40

# INTRODUCTION

Congress tasked the Transportation Security Administration ("TSA") with establishing policies and procedures to identify individuals who may be a threat to civil aviation or national security. To this end, TSA relies in part upon the No Fly List, the Selectee List, and the Expanded Selectee List—subsets of the consolidated Terrorist Screening Database ("TSDB") maintained by the Terrorist Screening Center ("TSC")—to screen passengers attempting to fly on United States commercial aircraft, or any commercial flight to, from, over, or within the United States. As Congress directed, TSA has in place procedures that allow individuals to seek redress for delayed or denied boarding resulting from TSA's screening program by filing an inquiry with the Department of Homeland Security's Traveler Redress Inquiry Program ("DHS TRIP"). In addition, several other agencies use information from the TSDB in connection with their respective terrorism-related missions, using the tools otherwise legally available to each respective agency.

One of the three Plaintiffs, Saadiq Long, has been denied boarding on a flight, and the U.S. Government facilitated his travel back to the United States by air. When Mr. Long sought redress, DHS TRIP provided confirmation that he was on the No Fly List, the criteria under which he was placed, and an unclassified, non-privileged statement of the reasons for his placement, to the extent possible, consistent with national security and law enforcement concerns. Upon due consideration of his response, TSA reasonably determined that continued placement on the No Fly List was appropriate. The other two Plaintiffs, Juangjan and Leshauna Daves (collectively, "the Daves Plaintiffs") do not allege that they have ever been denied boarding on a flight, and only make allegations with respect to a single trip in which they allegedly experienced delays related to their border inspection and enhanced security screening at the airport (when they were returning to the U.S. with Mr. Long, after having been detained in Turkey near the Syrian border). As a result, they speculate that they may be on the TSDB or may have received enhanced screening on account of TSA's risk-based rules as well. All three Plaintiffs speculate about a variety of governmental actions based on the TSDB. Plaintiffs' claims go well beyond Plaintiffs' actual experiences, and instead seek to challenge a

full range of actions, to which Plaintiffs were never subject, taken by the federal government to protect aviation security and border security.

As an initial matter, this Court lacks jurisdiction to consider Plaintiffs' challenges to TSA orders under 49 U.S.C. § 46110 ("Section 46110"), which vests exclusive jurisdiction in an appropriate Court of Appeals. The Court further lacks jurisdiction over any challenge by the Daves Plaintiffs regarding inclusion on any list resulting in enhanced screening, because they have not plausibly alleged any facts that would establish standing to bring such a challenge.

Each Plaintiff fails to state a claim as well. Plaintiffs fail to allege a plausible substantive due process claim, on either an as applied or facial basis. With respect to Plaintiffs' procedural due process claims, neither Mr. Long nor the Daves Plaintiffs have identified any constitutionally protected liberty interests; even if they had, the DHS TRIP redress process is constitutionally adequate to their respective circumstances. Plaintiffs' primary Administrative Procedure Act ("APA") claim is coextensive with their procedural due process claim, and should be dismissed for the same reasons. The APA challenge to the National Crime Information Center ("NCIC") fails to identify a final agency action or any valid legal objection to the NCIC. Plaintiffs' equal protection claims fail to plausibly allege that any unequal treatment was the result of discriminatory conduct. The related First Amendment claims must likewise be dismissed, as Plaintiffs have not shown any impairment of their ability to express their views as a result of Defendants' actions. And Plaintiffs' Second Amendment claims must be dismissed as to all Plaintiffs because, *inter alia*, none plausibly allege a current inability to bear arms. Finally, Plaintiffs' non-delegation claim must be dismissed because Congress' directive to TSA includes an "intelligible principle" for how TSA should protect the commercial aviation industry from terrorist threats.

## STATUTORY AND REGULATORY BACKGROUND

Several different components of the federal government work together to secure the United States and its borders and aviation system from terrorist threats. DHS is charged with "prevent[ing] terrorist attacks within the United States," 6 U.S.C. § 111(b)(1)(A), and "reduc[ing] the vulnerability

2

of the United States to terrorism," *id.* § 111(b)(1)(B); *see also id.* § 202(1) (charging DHS with the responsibility of "[p]reventing the entry of terrorists and the instruments of terrorism into the United States."). Within DHS, TSA is responsible for securing all modes of transportation, with a focus on preventing terrorist attacks against civil aviation and other methods of transportation. *See* 49 U.S.C. § 114(d). TSA is further responsible for day-to-day federal security screening operations for passenger air transportation, 49 U.S.C. § 114(e)(1), and for developing "policies, strategies, and plans for dealing with threats to transportation security," *id.* § 114(f)(3). TSA may "issue . . . such regulations as are necessary to carry out [its] functions," *id.* § 114(l)(1), as well as "prescribe regulations to protect passengers and property on an aircraft," *id.* §44903(b). Also within DHS, U.S. Customs and Border Protection ("CBP") has authority to inspect all those who are entering the United States. CBP exercises authority under numerous statutes to search persons and goods at the nation's border. *See, e.g.*, 19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582. These authorities include, but are not limited to, inspections for the purpose of preventing terrorist attacks. *See, e.g.*, 6 U.S.C. § 211(g)(3)(A); *Tabbaa v. Chertoff*, 509 F.3d 89, 97 (2d Cir. 2007) (describing antiterrorism mission of CBP and DHS).

The FBI investigates and analyzes intelligence relating to both domestic and international terrorist activities, *see* 28 U.S.C. § 533, 28 C.F.R. § 0.85(l). The FBI also administers the TSC, a multi-agency Executive organization established by Presidential Directive in 2003 and tasked with, *inter alia*, "consolidat[ing] the Government's approach to terrorism screening and provid[ing] for the appropriate and lawful use of Terrorist Information in screening processes." Homeland Security Presidential Directive 6 ("HSPD-6") (Sept. 16, 2003), https://fas.org/irp/offdocs/nspd/hspd-6.html (last visited Oct. 14, 2019); *see also* "Overview of the U.S. Government's Watchlisting Process and Procedures as of January 2018" ("Watchlisting Overview"), DEX1;[1] Christopher M. Piehota,

---

[1] The Watchlisting Overview document, which was released by the U.S. Government in January 2018 following an inter-agency review process, provides a description of watchlisting policies and procedures. The Court may properly take judicial notice of this public document, as well as the remainder of Defendants' exhibits, with the exception of the two declarations which are relevant to jurisdictional arguments only. *See, e.g., Goldstein v. FDIC*, No. CIV-ELH-11-1604, 2014 WL 69882, at *9 (D. Md. Jan. 8, 2014) ("[A] court may take judicial notice of a public document without

Statement before the House Homeland Security Committee, Subcommittee on Transportation Security, "*Safeguarding Privacy and Civil Liberties While Keeping Our Skies Safe*" (Sept. 18, 2014), at 1-2 ("Piehota Statement").[2]

## A. The Terrorist Screening Database, The No Fly List, and the Selectee List

Inclusion in the TSDB results from a multi-step assessment, based on analysis of available intelligence and investigative information about the individual. DEX1 at 3. The FBI "nominates" domestic KSTs for inclusion in the TSDB. NCTC, on behalf of the intelligence community, also "nominates" international KSTs for inclusion in the TSDB. TSC then determines whether those nominations will be accepted. *Id.* In order for a KST nomination to be accepted, it must include enough identifying information to allow screeners to be able to determine whether the individual they are screening is a match to a record in the TSDB, and enough information to satisfy a reasonable suspicion that the individual is a KST. *Id.* The "reasonable suspicion" standard for inclusion in the TSDB as a KST is satisfied only where there exists "articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct … in preparation for, in aid or furtherance of, or related to, terrorism and/or terrorist activities." *Id.* at 4.

The No Fly List, the Selectee List, and the Expanded Selectee List are subset lists of the TSDB. To place an individual on the No Fly List, there must be credible information showing the individual presents a threat of committing an act of terrorism with respect to an aircraft, the homeland, U.S. facilities or interests abroad, or is a threat of engaging in or conducting a violent act of terrorism and is operationally capable of doing so. *Id.* The criteria for inclusion on the Selectee List are not public.

---

converting the motion into one for summary judgment."); *Aguilar v. United Floor Crew, Inc.*, No. 14-CIV-61605, 2015 WL 2415421, at *6n.3 (S.D. Fla. May 21, 2015) ("judicial notice may be taken of public records and government documents available from reliable sources") (citation omitted).

[2] http://docs.house.gov/meetings/HM/HM07/20140918/102636/HHRG-113-HM07-Wstate-PiehotaC-20140918.pdf (last visited Oct. 14, 2019).

*Id.* While TSC maintains the TSDB, TSA is responsible for implementing the No Fly, Selectee, and Expanded Selectee subcomponents of this database.

The Government generally does not disclose whether an individual is in the TSDB. Such status is protected by the law enforcement privilege, and the identities of those on the No Fly, Selectee and Expanded Selectee Lists are protected as Sensitive Security Information ("SSI"). *See* 49 U.S.C. § 114(r); 49 C.F.R. § 1520.5(b)(9)(ii); *Blitz v. Napolitano*, 700 F.3d 733, 737 n.5 (4th Cir. 2012). However, as described below, No Fly List status is disclosed to U.S. citizens and lawful permanent residents (collectively, "U.S. persons") who have been denied boarding a commercial aircraft because of their presence on the No Fly List, among other requirements.

**B.**      <u>TSA's Security Measures and Its Use of the TSDB and Other Watchlists to Secure Aviation</u>

One of TSA's primary responsibilities is to ensure aviation security, including by implementing the No Fly, Selectee, and Expanded Selectee Lists. Congress has directed TSA to "assess threats to transportation," to "develop policies, strategies, and plans for dealing with threats to transportation security," to "enforce security-related regulations and requirements," and to "oversee the implementation, and ensure the adequacy, of security measures at airports." 49 U.S.C. § 114(f)(2), (3), (7), (11). Congress has further directed TSA to "perform[] . . . the passenger prescreening function of comparing passenger information to the automatic selectee and no fly lists and utilize all appropriate records in the consolidated and integrated terrorist watchlist maintained by the Federal Government in performing that function." *Id.* § 44903(j)(2)(C)(ii). TSA is also required, "in consultation with other appropriate Federal agencies and air carriers," *id.* § 114(h)(3), "to use information from government agencies to identify [travelers] who may be a threat to civil aviation or national security," *id.* § 114(h)(3)(A), and to "prevent [those] individual[s] from boarding an aircraft, or take other appropriate action with respect to that individual," *id.* § 114(h)(3)(B); *id.* § 114(h)(1).

TSA carries out its responsibilities in part through the "Secure Flight" program. *See* 49 C.F.R. Pt. 1560. Under Secure Flight, covered aircraft operators request the full name, gender, date of birth,

and other information from passengers, and submit the data to TSA. *Id.* § 1560.101(a)(1), (b). TSA uses the information to identify individuals "on Federal government watch lists who seek to travel by air." *Id.* § 1560.1(b). An aircraft operator may not issue a boarding pass to an individual "until TSA informs the covered aircraft operator of the results of watchlist matching for that passenger," and, if TSA so directs, the aircraft operator "may issue a boarding pass to that individual [but] must identify the individual for enhanced screening, in accordance with procedures approved by TSA." *Id.* § 1560.105(b)(2). TSA prohibits individuals on the No Fly List from boarding flights on U.S. carriers as well as flights into, out of, over, or within U.S. airspace, but permits individuals on the Selectee and Expanded Selectee Lists to enter the sterile area of an airport or board an aircraft after undergoing enhanced security screening. DEX1 at 2.

As recommended in the final report of the National Commission on Terrorist Attacks upon the United States ("9/11 Commission"), TSA is also authorized to use the "larger set of watch lists maintained by the federal government" to implement its pre-flight passenger pre-screening program. 49 C.F.R. § 1560.3. TSA uses several risk-based programs, including Quiet Skies and Silent Partner, to designate passengers for enhanced screening.[3] Under these programs, TSA creates rules and leverages its access to CBP's Automated Targeting System to identify passengers for enhanced screening. *See* GAO-14-531, *Report to Congressional Requesters: Secure Flight* (Sept. 2014), DEX2 at 12-13; *see generally DHS Privacy Impact Analysis Update for the Automated Targeting System*, Jan. 13, 2017, DEX3. Specifically, TSA analysts "review current intelligence to identify factors that may indicate an elevated risk for a passenger" and then "TSA creates rules based on these factors and provides them to CBP." DEX2 at 13. CBP then uses a tool to identify for TSA "passengers who correspond with the rules and provides TSA information on them in the form of a list." *Id.* "Upon receiving the list, TSA creates another rules-based list—a subset of the larger rules-based list—based on additional criteria. Through Secure Flight screening, TSA designates passengers on either rules-based list as selectees for enhanced

---

[3] Specific details of TSA's risk-based rules for screening are protected by statute as SSI. Certain details are also subject to the law enforcement privilege.

screening. *Id.*; *see also id.* at 45, fig. 3; *see also* DEX3 at 1. TSA also designates passengers for enhanced screening at random. DEX2 at 19, fig. 2.

Congress further directed TSA to deploy Federal Air Marshals ("FAMs") on every flight determined to "present high security risks." 49 U.S.C. § 44917(a)(2). By statute, the FAMs are also required to utilize a risk-based strategy (1) "when allocating resources between international and domestic flight coverage, including when initially setting its annual target numbers of average daily international and domestic flights to cover;" (2) "to support domestic allocation decisions;" and (3) "to support international allocation decisions." *Id.* § 44917(a)(9-11). Congress also directed TSA to consider its risk-based rules when creating Federal Air Marshal mission schedules. FAA Reauthorization Act of 2018, § 1949(d)(1).

### C. Redress Procedures for Travelers Who Allegedly Experience Delayed Boarding

Congress directed TSA to "establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I); *see also id.* §§ 44903(j)(2)(G)(i), 44926(a). Under these authorities, TSA has promulgated regulations governing the DHS TRIP process. 49 C.F.R. §§ 1560.201-1560.207. Under these regulations, travelers may initiate this redress process by submitting a redress inquiry form. *Id.* § 1560.205(b); *see generally* Declaration of Deborah O. Moore, dated October 11, 2019, DEX4. As set forth in more detail in the Moore Declaration, "DHS TRIP provides single point of contact for a wide variety of complaints and inquiries regarding travel difficulties," including delayed or denied boarding. DEX4 ¶¶ 3-8.

If the traveler's name is a match or near match to a name on the TSDB, "TSA, in coordination with the TSC and other appropriate Federal law enforcement or intelligence agencies, if necessary, will review all the documentation and information requested from the individual, correct any erroneous information, and provide the individual with a timely written response." 49 C.F.R. § 1560.205(d). This includes a review of TSDB information, as well as information on related U.S. Government

information systems. *See* DEX4 ¶¶ 3-8; Press Release, FBI, Newly Signed Government-wide Watchlisting Redress MOU (Oct. 24, 2007), https://archives.fbi.gov/archives/news/pressrel/press-releases/newly-signed-government-wide-watchlisting-redress-mou (last visited Oct. 14, 2019); *see also* Piehota Statement. At the end of this review, DHS TRIP responds with a determination letter, the contents of which vary based on the circumstances, but which generally advise the traveler of any corrections that may have been made as a result of the DHS TRIP review. *Id.* For inquiries alleging delayed or denied boarding due to TSA watchlist matching, the determination letter also typically states that it is a final agency decision, which is reviewable by the United States Court of Appeals under 49 U.S.C. § 46110. *See, e.g.*, DEX4 Exs. D, E, F. Approximately 98% of travelers who make redress inquiries with DHS TRIP are not in fact in the TSDB. DEX4 ¶ 5. The DHS TRIP redress process assigns a Redress Control Number, *id.* ¶¶ 4-5, and can, when appropriate, result in removal of a traveler from the TSDB or one of its subset lists, ¶ 8.

D.   <u>**Enhanced Redress Procedures for U.S. Persons Who Are Denied Boarding**</u>

In 2015, DHS TRIP adopted revised procedures applicable to any U.S person who is denied boarding due to No Fly status and who meets other requirements. *See generally* DEX4 ¶¶ 9-14 (describing process, information disclosed, and resulting order issued by TSA Administrator); *Latif v. Lynch*, 3:10-cv-00750 (BC), 2016 WL 1239925, at *5 (D. Or. Mar. 28, 2016); DEX A at 7-10 (same). If it is determined that a U.S. person who properly invokes these procedures is appropriately on the No Fly List, DHS TRIP will inform him of such status and of the opportunity to seek additional information. DEX4 ¶ 9. If the individual so responds, DHS TRIP will provide the individual with the No Fly List criterion or criteria on which his or her placement was based and, to the extent possible consistent with national security and law enforcement interests, a summary of the factual basis for the No Fly List determination. *See id.* ¶ 10. The amount and type of information provided will vary on a case-by-case basis, depending on the facts and circumstances. The individual then has an opportunity to submit to DHS TRIP any information that he considers potentially relevant to his No Fly List status. DHS TRIP will provide it to TSC for a review and recommendation. *Id.* ¶ 11.

The TSA Administrator reviews both TSC's recommendation and the DHS TRIP file (including any information the individual submitted), and will either issue a final order removing the individual from, or maintaining him on, the No Fly List, or remand the case back to TSC with a request for additional information or clarification. *Id.* ¶¶ 12-14. If TSA issues a final order maintaining the individual on the No Fly List, the order will state (to the extent possible consistent with national security and law enforcement interests) the basis for the decision, and will further notify the individual of the ability to seek judicial review pursuant to 49 U.S.C. § 46110. *Id.*

E.    **CBP's Border Search Authorities and Policies**

The Amended Complaint describes some alleged interactions with law enforcement at the border, likely referring to CBP. *See* First Amended Complaint ("FAC"), ECF No. 35, ¶¶ 230, 263. As noted above, one of DHS's most important responsibilities is "preventing the entry of terrorists and the instruments of terrorism into the United States." 6 U.S.C. §§ 111(b)(1)(A) & 202(1). CBP, in particular, is responsible for enforcing hundreds of laws and regulations at the border, including, among others, those addressing immigration, currency and financial transactions, customs, commerce and trade, copyrights and trademarks, narcotics, the safety of agricultural products and other goods, and import and export controls on wildlife and plants, chemical and biological weapons, guns, and other items.[4] CBP utilizes broad authorities to fulfill its mission responsibilities relating to border security. *See, e.g., id.* § 211; 8 U.S.C. § 1357; 19 U.S.C. §§ 482, 1455, 1459, 1461, 1467, 1499, 1581, 1582.

CBP's border security mission includes "deter[ing] and prevent[ing] terrorists and terrorist weapons from entering the United States" and "conduct[ing] inspections at such ports of entry to safeguard the United States from terrorism." *Id.* § 211(g)(3)(A)-(B). In order to carry out these responsibilities, CBP is congressionally directed to "develop and implement screening and targeting capabilities, including the screening, reviewing, identifying, and prioritizing of passengers and cargo across all international modes of transportation." *Id.* § 211(c)(9). Congress further directed CBP to

---

[4] *See generally* Summary of Laws and Regulations Enforced by CBP (last modified March 8, 2014), https://www.cbp.gov/trade/rulings/summary-laws-enforced/us-code (last visited Oct. 14, 2019).

establish "targeting operations within [CBP] to collect and analyze traveler and cargo information in advance of arrival in the United States to identify and address security risks." *Id.* § 211(g)(4)(C)(i). As part of its targeting operations, CBP uses rules which "compare[] existing information about individuals and cargo entering and exiting the country with patterns identified as requiring additional scrutiny." DEX3 at 1. The CBP system identifies "persons whose information matches criteria comprising a targeting rule" and such matches "are reviewed by CBP Officers to confirm continued official interest in the identified person." *Id.* at 3. These rules and subsequent assessment results from those rules are "designed to signal to CBP Officers that further inspection of a person, shipment, or conveyance may be warranted, even though an individual may not have been previously associated with a law enforcement action or otherwise be noted as a person of concern to law enforcement." *Id.* at 4.[5]

## **FACTUAL BACKGROUND**

The FAC alleges that Mr. Long was denied boarding on two occasions and that the other Plaintiffs received enhanced screening and were referred for additional scrutiny at the border, referred to as secondary inspection, on one trip.

The FAC also alleges that FBI agents engaged in investigative activity related to Saadiq Long as early as 2011, when he was living in Qatar, including interviews of his family-members and friends, and interviews or surveillance of him personally, but the FAC does not seek any particular relief with respect to this investigative activity. FAC ¶¶ 206-11, 213-14, 225-26, 231-33, 235-37. In 2012, Mr. Long had difficulty renewing his passport and his visa, both of which he had allowed to expire. *Id.* ¶¶ 215-19. He alleges that he was briefly detained in Qatar, allegedly at the behest of unknown U.S. officials, but released and provided with his renewed passport. *Id.* Shortly thereafter, he was informed

---

[5] Plaintiffs do not appear to allege any searches of their electronic devices, although electronic devices are mentioned several times in the complaint. FAC ¶¶ 44, 263, 304. To the extent it is relevant, CBP's guidance and standard operating procedures are set forth in CBP Directive No. 3340-049A, "Border Search of Electronic Devices," issued on January 4, 2018 ("CBP Directive" or "2018 Directive"), attached to FAC as ECF No. 35-7; *see also Privacy Impact Assessment Update for CPB Border Searches of Electronic Devices*, DHS/CBP/PIA-008(a), DEX5.

for the first time that he was denied boarding on a flight. *Id.* ¶¶ 220-21. He alleges that the Embassy initially provided him information only about DHS TRIP but later facilitated his travel back to the U.S. by air. *Id.* ¶¶ 222-27. On that trip, he encountered screening and questioning by U.S. and Dutch officials. *Id.* ¶¶ 228-30. In 2013, Mr. Long was again denied boarding on a flight when he attempted to return to Qatar, but was later able to travel to Qatar by taking a bus to Mexico and travelling from there. *Id.* ¶¶ 235-38.

In 2015, all three Plaintiffs travelled from Qatar to Turkey on "tourist" visas. After they had been travelling in Turkey for some unclear period of time, Turkish authorities arrested Plaintiffs in Gaziantep and held them for approximately two months. *Id.* ¶¶ 239-52. The FAC contains a confusing series of speculations about U.S. information-sharing with Turkey and appears to suggest or hypothesize that the detention may have been the result of some unknown U.S. communications with Turkey, FAC ¶¶ 239-43, but the Complaint does not describe the actual legal basis for the detention.[6] Plaintiffs refused proffered efforts to return them to the United States. ECF No. 9, at 4-6 (explaining that Plaintiffs were offered a flight to the U.S.); *see also* ECF No. 9-1, 9-2. When Plaintiffs ultimately accepted an itinerary to the United States, they were able to travel, subject to border inspection by CBP and enhanced screening by TSA. *Id.* ¶¶ 261-65. Although the FAC states somewhat cryptically that they were "unable" to board one flight, the allegation appears to be based on the screening process; *i.e.*, based on the time of arrival, they may have missed a flight during the waiting and screening process. *Id.* ¶ 264. There is no allegation that they were denied boarding.

---

[6] In fact, the record underlying the preliminary injunction briefing established that the Turkish National Police ("TNP") originally arrested them in response to a hotline tip regarding suspicious foreigners, based on the TNP's expanded authority to detain and deport foreigners in the Syrian border region following terrorist attacks in Ankara. ECF No. 9, at 4-6. Accordingly, even assuming for the purposes of this motion that Plaintiffs' "information-sharing" allegations are accurate, they do not provide a plausible basis for an inference that Plaintiffs' detention was somehow derived from the TSDB. And Turkey's actions do not provide a basis for a challenge to the TSDB.

Plaintiffs also speculate that the U.S. attempted to prevent their return to other countries, but when Plaintiffs attempted to travel to Qatar and the UAE, Turkey permitted such travel and those other countries denied them entry. ¶¶ 253-60.

Plaintiffs Juangjan and Leshauna Daves do not allege any additional travel or other difficulties related to their purported status with respect to the TSDB, other than that they feel like they "have been discouraged from travelling because of the anxiety, shame and humiliation" of the single trip in which they experienced screening and inspection. *Id.* ¶ 190. Plaintiff Long speculates as to a variety of other possible consequences, including that he claims to have been denied the ability to purchase a gun on two occasions, *id.* ¶¶ 234, 266, that he lost a job as a truck driver, *id.* ¶¶ 267-68, that a friend of his was detained by another foreign country, *id.* ¶ 269, and that the family members collectively "have had a bank account closed," *id.* ¶ 270. He states no factual basis for any supposition that any of those incidents relate to his watchlist status.

## PROCEDURAL BACKGROUND

On December 11, 2015, while Plaintiffs were still in Turkey, they filed a Complaint and an accompanying Emergency Motion for a Temporary Restraining Order. Plaintiffs alleged, among other things, that they have been unlawfully placed on the No Fly List. ECF No. 1. On December 22, 2015, this Court denied Plaintiffs' request for a temporary restraining order. ECF No. 11. On April 1, 2016, the Court granted the parties' joint motion to stay proceedings pending Plaintiffs' completion of the DHS TRIP process. ECF No. 16. Plaintiffs did not actually attempt submission of DHS TRIP inquiries until October 2016. ECF No. 19 (Amended Plaintiffs' Status Report); DEX4 & Ex. D (Long Final Order). The submission, however, was incomplete, and DHS TRIP did not receive completed DHS TRIP inquiries until March 27, 2019. DEX4 Ex. D (Final Order, explaining procedural background). Plaintiffs Juangjan Daves and Leshauna Daves received responses from DHS TRIP that did not confirm or deny their status with respect to the TSDB. FAC ¶ 178; ECF No. 22 (Joint Status Report); DEX4, Exs. E, F (Daves Plaintiffs' Final Letters). With respect to Mr. Long's redress request, on December 17, 2017, DHS TRIP sent a letter to both Mr. Long and his attorney about Mr. Long's No Fly List status, and informing him of the option to seek further information and additional process. ECF No. 22; DEX4 Ex A (Long Stage 1 Letter). The letter further indicated that if DHS TRIP did not receive a "request for additional information or a request for an extension within 30 days of the

date of this letter, the determination described above will become final." *Id.* Mr. Long failed to respond in a timely manner. ECF No. 22.

On March 23, 2018, counsel for Mr. Long emailed DHS TRIP to request that DHS TRIP reopen Mr. Long's administrative case. ECF No. 23 (Joint Status Report). On March 26, 2018, DHS TRIP sent an interim response to Mr. Long's counsel, advising that Mr. Long's redress inquiry had been reopened and that DHS TRIP would process his request for additional information about his placement on the No Fly List. *Id.* On August 15, 2018, DHS TRIP provided a letter containing the criteria under which Mr. Long was on the No Fly List and an unclassified, nonprivileged summary of the reasons. *See* ECF No. 25 (Joint Status Report), FAC ¶ 180, DEX4 Ex. B (Long Stage 2 Letter). In particular, the letter stated that Long "is an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so," and further explained that "the U.S. Government has received information that you have participated in training that may make you a threat to U.S. national security" and that "your arrest in Gaziantep, Turkey (not far from the Syrian border) in November 2015 is of concern to the U.S. Government." *Id.*

The FAC does not further detail the administrative process, but on October 15, 2018, Mr. Long responded by letter to DHS TRIP's letter. ECF No. 26 (Joint Status Report); DEX4 Ex. C (Long Response Letter). On April 23, 2019, upon due consideration of this submission, TSA issued a final order maintaining Long on the No Fly List and stating reasons therefore. ECF No. 29 (Joint Status Report); DEX4 Ex. D. The Final Order specifically considers and rejects Mr. Long's contentions, including, *inter alia,* his contentions that he is innocent and was placed on the No Fly List for inappropriate reasons. *Id.*

Plaintiffs eventually filed an (untimely) Amended Complaint, ECF No. 34, 35. The FAC raises nine claims against six agency defendants. *See generally* ECF 35. It seeks several forms of relief, including a declaratory judgment that "Defendants' policies practices and customs related to the federal terrorist watchlisting system" are unlawful and an injunction that requires "the removal of Plaintiffs from any watchlist or database", requires the provision of further process to "individuals designated on the

terrorist watchlist," requires expungement of all TSDB information relating to Plaintiffs, and prohibits the sharing of TSDB information through the NCIC.

## LEGAL STANDARDS

Under Federal Rule 12(b)(1) a defendant may challenge subject-matter jurisdiction (including standing) in one of two ways: facially or factually. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017). "In a facial challenge, the defendant contends 'that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based," *id.* (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)); *Wikimedia Found. v. NSA*, 857 F.3d 193, 208 (4th Cir. 2017) (citation omitted). "In a factual challenge, the defendant contends that the jurisdictional allegations of the complaint are not true." *Id.* "In that event, a trial court may look beyond the complaint and . . . determine if there are facts to support the jurisdictional allegations." *Id.*

A motion to dismiss under Federal Rule 12(b)(6) tests the sufficiency of a complaint. To survive such a motion, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). The Court must consider all well-pled allegations in a complaint as true and view the complaint in the light most favorable to the plaintiff. *See Albright v. Oliver,* 510 U.S. 266, 268 (1994). However, these principles do not apply to "a legal conclusion couched as a factual allegation," *Papasan v. Allain,* 478 U.S. 265, 286 (1986), nor to "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir. 2002) (citation omitted). In assessing a Rule 12(b)(6) motion, a court may consider documents of which it may take judicial notice, without converting a Rule 12(b)(6) motion into one for summary judgment. *Sec'y of State for Def. v. Trimble Navigation Ltd.,* 484 F.3d 700, 705 (4th Cir. 2007).

## ARGUMENT

### I. Challenges to the Adequacy of DHS TRIP and TSA Enhanced Screening Policies and Procedures Must Be Dismissed for Lack of Jurisdiction.

Challenges to the adequacy of DHS TRIP—which at least Counts II, III, and IX present— must be brought in the Court of Appeals under 49 U.S.C. § 46110. *See generally Mokdad v. Lynch,* 804

F.3d 807 (6th Cir. 2015). Section 46110 provides for exclusive jurisdiction in the courts of appeals to review orders issued "in whole or in part" by TSA.[7] This includes any challenge to the adequacy of DHS TRIP, and any challenge to the TSA order maintaining Mr. Long on the No Fly List.

In *Mohamed v. Holder*, prior to the revision of DHS TRIP procedures for U.S. persons on the No Fly List, the Fourth Circuit held in an unpublished order that a plaintiff could pursue a challenge to his purported No Fly List status in district court. The Court of Appeals reasoned that it was not clear that Congress intended to channel all claims related to placement on the No Fly List to the Court of Appeals in part because it was an interagency action and judicial review required review of both TSC and TSA actions. *See* Order, *Mohamed v. Holder*, No. 11-1924 (4th Cir. May 28, 2013) (attached hereto as DEX6). This unpublished decision was premised on "the unique character of Mohamed's claims," *id.* at 4, and is not applicable here for several reasons. It was premised on the prior version of the redress procedures. And Section 46110 explicitly directs to the Court of Appeals any order issued "in whole or in part" by TSA, and courts have generally interpreted that to include orders inextricably intertwined with TSA orders. *See Ligon*, 614 F.3d at 154-57. Unlike Mr. Mohamed at the time of that appeal, Plaintiffs have joined TSA as a party, and directly challenge the *procedures* devised and applied by TSA in the redress process. Thus, there is no question that TSA orders are at issue here, which must exclusively be reviewed in the courts of appeals.[8]

---

[7] In general, courts have given a broad construction to the term "order" in § 46110 and its predecessor statute. *See e.g. Blitz*, 700 F.3d at 735-36; *Gilmore*, 435 F.3d at 1132. The term "order" has been defined as a "decision which imposes an obligation, denies a right, or fixes some legal relationship." *Gilmore*, 435 F.3d at 1132-33 (citation omitted).

[8] The Fourth Circuit in *Mohamed* relied heavily upon the Ninth Circuit's ruling in *Latif v. Holder*, which reasoned in part that "TSA simply passes grievances along to TSC and informs travelers when TSC has made a final determination" and that any "relief must come from TSC—the sole entity with both the classified intelligence information Plaintiffs want and the authority to remove them from the List." *Latif v. Holder*, 686 F.3d 1122, 1128-29 (9th Cir. 2012). Those conclusions are not applicable to the TSA orders generated by the revised redress process for U.S. persons who are denied boarding. As the district court in *Latif* later recognized, under the revised procedures TSA now explicitly makes the final determination and does in fact have the information and the authority to effectuate the relief Plaintiffs are seeking. *See Latif v. Sessions*, 2017 WL 1434648 at *9 (D. Or. Apr. 21, 2017), DEX7 (appeal pending) (holding that the determination to include U.S. persons on the No Fly List is exclusively reviewable in a U.S. Court of Appeals).

First, with respect to Plaintiff Long and all claims related to his status on the No Fly List, the Fourth Circuit's order in *Mohamed* is not controlling in this matter because its ruling pertains to pre-2015 redress process for individuals on the No Fly List. As described above, subsequent to the jurisdictional ruling in *Mohamed*, TSA revised the redress procedures available to U.S. persons who are denied boarding as a result of No Fly status. *See Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958, at *13 (E.D. Va. July 16, 2015); *Latif*, 2016 WL 1239925, at *5. At the conclusion of the revised DHS TRIP process, the TSA Administrator now issues an order based on review of the DHS TRIP file, including responses from the traveler and a recommendation from the TSC, either maintaining the traveler on or removing the traveler from the No Fly List. *Latif*, 2016 WL 1239925, at *5; DEX1 ¶¶ 9-14. In light of this new process, as one court has held, any claims challenging the propriety of No Fly List placement, must be pursued in the Court of Appeals. *See Latif v. Sessions*, No. 3:10-cv-750, 2017 WL 1434648, at *1 (D. Or. April 21, 2017), DEX7. Mr. Long in fact completed this process, and TSA issued a final order. DEX4 ¶¶ 15-21 & Ex. D. Accordingly any challenge to the adequacy of the procedures employed with respect to his placement (including Counts II, III, and IX, as applied to him) and any challenge to his placement on the No Fly List (including Counts I, V, VI, as applied to him) should be dismissed for lack of subject matter jurisdiction.

Second, all challenges to the DHS TRIP procedures are properly directed to the Court of Appeals. As the Sixth Circuit recognized, "Congress has specifically directed" TSA to establish a redress process, and "TSA has issued regulations carrying out its responsibilities[.]" *Mokdad*, 804 F.3d at 811; *see supra* pp. 7-9; DEX4 ¶¶ 3-14. By extension, the court explained that, to the extent a plaintiff "challenges the adequacy of the redress process, his claims amount to a challenge to a TSA order." *Mokdad*, 804 F.3d at 811; *see also Beydoun v. Lynch*, No. 14-CV-13812, 2016 WL 3753561, at *3-4 (E.D. Mich. July 14, 2016) (dismissing alleged Selectee's claims for failure to join TSA as a necessary party because the Complaint essentially challenged DHS TRIP); *Bazzi v. Lynch*, No. 16-10123, 2016 WL 4525240, at *3-5 (E.D. Mich. Aug. 30, 2016) (same); *both aff'd on other grounds sub nom. Beydoun v. Sessions*,

871 F.3d 459 (6th Cir. 2017).[9] Thus, because Plaintiffs challenge the adequacy of DHS TRIP redress procedures, they challenge an order of TSA, and must bring any challenge directly in an appropriate Court of Appeals pursuant to § 46110. The FAC alleges the inadequacy of the DHS TRIP process, *see* FAC ¶¶ 313-21, and Counts II and IX also challenge the constitutional adequacy of the procedures, *see id.* ¶¶ 289-312, 369-74. Indeed, Count IX purports to challenge the specific language of the letters sent by DHS TRIP. Moreover, the Prayer for Relief seeks an order requiring Defendants to "provide individuals designated on the federal terrorist watchlist with a legal mechanism that affords them notice of the reasons and bases for their placement on the federal terrorist watchlist and a meaningful opportunity to contest their continued inclusion on the federal terrorist watchlist." *Id.* Prayer for Relief ¶ 3(b). The redress function has been specifically assigned by Congress to TSA; accordingly, Plaintiffs challenge an order of TSA.

Moreover, for much the same reasons, the Court also lacks jurisdiction to consider any challenge to the security measures enacted by TSA in response to its congressional directives detailed above. *See* Fed. R. Civ. P. 12(b)(1); *supra* pp. 6-7. A challenge to particular security measures authorized by Congress and chosen by TSA to ensure aviation security would necessarily implicate TSA orders, as it would involve TSA's statutory authority to establish screening procedures and deny boarding. *See* 49 U.S.C. §§ 114(e), (h); *see Blitz*, 700 F.3d at 735-37 (challenge to application of security procedures subject to § 46110). The Ninth Circuit has expressly held that § 46110 precludes the Court from reaching an APA claim that challenges TSA's "policies and procedures implementing" the Government's terrorism watchlists because such a claim constitutes a challenge to a TSA order. *Ibrahim v. DHS*, 538 F.3d 1250, 1256–57 (9th Cir. 2008); *see Gilmore*, 435 F.3d at 1133 (holding that a TSA Security Directive implementing the agency's airline passenger identification policy is a final order

---

[9] The court in *Mokdad* separately held, before the redress process was revised, that a challenge to a separate No Fly List determination by the TSC could be brought in the district court because it was not inextricably intertwined with the TSA order. *See* 804 F.3d at 812–15. While the Government disagrees with that aspect of the *Mokdad* decision, the Sixth Circuit recognized that a challenge to the DHS TRIP redress procedures would be a separate challenge to a TSA order subject to review under § 46110. *Id.* at 811.

within the meaning of § 46110); *accord Blitz*, 700 F.3d at 735-37; *Corbett v. U.S.*, 458 F. App'x 866, 871 (11th Cir. 2012); *Ruskai v. Pistole*, 775 F.3d 61, 65 (1st Cir. 2014); *Proctor v. DHS*, 777 F. App'x 235, 235 (9th Cir. 2019). Thus, the Court lacks jurisdiction to consider the aspects of Plaintiffs' claims that seek to challenge TSA's choice of security measures, including TSA's alleged decision to require them to undergo additional TSA screening and the procedures available to individuals selected for enhanced screening on account of TSA's risk-based rules. *See, e.g.,* FAC ¶¶ 53, 314 (making allegations about TSA's risk-based rules programs).[10] Unlike the claims analyzed in *Mohamed*, such challenges to TSA's risk-based rules are based solely on a TSA final order and fall squarely within § 46110.

Finally, *all* claims that are "inescapably intertwined" with orders that fall within § 46110 are subject to the statute's channeling effect, including claims against TSC for alleged placement in the TSDB. *See Americopters, LLC v. FAA*, 441 F.3d 726, 736 (9th Cir. 2006); *Gilmore v. Gonzales*, 435 F.3d 1125, 1132 (9th Cir. 2006); *see also Ligon v. LaHood*, 614 F.3d 150, 154-57 (5th Cir. 2010) (discussing the "inescapably intertwined" doctrine, giving the term "order" within the meaning of § 46110 "expansive construction," and collecting cases). As a result, Counts I, II, III, V, VI, VIII and IX are subject to 46110 and should be dismissed.

## II.     Plaintiffs Juangjan and Leshauna Daves Lack Standing to Challenge the TSDB or Risk-Based Rules.

The Court should dismiss the Daves Plaintiffs' claims under Rule 12(b)(1) for lack of standing, because they cannot demonstrate any "certainly impending" future injury. As the Supreme Court has explained, an "essential and unchanging part of the case-or-controversy requirement" is that a plaintiff

---

[10] The FAC mentions other TSA authorities in passing, including TWIC credentials and TSA Precheck. ¶ 309. Plaintiffs do not allege they have been denied any of these, and do not seek related relief. They therefore lack standing to challenge these programs. But in any event, TSA programs and related orders are subject to review, if at all, in the Court of Appeals, where the specific procedures available in those programs could be evaluated. *See generally Seraji v. Gowadia*, No. 8:16-cv-01637, 2017 WL 2628545 (C.D. Cal. Apr. 28, 2017) (TWIC challenge properly directed to Court of Appeals). Redress related to CBP's Global Entry is addressed in 8 C.F.R. § 235.12. *See also Roberts v. Napolitano*, 792 F. Supp. 2d 67, 73-74 (D.D.C. 2011) (travel benefit programs committed to agency discretion by law).

must establish Article III standing to sue. *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). Standing requires that a litigant must demonstrate an "(1) injury in fact (2) that is fairly traceable to the defendant's conduct and (3) that is likely to be redressed by a favorable decision." *Retail Indus. Leaders Ass'n v. Fielder*, 475 F.3d 180, 186 n. 1 (4th Cir. 2007). Importantly, where—as here—the relief sought is prospective relief only, it is well-established that a plaintiff must demonstrate a risk of future injury that is both "real" and "immediate" and neither "conjectural" nor "hypothetical." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102-03 (1983). Thus, a plaintiff seeking forward-looking relief must demonstrate the existence of a future "'threatened injury [that is] certainly impending.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Moreover, the Supreme Court has repeatedly held that "standing is not dispensed in gross" and that "a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (*quoting Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).

The Daves Plaintiffs claim to have experienced heightened scrutiny on one trip – their return to the United States from Turkey with Mr. Long after being detained near the Syrian border in 2015. FAC ¶¶ 262-65. Particularly given the circumstances of that trip, this is insufficient to allege plausibly any likelihood of future screening, much less "certainly impending" injury. It cannot be the case that a single incident of heightened screening is a basis for a claim against the watchlist specifically. TSA may choose passengers for enhanced screening for any reason or randomly. *See Scherfen*, No. 3:08-1554, 2010 WL 456784, at *7 (M.D. Pa. Feb. 2, 2010) ("Heightened screening at airports and border-crossing points does not necessarily signify inclusion" on a watchlist, as "travelers may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watch lists"); *see also* pp. 6-7, *supra* (discussing risk-based rules). CBP has significant, additional authorities that support the inspection of all persons and goods entering the country, and which are not challenged in this case. *See, e.g.*, 8 U.S.C. § 1357; 19 U.S.C. §§ 482, 1433, 1459; *U.S. v. Flores Montano*, 541 U.S. 149, 152-53 (2004) ("The Government's interest in preventing the entry of unwanted persons and effects is at its

zenith at the international border."). The FAC does not allege that the Daves Plaintiffs have ever been informed that they are on a watchlist, have ever been denied boarding, have ever been denied the purchase of a weapon, or have ever been subject to any other inconvenience that Plaintiffs imagine could be caused, hypothetically, by inclusion on a watchlist. Accordingly, their challenges seeking declaratory and injunctive relief specifically against the TSDB should be dismissed.[11]

## III.   Count I (Substantive Due Process) Should Be Dismissed.

Plaintiffs also bring a substantive due process claim, in which they subsume a number of other claims, including their equal protection, Second Amendment, and procedural due process claims. FAC ¶¶ 271-88. Initially, where substantive due process claims are coextensive with other constitutional claims, the appropriate legal framework is provided by the more specific constitutional provision.[12] With respect to equal protection, Second Amendment, and procedural due process claims, the Court should treat these claims under their respective constitutional frameworks, and dismiss them for the reasons set forth elsewhere in this filing. *See infra* Parts IV, VI, VII, VIII. With respect to the Fourth Amendment allegation, Plaintiffs have not set forth a Fourth Amendment claim and cannot raise one solely under the auspices of substantive due process.  In any event, a vague reference to "unreasonable searches and seizures" is insufficient to state a claim under the Fourth Amendment.  FAC ¶ 279.

---

[11] To the extent the Prayer for Relief seeks a universal injunction against the TSDB beyond Plaintiffs' own injuries, the requested injunction would seek relief far beyond "the inadequacy that produced the injury in fact" that the Plaintiffs have attempted to establish. *See Lewis v. Casey*, 518 U.S. 344, 357 (1996); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *Trump* v. *Hawaii*, 138 S. Ct. 2392, 2429 (2018) (Thomas, J., concurring) ("[U]niversal injunctions are legally and historically dubious."). And the requested relief is inconsistent with ordinary equitable principles as well. *See also, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) ("injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.").

[12] *See, e.g.*, *Graham v. Connor*, 490 U.S. 386, 395 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims."); *Kimberlin v. Quinlan*, 774 F. Supp. 1, 8 (D.D.C. 1991) (plaintiff's substantive due process claim depends upon and is coextensive with his First Amendment claim), *rev'd on other grounds*, 6 F.3d 789 (D.C. Cir. 1993).

Putting aside those other claims, the set of liberty interests protected by substantive due process is much narrower than that protected by procedural due process. *D.B. v. Cardall*, No. 15-1993, 2016 WL 3387884, at *13 (4th Cir. June 20, 2016); *Jordan v. Fisher*, 823 F.3d 805, 812-13 (5th Cir. 2016). "A violation of 'substantive' due process occurs only where the government's actions in depriving a person of life, liberty, or property are so unjust that no amount of fair procedure can rectify them." *Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir. 1995); *see Simi Inv. Co. v. Harris Cty., Texas*, 236 F.3d 240, 249-50 (5th Cir. 2000). The Fourth Circuit has identified "two strands of the substantive due process doctrine." *D.B.*, 2016 WL 3387884, at *13 (quoting *Seegmiller v. LaVerkin City*, 528 F.3d 762, 767 (10th Cir. 2008)). The first protects rights that are "fundamental," whereas the second "protects against the exercise of governmental power that shocks the conscience." *Seegmiller*, 528 F.3d at 767. Due to the heightened protections afforded substantive due process rights, "a careful description of the asserted fundamental liberty interest," and a demonstration that the interest is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it was] sacrificed," is required. *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (citation omitted). Thus, substantive due process prohibits "only the most egregious official conduct" and rarely comes into play. *Jordan*, 823 F.3d at 812-13 (citation omitted).

Within this framework, Plaintiffs fail to plead any "facial" substantive due process claim. Plaintiffs can succeed on a facial challenge only by "establish[ing] that no set of circumstances exists under which the [Act] would be valid," *i.e.*, that the "law is unconstitutional in all of its applications." *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2450-51 (2015). They would therefore have to establish that there are no circumstances in which the Government's interest in denying boarding or searching an individual who is boarding a commercial aircraft based on his or her watchlist status can justify the impairment of that individual's interest in travel. This they cannot do. Plaintiffs' facial substantive due process challenge consists of a single sentence that essentially recites the "no circumstances" standard. *See* FAC ¶ 286. Such a formulaic recitation of the applicable legal standard, without more, does not plausibly establish a substantive due process claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While

Plaintiffs assert that there is no need for them to undergo enhanced screening before they board a commercial airplane or inspection when crossing the border, their challenge to a purportedly incorrect government decision does not state a substantive due process claim. *See id.* at 678 (demanding "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" (citation omitted)). And regardless, Plaintiffs could not show that inclusion on a watchlist is unconstitutional in all its applications. *See Mohamed v. Holder*, 266 F. Supp. 3d 868, 883 (E.D. Va. 2017) (holding that the No Fly List is "necessary and sufficiently narrowly tailored to achieve a compelling government interest and therefore does not violate Plaintiff's substantive due process rights").

For example, Plaintiffs cannot demonstrate that the Constitution prohibits TSA from subjecting a person to additional screening, pursuant to congressional directive, where the individual is reasonably suspected of being connected to terrorism. *See* 49 U.S.C. § 114(h)(3)(A), (B) (requiring TSA to identify travelers *who may be a threat to* civil aviation or national security and to take "appropriate action with respect to that individual"). Even where a plaintiff contends that there is insufficient evidence for him or her to have been so designated, this does not render the list *facially* invalid where, under the applicable criteria, the evidence in a given case would justify screening an individual who poses a terrorist threat and is about to board an aircraft. Likewise, since Plaintiffs cannot show that the denial of boarding would be unlawful in all instances, their facial challenge to the No Fly List necessarily fails.

For similar reasons, Plaintiffs' so-called "broad, as-applied" challenge should be dismissed. *See* FAC ¶ 285. This claim is based on the argument that the watchlist or use of risk-based rules is unconstitutional as applied to U.S. citizens who have not been charged with a crime. *See id.* This is not an "as-applied" claim at all; it is a different (if slightly narrower) facial challenge. Rather than putting at issue any Plaintiff's own specific circumstances, the claim seeks invalidation of the watchlist for all U.S. citizens on the basis that the Government does not expressly link placement to an individual's criminal history. *See Speet v. Schuette*, 726 F.3d 867, 872 (6th Cir. 2013) ("In contrast to an as-applied challenge, which argues that a law is unconstitutional as enforced against the plaintiffs before the

court, a facial challenge is . . . an effort to leave nothing standing."(citation omitted)). Thus, as with Plaintiffs' other facial challenge, the legal question raised by this claim is whether the watchlist may constitutionally be applied in any circumstance to a U.S. citizen who has not been charged with a crime. This theory also fails, as there clearly can exist valid reasons for the Government to place an individual who has not been charged with a crime in the TSDB. For example, the Government may still be in the process of investigating an individual or his associates, developing evidence for an indictment, or choosing not to indict yet in order to protect sources and methods of an ongoing investigation. In no case would such circumstances plausibly bar the Government from undertaking additional screening of a person who may be associated with terrorism before he or she boards an aircraft or enters the country. And it is plain that there might be a sufficiently dangerous person who could not yet be arrested but could be denied boarding. Because placement in the TSDB in advance of any criminal charge is not unconstitutional, Plaintiffs substantive due process claim fails as a matter of law.[13] *See Mohamed,* 266 F. Supp. 3d at 883. Accordingly, Count I should be dismissed.

## IV.    Counts II, III, and IX (Procedural Due Process) Should Be Dismissed.

Counts II, III, and IX should be dismissed for failure to state a claim, because Plaintiffs have not alleged the deprivation of a cognizable interest at all, and in any event, have received all the process that is due. In order to state a procedural due process claim, Plaintiffs must show "(1) a cognizable liberty or property interest; (2) the deprivation of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." *Shirvinksi v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (quoting *Kendall v. Balcerzak*, 650 F.3d 515, 528 (4th Cir. 2011). "[D]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time,

---

[13] Plaintiffs' assertion that Defendants' conduct "shock[s] . . . the conscience" is implausible. Under this "strand" of substantive due process, egregious executive conduct is "unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies." *Rucker v. Harford Cty.*, 946 F.2d 278, 281 (4th Cir. 1991) (citation omitted). No such action is remotely at issue.

place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.*

## A.     Travel Delays Are Not A Deprivation of the Right to Travel.

The Daves Plaintiffs have not pled a deprivation of the right to travel. Both of these Plaintiffs allege that they are on a watchlist and that as a result, they were subject to travel delays of unclear length on exactly one trip. FAC ¶¶ 262-65. They further allege that they "have been discouraged from traveling because of the anxiety, shame and humiliation attached to their [purported] designation as 'known and suspected terrorist' and knowledge of how their designation will impact them if they travel." *Id.* ¶ 190. Count II alleges that these concerns infringe a "liberty interest in traveling free from unreasonable burdens[.]" *Id.* ¶ 301. Even if true, these allegations do not plead a deprivation of the right to travel.

Multiple courts have held that the right to travel is not implicated by travel delays and inconveniences akin to those alleged here. *See Cramer v. Skinner*, 931 F.2d 1020, 1030 (5th Cir. 1991) (finding no violation of the right to travel where a statutory restriction on airline service "makes travel less convenient" but "does not bar travelers" from using the airport); *U.S. v. Shenandoah*, 595 F.3d 151, 162-63 (3d Cir. 2010) (finding that the right to travel is not offended by a law causing some inconvenience), *abrogated on other grounds by Reynolds v. U.S.*, 565 U.S. 432 (2012); *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007) (explaining that a law causing "inconvenience" for the traveler does not amount to a constitutional "denial of the right to travel"); *see also Green v. TSA*, 351 F. Supp. 2d 1119, 1130 (W.D. Wash. 2005) (holding in the context of a challenge to enhanced security screening that "Plaintiffs do not have a right to travel without any impediments whatsoever"); *Bibicheff v. Holder*, 55 F. Supp. 3d 254, 264–65 (E.D.N.Y. 2014) (rejecting argument that repeated CBP inspections curtailed freedom to travel).

In *Beydoun v. Sessions*, the Sixth Circuit addressed a due process challenge brought by two individuals who alleged they were on the Selectee List. 871 F.3d 459 (6th Cir. 2017). Much more expansive than the allegations in the present case, the plaintiffs in *Beydoun* alleged that they "missed

'countless flights' after being subjected to lengthy secondary screenings," *id.* at 467, citing "delays ranging from ten minutes to one hour in duration" and contended that they "had been deterred from flying on one occasion," *id.* at 467-68. The court affirmed the dismissal of both plaintiffs' claims, holding that "Plaintiffs did not allege that any protected interest was violated by the[ir] being on the Selectee List." *Id.* at 468. The court reasoned that "Plaintiffs may have been inconvenienced by the extra security hurdles they endured in order to board an airplane," but "these burdens do not amount to a constitutional violation" because "Plaintiffs have not actually been prevented from flying altogether or from traveling by means other than an airplane." *Id.* In addition, the court held, plaintiffs' delays and inconveniences "can only be described as incidental or negligible and therefore do not implicate the right to travel….When Plaintiffs' only allegations amount to delays that many individuals are likely to experience at the airport, it is hard to conclude that the fundamental right to travel has been implicated." *Id.*;[14] *see also Abdi v. Wray*, No. 2:17-CV-622-DB, 2018 WL 1940411, at *3 (D. Utah Apr. 23, 2018), appeal pending (rejecting due process claim based on alleged watchlist status because "Plaintiff has failed to show that the right to movement is a liberty interest that is protected under the Constitution, particularly where, as here, Plaintiff has been able to travel, albeit inconveniently."); *Kovac v. Wray,* 363 F. Supp.3d 721, 752 (N.D. Tex. 2019) (similar); *Proctor,* 777 F. App'x at 235 (similar); *Kadura v. Lynch*, No. CV 14-13128, 2017 WL 914249, at *6-7 (E.D. Mich. Mar. 8, 2017) (similar). Indeed, any passenger may be required to undergo enhanced screening for reasons unrelated to watchlists. *See Scherfen v. DHS*, 2010 WL 456784, at *7; Secure Flight Program, 73 Fed. Reg. 64,018, 64,025 (Oct. 28, 2008) ("standard passenger and baggage screening . . . may include additional, random screening"); *id.* at 64,026 ("[Passengers who are not on the Selectee List] will not always avoid enhanced screening.").[15]

---

[14] The Sixth Circuit decision ("*Beydoun II*") was addressing a substantive due process claim, while affirming two district court decisions that reached similar conclusions on the procedural due process claim: *Beydoun v. Lynch* ("*Beydoun I*"), No. 14-CV-13812, 2016 WL 3753561 (E.D. Mich. July 14, 2016); *Bazzi v. Lynch*, No. 16-10123, 2016 WL 4525240 (E.D. Mich. Aug. 30, 2016).

[15] In *Elhady v. Piehota*, the district court permitted Selectee List claims of multiple plaintiffs to survive a Rule 12 motion, 303 F. Supp. 3d 453 (E.D. Va. 2017), and later granted the plaintiffs' motion for

Even in the context of interstate travel, the courts have held that travel delays ranging from a few hours to a full day do not unconstitutionally burden the right to travel. *See, e.g., City of Houston v. FAA*, 679 F.2d 1184, 1186-99 (5th Cir. 1982) (upholding regulation limiting use of airport so that certain passengers must use connecting flights or land at a more distant airport); *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 51 (2d Cir. 2007) (upholding law banning certain ferry travel to an island thereby making interstate travel "longer and more expensive"); *Torraco v. Port Auth.*, 615 F.3d 129, 141 (2d Cir. 2010) (holding that a delay of "a little over one day . . . was a minor restriction" that did not deny the right to travel).

The Daves Plaintiffs allege, at most, that they were referred for secondary inspection at the border when travelling inbound internationally on one trip, and required to undergo enhanced security measures prior to boarding a connecting flight originating in the United States on the same trip. These Plaintiffs do not allege that they have been prevented from traveling domestically or internationally through the watchlist or through any action related to watchlisting. As the *Beydoun* court noted, plaintiffs claiming to be on the Selectee List "can still fly after additional screening." *Beydoun*, 2016 WL 3753561, at *5; *Bazzi*, 2016 WL 4525240 at *6-7. Inconvenience, inspections, or delays at the airport or at the border, like those alleged by the Daves Plaintiffs, do not amount to a constitutionally cognizable violation of the right to travel. *See, e.g., League of United Latin Am. Citizens*, 500 F.3d at 535; *Beydoun*, 2016 WL 3753561, at *5; *Bazzi*, 2016 WL 4525240 at *6-7.

To the extent these Plaintiffs are challenging potential delays at the border, the Supreme Court has held that "delays of one to two hours at international borders are to be expected," *U.S. v. Flores-Montano*, 541 U.S. 149, 155 n.3 (2004), and other courts have found detentions at the border of four

---

summary judgment on some portion of those claims, *Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019). Respectfully, the Government maintains that those opinions are incorrect, contrary to the overwhelming weight of case law, and in any event distinguishable from the facts here. For example, on summary judgment, the court noted that "actions that 'actually deter' travel can create such an unreasonable burden that they constitute, in practical terms, a ban" and described instances of repeated, severe, and/or ongoing delays of many hours that could cause at least a few of the *Elhady* plaintiffs to refrain from travel. 391 F. Supp. 3d at 578-79, 575-76. In any event, the court in *Elhady* has not yet issued a final, appealable judgment.

to six hours to be constitutional, *Tabbaa*, 509 F.3d at 100-01. Thus, a law causing "inconvenience" for the traveler, including substantial delays at the border, does not amount to a constitutional "denial of the right to travel." *League of United Latin Am. Citizens*, 500 F.3d at 535; *Bibicheff*, 55 F. Supp. 3d at 264–65. Moreover, the Plaintiffs' allegations about border searches do not support a plausible inference of illegal government action, as the Government has the well-established authority to perform border searches without warrant, probable cause, or reasonable suspicion. *See U.S. v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985).

### B.   Mr. Long Also Has Not Pled a Deprivation of the Right to Travel.

Mr. Long also has not alleged a deprivation of the right to travel by virtue of being denied boarding. As an initial matter, the Second, Fifth, and Ninth Circuits have determined that a traveler does not have a constitutional right to the most convenient form of travel, such as traveling by airplane as opposed to car. *See Town of Southold*, 477 F.3d at 54 (holding that there is no constitutional right to the most convenient form of travel); *Gilmore*, 435 F.3d at 1137 (holding that there is no "right to travel by airplane"); *Miller v. Reed*, 176 F.3d 1202, 1205 (9th Cir. 1999) (holding there is no "right to drive" and that "burdens on a single mode of transportation do not implicate the right to interstate travel"); *Cramer*, 931 F.2d at 1031 (holding that "travelers do not have a constitutional right to the most convenient form of travel").[16]

Moreover, the ability to travel by plane is only a limited aspect of an individual's liberty interest in international travel. The Supreme Court has held that "the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States." *Haig v. Agee*, 453 U.S. 280, 306 (1981). The freedom to travel internationally is "no more than an aspect of the 'liberty' protected by

---

[16] In *Mohamed*, a district court in this district disagreed, holding that a plaintiff who was denied boarding had stated a claim for a procedural due process violation under the then-existing redress procedures, in part because of the burden on international travel. *Mohamed*, 2015 WL 4394958, at *6 (following the district court in *Latif* in Oregon). At the time the *Mohamed* Complaint was filed, the plaintiff was in foreign custody and unable to return home. In any event, the redress process has now changed since that decision and the Government continues to preserve its argument that the lack of access to a single mode of transportation does not deprive Mr. Long of a constitutionally protected liberty interest, particularly given his demonstrated ability to travel.

the Due Process Clause of the Fifth Amendment," and is "subordinate to national security . . . considerations." *Id.* at 306-07; *Califano v. Aznavorian*, 439 U.S. 170, 176-77 (1978) (Government action that infringes the right to travel abroad will be upheld unless it is "wholly irrational."); *see also Clancy v. Office of Foreign Assets Control of U.S. Dep't of Treasury*, 559 F.3d 595, 604 (7th Cir. 2009) ("The Supreme Court affords great deference to restrictions on international travel so long as they are justified by a rational foreign policy consideration."); *Dearth v. Lynch*, 791 F.3d 32, 38 n.1 (D.C. Cir. 2015) (claimed violation of right to international travel "trigger[s] nothing more than rational-basis scrutiny"). Here, Mr. Long has been able to travel internationally using less convenient means than a direct flight from the United States, and he alleges that the Government twice facilitated his travel back to the United States after he was first denied boarding. *See, e.g.,* FAC ¶ 238. Nothing inhibits his ability to travel domestically by other means. Accordingly, whether the Plaintiffs here frame their injury as a deprivation of the *right* to interstate travel or a deprivation of the *liberty interest* in international travel, Plaintiffs have not identified a liberty interest to support their "right to travel" claim.

### C. The Plaintiffs Have Not Pled a Protected Interest in Their Reputations.

In addition to a deprivation of the "right to travel", Plaintiffs allege an infringement of their "right to be free from false government stigmatization as individuals who are 'known or suspected to be' terrorists." FAC ¶ 302. Because "injury to reputation by itself [is] not a 'liberty' interest protected under the [Due Process Clause]," *Siegert v. Gilley*, 500 U.S. 226, 233 (1991), the Supreme Court has formulated a standard, known as the "stigma-plus" test, to determine whether alleged reputational harm infringes a liberty interest. *See Paul v. Davis*, 424 U.S. 693, 711 (1976); *Shirvinski*, 673 F.3d at 315; *Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012). Under this test, plaintiffs alleging reputational harm must demonstrate: (1) they suffered a stigma from governmental action; plus (2) they experienced an alteration or extinguishment of "a right or status previously recognized by state law." *Paul*, 424 U.S. at 711. Numerous courts have rejected this claim in the same context as it is raised here. *See Beydoun,* 2016 WL 3753561, at *5 (rejecting stigma-plus claim in the context of a challenge to alleged watchlist status because plaintiff failed to allege that he was deprived of a right previously held under

the law); *Bazzi*, 2016 WL 4525240, at *7 (same); *Green*, 351 F. Supp. 2d at 1129-30 (similar); *Kadura*, 2017 WL 914249, at *7 (Plaintiffs who had alleged widespread TSDB distribution of their names to third party entities "[did] not provide any factual support that they suffered any stigmatization by the disclosure of their names to third parties" and thus had failed to state a stigma-plus claim); *Abdi*, 2018 WL 1940411, at *3 ("Plaintiff's repeated screening at airports, while no doubt frustrating to Plaintiff, do not rise to the level of a change in legal status."); *Kovac*, 363 F. Supp. 3d at 754 (similar); *Scherfen*, 2010 WL 456784, at *7 (enhanced screening does not signify inclusion on a watchlist). Like the plaintiffs who received enhanced screening in *Beydoun*, *Bazzi*, *Abdi*, *Kadura*, *Green*, *Proctor* and *Kovac*, Plaintiffs here fail to adequately allege the elements of a stigma-plus claim.

To begin, Plaintiffs' claims fail because they do not allege facts showing public stigmatization. Plaintiffs have not alleged that any Defendant has disclosed to the general public their purported placement on a watchlist, let alone claimed that the Government has otherwise publicly labeled them, as they assert, "individuals who are 'known or suspected to be' terrorists, or who are otherwise associated with terrorist activity." *See* FAC ¶ 302. In fact, as Plaintiffs allege elsewhere in their FAC— and thus concede—government policy provides that an individual's status with respect to the TSDB or Selectee List, or rules-based lists, cannot be disclosed to the individual, let alone the general public. *Id.* ¶¶ 178, 295; *see also* 69 Fed. Reg. 28,066, 28,071 (May 18, 2004) (§1520.5(b)(9)(ii) adds a provision clarifying that SSI includes information used by a passenger screening program; this is intended to include lists of individuals identified as threats to transportation or national security). While Plaintiffs claim (without any apparent basis in fact) that Defendants have revealed their alleged TSDB status to certain third party stakeholders—*e.g.*, "state and local authorities," "foreign governments," "gun sellers," and "the captains of sea-faring vessels," *see, e.g., id.* ¶¶ 19, 293—Plaintiffs do not allege that the Government has disclosed their purported status to the general public. In an analogous case, the district court in *Tarhuni v. Holder* held that an instruction to an airline to deny boarding does "not constitute dissemination of the stigmatizing information in such a way as to reach the community at large." 8 F. Supp. 3d 1253, 1275 (D. Or. 2014). Other courts have reached similar conclusions,

differentiating between the proper government use of information and the public dissemination of potentially stigmatizing information. *See Johnson v. Martin*, 943 F.2d 15, 17 (7th Cir. 1991) (no public disclosure when statements not disseminated beyond proper chain of command); *Van Atta v. Def. Intelligence Agency*, No. 87-1508, 1988 WL 73856, at *2-3 (D.D.C. July 6, 1988) (recognizing the "crucial distinction between official disclosure and public disclosure" in cases where "[t]he government's decision to share information with a foreign power does not open that information to public scrutiny").

Further, individuals are subjected to enhanced screening for reasons unrelated to a watchlist. *See Scherfen*, 2010 WL 456784, at *7 ("Heightened screening at airports and border-crossing points does not necessarily signify inclusion" on a watchlist"); 73 Fed. Reg. at 64,025 ("standard passenger and baggage screening . . . may include additional, random screening"); *id.* at 64,026 ("[Passengers who are not on the Selectee List] will not always avoid enhanced screening."). Thus, several courts have correctly observed that "[s]ince every air passenger is subjected to a search, there is virtually no 'stigma attached to being subjected to search at a known, designated airport search point.'" *U.S. v. Hartwell*, 436 F.3d 174, 180 (3d Cir. 2006); *U.S. v. Skipwith*, 482 F.2d 1272, 1275 (5th Cir. 1973)) (noting "the almost complete absence of any stigma attached to being subjected to search at a known, designated airport search point"); *accord U.S. v. Wehrli*, 637 F.2d 408, 409 (5th Cir. 1981) (same). Further, every person entering the United States is subject to inspection by CBP officials. *See U.S. v. Ramsey*, 431 U.S. 606, 619 (1977); *Carroll v. U.S.*, 267 U.S. 132, 154 (1925); *Flores-Montano*, 541 U.S. at 153; *Ekiu v. U.S.*, 142 U.S. 651, 659 (1892). Thus, Plaintiffs' allegations related to border inspections, even if true, do not establish the requisite public dissemination of stigmatizing information to state a valid claim on this basis.[17]

---

[17] Here again, the *Elhady* opinion ignores the weight of the case law. The court determined at summary judgment– relying almost entirely on the plaintiffs' statements of fact (which were contradicted in important respects in the record) – that the plaintiffs' "reputational interests" were "substantial because of the extent to which TSDB information is disseminated, both in terms of the numbers of entities who have access to it and the wide range of purposes for which those entities use the information." *Elhady v. Kable*, 391 F. Supp. 3d at 580. The court concluded that "while

### D. Plaintiffs Fail to Allege a "Plus" Factor.

Plaintiffs also do not allege a "plus" factor as required to demonstrate a reputational harm amounting to an infringement of the Fifth Amendment. In *Paul v. Davis*, the Supreme Court concluded that reputational harm alone does not implicate a liberty or property interest, and as a result, a claimant must identify a "plus" factor establishing the deprivation of such an interest. *See* 424 U.S. at 701. In *Green v. TSA*, *supra*, a district court held that the allegation of reputational harm should be dismissed because the plaintiffs did "not allege[] any tangible harm to their personal or professional lives that is attributable to their association with the No-Fly List, and which would rise to the level of a Constitutional deprivation of a liberty right . . . [or] any injury to a property interest." 351 F. Supp. 2d at 1130. And in *Beydoun*, the Sixth Circuit held that plaintiffs claiming to be on the Selectee List "cannot show that their liberty interest in travel was infringed upon by being subject to relatively minor additional screening." 871 F.3d at 469. In short, there is no right to enter the country or board a plane without being subjected to inspection or search.

The FAC speculates as to a variety of other alleged impacts of the federal watchlist, mostly implausible and not connected to any plaintiff. None are sufficient to establish the plus factor of a stigma-plus claim. For example, the FAC alleges that Plaintiffs' purported watchlist status could be theoretically cross-referenced in an application for "wide range of government benefits," including federal government employment, security clearances, certain credentials for private employment, Hazmat licenses, family-based immigration benefits, bail determinations, and denial of entry onto military bases. FAC ¶¶ 87, 91, 100, 103-06, 108, 309. But Plaintiffs do not allege having sought such benefits, have not alleged any deprivation they have suffered pursuant to those programs, and do not

---

Plaintiffs' constitutionally protected reputational interests implicated by their TSDB status are not as strong as their travel related interests, they underscore the need overall for strong procedural protections." *Id.* The *Elhady* court failed to consider whether plaintiffs had suffered any such deprivations or whether such information-sharing is public in the sense that matters for purposes of reputational injury, *i.e.*, harm to reputation within one's community. *See Paul*, 424 U.S. at 702. Setting aside the lack of factual support for the alleged dissemination at all, these Plaintiffs do not allege, for example, that there is a public list of persons to whom guns cannot be sold, or that such lists are posted at gun retailers, or that similar lists exist for use by the captains of "sea-faring vessels" or banks, or that any such information is otherwise made public within their community.

allege that watchlist status would necessarily be determinative. Moreover, almost all of those programs also have separate procedural options and safeguards, which Plaintiffs have not utilized or challenged.[18]

The FAC also claims that Plaintiffs may be subject to traffic stops, *id.* ¶¶ 97, 100, that they had a bank account closed, *id.* ¶¶ 90, 270, that Mr. Long lost a job, *id.* ¶¶ 267-68, 305, and that Mr. Long was denied the purchase of a firearm, *id.* ¶¶ 234, 266. These allegations supporting these claims are at best threadbare, and the incidents are not plausibly based on their purported watchlist status. For example, Plaintiff Long claims that the FBI informed local police on one occasion that he was a "fleeing felon" and that police officers assisted the FBI in surrounding his car. *Id.* ¶¶ 231-33. But he does not allege any of these supposed actions were based on or required by his purported watchlist status; indeed, the FAC has a contrary explanation – that the agent supposedly gave incorrect information to the local police. The FAC contains no other descriptions of "traffic stops."

Second, the allegation that the watchlist may be disseminated to banks or financial institutions is wholly without factual basis, as is the claim that their bank account closure "was due to Plaintiffs' TSDB status." *Id.* ¶ 270. There is no factual indication that such closures were as a result of their purported watchlist status, and no factual indication that watchlist status is *ever* disseminated to financial institutions. Accordingly, Plaintiffs' supposition that their account was closed based on inappropriate dissemination of the watchlist appears to be based purely on speculation and cannot defeat a motion to dismiss. *Twombly*, 550 U.S. at 555 (stating that "[f]actual allegations must be enough to raise a right to relief above the speculative level").

Similarly, Plaintiff Long alleges he lost a job based on alleged FBI investigative activity, but does not allege a connection to the TSDB. In any event, any such lost economic opportunities were the actions of third parties—injuries that flow as a consequence of purportedly stigmatic injuries have

---

[18] To the extent Plaintiffs are relying on hypothetical base access as a "plus," FAC ¶ 309, it is well-established that civilians have no constitutional right to enter a military base. *See Greer v. Spock,* 424 U.S. 828 (1976)); *Cafeteria and Restaurant Workers Union, Local 473, AFL–CIO v. McElroy* 367 U.S. 886, 893-94 (1961); *Berry v. Bean,* 796 F.2d 713, 717 (4th Cir. 1986).

been excluded from the stigma-plus doctrine. FAC ¶¶ 267-68; *cf. Seigert v. Gilley*, 500 U.S. 226, 234 (1991). Finally, as discussed in further detail below, there is no plausible allegation that the alleged denial of a firearm was based on TSDB status because TSDB status is not a disqualifier for owning a firearm under the statute. *See* Part VIII, *infra*.

There is thus no factual or legal basis for the claim that Plaintiffs have suffered "tangible harm to their personal or professional lives that is attributable," whether directly or indirectly through a nonexistent publicized stigma, to the TSDB or risk-based rules. *Green*, 351 F. Supp. 2d at 1130; *see also Beydoun*, 2016 WL 3753561, at *5; *Bazzi*, 2016 WL 4525240, at *7 (same); *Kadura*, 2017 WL 914249, at *7; *Abdi*, 2018 WL 1940411, at *3; *Kovac*, 363 F. Supp. 3d at 755.

Finally, Plaintiffs also assert that they have a liberty interest "in nonattainder (i.e. the interest against being singled out for punishment without trial)." FAC ¶ 304. But, as the district court held in *Beydoun*, the security precautions described by Plaintiffs amount to permissible regulation as authorized by congressional mandate, not impermissible punishment. *See Beydoun,* 2016 WL 3753561, at *6; *see also U.S. v. Salerno*, 481 U.S. 739, 747 (1987) ("To determine whether a restriction on liberty constitutes impermissible punishment or permissible regulation, we first look to legislative intent."). The relevant statutory authorities expressly provide that DHS's mandate is to protect the public from terrorist threats, not to impose a punishment for a purported crime. *See Elec. Privacy Info. Ctr. v. DHS*, 653 F.3d 1, 10 (D.C. Cir. 2011) (explaining that the "primary goal" of airport screening protocols "is not to determine whether any passenger has committed a crime but rather to protect the public from a terrorist attack").

## E. The Redress Process Is Constitutionally Adequate.

Assuming that the question is reached, currently existing redress processes are adequate for both Long and the Daves Plaintiffs. In evaluating the adequacy of procedures, the Court should consider: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest," including the

function involved and the administrative burdens that additional or substitute procedural requirements would entail. *Gilbert*, 520 U.S. at 931-32 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Even if Plaintiffs had identified a constitutionally protected interest, then as discussed above, any interest in the most convenient possible travel is quite limited. In contrast, "[t]here is obviously a compelling government interest in preventing terrorist attacks against commercial aviation." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 880 (E.D. Va. 2017); *see also Haig*, 453 U.S. at 307 ("[N]o governmental interest is more compelling than the security of the Nation."); *see also Wayte v. U.S.*, 470 U.S. 598, 612 (1985) ("Unless a society has the capability and will to defend itself from the aggressions of others, constitutional protections of any sort have little meaning.").

With respect to Mr. Long, the process provided to him is adequate because he received both notice and an opportunity to be heard, appropriate to the circumstances. DEX4 ¶¶ 9-21. Indeed, at least one court has upheld these procedures under the Due Process Clause. *Latif*, 2016 WL 1239925, at *6 (D. Or. Mar. 28, 2016), *appeal filed* Aug. 8, 2017; *see also Mohamed*, 2015 WL 4394958, at *13 (concluding that there is "nothing in the revised DHS TRIP that would preclude an adequate post deprivation process and the creation of an administrative record"); Order, *Latif v. Lynch*, No. 3:10-cv-750-BR, (finding revised redress procedures adequate as applied) (attached hereto as DEX7).

With respect to the Daves Plaintiffs, the process does not permit them to learn their watchlist status, but it is nonetheless adequate to protect against erroneous deprivation, especially given the extremely limited nature of the plaintiffs' interest in being free from screening at the airport. When an individual is placed on the TSDB, that placement decision undergoes several layers of review: (1) a decision by the nominating agency to nominate an individual for placement on the TSDB, (2) a determination by TSC that placement in the TSDB is appropriate; (3) regular reviews and audits of placement, and (4) redress in which the traveler can draw the Government's attention to any possible errors by explaining the difficulties the traveler has encountered and submitting relevant information, and in which the Government conducts a review of available relevant information. *See supra* pp. 7-8; *see also generally* DEX1; DEX4; Piehota Statement. Providing additional process would not substantially

reduce the risk of error but would undermine the Government's efforts to detect terrorists and prevent terrorist attacks. There is substantial authority supporting the Government's interest in withholding watchlist status from the public, because it is operationally valuable information to terrorists. *Bassiouni v. CIA*, 392 F.3d 244, 245-46 (7th Cir. 2004); *Tooley v. Bush*, No. 06-306, 2006 WL 3783142, at *20 (D.D.C. Dec. 21, 2006), *aff'd, Tooley v. Napolitano*, 586 F.3d 1006 (D.C. Cir. 2009) (upholding government's position that confirming or denying records indicating plaintiff's presence on watch lists would reveal sensitive security information); *Al-Kidd v. Gonzales*, No. 05-093, 2007 WL 4391029, at *8 (D. Idaho Dec. 10, 2007). On balance, therefore, the harm to counterterrorism efforts caused by alerting individuals as to whether or not they are on a terrorist watchlist far outweighs the benefits of additional process for people who are merely subject to travel delays. *See Rahman v. Chertoff*, 530 F.3d 622, 627 (7th Cir. 2008) ("Any change that reduces the number of false positives on a terrorist watch list may well increase the number of false negatives."); *Proctor*, 777 F. App'x at 236. Because all Plaintiffs have received constitutionally adequate process, their procedural due process claims in Counts II and III should be dismissed.

### F.     Count III (APA—DHS TRIP) Should Be Dismissed.

Plaintiffs' APA claim challenging the DHS TRIP program appears to be coextensive with their procedural due process claim, and does not add anything to that claim. Plaintiffs allege that they were stigmatized without a "constitutionally adequate avenue for redress," FAC ¶¶ 316, 319. Accordingly, this claim fails for the same reasons the procedural due process claim does. The scope of APA review is narrow and deferential, and a court cannot substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). As long as the agency's action being challenged has a rational basis, it must be affirmed. *See Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984). As set forth above, the contours of the redress process for both Mr. Long and the Daves Plaintiffs are plainly reasonable.

### G.     Count IX Should Be Dismissed As Well.

Count IX alleges that the redress process is inadequate because the Government is "untruthful" about the process available in two respects. FAC ¶¶ 369-74. First, Plaintiffs claim that the Government failed to inform Long immediately in 2012 after his denial of boarding that the Government could facilitate his travel to the United States. *Id.* ¶¶ 221-27, 371-72. This claim is patently meritless. He concedes that the Government offered to facilitate his travel and in fact did so. *Id.* And in any event he cannot plausibly allege that he is subject to any certainly impending future deprivation of such information. Accordingly, these allegations fail to state a due process claim.

Second, the FAC argues that DHS TRIP provided Plaintiffs with "deliberately false" information when it directed them to file challenges to the final DHS TRIP determination in the Court of Appeals under 49 U.S.C. § 46110. FAC ¶¶ 373-74. Again, this claim is clearly without merit. At most this is a dispute about a legal question of jurisdiction, not a false statement claim. The Government's position on jurisdiction is well supported, particularly as to any challenge to the revised redress process itself. And even if the Court ultimately concludes that jurisdiction for all potential challenges lies only in the district court notwithstanding § 46110, the Government's position on jurisdiction would not give rise to a due process violation based on an alleged "false" statement, as the Plaintiffs' right to review in some court of course would be preserved.

## V.     Count IV (APA—NCIC) Should Be Dismissed.

In Count IV, Plaintiffs bring a separate APA claim, styled as a challenge to the National Crime Information Center's ("NCIC") inclusion of the Known and Suspected Terrorist File ("KST File"). FAC ¶¶ 322-29. NCIC is a database established by Congressional directive, 28 U.S.C. § 534, and administered by the Criminal Justice Information Services ("CJIS") Division of the FBI, to enable information-sharing among, *inter alia*, federal, state, and local law enforcement agencies and affiliated entities. *See* About NCIC, https://www.fbi.gov/services/cjis/ncic (last visited Oct. 14, 2019). The NCIC database currently contains 21 files, including, *inter alia*, the National Sex Offender Registry, Missing Person File, Wanted Person File, Foreign Fugitive File, and the Known or Appropriately

Suspected Terrorist File ("KST File"), as well as seven stolen property files. *Id.*; *see also* NCIC File Reference (Sept 2017), DEX8. Federal regulations permit local law enforcement agencies to access these records, but only for specific law enforcement purposes, and only if they agree in writing to abide by the regulations. 28 C.F.R. § 20.33; *see generally* 28 C.F.R. Part 20. NCIC access is subject to stringent security controls and regular audits, and the applicable federal security policy is set forth in the CJIS Security 2018 Policy. *See* https://www.fbi.gov/file-repository/cjis-security-policy_v5-7_20180816.pdf/view (last visited Oct. 14, 2019). The information-sharing facilitated by the NCIC aids criminal justice professionals in, *inter alia*, apprehending fugitives, locating missing persons, recovering stolen property, and preventing crime; importantly, it also assists such officials in performing their duties more safely. *See* https://www.fbi.gov/services/cjis/ncic. As set forth below, Count IV must be dismissed under both Rule 12(b)(1) and 12(b)(6).

### A.    Plaintiffs Lack Standing to Pursue the Relief They Seek In Count IV.

First, Plaintiffs lack standing to challenge the NCIC's inclusion of the KST File as among the data sets which qualified law enforcement officers may query, for qualified law enforcement purposes. Initially, Plaintiffs have not alleged so much as a single fact having *anything at all to do* with any NCIC-related query. Thus, they have patently failed to plead or identify any injury in fact, *i.e.*, any "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical," in conjunction with this claim. *Lujan*, 504 U.S. at 560 (citations omitted). Even if they had an injury, they could not show it was caused by inclusion in NCIC. *See National Council of La Raza v. Mukasey*, 283 Fed. App'x 848 (2d Cir. 2007) (no standing to pursue NCIC claim where any injury would be caused by third parties).

Further, the relief that Plaintiffs seek with respect to this claim—an injunction prohibiting the inclusion of the KST File in the NCIC database, *see* FAC, Prayer for Relief ¶ 3(d)—is prospective. Again, it is well-established that in order to establish standing to seek such relief, Plaintiffs must demonstrate the existence of a future "threatened injury [that is] *certainly impending.*" *Clapper*, 568 U.S. at 401 (emphasis added) (quoting *Whitmore*, 495 U.S. at 158). Here, however, no Plaintiff has pled *any*

personal injury, even one occurring in the past, to any "legally protected interest" connected to the inclusion of the KST File in the NCIC—much less any "credible threat of future injury" that will result from the same, *Winsness v. Yocom*, 433 F.3d 727, 735 (10th Cir. 2006). Accordingly, Count IV must be dismissed for lack of standing.[19]

### B.  Count IV Also Fails to State a Claim.

In any event, Count IV must also be dismissed for failure to state a claim. As an initial matter, Plaintiffs fail to identify an agency action challenged under the APA. The APA only authorizes judicial review of final agency action. *See* 5 U.S.C. § 704. Plaintiffs fail to challenge an "agency action," much less a "final agency action." "Agency action" is defined in § 551(13) to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." In *Bennett v. Spear*, 520 U.S. 154 (1997), the Supreme Court held that two conditions must be satisfied for a plaintiff to make the threshold showing of final agency action: First, the action must mark the "consummation" of the agency's decision making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow." *Id.* at 177–78. "An agency action is not final if it 'does not of itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action.'" *Jama v. DHS*, 760 F.3d 490, 496 (6th Cir. 2014), *reh'g denied* (Sept. 16, 2014) (quoting *Rochester Tel. Corp. v. United States,* 307 U.S. 125, 130 (1939)); *see also City of New York v. U.S. Dep't of Def.*, 913 F.3d 423, 431 (4th Cir. 2019) ("the definition of 'agency action' is limited to those governmental acts that 'determin[e] rights and obligations'" to ensure that "judicial review does not reach into the internal workings of the government, and is instead properly directed at the effect that agency conduct has on private parties."); *Flue-Cured Tobacco Coop. Stabilization Corp. v. EPA.*, 313 F.3d 852, 858 (4th Cir. 2002) (Report regarding dangers of secondhand smoke was not a "final agency action," regardless of its supposed "indirect regulatory effects").

---

[19] Also, as explained in note 11, *supra,* Plaintiffs' requested universal injunctive relief with respect to this claim would violate the requirements of Article III.

Here, Count IV of the Complaint does not identify any specific agency action or describe any discrete act that would determine legal rights and obligations. The sharing of information with law enforcement and law enforcement-affiliated entities for criminal justice purposes is not a discrete act that qualifies as an agency action. Even the public sharing of derogatory information has been held to be not an agency action. *See, e.g., Invention Submission Corp. v. Rogan*, 357 F.3d 452 (4th Cir. 2004) (PTO advertising campaign warning of patent promotion scams was not agency action despite allegations that it targeted and injured the plaintiff specifically); *Joshi v. Nat'l Transp. Safety Bd.*, 791 F.3d 8, 11 (D.C. Cir. 2015) (publication of report identifying pilot as likely cause of a crash was not final agency action, regardless of the financial and reputational harm to the pilot); *see also ACLU v NSA*, 493 F.3d 644, 677-79 (6th Cir. 2007) (alleged surveillance not an agency action subject to APA challenge).

Moreover, the claim also fails as a matter of law because the inclusion of the KST File in the NCIC is legally authorized. As noted above, the NCIC was created pursuant to Congressional mandate—specifically, 28 U.S.C. § 534(a), which provides that the Attorney General "shall," *inter alia*, "acquire, collect, classify, and preserve identification, criminal identification, crime, *and other records*" (emphasis added), and "exchange such records and information with, and for the official use of, authorized officials of the Federal Government, … the States, … Indian tribes, cities, and penal and other institutions." Thus, while the gravamen of Plaintiffs' theory on Count IV is that the KST File may not properly be included in the NCIC because it consists of "non-criminal information," 28 U.S.C. § 534 contains no such limitation. *See also* 28 C.F.R. § 0.85(f) (providing that the FBI Director, as the Attorney General's delegee, "shall" "[o]perate … a computerized nationwide index of *law enforcement information* under the National Crime Information Center" (emphasis added)).

Further, by authorizing the collection of both "identification" and "criminal identification" records, Congress clearly intended to permit the DOJ to acquire and disseminate non-criminal law enforcement information. The same is true for the statutory distinction between "crime" and "other" records, also embedded in Section 534(a)(1). Section 534 thus permits the DOJ to include in the NCIC at least some non-criminal information for the official use of law enforcement officials.

And, if more is needed to debunk this meritless claim, it is worth noting that the 9/11 Commission found that, prior to the attacks on September 11, 2001, federal and local law enforcement officials lacked a common operating picture, such that the CIA, for example, might have known an individual had ties to terrorism—but did not know the individual was in the U.S.—while local law enforcement knew the individual was in the U.S.—but did not know the individual had ties to terrorism. *See The 9/11 Commission Report*, § 13.3 (recommending greater information-sharing), § 8.2 (describing what the Commission found to be specific information failures in the months leading up to the 9/11 attacks), https://www.9-11commission.gov/report/ (last visited Oct. 14, 2019). Pursuant to HSPD-6's directive to share information to the full extent permitted by law, the KST File is properly included in the NCIC database. HSPD-6. The very point of inclusion of this File allows for federal, state, and local law enforcement and criminal justice agencies to share relevant information necessary to carry out their respective missions in a concerted effort to prevent terrorist attacks, and is by no measure "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

Finally, Plaintiff's contention that the inclusion of the KST File in the NCIC further conflicts with 28 C.F.R. § 20.20, is also unavailing. This regulation provides, in relevant part, that "[u]se of information obtained from" either the precursor office to CJIS, or "the FBI/NCIC system[,] shall also be subject to limitations contained in subpart C." 28 C.F.R. § 20.20. Subpart C of 28 C.F.R. Part 20, in turn, includes 28 C.F.R. § 20.33, which sets forth various limitations on the use and dissemination of "criminal history record information." Thus, when the KST File is exported to the NCIC, it does not "become" a criminal record. Rather, it is given the same protections and subject to the same restrictions as criminal records are afforded.

## VI.    Count V (Equal Protection) Should Be Dismissed.

Plaintiffs' equal protection claims also fail. "In order to survive a motion to dismiss an equal protection claim, a plaintiff must plead sufficient facts to demonstrate plausibly that he was treated differently from others who were similarly situated and that the unequal treatment was the result of discriminatory animus." *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011). A

showing of disparate impact is insufficient, *see Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 818 (4th Cir. 1995); rather, a plaintiff must set forth "specific, non-conclusory factual allegations that establish improper motive." *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003).

Plaintiffs' equal protection claim fails to allege any claim upon which relief may be granted. Plaintiffs advance the bare allegation, without any factual elaboration, that "[t]he disparate treatment between Muslims and non-Muslims is the result of Defendants' intentional and purposeful discrimination." FAC ¶ 334. But far from alleging facts from which one would reasonably infer racial or religious animus, the FAC acknowledges that discrimination on the basis of religion or race is, in fact, contrary to the Government's policy and practice. *Id.* ¶ 336. Additionally, neither Juangjan Daves nor Leshauna Daves alleges even a single fact that could plausibly be read as having anything do with, much less supporting, an equal protection-based harm.

For his part, Long alleges that during an FBI interview in 2013, he "was questioned about his time with the U.S. military, about his conversion to Islam and about his request for conscientious objector status. The FBI agent stated, 'can't you see how that would be suspicious to us.'" FAC ¶ 237. Initially, as Long himself acknowledges, the Government has expressly informed Long that his No Fly List designation is based on, *inter alia*, information that he "participated in training that may make [him] a threat to U.S. national security," as well as his November 2015 arrest in Gaziantep, Turkey, near the Syrian border. *Id.* ¶ 180; DEX4 Exs. B (stage 2 letter), D (final order also explaining that the TSA determination is not based on religion or constitutionally-protected speech). The actual bases for his placement are not protected classes, and belie Long's assertions that the alleged statements by unnamed FBI officials somehow demonstrate that Long's "conversion to Islam and . . . request of [sic] conscientious objector status" are the "bare facts" supporting his TSDB status. FAC ¶ 237. Any such contentions are not plausible. *Cf. Iqbal*, 556 U.S. at 678-79 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Moreover, even setting aside, *arguendo*, these pleading defects, it is well-established that a stray remark by a non-decisionmaker with no authority to set policy does not plausibly allege an equal

protection violation. *See, e.g.*, *U.S. v. Johnson*, 122 F. Supp. 3d 272, 350 (M.D.N.C. 2015) (noting that "oral statements of government officials have rarely been held to be express classifications" in the equal protection context, but observing further that an exception—not applicable here—may exist "only . . . at the managerial level, when commanders and supervisors acting in accordance with the policy instruct officers to target racially defined groups"); *Howard v. City of New York*, No. 12-CIV-933 JMF, 2014 WL 84357, at *2 (S.D.N.Y. Jan. 6, 2014), *aff'd*, 602 F. App'x 545 (2d Cir. 2015) ("a single racially motivated comment uttered by a non-decisionmaker" insufficient to state an equal protection claim); *Orgain v. City of Salisbury*, 521 F. Supp. 2d 465 (D. Md. 2007), *aff'd in part sub nom. Orgain v. City of Salisbury, Md.*, 305 F. App'x 90 (4th Cir. 2008) (fair inference of discrimination was not raised by, *inter alia*, one stray reference by board member to predominant race of club's customers); *cf. Brinkley v. Harbour Recreation Club,* 180 F.3d 598, 608 (4th Cir. 1999) (noting well-established rule in the Title VII context that "to prove discriminatory animus, the derogatory remark cannot be stray or isolated[.]").

Thus, at most, Long—and Long only—has alleged nothing more than an isolated stray remark by a governmental official without any authority to set watchlisting policy or place Long in the TSDB.[20] Under the controlling legal framework, such allegations do not suffice to support a claim of discriminatory animus, as necessary to state an equal protection claim. *Williams*, 326 F.3d at 584. Accordingly, Count V should also be dismissed for failure to state a claim. *See Elhady*, 303 F. Supp. 3d at 466 (dismissing similar claims); *Abdi*, 2018 WL 1940411, at *4 (same); *Kovac*, 363 F. Supp. 3d at 759-60 (same); *Kadura,* 2017 WL 914249, at *9 (same).

## VII.   Count VI (First Amendment) Should Be Dismissed.

Count VI, which purports to allege harms to Plaintiffs' First Amendment rights likewise fails to state a claim. Initially, Plaintiffs' bare allegations in support of this claim are devoid of any substantiation or elaboration on the legal theory on which it purports to be based, and thus fail to

---

[20] Long also alleges that in 2012, a Qatari official "told Plaintiff Long that he believed the FBI was requesting his deportation [to the U.S.] because he is Muslim." FAC ¶ 218. The stated subjective perception of a foreign official also cannot save Long's claim.

satisfy Plaintiff's Rule 8 obligation to "give the court and Defendants 'fair notice of what the[ir] claim is and the grounds upon which it rests.'" *Barber v. Obama*, No. CV RDB-12-2614, 2012 WL 12877388, at *1 (D. Md. Sept. 6, 2012), *aff'd*, 505 F. App'x 278 (4th Cir. 2013) (quoting, *inter alia*, *Swirkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)); *see also*, *e.g.*, *Prater v. Am. Heritage Fed. Credit Union*, 351 F. Supp. 3d 912, 916 (E.D. Pa. 2019) (noting that Rule 8 "requires that pleadings provide enough information to put a defendant on sufficient notice to prepare their defense and also ensure that the Court is sufficiently informed to determine the issue" (citation omitted)). Specifically, although Plaintiffs baldly allege that "Defendants' actions … burden[] Plaintiffs' … rights to expression and association," FAC ¶ 344, they fail to offer any elaboration whatsoever as to what alleged "actions" on the part of Defendants form the basis of this claim. Nor do Plaintiffs offer anything as to how they have been impermissibly "burdened" in the exercise of any First Amendment-protected activity.

It is well-established that where a pleading is "'so confused, ambiguous, vague or otherwise unintelligible that its true substance, if any, is well disguised,'" it "places an unjustifiable burden on defendants to determine the nature of the claim against them and to speculate on what their defenses might be"—and thus may properly be dismissed. *Ferrell v. My Life*, No. CIV.A. TDC-15-1619, 2015 WL 4637784, at *1 (D. Md. July 31, 2015) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988)) (additional citations omitted). The Court should so do here as to Count VII or, at a minimum, require a more definite statement from Plaintiffs pursuant to Rule 12(e), so that Defendants may be afforded the notice to which they entitled in formulating their defenses at all relevant stages of this case. *See*, *e.g.*, *The Collection, LLC v. Valley Bank*, No. 4:09-cv-00007, 2009 WL 2357145, *5 (W.D. Va. July 31, 2009) (relief pursuant to Rule 12(e) is appropriate where "pleadings are so unclear that drafting a response to them is practically impossible" because "the pleading is unintelligible or the meaning is unclear").

Moreover, insofar as Plaintiffs intend for Count VII, notwithstanding its ambiguous pleading, to be premised on the allegation that "[u]pon information and belief, the nomination and designation of Plaintiffs Juangjan Daves and Leshauna Daves were made solely based upon their familial

relationship and association with each other and Plaintiff Long … or First Amendment protected activities," FAC ¶¶ 178-79, it still fails to state any valid First Amendment claim.[21] The First Amendment protects a right to "expressive association," that is, a "right to associate *for the purpose of speaking*," *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 68 (2006) (emphasis added)—not a right to associate unimpeded while traveling, or to family integrity. *See also, e.g.*, *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716 (4th Cir. 2016) ("The First Amendment … protects the rights of individuals to associate *for the advancement of political beliefs and ideas*." (emphasis added)). "The right to family integrity rests not within the First Amendment but within the Fourteenth Amendment's Substantive Due Process guarantees." *Schattilly v. Daugharty*, No. 14-CV-11905, 2015 WL 1412502, at *10 (E.D. Mich. Mar. 20, 2015) (citing *Stanley v. Illinois*, 405 U.S. 645, 651, (1972); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)). The Daves Plaintiffs allege travel impairments—albeit on only one trip to the United States, in 2016, *see* FAC ¶¶ 262-65—but identify no inhibition of their right to express particular viewpoints through their association. Accordingly, this purported theory, insofar as it is what Plaintiffs intended to plead, fails to state a valid claim, and must be dismissed.

## VIII. Plaintiffs' Second Amendment Claim (Count VII) Should Be Dismissed For Lack of Subject Matter Jurisdiction.

Because no Plaintiff can establish standing to pursue any claim grounded in the Second Amendment, Count VII must be dismissed in its entirety.

### A. Neither Juangjan Daves nor Leshauna Daves Alleges Any "Particularized" Injury Related to Firearms.

Initially, of the three Plaintiffs, only Mr. Long alleges any attempt to purchase a firearm. The Daves Plaintiffs fail to allege any "particularized" Second Amendment injury "affecting [them] in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1, and this is fatal to their ability to establish standing as to Count VII. *See supra* Part V.A. Relatedly, any Second Amendment claim on the part of the Daves Plaintiffs also fails for the reason that "to challenge an allegedly unconstitutional policy"

---

[21] Notably, the request relief does not address any such First Amendment theory—so even if the theory were viable, the requested injunction would not redress it. *See* FAC, Prayer for Relief ¶ 3.

regarding the granting of a permit or benefit "a plaintiff must submit to the challenged policy." *see also Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166-68 (1972) (plaintiff lacked standing to challenge the discriminatory membership policy of a club to which he never applied); *S. Blasting Servs., Inc. v. Wilkes Cnty.*, 288 F.3d 584, 595 (4th Cir. 2002) (plaintiffs did not suffer any injury where they had "never even applied for [the] permit [in question], much less been denied one"); *United States v. Decastro*, 682 F.3d 160, 164 (2d Cir. 2012) ("[B]ecause Decastro failed to apply for a gun license in New York, he lacks standing to challenge the licensing laws of the state."). Here, as explained below, the allegedly unconstitutional policy at issue does not exist. But even assuming *arguendo* that it did, no Plaintiff who has not herself applied to purchase a firearm could establish standing as to Count VII.

### B. Plaintiff Long Also Lacks Standing as to Count VII.

Mr. Long also lacks standing to pursue any claim based on the Second Amendment. Long alleges that during his

> 2012-2013 trip to Oklahoma, he applied for a gun, passed his background check, and was told by the gun shop to come and pick up his gun, but when he arrives [sic] at the gun shop, the shop attendant informed Plaintiff Long that the 'authorities' called, told the attendant that Plaintiff Long was not authorized to purchase a weapon, and directed the gun shop to refrain from selling a weapon to Plaintiff Long despite the fact that Oklahoma allows the open carry of guns without a permit.

FAC ¶ 234; *see also id.* ¶ 236 (further alleging that during an interview with long, FBI agents "confirmed that they knew Plaintiff Long had attempted a gun purchase and made clear that they believed Plaintiff Long's interest in exercising his Second Amendment rights was a danger to them."). Long also alleges, without any elaboration, that "[s]ince the filing of this lawsuit, [he] was again denied the purchase of a gun." *Id.* ¶ 266.

These allegations are insufficient to establish Long's standing to pursue any Second Amendment claim, for several reasons. Initially, because he seeks injunctive and declaratory relief, he must do more than simply allege a past injury; instead, he must demonstrate the existence of either an "ongoing injury," *McBurney v. Cuccinelli*, 616 F.3d 393, 410-11 (4th Cir. 2010), or a future "'threatened injury [that is] certainly impending,'" *Clapper*, 568 U.S. at 401, and the injury must be caused by the

challenged action. Here, Mr. Long's asserted injury is that on two occasions a federal firearm licensee ("FFL") denied his purchase of a particular firearm. However, as set forth in the Declaration of John Francis Keough (as redacted by counsel pursuant to Fed. R. Civ. P. 5.2), the National Instant Criminal Background Check System ("NICS") Section of the FBI recently conducted an audit to determine if any record exists in the databases searched for a NICS check, demonstrating that Long is prohibited from receiving or possessing a firearm under 18 U.S.C. § 922(g) or (n) or state law. DEX9 ¶ 12. As of September 27, 2019, none of these three systems held any records indicating Long is prohibited from receiving a firearm. *Id.* ¶ 13. In these circumstances, Long's allegations do not credibly support a finding that he faces any ongoing or impending future injury, as necessary for him to maintain standing. *Clapper*, 568 U.S. at 401.

Nor can Long demonstrate that his injury would be redressable through the declaratory and injunctive relief he seeks. *See* Prayer for Relief ¶¶ 1, 3(a). Here, NICS has conducted an audit pursuant to 28 C.F.R §§ 25.9(2) and 25.11 of the NICS system, and has determined that there are no transactions in the NICS Audit Log associated with the name "Saadiq Long" or "Paul Anderson." *Id.* ¶ 12. Per the regulatory scheme set forth above, this absence—combined with the fact that there are no records in any NICS system indicating Long is prohibited from receiving a firearm, *id.* ¶ 13—is dispositive of Long's ability to establish causation and redressability. It is well-established that "a federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party," *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). Thus, where an intermediary "st[ands] between the plaintiff and the challenged action[]," standing is lacking. *Frank Krasner Enters., Ltd. v. Montgomery Cty. Md.*, 401 F.3d 230, 235 (4th Cir. 2005). "This is so because[] 'the existence of one or more of the essential elements of standing 'depends on the *unfettered choices made by independent actors not before the courts* and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.'" *Id.* (quoting *Lujan, 504 U.S. at 562)*.

These well-established principles, affirmed by the Fourth Circuit in *Frank Krasner Enters.*, 401

F.3d 230, require the dismissal of Count XIII. Simply put, *any* relief issued by this Court would not affect any gun store's ability to legally sell Long a firearm, because such stores are already entitled to engage in such transactions. DEX9 ¶ 7.[22] *See also Turaani v. Sessions*, 316 F. Supp. 3d 998, 1005 (E.D. Mich. 2018), *reconsideration denied*, No. 17-CV-14112, 2018 WL 3968614 (E.D. Mich. Aug. 20, 2018) (dismissing Second Amendment claim on standing grounds where the store clerk's voluntary and independent actions denying sale of firearm were not the Government's conduct, observing that "no law prohibit[ed]" plaintiff from purchasing a firearm). Even assuming, *arguendo* and for purposes of this motion only, the accuracy of Long's allegation that the Oklahoma dealer denied the prospective gun purchase based on information provided to it by the FBI, there is no allegation that any federal *watchlisting* policy *required* this result. The FAC only seeks relief as to the *watchlist*, but KST status does not prohibit gun ownership under the statute or pursuant to any policy or program.

## IX. <u>Count VIII (Non-Delegation) Should Be Dismissed.</u>

Count VIII, which purports to allege a claim of unconstitutional delegation, should also be dismissed. The non-delegation doctrine provides "that Congress may not constitutionally delegate its legislative power to another branch of Government." *Touby v. U.S.*, 500 U.S. 160, 165 (1991). But when Congress "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Mistretta v. U.S.*, 488 U.S. 361, 372 (1989) (citation omitted). The Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457,

---

[22] Under *Frank Krasner Enters.*, this deficiency is dispositive. There, a company that had routinely used a private convention space to put on gun shows sued Montgomery County, Maryland, after the County passed a law prohibiting the use of "financial or in-kind support to any organization that allow[ed] the display and sale of guns" at its facilities. *Frank Krasner Enters.*, 401 F.3d at 232. The convention center, which had received substantial financial support from the County, informed the plaintiff, in terms that "made clear that [its] decision was a result of the County's funding restriction," that it would no longer host its gun shows. *Id.* at 232-33. Even accepting that the County's action was a "deal-breaker" for the convention center, the Fourth Circuit held that the plaintiff's injury was "not directly linked to the challenged law because an intermediary … [stood] directly between . . . the challenged conduct in a way that breaks the causal chain." *Id.* at 236.

474-75 (2001). To set forth an "intelligible principle" while delegating authority, Congress need only "'clearly delineate[] the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" *Mistretta*, 488 U.S. at 372-73.

The statutory scheme underlying the Government's watchlisting programs easily meets these requirements. Congress has charged TSA with overall responsibility for airline security. *See* 49 U.S.C. § 114(d). Together with the FBI, TSA must "assess current and potential threats to the domestic air transportation system," and "decide on and carry out the most effective method for continuous analysis and monitoring of security threats to that system." 49 U.S.C. § 44904(a). Moreover, in consultation with other federal agencies, TSA must "establish policies and procedures requiring air carriers [to] … prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual." 49 U.S.C. § 114(h)(1)-(3). This delegation of authority reflects a clearly delineated general policy" that is no broader in scope nor less intelligible in principle than any number of congressional directives that have withstood non-delegation challenges.[23] *See Elhady*, 303 F. Supp. 3d at 467-68 (rejecting identical non-delegation claim). *Kadura*, 2017 WL 914249, at *9-10 (same); *Abdi*, 2018 WL 1940411, at *4 (same); *Kovac*, 363 F. Supp. 3d at 762 (same). Specifically, the statutory authority detailed above quite clearly authorizes the TSA to "develop policies, strategies, and plans for dealing with threats to transportation security," 49 U.S.C. § 114(f)(3); to work with and use information from other government agencies, 49 U.S.C. § 114(h)(3); to prevent individuals from boarding an aircraft or to "take other appropriate action with respect to that individual," 49 U.S.C. § 114(h)(3)(B); to "perform[] . . . the passenger prescreening function of comparing passenger information to the automatic selectee and no fly lists . . . ," 49 U.S.C. § 44903(j)(2)(C)(ii); and to

---

[23] *See, e.g.*, *Whitman*, 531 U.S. at 473, 476 (upholding air quality standards at a level "requisite to protect public health"); *Touby*, 500 U.S. at 163 (upholding restriction on controlled substance if "necessary to avoid an imminent hazard to the public safety"); *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 689 (1980) (upholding promulgation of regulatory safety standards that "most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health"); *Nat'l Broad. Co. v. U.S.*, 319 U.S. 190, 225-26 (1943) (upholding regulation of broadcast licensing in the "public interest").

"establish a procedure to enable airline passengers, who are delayed or prohibited from boarding a flight because the advanced passenger prescreening system determined that they might pose a security threat, to appeal such determination and correct information contained in the system." 49 U.S.C. § 44903(j)(2)(C)(iii)(I); *see also id.* §§ 44903(j)(2)(G)(i), 44926(a). The notion that there is any lack of clearly delegated authority to TSA, working with TSC, in the watchlisting and redress process is plainly meritless.

Plaintiffs further allege that HSPD-6 "is an illegal usurpation of Congress' legislative function and … runs afoul of separation of powers principles." FAC ¶ 363. As discussed above, HSPD-6 directed the Attorney General to "establish" the TSC in order to "to consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes." HSPD-6 ¶ 2. This argument is likewise baseless. On its face, HSPD-6 is a statement of Executive branch "policy" with respect to terrorist watchlisting. It "*does not alter existing authorities or responsibilities of department and agency heads to carry out operational activities or provide or receive information*," and "*is intended only to improve the internal management of the executive branch* …." HSPD-6 (emphasis added). It was issued neither "pursuant to statutory mandate [n]or a delegation from Congress of lawmaking authority," and as such does not "have the force and effect of law," *HHS v. FLRA*, 844 F.2d 1087, 1096 (4th Cir. 1988). Thus, in keeping with separation of powers principles, HSPD-6 is simply a "management directive," the source of authority for which is "the President's general constitutional powers to direct the exercise of powers statutorily delegated to executive branch officials." *Chen Zhou Chai v. Carroll*, 48 F.3d 1331, 1339 (4th Cir. 1995) (citing *Myers v. U.S.*, 272 U.S. 52, 135 (1926)).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss this action.

Dated: October 15, 2019   Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

G. ZACHARY TERWILLIGER
United States Attorney

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

AMY E. POWELL
Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
150 Fayetteville St., Suite 2100
Raleigh, NC 27601
Tel: (919) 856-8013
E-Mail: amy.powell@usdoj.gov

_____/s/_____
R. TRENT MCCOTTER
Assistant United States Attorney
Office of the U.S. Attorney
2100 Jamieson Ave.
Alexandria, VA. 22314
Tel: (703) 299-3845
Fax: (703) 299-3983
E-Mail: trent.mccotter@usdoj.gov

*Attorneys for the Defendants*