# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# ALEXANDRIA DIVISION

**SAADIQ LONG,** *et al.*,                )
                                          )    **Case No. 1:15-cv-01642-LO-MSN**
           Plaintiffs,                    )    Hon. Liam O'Grady
                                          )
           v.                             )
                                          )
**WILLIAM P. BARR,** Attorney General   )
Of the United States; in his official     )
capacity, *et al.;*                       )
                                          )
           Defendants.                    )

**CAIR LEGAL DEFENSE FUND**
Lena F. Masri (DC # 93291)
Gadeir I. Abbas (VA # 81161)*
Justin M. Sadowsky (VA # 73382)
453 New Jersey Ave SE
Washington, DC 20003
Tel: (202) 516-4724
Fax: (202) 379-3317
ldf@cair.com

*Mr. Abbas licensed in VA, not in D.C.
Practice limited to federal matters
Admitted to practice in this Court*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.   This Court Has Jurisdiction over Plaintiffs' Claims .................................................... 2

    II.   The Daves Plaintiffs Have Standing Due to their Watchlist Placement ..................... 6

    III.   Plaintiffs State a Procedural Due Process Claim .................................................... 7

       A.   The Watchlist Has Impaired Plaintiffs' Movement-Related Liberty Interests ........ 7

          1.   Any Watchlist Placement Impairs Movement-Related Liberty Interests ............ 7

          2.   No Fly List Placement Impairs a Movement-Related Liberty Interest ............. 11

       B.   Watchlist Placement Causes Stigma-Plus Injury ................................................. 12

          1.   Watchlist Placement Causes Significant Stigma ................................................. 12

          2.   Watchlist Placement Satisfies the Plus Factor Requirement ............................. 14

       C.   DHS TRIP Does Not Eliminate Plaintiffs' Due Process Claim .......................... 16

    IV.   Plaintiffs State a Substantive Due Process Claim, Because the TSDB Significantly Interferes with the Plaintiffs' Fundamental Right of Movement .................................... 18

       A.   History reflects that there is a movement right inherent to the Due Process Clause ............................................................................................ 20

       B.   The Right of Movement is Inherent in the Due Process Clause .......................... 22

       C.   The Constitutional Right of Movement Is also Supported by International Law . 25

    V.   The Watchlist Violates the APA .......................................................................... 26

    VI.   NCIC Dissemination Violates the APA ................................................................ 27

       A.   The Government's NCIC Information Sharing Is Beyond Legal and Statutory Authority .......................................................................................................... 27

       B.   Plaintiffs Have Standing to Challenge NCIC Database Information Sharing ....... 30

    VII.   Plaintiffs Have Stated an Equal Protection Claim ................................................. 31

    VIII.   The Government Has No Congressionally-Delegated Authority for the Watchlist .................................................................................................... 38

    IX.   Plaintiffs Voluntarily Dismiss Counts VI, VII, and IX ......................................... 41

CONCLUSION .............................................................................................................. 41

## TABLE OF AUTHORITIES

### Cases

*Abdi v. Wray*, 2018 WL 1940411 (D. Utah Apr. 23, 2018) ...........................................10, 37

*Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 176 (2d Cir. 2009) ................................... 30

*Adams v. Bain*, 697 F.2d 1213 (4th Cir. 1982) ....................................................... 6

*AFGE, AFL-CIO, Local 3090 v. FLRA*, 777 F.2d 751 (D.C. Cir. 1985) ................................ 30

*Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252 (1977)...................................34, 35

*Bank of Jackson Cty. v. Cherry*, 980 F.2d 1362 (11th Cir. 1993)........................................... 16

*Bazzi v. Lyn*ch, No. 16-10123, 2016 WL 4525240 (E.D. Mich. Aug. 30, 2016)..............13, 14

*Beydoun v. Lynch*, No. 14-CV-13812, 2016 WL 3753561 (E.D. Mich. July 14, 2016).......... 14

*Beydoun v. Sessions,* 871 F.3d 459 (6th Cir. 2017) ...........................................................9, 10

*Board of Regents v. Roth*, 408 U.S. 564 (1972) ....................................................... 16

*Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014)............................................................... 7, 8

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ........................................... 41

*Cherri v. Mueller*, 951 F. Supp. 2d 918 (E.D. Mich. 2013)..........................................33, 36

*Conset Corporation v. CSA*, 655 F.2d 1291 (D.C. Cir.1981) ................................. 15

*Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535 (4th Cir. 2013) ........................... 25

*CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277 (2011) ................................. 28

*Doe v. DOJ*, 753 F.2d 1092 (D.C. Cir. 1985)...............................................................14, 15

*Ege v. DHS*, 784 F.3d 791 (D.C. Cir. 2015) ....................................................................... 5

*Elhady v. Kable*, 391 F. Supp. 3d 562 (E.D. Va. 2019). ..................................................passim

*Elhady v. Piehota*, 303 F. Supp. 3d 453 (E.D. Va. 2017)...............................................passim

*Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91 (4th Cir. 2011) ................................. 33

*Filartiga v. Pena-Irala, 630 F.2d 876, 883 (2d Cir. 1980)* ..................................................... 30

*Fletcher v. Tidewater Builders Ass'n Inc.*, 216 F.R.D. 584 (E.D. Va. 2003)................................ 6

*Goad v. Mitchell,* 297 F.3d 497 (6th Cir. 2002)...................................................... 34

*Green v. TSA*, 351 F.Supp.2d 1119 (W.D. Wash. 2005) ............................................5, 13, 14

*Griswold v. Connecticut*, 381 U.S. 479, 481-86 (1965) ..........................................27, 28

*Hately v. Watts*, 917 F.3d 770 (4th Cir. 2019)............................................................ 6

*Ibrahim v. Department of Homeland Sec.*, 538 F.3d 1250 (9th Cir. 2008) ...........................5, 11

*Ibrahim v. Department of Homeland Sec.*, 669 F.3d at 983 (9th Cir. 2012) ............................ 11

*Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324 (1977) ................................................ 34

*Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205 (4th Cir. 1989) ....... 30

*Kadura v. Lynch*, No. CV 14-13128, 2017 WL 914249 (E.D. Mich. Mar. 8, 2017).. 10, 13, 14, 37

*Kashem v. Barr*, --- F.3d ----, No. 17-35634, 2019 WL 5303288 (9th Cir. Oct. 21, 2019) ...... 22

*Kovac v. Wray*, 363 F. Supp. 3d 721 (N.D. Tex. 2019) ..................................................passim

*Latif v. Holder*, 28 F. Supp. 3d 1134  (D. Or. 2014)................................................ 11

*Latif v. Holder*, 969 F.Supp.2d 1293 (D. Or. 2013) ..............................................10, 11

*Latif v. Lynch*, 10-vb-00750, 2016 WL 1239925 (D. Or. Mar. 28, 2016) ............................. 17

*McClellan v. City of Alexandria*, 363 F. Supp. 3d 665 (E.D. Va. 2019) ................................ 25

*Michael H. v Gerald D.*, 491 U.S. 110,(1989) ...................................................... 25

*Mohamed v. Holder*, 266 F. Supp. 3d 868 (E.D. Va. 2017)............................................passim

*Mohamed v. Holder*, 995 F. Supp. 2d 520 (E.D. Va. 2014)................................................ 11

*Mohamed v. Holder*, No. 1:11-CV-50 AJT/MSN, 2015 WL 4394958 (E.D. Va. July 16, 2015) ..................................................................................................passim

*Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192 (D.C. Cir. 2001).................. 15

*The Paquete Habana, 175 U.S. 677 (1900)* .......................................................... 30

*Paul v. Davis*, 424 U.S. 693 (1976)................................................... 12, 15, 16

*Proctor v. DHS*, 777 F. App'x 235 (9th Cir. Sept. 16, 2019)..................................... 10, 13, 14

*Richmond Black Police Officers Ass'n v. City of Richmond, Va.*, 548 F.2d 123 (4th Cir. 1977).... 29

*Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451 (4th Cir. 2013).................................. 28

*Scherfen v. DHS.*, 2010 WL 456784 (M.D. Pa. 2010)......................................................5, 13

*Shearson v. Holder*, 725 F.3d 588 (6th Cir. 2013)................................................................. 11

*Shirvinski v. U.S. Coast Guard,* 673 F.3d 308 (4th Cir. 2012)................................................. 15

*Sylvia Development Corp. v. Calvert County*, 48 F.3d 810 (4th Cir. 1995).........................34, 35

*Tarhuni v. Holder*, 8 F. Supp. 3d 1253 (D. Or. 2014) ....................................................11, 13

*Trulock v. Freeh*, 275 F.3d 391 (4th Cir. 2001) .................................................................. 34

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ......................................................................... 34

*U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749 (1989) ................ 31

*U.S. v. Hartwell*, 436 F.3d 174 (3d Cir. 2006) .................................................................... 13

*U.S. v. Sweeney*, 914 F.2d 1260 (9th Cir. 1990) ................................................................. 28

*Valmonte v. Bane*, 18 F.3d 992 (2d Cir. 1994)................................................................... 14

*Washington v. Guardianship Estate of Keffeler*, 537 U.S. 371 (2003)...................................... 28

*Washington v. Glucksberg*, 521 U.S. 702 (1997) .................................................18, 25, 26

*Williams v. Hansen*, 326 F.3d 569 (4th Cir. 2003) ..................................................33, 35, 36

*Wilwal v. Nielsen*, 346 F. Supp. 3d 1290 (D. Minn. 2018) .................................................... 5

*Wright v. North Carolina*, 787 F.3d 256 (4th Cir. 2015) ...................................................... 34

*Yates v. U.S.*, 135 S. Ct. 1074 (2015)............................................................................... 29

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ....................................................................... 36

## Statutes

46 U.S.C. § 70101 ........................................................................................................ 35

49 U.S.C. § 114 ........................................................................................................... 34

49 U.S.C. § 44909 ....................................................................................................... 35

5 U.S.C. § 553 ............................................................................................................. 25

5 U.S.C. § 706 .............................................................................................22, 23

6 U.S.C. § 488 ................................................................................................. 35

6 U.S.C. § 621 ................................................................................................. 35

## Other Authorities

Richard F. Grimmett, *9/11 Commission Recommendations: Implementation Status*
Congressional Research Service (Dec. 4, 2006), .......................................... 31

## Regulations

28 C.F.R. § 0.85 .............................................................................................. 24

28 C.F.R. § 20.20 .............................................................................. 23, 24, 25

28 C.F.R. § 20.33 ............................................................................................ 25

49 C.F.R. § 1560.3 .......................................................................................... 36

## INTRODUCTION

The Government's Watchlisting System, a vast set of interlocking programs and joint ventures, has sprawled beyond constitutional limits. Through the federal terrorist watchlist, the Government has extrajudicially branded Plaintiffs and thousands of innocent American Muslims as suspicious. Through this Watchlisting System, the Government has extrajudicially assigned Plaintiffs and thousands of innocent American Muslims a kind of second-class status.

Targets of the Watchlisting System struggle through an unending set of adverse consequences that becomes life-defining. Children are separated from their parents, and innocent people—including Plaintiffs, who have never been charged, arrested, or convicted of violent crimes—are denied the ability to attend weddings and funerals and otherwise access modern transportation.

Each Plaintiff has been branded as a "known or suspected terrorist," then had that label disseminated throughout local, state, federal and foreign governments. After misleading the public and courts for years, the Government was even recently forced to admit it makes watchlist information to hundreds of private entities. It is a cavalier dissemination—the full extent still unknown—done without thought or reason. The Government broadcasts that Plaintiffs and others are "known or suspected terrorists" to every law enforcement agency in the country, every part of the federal government, more than 60 foreign countries, an unknown number of private companies, and other third parties, that the United States considers Plaintiffs to be dangerous. The watchlist places Plaintiffs' lives at risk.

So, in a recent and important decision, this Court in a different case found that the watchlist system violated the Constitution.  The Court held that inclusion on the watchlist, even when not placed on the No Fly List, creates "wide-ranging consequences" harming constitutionally-protected travel-related liberty interests. *Elhady v. Kable*, 391 F. Supp. 3d 562, 578 (E.D. Va. 2019). The Court also held that the dissemination of the watchlist to various federal government officials and "over 18,000 state, local, county, city, university and college, tribal, and federal law enforcement agencies and approximately 533 private entities for law enforcement purposes" also harms Plaintiffs' constitutionally-protected reputation interests. *Id.* at 579-80. Dissemination of the allegation that an individual is a "known or suspected terrorist" causes significant risks that ""underscore the need overall for strong procedural protections" against being placed on the watchlist.  *Id.* at 580. Because the watchlist did not, in fact, provide strong procedural protections, the Court held the watchlist system violated the Constitution. *Id.* at 580-84.

The Government's scattershot Motion to Dismiss attempts to deny Plaintiffs their constitutional rights by making various arguments about standing, pleading burdens, and other legal arguments. For the reasons explained in this Opposition, the Government's arguments all fail. The Court should deny the Government's Motion to Dismiss and subject the federal terrorist watchlisting enterprise to judicial review.

## ARGUMENT

### I.      This Court Has Jurisdiction over Plaintiffs' Claims

The Government claims (at 14-18) that 49 U.S.C. § 46110 bars the district court from hearing challenges to "the adequacy of DHS TRIP."

First off, the Government is just wrong that Count II (Procedural Due Process) and Count III (APA) challenge the adequacy of DHS TRIP.   Instead, those two counts challenge the procedural legality of watchlist placement generally.   Plaintiffs were not placed on the watchlist by DHS TRIP or by TSA, but by TSC and other Defendants prior to any invocation of DHS TRIP.   *See* AC ¶¶ 59, 63, 74, 124, 180-1. And, although DHS TRIP exclusively deals with grievances because of problems with TSA involving screening or boarding at airports. 2AC ¶¶ 148-150, Plaintiff Long's injuries go well beyond that. For example, Plaintiff Long alleges that, due to his placement on the watchlist, he was detained by Qatar and Turkey, *see* AC ¶¶ 215 and 240-249, strip searched by Dutch security agents, AC ¶ 228, interrogated by DHS and FBI, AC ¶¶ 229-30, taken into custody by CPB, AC ¶ 230, stopped by the FBI and police with guns pointed at him, AC ¶ 232, denied a gun license, AC ¶ 234, and banned from Qatar, AC ¶ 256-57. For this reason alone, the Government's jurisdictional argument must fail.

In any event, as the Government concedes (at 15-16), the Fourth Circuit already held in *Mohamed v. Holder*, 11-1924 (4th Cir. May 28, 2013) that 49 U.S.C. § 46110 "does not evidence Congress' intent to exclude Mohamed's challenge to past and future restrictions on his ability to travel from consideration in the district court."   *Id.* at 6.   As explained by the Court of Appeals, "this is not a situation in which Congress has painstakingly constructed an administrative process for resolving claims like Mohamed's."   This constitutes a rejection of the Government's arguments as to all three Plaintiffs.

The Government suggests (at 15-16) a number of arbitrary distinctions between this case and *Mohamed*.   These range from the case being an "unpublished decision" premised on "the unique character of Mohamed's claims"; to the TSA being a party here when it was

3

not in *Mohamed* (citing *Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010)); to the fact that "TSA revised the redress procedures" in No Fly List cases as a result of losing the *Latif* case. None of these arbitrary distinctions have any effect on the *Mohamed* decision as precedent. Mohamed's "unique" claims are the same as Long's—the watchlist and plaintiffs' placement on it are unlawful and unconstitutional. *See Arjmand v. U.S. Dep't of Homeland Sec.,* 745 F.3d 1300, 1302 (9th Cir. 2014). The issue in *Ligon* was whether the plaintiffs were challenging a specific administrative order, 614 F.3d at 154, and here Plaintiffs are not, and it is unclear how a slight modification to the DHS TRIP procedures for only some of the Plaintiffs (telling those Plaintiffs whether or not they are on a No Fly List) would change the Congressional-intent-based analysis of the Fourth Circuit; *see Elhady v. Piehota*, 303 F. Supp. 3d 453, 461 (E.D. Va. 2017) (rejecting distinction); *Arjmand*, 745 F.3d at 1302-03 (noting difference in remedy sought creates no distinction from *Latif v. Holder*, 686 F.3d 1122 (9th Cir. 2012)).

So the Government wants this Court to ignore the Fourth Circuit decision and analysis entirely, and instead rely on *Mokdad v. Lynch*, 804 F.3d 807 (6th Cir. 2015). Dkt. 46 at 14-17. So one would think that case must surely have found that the district court could not resolve any watchlist-based claims due to the jurisdiction stripping provision of 49 U.S.C. § 46110. But instead, the Sixth Circuit expressly rejected the Government's claim that 49 U.S.C. § 46110 meant that the DHS TRIP process prohibited plaintiffs from challenging "another agency's order," i.e., "TSC's order placing [plaintiff] on the No Fly List" in the first instance. 804 F.3d at 814. That "would be an unprecedented departure from the doctrine of inescapable intertwinement as applied in other circuits." *Id*

Unsurprisingly, then, the Government's 49 U.S.C. § 46110 exclusive jurisdiction claim has been rejected nearly every time the Government has raised it in an attempt to avoid a challenge to its watchlisting system.  *See, e.g.*, *Ibrahim v. DHS*, 538 F.3d 1250, 1254–57 (9th Cir. 2008); *Arjmand v. U.S. Dep't of Homeland Sec.,* 745 F.3d 1300, 1302 (9th Cir. 2014); *Kovac v. Wray*, 363 F. Supp. 3d 721, 743 (N.D. Tex. 2019); *Wilwal v. Nielsen*, 346 F. Supp. 3d 1290, 1303 (D. Minn. 2018); *cf. Ege v. DHS*, 784 F.3d 791, 795 (D.C. Cir. 2015) (rejecting plaintiff's 49 U.S.C. § 46110 lawsuit for similar reasons). The only decisions to the contrary are *Scherfen v. DHS.*, 2010 WL 456784, at \*11 (M.D. Pa. 2010) and *Green v. TSA*, 351 F.Supp.2d 1119, 1127-28 (W.D. Wash. 2005). These decisions were "decided many years prior to the Sixth Circuit's decision in *Mokdad*," and thus have little persuasive value. *Kovac*, 363 F. Supp. 3d at 744 n.7. And *Green*, as a 2005 district court case, would not be valid as applied to watchlist challenges in light of the Ninth Circuit's decisions in *Ibrahim*, *Arjmand*, and *Latif*.

The Sixth Circuit in *Mokdad* separately "dismiss[ed] without prejudice" the plaintiff's "challenges to the adequacy of the redress process," not because of 49 U.S.C. § 46110, but "because he failed to join TSA as a defendant." 804 F.3d at 815. The Court "decline[d] to opine" whether "§ 46110 would deprive the district court of subject-matter jurisdiction over" the Court once that defect was cured.  *Id.* at 812; *but see Wilwal*, 346 F. Supp. 3d at 1303-04 (reaching issue and finding 49 U.S.C. § 46110 not a bar). The Government's citation to a series of cases (on 16-17) that, following *Mokdad*, dismissed plaintiffs' claims for failing to join TSA as a defendant are irrelevant as well.  TSA is a defendant here. AC ¶ 24.

5

## II.      The Daves Plaintiffs Have Standing Due to their Watchlist Placement

The Government alleges that the Daves Plaintiffs' claims must be dismissed under Rule 12(b)(1) for lack of standing.   Dkt. 46 at 18-20. It is unclear whether the Government's argument is that the Daves Plaintiffs have not sufficiently alleged they are on a watchlist or have not sufficiently alleged injury by being placed on the watchlist.   Either way, the Government's argument must fail.

The Daves Plaintiffs alleged they were placed on the watchlist.   AC ¶ 178. The Government did so "solely based upon their familial relationship and association with each other and Plaintiff Long, based upon a hunch, and/or based upon their race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities." *Id.*  Placement on the watchlist comes with specific consequences. AC ¶ 179; *see also id.* at ¶¶ 80-115.

To the extent the Government is alleging that Plaintiffs have not established their watchlist status, the Court must assume Plaintiffs' allegations are true upon a motion to dismiss.  *Hately v. Watts*, 917 F.3d 770, 782 (4th Cir. 2019). This is true even for the Government's 12(b)(1) claim when that claim is based, as here, on the Government's contention "that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Fletcher v. Tidewater Builders Ass'n Inc.*, 216 F.R.D. 584, 587 (E.D. Va. 2003) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).

To the extent the Government is alleging that placement on a watchlist is insufficient to establish injury, this Court has held—based on undisputed facts—that "the wide-ranging consequences of an individual's Watchlist status render it more closely analogous to the No Fly List than to the types of regulations that courts have found to be reasonable regulations

6

that still facilitated access and use of means of travel." *Elhady v. Kable*, 391 F. Supp. 3d at 578.  The Government has conceded that the Daves Plaintiffs have suffered adverse travel consequences that they allege were because of the watchlist status, Dkt. 46 at 19 (citing AC ¶¶ 262-65).  And the Daves' Plaintiffs allege they have been deterred from travel based on their watchlist status. AC ¶ 190. Indeed, their inability to return to their home in Qatar, their detention in Turkey, and their denial of entry to the United Arab Emirates were all caused by Defendants' decision to place them in the TSDB and disseminate it all over the world. This is enough to confer standing.  *Elhady v. Piehota*, 303 F. Supp. 3d 453, 464 (E.D. Va. 2017).

In any event, "a claim is justiciable if even only one plaintiff has standing to raise it." *Elhady v. Piehota*, 303 F. Supp. 3d at 462 (citing *Bostic v. Schaefer*, 760 F.3d 352, 370–71 (4th Cir. 2014)). As the Government concedes Long has standing, the Court can assume that the Daves Plaintiffs have standing as well.

## III.   Plaintiffs State a Procedural Due Process Claim

### A.   The Watchlist Has Impaired Plaintiffs' Movement-Related Liberty Interests

#### 1.   Any Watchlist Placement Impairs Movement-Related Liberty Interests

"Plaintiffs' movement-related liberty interests involve the right to travel by airplane or reenter the United States without being detained for additional screening." *Elhady v. Piehota*, 303 F. Supp. 3d at 463. Whatever the precise standard for determining when a movement-related deprivation is sufficient to require due process, that standard is met by "invasive additional screening and other liberty-constraining activities when they fly or reenter the country at a land border or port," including being "detained for hours," and the

result "has caused them to avoid travel." *Id.* at 464  (noting conflicting decisions about when travel-related deprivations constitute constitutional harm but that the above allegations establish standing regardless of what test is used); *see also Mohamed v. Holder*, 266 F. Supp. 3d 868, 875 (E.D. Va. 2017) ("Plaintiff's decision not to engage in international travel because of the difficulties he reasonably expects to encounter upon return to the United States is sufficient to demonstrate standing.") (stringcite omitted).

In a recent 2019 decision, this Court has affirmed—using the materially-undisputed standard for motions for summary judgment—that "the wide-ranging consequences of an individual's Watchlist status render it more closely analogous to the No Fly List than to the types of regulations that courts have found to be reasonable regulations that still facilitated access and use of means of travel." *Elhady v. Kable*, 391 F. Supp. 3d at 578; *see generally* § II, *above*.

Here, as a result of being placed on the watchlist, Long was detained by Qatar and Turkey, *see* AC ¶¶ 215 and 240-249, strip searched by Dutch security agents, AC ¶ 228, taken into custody by CPB, AC ¶ 230, and banned from Qatar and the UAE, AC ¶¶ 256-60. All of this interferes with his right to travel. So too does Long's placement on a No Fly List, which constitutes an absolute bar against most airline travel to or from the United States. AC ¶ 180.

Although the Daves Plaintiffs do not have quite the same history, their injuries are also sufficient.  They have alleged being placed on the watchlist, adverse travel consequences as a result, and a deterring effect on their willingness to fly.  AC ¶¶ 178, 190, 262-65; *see also* § II, *above*. Placement on the watchlist will continue to cause travel injury. *Elhady v. Kable*, 391 F. Supp. 3d at 578. And, in any event, "a claim is justiciable if even

8

only one plaintiff has standing to raise it." *Elhady v. Piehota*, 303 F. Supp. at 462 (citing *Bostic*, 760 F.3d at 370–71).

The Government claims the *Elhady* cases are wrongly decided. Dkt 46 at 25-26 n.15. The Government claims these cases "are incorrect, contrary to the overwhelming weight of case law, and in any event distinguishable from the facts here." *Id.* at 26 n.15. The Government does not explain why either decision is incorrect. *Id.* The Government's suggestion that the cases are distinguishable because they "described repeated, severe, and/or ongoing delays of many hours that could cause at least a few of the Elhady plaintiffs to refrain from travel," *id.*, ignores the severe harm Long in particular has suffered. In any event, once someone is placed on the watchlist, experiences others have faced for being on that same list acts equally as a deterrent. One need not actually touch an electric fence to be deterred from doing so.

The Government also suggests (at 27 n.16) that *Mohamed* may be distinguished because "[a]t the time the Mohamed Complaint was filed, the plaintiff was in foreign custody and unable to return home," and because "the redress process has now changed since that" decision. Respectfully, the Court in *Mohamed* did not rely on the foreign custody issue, 266 F. Supp. 3d at 879-80; *see also id.* at 873 (noting that by the time of the decision he had returned to the United States but remained on the No Fly List), making this distinction meaningless. Moreover, the change in redress process is irrelevant to whether there is a deprivation in the first instance.

The Government (at 24-26), cites, among other cases, *Beydoun v. Sessions*, for claiming that "inconvenience[]" and deterrence alone is insufficient to establish standing based on TSDB placement because "Plaintiffs have not actually been prevented from flying

9

altogether or from traveling by means other than an airplane." *See Beydoun v. Sessions,* 871 F.3d 459, 468 (6th Cir. 2017). But this is not what the Court held in that case. Instead, Court's only reason for finding a lack of travel-related standing as to one plaintiff was insufficient detail, noting that "*Beydoun* has not attempted to provide any information about when those delays occurred, how long the delays were, what type of enhanced screening he was subjected to, or indeed any information beyond general allegations that he has been prevented from traveling." *Id.* at 467. As to the other plaintiff, he merely alleged "instances when he has been delayed or subjected to additional screening, with delays ranging from ten minutes to one hour in duration." *Id.* The language cited by the Government was simply the Court's attempt to distinguish the vague allegations made by the *Beydoun* plaintiffs from No Fly List cases such as *Latif v. Holder*, 969 F.Supp.2d 1293, 1303–04 (D. Or. 2013), and *Mohamed*, which the Court accepted was sufficient to establish an infringement of a liberty interest. 871 F.3d at 468. But here, in any event, *Long* has been placed on a No Fly List. He was denied boarding, detained, strip-searched, banned from entry into Qatar and the UAE, and informed he could not fly on airplanes generally. AC ¶¶ 180, 215, 228, 230, 240-249, and 256-60. Even if constitutionally injury does require being "prevented from flying altogether," Long has met this requirement.

There likewise is no discussion of similar, substantial information about the length, use of force, and other attributes of detention and delay in *Abdi v. Wray*, 2018 WL 1940411, at *4 (D. Utah Apr. 23, 2018) (appeal pending), *Kovac*, 363 F. Supp. 3d at 762; and *Kadura v. Lynch*, No. CV 14-13128, 2017 WL 914249, at *6 (E.D. Mich. Mar. 8, 2017); and *Proctor v. DHS*, 777 F. App'x 235 (9th Cir. Sept. 16, 2019) (unpublished opinion) Dkt. 46 at 25. Thus, those opinions merely stand for the proposition that the plaintiffs in those cases "have

not sufficiently alleged" a travel-related liberty deprivation, *Kadura*, 2017 WL 914249 at *6 rather than for the proposition that placement on the watchlist does not rise to a travel-related liberty deprivation as a matter of law.

### 2.      No Fly List Placement Impairs a Movement-Related Liberty Interest

The Government argues that even if Long could not get on an airplane at all, this *still* does not implicate a liberty interest in travel. Dkt. 46 at 27-28. This argument obviously cannot survive the standard in *Elhady v. Piehota,* 303 F. Supp. 3d at 463, and *Mohamed*, 266 F. Supp. 3d at 875, which finds a liberty interest deprived by the mere deterrence on travel. The argument has also been rejected in a variety of contexts where courts have entertained due process challenges to being placed on the No Fly List. *Latif v. Holder*, 969 F. Supp. 2d 1293, 1302 (D. Or. 2013); *Mohamed*, 995 F. Supp. 2d 520, 538 n.22 (E.D. Va. 2014); *Shearson v. Holder*, 725 F.3d at 493; *Ibrahim*, 669 F.3d at 993; *Tarhuni v. Holder*, 8 F. Supp. 3d 1253, 1271 (D. Or. 2014).  As these cases all establish, being placed on a No Fly List, at minimum, is a practical barrier to international travel, which plaintiffs have a right to engage in without significant (even if not absolute) barriers. *Mohamed*, 995 F. Supp. 2d at 537; *Mohamed v. Holder*, No. 1:11-CV-50, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015); *Latif*, 969 F. Supp. at 1303-4; *Latif v. Holder*, 28 F. Supp. 3d 1134, 1149 (D. Or. 2014). In contrast, none of the cases the Government cites (Dkt. 46 at 27-28) stand for the novel proposition that the Government can outright prohibit an individual from flying without any due process concerns.  *See, e.g.*, *Ibrahim*, 538 F.3d at 1255 (distinguishing *Gilmore* because *Gilmore* was not on a No–Fly list); *Latif v. Holder*, 969 F. Supp. 2d at 1303 (distinguishing *Green, Gilmore, Miller, Southold, and Cramer*).

### B.     Watchlist Placement Causes Stigma-Plus Injury

#### 1.     Watchlist Placement Causes Significant Stigma

Plaintiffs also have a cognizable due process interest under the "stigma-plus" test. That test finds that suffering stigma from governmental action plus a negative impact on legally-recognized right or status constitutes constitutional injury. *Paul v. Davis*, 424 U.S. 693, 711 (1976).  The Government claims Plaintiffs fail both prongs of this test.

The Government claims (Dkt. 46 at 29) that being designated by the Government as a "known or suspected" terrorist is not stigmatizing because it is not disseminated to the general public.  *See also Kovac*, 363 F. Supp. 3d 721 at 753 (similar). But as explained in *Mohamed*, 2015 WL 4394958, at *6, "a person's placement on the No Fly List would likely become known over time to persons beyond government agencies or the airlines, with accompanying adverse consequences visited upon a restricted person." The Complaint alleges this as well. AC ¶¶ 49, 111. Plaintiffs allege that these disclosures happened to their own family members, friends, and colleagues.  AC ¶ 189. Most notably. Long's sister was stopped at gunpoint by police due to Long's watchlist status. AC ¶¶ 231-233.

In addition, "the Government disseminates an individual's TSDB status with over 18,000 state, local, county, city, university and college, tribal, and federal law enforcement agencies and approximately 533 private entities for law enforcement purposes."  *Elhady v. Kable*, 391 F. Supp. 3d at 580; *see also* AC ¶¶ 45, 96-102, 112. These private entities include "airlines, universities, hospitals, private correctional facilities, private security services, and private city attorneys." AC ¶ 99. "The dissemination of an individual's TSDB status to these entities would reasonably be expected to affect any interaction an individual on the Watchlist has with law enforcement agencies and private entities that use TSDB

12

information to screen individuals they encounter in traffic stops, field interviews, house visits, municipal permit processes, firearm purchases, certain licensing applications, and other scenarios." *Elhady v. Kable*, 391 F. Supp. 3d at 580.  This subjects Plaintiffs and others to the obvious risk of "being surrounded by police, handcuffed in front of their families, and detained for many hours." *Id.* The risk caused by, for instance, the police thinking an individual is a terrorist and stopping them at gunpoint, AC ¶ 232, is obvious.   Thus, as *Elhady v. Kable* found, the watchlist's effect on "constitutionally protected reputational interests … 'underscore the need overall for strong procedural protections for Mohamed's travel-related rights.'" 391 F. Supp. 3d at 580 (quoting *Mohamed v. Holder*, 11-cv-50, 2015 WL 4394958, at *6 (E.D. Va. July 16, 2015)).

The Government argues there is no stigma to being searched at an airplane but tellingly relies almost exclusively on cases that predate the watchlist itself.  Dkt. 46 at 29-30. The two post-watchlist cases, *Scherfen*, 2010 WL 456784, at *11, and *U.S. v. Hartwell*, 436 F.3d 174, 176 (3d Cir. 2006), have nothing to do with the stigma-plus test at all. Separately, in *Tarhuni*, the only disclosure alleged was to Air France and Alaska Airlines, 8 F. Supp. 3d at 1274.   But here, Plaintiffs allege—based on since-discovered information—that the Government discloses Plaintiffs' TSDB status to "state and local authorities, courts, foreign governments, private corporations, private contractors, airlines, gun sellers, financial institutions, the captains of sea-faring vessels, and others."  AC ¶ 19.  For this reason, Long was twice denied the right to purchase a gun.  AC ¶¶ 236 and 266.  The Government retorts that these allegations are "without any apparent basis in fact, " Dkt. 46 at 29; while the Government is wrong, *see Elhady v. Kable*, 391 F. Supp. 3d at 580, their factual challenge to this assertion is inappropriate at the motion to dismiss stage anyway.

The Government also cites to other cases supposedly "in the same context," including *Beydoun*, *Bazzi*, *Abdi*, *Kadura*, *Green*, *Proctor* and *Kovac*. Dkt. 46 at 28-29. *Proctor* had nothing to do with stigma. *See* n.2, *above* (explaining *Proctor*). As for the remaining cases, the Complaint in this case details Long's detentions, banishments, arrests at gunpoint, and inability to purchase a gun.  All of these issues were directly a result of Defendant TSC sharing watchlist information with other federal government agencies and officials, state and foreign officials, and private gun sellers.  These allegations distinguish this case from those cited by the Government. *Green,* 351 F. Supp. 2d at 1130 ("Plaintiffs have not alleged any tangible harm to their personal or professional lives that is attributable to their association with the No–Fly List"); *Beydoun v. Lynch*, No. 14-CV-13812, 2016 WL 3753561, at *5 (E.D. Mich. July 14, 2016) (only allegation was that he could only fly after enhanced screening); *Bazzi v. Lynch*, No. 16-10123, 2016 WL 4525240, at *7 (E.D. Mich. Aug. 30, 2016) (same); *Abdi,* 2018 WL 1940411, at *3 (same), *Kadura*, 2017 WL 914249, at *7 (noting closure of bank accounts would qualify but plaintiffs did not allege they themselves had bank accounts closed); *Kovac*, 363 F. Supp. 3d at 753-54 (noting that Plaintiffs there failed to allege  sufficient details or that "Plaintiffs have been the subject of such information sharing and meaningfully harmed as a result").  In any event, all of these cases (other than the irrelevant *Proctor*) were decided prior to this Court's recent decision in *Elhady v. Kable*, which not only found that the allegations of stigma caused by watchlist were plausible but determined beyond a material dispute that they existed and were severe.

### 2.    Watchlist Placement Satisfies the Plus Factor Requirement

The Government alleges (Dkt. 46 at 31-33) there are no "plus" factors. But all Plaintiffs must show for a plus factor is "some tangible change of status." *Doe v. DOJ*, 753

F.2d 1092, 1108 (D.C. Cir. 1985). This includes any "deprivation of" an "opportunity" which is "caused by a statutory impediment." *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994).

For example, courts have held that "statutory impediments to buying alcohol, opening or maintaining bank accounts, or receiving material support from other people," qualify. *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001). Also qualifying is a "loss of tax exemption." *Paul*, 424 U.S. at 705. Likewise, the right to be considered for government contracts qualifies. *Doe*, 753 F.2d at 1109 (citing *Conset Corporation v. CSA*, 655 F.2d 1291 (D.C. Cir.1981)); *see also Shirvinski v. U.S. Coast Guard,* 673 F.3d 308, 316 (4th Cir. 2012).

Here, Long has established numerous changes in status that have already affected him. His placement on the No Fly List makes him ineligible to fly. AC ¶ 180. His watchlist placement has also made him ineligible to enter Qatar or the UAE or to purchase a gun. AC ¶¶ 187, 217, 224, 234, 259, 266. And, as *Elhady* and *Mohamed* both found, the placement on the watchlist and No Fly List is a change in status itself. *Elhady v. Kable*, 391 F. Supp. 3d at 579-81; *Mohamed*, 2015 WL 4394958, at *6.

The Government may argue that none of the effects of watchlist placement are "sufficient to demonstrate an infringement of the Fifth Amendment." *See El Ali v. Barr*, 18-cv-2415 (D. Md.), Dkt. 53 ("*El Ali* Reply") at 14. In other words, the Government may claim that none of the changes in legal status create any constitutional harm. But this is wrong. Not only does being placed on the No Fly List automatically bar one from flying, being placed on the watchlist comes with numerous consequences which are significant and, practically, automatic. Thus, for instance, CBP Directive 3340-049A (*El* Ali, Dkt. 48-7)

15

states that placement on the terrorist watchlist creates specific authority for the Government to perform an advanced search of an electronic device. *Id.* at § 5.1.4. It also forbids the Government from providing notice regarding the search. *Id.* at 5.4.2.5. After all, when you disseminate information to official agents and tell them that the individual in question is a known or suspected terrorist, the resulting effect on the individual's rights is caused by the "understandable response by law enforcement in even the most routine encounters." *Elhady v. Kable*, 391 F. Supp. 3d at 580.

The Government may also suggest that it is not the Government's fault that a state or foreign government—being told that Plaintiffs are officially suspected terrorists by the United States—drew their guns on, or strip-searched, or arrested and detained, or denied the right to purchase a gun to, anyone on the list. But this ignores that the sigma-plus test looks at the result of the dissemination, i.e., if there was a "loss of some tangible interest due to publication of the stigmatizing allegation," *Bank of Jackson Cty. v. Cherry*, 980 F.2d 1362, 1367 (11th Cir. 1993) (citing *Paul*, 424 U.S. at 701 and *Board of Regents v. Roth*, 408 U.S. 564, 573-74 (1972)).  It does not depend on whether the dissemination is also accompanied by separate constitutional harm caused by the disseminator itself.  After all, if the Government was responsible for the separate constitutional harm in the first instance, then the stigma-plus test would be unnecessary.

## C.    DHS TRIP Does Not Eliminate Plaintiffs' Due Process Claim

The Government's argument that the DHS TRIP is all that is constitutionally required (Dkt. 46 at 33-35) tries to inject a factual conclusion into a Motion to Dismiss.  It relies on conclusions based on two cases involving summary judgment on fully-developed records. In one of the two cases, the Government lost on this issue, *Mohamed*, 2015 WL

4394958, at *2. In the other, *Latif v. Lynch*, the Court found that while the revised DHS TRIP facially satisfied "in principle most of the procedural due-process requirements that the Court set out in its June 2014 Opinion," (notably, most is not all) nevertheless "the record" in that case was "not sufficient to resolve whether such procedures were, in fact, constitutionally sufficient*."* 10-vb-00750, 2016 WL 1239925, at *2 (D. Or. Mar. 28, 2016).

Here, of course, there is no record yet.  Instead, as the Courts in *Elhady* and *Mohamed* found at the motion to dismiss stage, "the ultimate merits of that claim are tethered to the *Mathews* factors, which are 'fact-intensive consideration[s],' which 'when considered within the context of [these] allegations, necessarily require an evidentiary record beyond that presented to the Court in connection with the defendants' motion to dismiss." *Elhady v. Piehota*, 303 F. Supp. at 465-66 (quoting *Mohamed*, 995 F.Supp.2d at 538-39).

On reply, the Government is likely to cite liberally to the Ninth Circuit's recent decision in *Kashem v. Barr*, --- F.3d ----, No. 17-35634, 2019 WL 5303288 (9th Cir. Oct. 21, 2019) (declining to reach a facial challenge).  In *Kashem*, The Ninth Circuit recently decided that the *Latif* Remedy to the No Fly List did not violate due process as applied solely to the *Latif* plaintiffs and only with respect to the No Fly List.  *Id.* at *6.  Because *Kashem* was dealing with an as-applied challenge, the Court approved of a one-time-only process.  The *Kashem* plaintiffs did not receive their remedy through DHS TRIP and the revised No Fly List process, they received a neutral evaluation through a district court. The Ninth Circuit's approval of the process received was based on the neutral and searching inquiry made by the district court in the first instance.  So, for instance, the failure to provide exculpatory information was excused because the Court "required the government to explain and justify the information withheld, and it then independently verified the government's

17

representations." *Id.* at *19. But Plaintiffs have not gotten any sort of similar process here. *See also id.* at *24 (requiring in the future that DHS TRIP decisions now be appealed directly to the Court of Appeals).

Also, *Kashem* was decided at the end of that case, as applied to those plaintiffs only, on the basis of a full record. Even if the conclusions made there might be ultimately applicable to Plaintiffs here—which Plaintiffs dispute—any such determination is premature at the Motion to Dismiss stage.

## IV. Plaintiffs State a Substantive Due Process Claim, Because the TSDB Significantly Interferes with the Plaintiffs' Fundamental Right of Movement

Substantive due process "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). Those rights are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* at 721 (internal quotation marks and citations omitted). While Plaintiffs' complaint stated a multifaceted substantive due process claim, the Plaintiffs hereby narrow that claim to the TSDB's movement-related consequences, including the flight ban that the TSDB has imposed on all Plaintiffs, and continues to impose on Long.

A court in this district previously held that the TSDB's flight ban, applied to persons like Long on the No Fly List subset of the TSDB, "significantly interferes with the fundamental right to travel domestically." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 879-880 (E.D. Va. 2017) (explaining that "placement on the No Fly List does far more than 'significantly discourage' designees from traveling; it often absolutely bars them from so doing and effectively precludes them from engaging in a wide range of constitutionally

protected activities"). And though Government minimizes the movement-related consequences of a TSDB designation, it is not only the flight ban that interferes with Plaintiffs' right of movement—which encompasses international and interstate travel—but also the TSDB's global dissemination, a dissemination the Government undertakes for the purpose of restricted the ability of Plaintiffs to move about the world. This direct attempt to encumber Plaintiffs' movement interests, which in this case has prevented Plaintiffs from traveling back to their home in Qatar, moving to the United Arab Emirates, or traveling freely in Turkey, sounds in substantive due process and is illegal. AC ¶¶ 215, 240-249, 256-260. For this reason alone, the Government's jurisdictional argument must fail. As the Supreme Court held long ago, [i]f a law has no other purpose…than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it is patently unconstitutional." *Shapiro v. Thompson*, 394 U.S. 618 (1969).

Nevertheless, the flight ban Defendants impose via their TSDB on Long, as well as the flight bans they previously imposed on the other plaintiffs, warrant the same ground-up *Glucksberg* analysis the Court undertook in *Mohamed*.

To be sure, the Court in *Mohamed* found, on a different record and at the summary judgment stage, that the No Fly List survived strict scrutiny. 266 F. Supp. 3d at 880-83. But whether or not government conduct is narrowly tailored to meet a compelling Government interest is, here and elsewhere, a "highly fact intensive" question not appropriate for resolution at the motion to dismiss stage. *McClellan v. City of Alexandria*, 363 F. Supp. 3d

19

665, 677 (E.D. Va. 2019); *see also Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 545

(4th Cir. 2013) (inappropriate to resolve fact-intensive questions at motion to dismiss stage).[1]

To the extent the Court seeks to evaluate the *Glucksburg* analysis anew, the Supreme

Court requires courts to follow its "established method of substantive-due-process analysis"

which has "two primary features." 521 U.S. at 721. The first step is to "carefully formulat[e]

the interest at stake." *Id.* at 722.  The second step is to determine whether the freedom in

dispute is among those "fundamental rights and liberties" rooted in our country's history.

*Id.* at 720-721. Because the formulation of the interest at stake requires this Court to

determine "the most specific level at which a relevant tradition protecting, or denying

protection to, the asserted right can be identified," both steps of the *Glucksberg* analysis are

contained within the historical and precedential review that follows. *Michael H. v Gerald D.*,

491 U.S. 110, 127 (1989).

A.     **History reflects that there is a movement right inherent to the Due Process Clause**

The historical examination the Supreme Court requires this Court to make is, by

necessity, broad. For example, in *Glucksberg*, the Supreme Court analyzed the present and

past laws of the fifty states, as well as laws of other countries, to frame its historical

examination. *Glucksberg*, 521 U.S. at 710-711.  In this case, the Court should consider the

history of the right of movement between the states, as well as between this country and

---

[1] In any event, despite the ruling of *Mohamed*, the No Fly List is not narrowly tailored because it is underinclusive (as it has left off every actual perpetrator of terrorism inside the United States, *see also* § VII, *below*) and overinclusive (because it includes people based on conduct not constituting a criminal threat, *see Mohamed*, 995 F. Supp. 2d at 531. Plaintiffs respectfully believe that discovery will further establish that the No Fly List is ineffective, much less necessary, for combatting terrorism. Plaintiffs also believe such discovery will show that other, less restrictive methods, such as enhanced screening techniques, are at least as effective as the No Fly List's total ban.

others, in framing its examination. This examination of the country's traditions is also meant to be probing.

Many English colonists were motivated by "[t]he unhappiness and frustration caused by the various restrictions on freedom of movement in England." Zechariah Chafee, Jr., Three Human Rights in the Constitution of 1787 (1956). While in England, these same colonists could only move from town to town with permission from various authorities. *Id.* at 164.

Religious discrimination in England also motivated some colonists and amplified the deleterious effect of movement restrictions. *Id.* at 175. In fact, it was the willingness of English authorities to protect the right of movement that is in no small part responsible for the emergence of English authority in North America, rather than Spanish or French. Within areas administered by Spanish and French colonial administrations, bureaucratic examinations, licensing, and restrictions on the religious and political affiliations of colonists were widespread. *Id.* at 167-170. These various limitations obstructed mass colonization and economic development of territory in North America claimed by Spanish and French authorities. *Id.* The charters of the English colonies on the other hand required or contained "no examination, no licenses, no mention of religion." *Id.* at 173.

As a general matter, this enlightened attitude toward the right of movement prevailed between the English colonies of the New World as well.  Men were free to move "across boundaries wherever their work called them." *Id.* at 181. When the colonies gained independence, their representatives codified the right of movement within the Articles of Confederation. *Id.* at 185. "[T]he free inhabitants of each of these States…shall [have] free ingress and regress to and from any other State." Articles of Confederation, Article IV. And

while the right of movement was not enumerated in the Constitution, this is because the Founders saw that the right "was already embodied elsewhere" in the text. Chafee at 181. The existence of the right of movement in the Constitution, with a presence that saturates the entire document but especially the Bill of Rights' penumbras, is beyond dispute and is established below.

**B.      The Right of Movement is Inherent in the Due Process Clause**

The number of enumerated rights that presume a freedom of movement is an indication that, although the right of movement is unenumerated, the Constitution confers it.  To begin with, it is beyond dispute that the text of the Constitution has been interpreted as protecting freedoms not specifically enumerated. In *Griswold v. Connecticut*, for example, the Supreme Court recognized an unenumerated fundamental right: the right to privacy. 381 U.S. 479, 481-86 (1965). The Court's process of arriving at this recognition began with an examination of the country's legal traditions and concluded that certain fundamental rights can be inferred from existing traditions and the Constitution's text. *Id.* at 482-484 ("[t]he foregoing cases suggest that specific guarantees in the Bill of Rights have penumbras").

The way *Griswold* uncovered the constitutional right to privacy is germane to the present matter. The Supreme Court identified the right of privacy within the "penumbras" of the Bill of Rights by charting recognized fundamental rights which tacitly include or require the right of privacy to be constitutionally guaranteed. *Id.* For example, the Court analyzed several First Amendment cases dealing with "the freedom to associate and privacy in one's associations." *Id.* at 483. That right did not appear explicitly in the First Amendment, but still existed as a "peripheral First Amendment right." *Id.* at 483. The Court

22

mentioned other explicit constitutional guarantees which arguably include a privacy component: the Third Amendment, prohibiting quartering of soldiers, the Fourth Amendment, prohibiting searches and seizures, the Fifth Amendment prohibiting self-incrimination, and the Ninth Amendment reserving unenumerated rights to the People. *Id.* at 484. These amendments, along with the freedom to associate found in the First Amendment, create "zones of privacy." *Id.* These "zones of privacy" point to the existence of a more fundamental and basic right of privacy, a right which itself gives "life and substance" to the Constitution's explicit guarantees. *Id.*

Like the right of privacy in *Griswold*, the right of movement at issue in this case is basic and far-reaching in nature—the right of movement is simply necessary to the practicing of democracy and the functioning of a healthy society. Just as the Supreme Court in *Griswold* recognized "zones of privacy" in threading together various constitutional guarantees, this Court should recognize zones of movement emanating from various constitutional guarantees. It is clear from this nation's legal traditions that such a right exists, and the "penumbras" of the Bill of Rights suggest and imply that right as well.

Article IV of the Constitution entitles citizens of one state to the privileges and immunities of all the states. Article IV clearly recognizes a zone of movement because it guarantees equal treatment for citizens moving from one state to another state, a guarantee that would be unnecessary if the Founders did not consider such movement essential to the healthy functioning of the United States. Article I of the Constitution gives Congress the ability to regulate interstate commerce, and commerce with foreign states. This authorization anticipates a zone of movement as well: the movement of goods and people between states and between the United States and other countries. The First Amendment,

which guarantees the right to assemble, implies a zone of movement: citizens must move between states, and from other countries to this country, to freely assemble.

The First Amendment also guarantees the right to free exercise of religion. This guarantee implies a separate zone of movement: for many citizens, movement is a necessary component of free exercise of religion. Aside from congregating regularly with members of their faith at a site of worship, many religions encourage pilgrimage in foreign countries. For example, Catholics travel to the Vatican, Jews to Israel, and Muslims to Mecca.

The Fourth Amendment protects against unreasonable searches and seizures. This protection recognizes a zone of movement: citizens who have not been lawfully stopped or arrested must be released from custody and are free to move as they please. Similarly, citizens are not required to consent to searches, and may move themselves or their possessions, unless a warrant issues.

The historical record makes clear the right of movement is so fundamental and basic that it was not necessary to dedicate explicit text to it. Indeed, our constitutional scheme—from the Commerce Clause to the Bill of Rights, from federalism to the Citizenship Clause—presupposes the existence of a right of movement. These various and explicit constitutional guarantees point to an underlying right[2]: the right of movement. The zones of movement found within these guarantees extend from that underlying right. The zones of movement, when considered in tandem with our nation's constitutional scheme and history,

_____

[2] While *Mohamed* ultimately did not find a fundamental right of movement, it explained that "[t]here is much to warrant extending the fundamental right to travel or movement to include international travel." *Mohamed v. Holder*, 266 F. Supp. 3d 868, 878 (E.D. Va. 2017). The fundamental right of movement that undergirds the various movement-regarding interests that *Mohamed*, other federal courts, and the Supreme Court have repeatedly identified.

provide clear evidence of the Founders' intent to enshrine the right of movement as a part of the Constitution.

### C.   The Constitutional Right of Movement Is also Supported by International Law

It is not only the history of the United States and the text of its Constitution that reveal a right of movement. The international law which our constitutional scheme incorporates does so as well. As the Supreme Court explained in *The Paquete Habana*, "[customary] [i]nternational law is part of our law" and "must be ascertained…as often as questions of right depending upon it are duly presented for their determination." *The Paquete Habana*, 175 U.S. 677, 700 (1900). In determining what freedoms are protected by customary international law, the Second Circuit, for example, relied on the contents of the Universal Declaration on Human Rights, explaining that adoption of the Declaration was made "without dissent by the General Assembly." *Filartiga v. Pena-Irala*, 630 F.2d 876, 883 (2d Cir. 1980).

The Second Circuit noted that UN declarations are particularly useful articulations of international law "because they specify with great precision the obligations of member nations under the Charter*." Id.* Likewise, the Second Circuit has also found that even agreements that are not self-executing, such as the International Covenant on Civil and Political Rights, "are appropriately considered evidence of the current state of customary international law." *Abdullahi v. Pfizer, Inc.*, 562 F.3d 163, 176 (2d Cir. 2009).  Assessing these two international agreements—the Universal Declaration on Human Rights and the International Covenant on Civil and Political Rights—it is telling that both include an explicit right of movement.  The Declaration conceives of the right without equivocation: all people have "the right to freedom of movement… [as well as] the right to leave any country,

including his own, and to return to his country." Universal Declaration on Human Rights, Article 13. The Covenant's articulation of the right of movement is essentially the same. Everyone has the "right to liberty of movement…[and] shall be free to leave any country, including his own…[and] shall not be arbitrarily deprived of the right to enter his own country." International Covenant on Civil and Political Rights, Article 12.1 – 12.4. The fact that the right of movement is enumerated in two of the cornerstone agreements of customary international law adds further confirmation to the revered status of this right within our own legal traditions, which reflect and incorporate international law. Therefore, this Court should identify the right of movement as the fundamental right that the TSDB, through its global dissemination and flight ban, violates.

## V.    The Watchlist Violates the APA

The Government asks for the Court to dismiss Count III, which Plaintiffs have referred to as "APA-DHS TRIP" to distinguish it from a narrower APA claim regarding dissemination through the NCIC (Count IV, APA-NCIC).

Plaintiffs allege that TSDB placement and removal violates the APA for the same reason that it violates the Constitution, AC ¶¶ 314-19, as well as the impermissible burdens that the Government have imposed as a result of TSDB placement,  AC at ¶ 320.  Plaintiffs also allege that the placement is "not in accordance with law," AC ¶ 316, a problem which is further elaborated in Paragraphs 358-68.  *See also* § VIII, *below*.

The Government alleges that Plaintiffs' APA "claim fails for the same reasons the procedural due process claim does, and Plaintiffs cannot separately demonstrate that the DHS TRIP process is arbitrary or capricious in violation of the APA."  Dkt. 46 at 35.  But the Government construes the APA claim too narrowly. Despite the colloquial title it

specifically alleges constitutional defects with both the placement, removal, and the resulting effect, Plaintiffs' APA claims should survive so long as any of its other constitutional claims (not just due process) survive.  *See* 5 U.S.C. §§ 706(2)(A) (agency action may be set aside when "not in accordance with law") 706(2)(B) (same when "contrary to constitutional right, power, privilege, or immunity") and 706(2)(D) (same when "without observance of procedure required by law").   Likewise, the APA claim should survive to the extent there is no statutory support the watchlist.  *See* 5 U.S.C. § 706(2)(C) ("in excess of statutory jurisdiction, authority, or limitations, or short of statutory right").

## VI.    NCIC Dissemination Violates the APA

In Count IV, Plaintiffs allege that the Government shares information stigmatizing and injuring them, *see also* § III(B), above, via the National Criminal Information Center. AC ¶ 323.  The Government's only purported authority for doing so is 28 C.F.R. § 20.20 and 28 U.S.C. § 534.  *Id.*

### A.    The Government's NCIC Information Sharing Is Beyond Legal and Statutory Authority

28 U.S.C. § 534(a)(1) allows the Attorney General to "acquire, collect, classify, and preserve identification, criminal identification, crime, and other records." That information may be shared for missing persons cases, *id.* at § (a)(3) with the federal government for sentencing and penal purposes, *id.* at § (a)(4).   Nothing in 28 U.S.C. § 534 permits the sharing of non-criminal information other than mere identification records.  This is why information may only be shared with certain "authorized" officials of the Federal Government, including the United States Sentencing Commission, the States, including State sentencing commissions, Indian tribes, cities, and penal and other institutions that

27

"have arrest powers," *id.* at §§ (a)(4) and (e), regardless of whether they serve any national security or law enforcement purposes. *See, e.g., U.S. v. Sweeney*, 914 F.2d 1260, 1263–64 (9th Cir. 1990) (28 U.S.C. § 534 authorizes Government "to collect criminal records data and make it available to law enforcement agencies throughout the country"); *Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 467 (4th Cir. 2013) ("[w]e agree with the defendants that there is a good argument that Section 534(a)(1), which directs the Attorney General to 'acquire, collect, classify, and preserve identification, criminal identification, crime, and other records,' does not authorize inclusion of civil immigration records in the NCIC database").

In conformity with this plain reading of 28 U.S.C. § 534, 28 C.F.R. § 20.20(a) permits disseminating only certain "criminal history record information."  The watchlist is a civil, rather than criminal, record.[3]  So the sharing of information through the NCIC is beyond statutory and regulatory authority.

The Government's primary argument on the merits is merely that 28 U.S.C. § 534's reference to "other records" is open-ended to apply to any civil record.  Dkt. 46 at 39.  So This argument would render the limitations of 28 U.S.C. § 534 irrelevant, and conflict with the canons of *ejusdem generis*, *CSX Transp., Inc. v. Alabama Dept. of Revenue*, 562 U.S. 277, 295 (2011) ("We typically use *ejusdem generis* to ensure that a general word will not render specific words meaningless."), and *noscitur a socii*, *Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) ("the general words are

---

[3] No definition of criminal record that Plaintiffs are aware of covers anything other than convictions or pending criminal charges, all of which require at least probable cause. *Compare with* 2AC ¶¶ 94, 108, 125, 127, and 1567 (watchlist placement requires merely watered-down form of reasonable suspicion).

28

[usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *See Yates v. U.S.*, 135 S. Ct. 1074, 1086 (2015).

The Government also suggests (Dkt. 46 at 39) that its dissemination of watchlist information is justified by 28 C.F.R. § 0.85(f), which states that the NCIC is "a computerized nationwide index of law enforcement information." Ignoring the separate issue of the lack of any Congressional authority, this language neither provides any authorization to share civil records nor alters 28 C.F.R. § 20.20(a)'s use of the phrase "criminal history record information." Instead, it makes the Government's lack of authority more apparent. The Government knew how to use the broader "law enforcement information" when it wanted that broader effect. That it did not tells everything.

The Government finally alleges that Plaintiffs' placement on a watchlist is not a criminal record but "is given the same protections and subject to the same restrictions as criminal records are afforded." Dkt. 46 at 38. The Government is simply imagining a different regulatory system. 28 C.F.R. § 20.33, like 28 C.F.R. § 20.20, on its face only applies to "criminal history record information." That the Government would apply it to non-criminal records is simply showing that the Government recognizes it is acting outside of the law. The Government's voluntary application of standards that likely *would* apply if the information being shared was allowed to be shared in the first instance is simply designed to mask the unlawfulness. In any event, if TSDB placement has the effect of a criminal record, *Richmond Black Police Officers Ass'n v. City of Richmond, Va.*, 548 F.2d 123, 129 (4th Cir. 1977) (criminal conviction not moot because it would subject individual to 28 U.S.C. § 534), then the process required for placement must satisfy criminal due process.

And TSDB placement simply cannot meet that standard. *See* § III *above*; *see also Elhady v. Kable*, 391 F. Supp.3d at 584.

Other than that, the Government goes on to wax poetically about the 9/11 Commission and HSPC-6 to suggest that information sharing about terrorism is within the Government's interest.   Dkt. 46 at 40.   But even if Congress could or should have authorized the sharing of Plaintiffs' personal information alleging that they have some unknown "connection" to terrorism, and even if the Attorney General could or should have promulgated regulations under that authority allowing the sharing, that does not mean either Congress or the Attorney General did so. Nor were HSPC-6 or the 9/11 Commission given legal effect through rulemaking, *see* 5 U.S.C. § 553; *Jerri's Ceramic Arts, Inc. v. Consumer Prod. Safety Comm'n*, 874 F.2d 205, 208 (4th Cir. 1989) (substantive rules must be enacted through notice and comment rulemaking), or have the ability to undercut or valid rules issued subject to notice and comment, *AFGE, AFL-CIO, Local 3090 v. FLRA*, 777 F.2d 751, 760 (D.C. Cir. 1985) (notice-and-comment rulemaking is required for agency action that repeals or conflicts with prior enacted rules).

## B.    Plaintiffs Have Standing to Challenge NCIC Database Information Sharing

The Government separately argues Plaintiffs lack standing to challenge the Government's unauthorized actions in disseminating the watchlist.   Dkt. 46 at 37-38. According to the Government, Plaintiffs do not have any "legally protected" interests in the wrongful sharing of their information on the NCIC database.   *Id.* at 37. The Government cites no case that directly stands for this proposition, and that is because the Supreme Court has effectively foreclosed it, noting that 28 U.S.C. § 534's limitations directly protect the

rights of "personal privacy." *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 765 (1989).

Further, the Court in *Elhady v. Kable* found the dissemination of watchlist status created "substantial" harm to "Plaintiffs' reputational interests." 391 F. Supp. 3d at 580. Among the cause of this harm is that "placement on the TSDB triggers an understandable response by law enforcement in even the most routine encounters with someone on the Watchlist that substantially increases the risk faced by that individual from the encounter." *Id.* It also includes the fact that "law enforcement agencies and private entities that use TSDB information to screen individuals they encounter in traffic stops, field interviews, house visits, municipal permit processes, firearm purchases, certain licensing applications, and other scenarios." *Id.* Here, Long and his sister were stopped by police cars with guns pointed at them, AC ¶ 232, and Long was also prevented on two occasions from purchasing a gun, AC ¶¶ 234, 266, 278. The harm from dissemination is not merely hypothetical. And the harm comes from the individuals to whom the Government shares the list with, so the argument the Government made in another case that "NCIC is strictly controlled" would be irrelevant even if the Government could establish that for purposes of a motion to dismiss (which it cannot). *See El Ali* Reply (Dkt. 53) at 22-23.

## VII.   Plaintiffs Have Stated an Equal Protection Claim

The Government claims that Plaintiffs' Equal Protection argument must be dismissed because Plaintiffs failed to "alleg[e] facts from which one would reasonably infer racial or religious animus." Dkt. 46 at 41. But the Plaintiffs' claims of intentional discrimination against Muslims, Arabs, and Asians from Majority-Muslim countries is well pled. For instance, the Amended Complaint notes that "Defendants, knowingly,

intentionally, and purposefully use impermissible and inaccurate religious profiles to nominate, accept, disseminate, and deploy the federal terrorist watchlist against American Muslims in a manner that is different from other faith backgrounds."   AC ¶ 133. The Complaint also alleges that "Defendants consider origin from Muslim-majority countries, travel to Muslim-majority countries, travel on religious pilgrimages, learning Arabic, attending mosques, zakat donations to Muslim charities, the wearing of typical Muslim dress, the frequency of Muslim prayer, adherence to Islamic religious practices, affiliations with Muslim organizations, and associations with other Muslims as suspicious factors supporting inclusion in the TSDB, on the Quiet Skies/Silent Partner Selectee List(s), and on other high-risk-potential-terrorist watchlists."   AC ¶ 134.   "[W]hile travel to Muslim-majority countries is more likely to land a Muslim on the watchlist, the same is not true of a non-Muslim." *Id.* a¶¶ 135, 142. And "when Defendants review lists of social networks and known associates of a currently watchlisted individual, they routinely chose to nominate Arab or Muslim names that cross their desk on the stereotyped basis of race, religion, or national origin alone. Meanwhile, Defendants gloss over any stereotypically white, Christian, English, or Western-European names that may appear in the same network lists, such as classmates or colleagues. This is true even when the only distinction between a nominated person and a non-nominated person are improper race, religion, or national origin criteria." AC ¶ 137.

The heart of Plaintiffs' Equal Protection argument is that although the TSDB is nominally a "terrorism" database, the Government has—purposefully and intentionally— treated it as either exclusively or almost exclusively an "Islamic terrorism" database.  Even terrorist threats that, based on facts the Government is aware of, unquestionably meet the

standard for inclusion, such as white nationalist Christopher Hasson, do not end up on the watchlist.  AC ¶ 141.  Yet if Hassan were Muslim, the Government would not only have put Hassan on the watchlist, they would have also put his friends and family on the watchlist as well.  *Id.*; *see also* AC  ¶¶ 6, 10, 49, and 140.

As a result, the watchlist acts as a tool for impermissible ends that target the Muslim community.  *See* AC ¶ 143. Given that most terrorist threats are not Muslim, this singling out of Muslims cannot survive strict scrutiny.  *See* AC ¶ 138.

Plaintiffs have thus alleged that the Government's conduct has "had a discriminatory effect upon and have disparately impacted Muslim American travelers, and not travelers of other faiths."  *Cherri v. Mueller*, 951 F. Supp. 2d 918, 937 (E.D. Mich. 2013)  "Indeed, central to Plaintiffs' first amended complaint is that the policy, custom and practice is only applied against Muslims, and not travelers of other faiths."  *Id.* And "Plaintiffs have sufficiently alleged that such policy, practice and custom targets a suspect class and has no rational basis." *Id.* "At this stage in the case, Plaintiffs' allegations are sufficient." *Id.*

The Government, relying on *Williams v. Hansen*, 326 F.3d 569, 584 (4th Cir. 2003), alleges Plaintiffs "must set forth 'specific, non-conclusory factual allegations that establish improper motive.'" Dkt. 46 at 40-41.  Even if Plaintiffs had not met that standard through the above allegations, *Williams* was decided on summary judgment.  Plaintiffs are entitled to discovery before having to reach such level of specificity.  At this stage, the mere plausibility standard of *Equity in Athletics, Inc. v. Dep't of Educ.*, 639 F.3d 91, 108 (4th Cir. 2011) (citation omitted), applies.  Likewise, whatever the import of *Armstrong* (a criminal case) and *Zigler* (a case about extending a *Bivens* damages remedy), neither the defense that this is an "executive function" nor the "presumption of regularity" alters the pleading standard at the

33

motion to dismiss stage.  *See Goad v. Mitchell,* 297 F.3d 497, 501 (6th Cir. 2002) (explaining there is no heightened pleading standard for showing the Government acted with "improper motive" and citing cases from the Supreme Court as well as jurisdictions, including *Trulock v. Freeh*, 275 F.3d 391, 405 (4th Cir. 2001)).  Thus all that needs to be alleged are facts sufficient to show plausibility. Plaintiffs do not need to show a smoking gun admission of obvious unconstitutional intent.  *Wright v. North Carolina*, 787 F.3d 256, 267 (4th Cir. 2015)

Assuming the above allegations as true, it is difficult to claim that it is not plausible that the Government through the watchlist has purposefully discriminated against Muslims and individuals from Muslim-majority countries.  After all, the Government has recently implemented "a policy first advertised openly and unequivocally as a 'total and complete shutdown of Muslims entering the United States'" that "now masquerades behind a facade of national-security concerns."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2433 (2018) (Sotomayor, J., dissenting).[4] It would be expected, not surprising, if the significant allegations of vastly unequal impact and treatment described above were a result of allegations of discriminatory intent. *See generally* AC ¶¶ 130-45.

Indeed, "proof of discriminatory intent … can in some situations be inferred from the mere fact of differences in treatment."  *Int'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 335 (1977).  Thus, when "a clear pattern, unexplainable" through proper motives, "emerges," disparate treatment or impact suffices. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). The Government claims that *Sylvia Development Corp. v. Calvert County*,

---

[4] *Hawaii* was decided at a preliminary injunction and not a motion to dismiss phase.  It did not contain Equal Protection claims. Muslim Ban cases on remand have survived a motion to dismiss.  *See IRAP v. Trump*, 373 F. Supp. 3d 650 (D. Md. 2019) (now on interlocutory appeal).

34

48 F.3d 810, 818 (4th Cir. 1995), states that a showing "of disparate impact is insufficient," but *Sylvia Development* simply incorporates the standard of *Arlington Heights, id.* at 819, which in turn notes that a "stark" pattern alone may be "determinative." 429 U.S. at 266 Here, Plaintiffs have alleged a stark pattern of discrimination against Muslims.  AC ¶¶ 130-133, 136, and 144.  This cannot be explained through any non-discriminatory purpose, given the Government's refusal to treat similarly situated white nationalists suspected of terrorism the same. AC ¶¶ 138-42.   And, in any event, Plaintiffs can buttress their claims of discriminatory motive (*see* AC ¶¶ 133 and 143) and intentional discriminatory treatment (AC ¶¶ 134, 137-142) with a "consistent pattern" of targeting Muslims, AC ¶¶ 137-42, the "historical background" of the Watchlist as a response to perceived threats from Muslims, and significant departures from normal procedures, *see* § VIII, below (explaining there was no Congressional authorization for the watchlist).   *See* Richard F. Grimmett, *9/11 Commission Recommendations: Implementation Status* Congressional Research Service (Dec. 4, 2006)[5], at 1, 19, 21, and 31-33 (TSDB was a response to 9/11 Commission, which was aimed at "counter[ing] Islamic terrorism"); *Sylvia Development*, 48 F.3d at 819 (stating that these are "probative factors" for finding "discriminatory intent").

Thus, Plaintiffs have cruised through the plausibility standard of *Equity in Athletics*. Even if the standard were the *Williams* summary judgment standard requiring "specific, non-conclusory factual allegations that establish improper motive," 326 F.3d at 584, Plaintiffs satisfy that burden.

The Government suggests that the fact that "discrimination on the basis of religion or race is, in fact, contrary to the Government's policy and practice." Dkt. 46 at 41.  It

---

[5] Available at https://fas.org/sgp/crs/homesec/RL33742.pdf.

suggests—without expressly stating or citing any case in support—that its purported official policy against discriminating on race or religion is sufficient to defeat Plaintiffs' Equal Protection claim. But the Government is wrong in both claiming that it has an official policy against unlawful discrimination or that such an official policy defeats Plaintiffs' claims. As the Second Amended Complaint alleges, the official policy simply states that "'nominations' must not be solely based on race, ethnicity, national origin, religious affiliation, or First Amendment protected activities." *See* AC ¶ 275. Although the Government "blatantly violate[s]" even this policy," *id.*, the policy expressly allows the Government to "consider and rely on those protected traits as factors supporting placement on federal terrorist watchlists." AC ¶ 276; *see also* ¶¶ 11, 134-35; *see also id.* Ex. 5 (stating expressly that nominations are impermissible when they are based "solely" on protected categories). And even if the Government did have a facial policy of neutrality, that does not defeat Plaintiffs' claim. Even when a law is "fair on its face, and impartial in appearance" it is unconstitutional "if it is applied … with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances." *Yick Wo v. Hopkins*, 118 U.S. 356, 373–74 (1886). Thus, in order to show an Equal Protection violation, "a plaintiff can identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner." *Williams*, 326 F.3d at 584; *see also Cherri*, 951 F. Supp. 2d at 933-34 (explaining, on far less detailed evidence regarding the Government's official policies, that "Plaintiffs have alleged sufficient facts to show that their alleged treatment at the border was pursuant to an official policy, custom and practice"). As seen in significant detail above, Plaintiffs have alleged the watchlist policies have "been applied in an intentionally discriminatory manner."

The Government cites a handful of district court opinions that have dismissed Equal Protection claims in other watchlist cases. Dkt. 46 at 42. But even if those decisions controlled, they turned on the specific allegations and arguments of those cases. For instance, at the time *Elhady v. Piehota* was decided, "[t]he publicly disclosed criteria used in connection with the Watchlist [were] facially neutral." 303 F. Supp. 3d at 467 (citation omitted). So the plaintiffs there rested entirely on allegations of disparate impact. *Id.* The Equal Protection claim there was dismissed due to lack of sufficient allegations of intentional discrimination. *Id Abdi* is similar. 2018 WL 1940411, at *4. *Kadura* was decided based on the complaint's "threadbare recitals" of the elements without any supporting factual allegations. 2017 WL 914249, at *9. Meanwhile, *Kovac* was decided on more narrow grounds, that "Defendants that Plaintiffs have not alleged a plausible comparison to similarly situated groups," and the Court gave Plaintiffs an opportunity to replead; that case is ongoing. 363 F. Supp. 3d at 760. Here, Plaintiffs specifically note that some of the criteria on which a determination may apply is *not* facially neutral. AC ¶¶ 11, 133-35. And Plaintiffs have met the burden offered in *Kovac* by comparing the treatment of Muslims to even known terrorists when those terrorists are Christians engaged in white nationalist terrorism. *Id.* at ¶ 138-42.

The Government also claims that the discriminatory statements from the FBI which tied his No Fly List status to his conversion to Islam do not establish that the watchlist is discriminatory. Dkt. 46 at 41-42. But while these statements do not show conclusively that Long and others were placed on the watchlist because he was Muslim, it shows that those who interact with the watchlist understand it to be a compendium of Muslims. This provides further evidence that the watchlist is discriminatory.

In any event, the Government's claim (relying impermissibly on facts outside of the four corners of the Complaint, *id.* at 41) that Islam had nothing to do with his terrorism watchlist placement is not, itself, believable. According to the Government, Long was placed on the watchlist due to an arrest in Turkey (near the Syrian border) along with military training. *Id.* Long, of course, "has never received any military training other than the military training he received in connection with his service with the U.S. Air Force." AC ¶ 204. But many American soldiers have been arrested in areas near countries involved in terrorism. And yet there is no indication that these criteria have put anyone else on the watchlist.

## VIII.   The Government Has No Congressionally-Delegated Authority for the Watchlist

Plaintiffs also bring a nondelegation claim. AC Count VIII, ¶¶ 357-368. To be fair, this is not a typical nondelegation claim, in which there is a statute authorizing the creation of a massive, far-reaching, and highly-consequential terrorist watchlist, but did not provide an intelligible principle. Instead, Congress has not authorized the TSDB at all. *Id.* at ¶¶ 359-62. In that sense, the nondelegation claim dovetails with Plaintiffs' APA claim, *id.* at ¶ 316, *see also* § VI above, in that the watchlist (regardless of whether it is otherwise constitutional) and its impact was legislatively enacted by the executive without statutory authority

Yes, the Government (Dkt. 46 at 48-49) does cite to several statutory provisions passed by Congress that assumes the existence of some sort of national terrorism database. *See, e.g.*, 49 U.S.C. § 114 (h); 49 U.S.C § 44903 (j)(2)(C). But the Government does not cite to—and Plaintiffs are not aware of—any legislative authority for the Government to create the watchlist in the first place.  Thus except for two specific circumstances inapplicable to

any of Plaintiffs' allegations,[6] Congress has provided the Executive with neither statutory authorization for creating the watchlist nor intelligible principles on how to develop the watchlist. Congress provided no instructions as to what constitutes a sufficient risk to national security to justify the deprivation of rights the TSDB causes, what standards should govern factual determinations placing a person on the list, whether it is appropriate to discriminate specifically against Muslims and focus exclusively on so-called "Islamic terrorism" in compiling the list, or what procedural processes should be put in place in order to protect the rights of individuals nominated to the list, including, as this case shows, United States citizens. Indeed, in the Intelligence Reform and Terrorism Prevention Act of 2004, PL 108–458, December 17, 2004, Congress asked DHS to provide this information *to Congress*, demanding "(A) the criteria for placing the name of an individual on the watch list, (B) the minimum standards for reliability and accuracy of identifying information, (C) the degree of information certainty and the range of threat levels that are to be identified for an individual; and (D) the range of applicable consequences that are to apply to an individual, if located."  49 U.S.C. § 44909 (c)(2).

Other than the two inapplicable provisions in 49 U.S.C § 44903 (j)(2)(C)(v) and 46 U.S.C. § 70101 described above, the Terrorist Screening Center (*see* 2AC ¶¶ 59, 93, 120, 124-25, 141-46, 185, 209, 212, 226) appears in only one other place in the entirety of the

---

[6] *See* 49 U.S.C § 44903(j)(2)(C)(v) ("The Administrator, in coordination with the Terrorist Screening Center, shall include on the No Fly List any individual who was a detainee held at the Naval Station, Guantanamo Bay, Cuba, unless the President certifies in writing to Congress that the detainee poses no threat to the United States, its citizens, or its allies."); *see also* 46 U.S.C. § 70101, note (DHS instructed, in context of cruise ships only, to "develop guidelines, policies, and operating procedures for the collection, removal, and updating of data maintained, or to be maintained, in the 'no transport' and 'automatic selectee' lists described in subsection (a)(1) that are designed to ensure the accuracy and integrity of the lists."

(unannotated) United States Code.   In 6 U.S.C. § 621 (10), a provision providing for definitions for Chemical Facility Anti-Terrorism Standards, Congress defines "terrorist screening database" as meaning "the terrorist screening database maintained by the Federal Government Terrorist Screening Center or its successor." Nothing else in Title VI—or elsewhere—provides for the creation of that "terrorist screening database" or for what standards guide its contours.  Instead, the only two relevant instances of that term merely require vetting against the database.  *See* 6 U.S.C. §§ 488.  So the Terrorist Screening Center itself was not authorized by Congress, either.

So while Congress has acknowledged the Terrorist Screening Center and the TSDB, it has not authorized it.  This whole enterprise has been invented out of whole cloth by the Government itself.  So Congress cannot have given the Government an intelligible principle to guide it in this endeavor.  And this separately constitutes a violation of the Administrative Procedures Act, in that the TSDB—as well as many of its components, including the CBP's usage and participation—are wholly without any statutory authorization.  AC ¶ 316 and Count III; *see also* § V, above.

The Government also cites to the 9/11 Commission Report and HSPD-6 as authorizing the watchlist. Dkt. 46 at 39 and 49.  Neither a Commission Report nor a Homeland Security Presidential Directive are a Congressional Act, and so neither can provide any Congressional authority for the watchlist. 49 C.F.R. § 1560.3 and other parts of the Code of Federal Regulations issued by the Executive do not make for Congressional authority either.

The Government also suggests that generalized mission statements authorize the watchlist. Dkt. 46 at 48 (citing 49 U.S.C. §§ 114(d), 114(f)(3), 44904(a)).  Because these

40

agencies have the responsibility of protecting the country, the Government asserted, this authorizes the watchlist.  But, as this Court has already found, placement on the watchlist is not incidental.  Rather, watchlist placement has significant and profound effects that deprive Plaintiffs of constitutionally-protected rights. Under the Government's theory, the basic mission statements for each agency authorize them to do whatever they want so long as what that is supports the mission.  This is incorrect.  *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, (1988) ("It is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress").  If a mission statement can justify any agency power enacted in support of the mission, then the vast majority of the United States Code would be unnecessary.

## IX.   Plaintiffs Voluntarily Dismiss Counts VI, VII, and IX

The Government makes additional arguments related to Counts VI (First Amendment), VII (Second Amendment), and IX (an additional Due Process claim).  Dkt. 46 at 36, 42-47. Under Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiffs dismiss these three Counts without prejudice.

CONCLUSION

The Court should deny the Government's Motion to Dismiss.

October 31, 2019                           Respectfully submitted,

                                          CAIR LEGAL DEFENSE FUND

                                          BY:   /s/ Lena F. Masri
                                          LENA F. MASRI (DC 1000019)
                                          GADEIR I. ABBAS (VA 81161)*
                                          JUSTIN SADOWSKY (VA 73382)
                                          *Attorneys for Plaintiffs*
                                          453 New Jersey Ave, SE

Washington, DC 20003
Phone: (202) 742-6420

*Gadeir Abbas is licensed in VA, not in D.C.
Practice limited to federal matters*