## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

SAADIQ LONG, *et al.*,

        *Plaintiffs,*

    v.

WILLIAM P. BARR, *et al.*,

        *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)

Civil No. 1:15-cv-1642
Hon. Liam O'Grady

## MEMORANDUM OPINION & ORDER

This matter is before the Court on Defendants' Motions to Dismiss. Dkts. 44, 45. There

are three Plaintiffs and six Defendants named in the August 13, 2019, Amended Complaint. Dkt.

35 ("Am. Compl."). The Plaintiffs are immediate family members: (1) Plaintiff Long ("Long"),

a.k.a. Paul Anderson; (2) his wife, Juangan; and (3) his daughter, Leshauana. Juangan and

Leshauana share the last name Daves ("Daves Plaintiffs").[1] Defendants include, in their official

capacities at the time of filing: William P. Barr, Attorney General of the United States;

Christopher A. Wray, Director of the Federal Bureau of Investigation; Charles H. Kable, IV,

Director of the Terrorism Screening Center; Joseph McGuire,[2] Director of the National

---

[1] This is not a class action. Nevertheless, Plaintiffs refer all throughout the Amended Complaint to, "similarly situated American citizens, lawful permanent residents, and foreign nationals" with various and sporadic qualifications. Some of the qualifications include, "…who have been unreasonably burdened or denied boarding on commercial flights due to their placement on the watchlist," ¶ 319, or "…who have not been arrested, charged, or convicted of a terrorism-related offense," ¶ 296, or "…who are or who are perceived as Muslim, Arab, Middle Eastern, or otherwise belonging to a racial, ethnic, or national origin class associated with Muslim-majority regions of the world," ¶ 340, or, simply, "…on federal terrorist watchlists." ¶ 299. Despite these sweeping claims, the Court considers the present allegations to the extent they apply to the three individually-named plaintiffs.

[2] Russell Travers is now the Acting Director of the National Counterterrorism Center.

Counterterrorism Center, Office of the Director of National Intelligence; Kirstjen Nielson,[3] Secretary of Homeland Security, United States Department of Homeland Security; and David P. Pekoske, Administrator, Transportation Security Administration, United States Department of Homeland Security.

The Amended Complaint asserted nine counts; six counts remain before the Court: (I) The Fifth Amendment – Substantive Due Process; (II) The Fifth Amendment – Procedural Due Process; (III) The Administrative Procedure Act, 5 U.S.C. § 706 – DHS TRIP; (IV) The Administrative Procedure Act, 5 U.S.C. § 706 – NCIC; (V) The Fifth Amendment – Equal Protection; (VIII) The Non-Delegation Doctrine.[4] Further, Plaintiffs submit, this Court has jurisdiction and is the proper venue because the Terrorism Screening Database at the center of this case is compiled and maintained in the Eastern District of Virginia.

Plaintiffs filed the initial Complaint in December 2015. The Court subsequently granted a joint motion to stay the proceedings while Plaintiffs completed the Department of Homeland Security Traveler Redress Inquiry Program. After the program was complete, the stay was lifted in June 2019, and Plaintiffs filed the Amended Complaint on August 13, 2019. The Government moves to dismiss the Amended Complaint in its entirety for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim under Rule 12(b)(6).

## I. BACKGROUND

### A. The Terrorist Screening Database

At the time of the terrorist attacks on the United States on September 11, 2001, "nine U.S. Government agencies maintained twelve different watchlists intended to accomplish a

---

[3] Chad F. Wolf is now the Acting Secretary of Homeland Security.
[4] Plaintiffs voluntarily dismissed Counts VI, VII, and IX. Opp'n at 41.

variety of purposes." *Latif v. Holder*, No. 3:10-cv-00750-BR, ECF No. 253, May 28, 2015, at ¶ 6 [hereinafter "Grigg Decl."] (citing Government Accountability Office, *Terrorist Watch Lists Should be Consolidated to Promote Better Integration and Sharing*, GAO-03-322, April 2003). Thereafter, Homeland Security Presidential Directive – 6 ("HSPD-6") directed the Attorney General to consolidate the existing terrorist watchlists, "to consolidate the U.S. Government's approach to TERRORISM SCREENING and provide for the appropriate and lawful use of TERRORIST INFORMATION in screening processes." *See* Dkt. 35-1 ("2013 Watchlisting Guidance") at 6 (emphases original).

The creation of the Terrorist Screening Center ("TSC") in 2003 was one response to HSPD-6, and it is responsible for maintaining the Terrorist Screening Database ("TSDB" or, colloquially, "the Watchlist"). "TSC is a multi-agency center" that is: (1) administered by the Federal Bureau of Investigation ("FBI"); (2) supported by several entities such as the Department of Homeland Security ("DHS"), the Department of Justice ("DOJ"), and the Department of State ("DOS"); (3) and staffed by officials from multiple agencies, including but not limited to the FBI, DHS, DOS, TSA, and U.S. Customs and Border Patrol ("CBP"). Several federal agencies draw on the Watchlist in their respective national security and law enforcement efforts. Grigg Decl. ¶ 2.

More recently, TSC released an "Overview of the U.S. Government's Watchlisting Process and Procedures as of January 2018" ("Watchlisting Overview"), explaining the nomination process for an individual to be included in the TDSB as a known or suspected terrorist ("KST"). Dkt. 46-1 at 3 (DEX1).[5] The nominations generally go through a three-step

---

[5] Both Parties have included exhibits with their pleadings, and the Court finds a basis to consider them at this stage in the litigation without transforming this into a motion for summary judgment. "A court may consider [a document outside the complaint] in determining whether to dismiss the

review process beginning at the nominating agency, then continuing at the FBI or National Counterterrorism Center ("NCTC"),[6] and finally at the TSC.

"The standard for inclusion in the TDSB is generally one of **reasonable suspicion**." *Id.* (emphasis original). This reasonable suspicion arises from credible information shared by government agencies and foreign partners, gathered from law enforcement, immigration records, intelligence from homeland security and related entities, and other sources. Mere guesses regarding suspicious activity are not enough to support a nomination – rather, reasonable suspicion is explained as follows:

> [F]or inclusion in the TSDB as a known or suspected terrorist, the nominator must rely upon articulable intelligence or information which, based on the totality of the circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct constituting in preparation for, in aid of or in furtherance of, or related to, terrorism and/or terrorist activities.

*Id.* at 4.

The Transportation Security Administration ("TSA") is required by statute, *inter alia*, to "(2) assess threats to transportation; (3) develop policies, strategies, and plans for dealing with

---

complaint" where the document 'was integral to and explicitly relied on in the complaint' and there was no authenticity challenge." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (quoting *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir.1999)). Beyond that, Federal Rule of Evidence 201 states, in relevant part, that "the Court may judicially notice a fact that is not subject to reasonable dispute because it…can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). The Court may also take judicial notice of matters of public record. *Phillips v. Pitt Cnty Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). This is true regardless of whether a party seeks such recognition. *See, e.g., Combe Inc. v. Dr. August Wolff GmbH & Co. KG Arzneimittel*, 309 F. Supp. 3d 414, 417 n.2 (E.D. Va. 2018) ("Although the following facts . . . are not alleged in the complaint, it is appropriate to take judicial notice of these facts as they are in the public record as a part of the [Trademark Trial and Appeal Board] proceedings.").

[6] "If the nomination has an international nexus to terrorism it is reviewed by NCTC, otherwise it is reviewed by the FBI." Dkt. 46-1 at 3 (DEX1).

threats to transportation security; ... [and] (7) enforce security-related regulations and requirements." 49 U.S.C. § 114(f). The TSA is further tasked with consulting with appropriate agencies and air carriers to use government agency information to identify individual passengers who may be a threat to civil aviation or national security – upon identifying such an individual, TSA is to notify appropriate law enforcement agencies, prevent the individual from boarding, or take other appropriate action. *See id.* at § 114(h)(3)(A-B).

To comply with these statutory obligations, TSA relies—in part—on the Watchlist information. It uses subsets of the TSDB to implement its own policies and procedures to identify and address threats to transportation security. Specifically, TSA's Secure Flight program draws on the TSDB to implement the No Fly List and the Selectee Lists. Grigg Decl. ¶ 35. The nominations to the subsets of the TDSB are held to additional standards, only some of which are disclosed publicly. "No Fly-Selectee ('NFS') subject matter experts ('SMEs') at the TSC are used to review nominations for possible inclusion on the No Fly or Selectee Lists." *Id.* ¶ 19. The NFS SMEs require specific training, and generally comprise agents from TSA, FBI, and DHS. *Id.* Any individual may be included on the No Fly List when the TSC determines the individual meets at least one of four criteria, including, *inter alia*, posing a threat to commit an act of international terrorism with respect to an aircraft, or of domestic terrorism with respect to the homeland. Watchlisting Overview at 4. "For security reasons, the criteria for inclusion on the Selectee List are not public." *Id.*

Individuals included in these lists may be identified by TSA while traveling and subject to varying security measures; "TSA implements the Selectee and Expanded Selectee Lists by requiring individuals on the Lists to undergo enhanced security screening before boarding an

5

aircraft flying to, from, or over the United States." Dkt. 46-1, DEX4 ¶ 6 ("Moore Decl."). If an individual is on the No Fly List, TSA prevents that individual from boarding said aircrafts. *Id.*

An individual seeking to challenge what he perceives to be unlawful treatment related to increased travel security measures may use the DHS redress process: Department of Homeland Security Traveler Redress Inquiry Program ("DHS TRIP"). Submitting an inquiry with DHS TRIP allows the individual to submit information relevant to travel difficulties for the government to review, but the "general policy is neither to confirm nor deny a person's watchlist status." Watchlisting Overview at 9. "In the small fraction of cases in which DHS TRIP determines that a traveler is an exact or possible match to an identity in the TSDB, then DHS TRIP refers the matter to the Redress Unit at the [TSC]." Moore Decl. ¶ 6. DHS TRIP then issues a determination letter to the traveler based on the TSC review. Regarding select TSDB statuses, when appropriate, the traveler may be removed from the TSDB or one of its subsets. *Id.* ¶ 8.

The constitutionality of DHS TRIP's policy was challenged repeatedly in federal courts. Ultimately, the Government revised the procedures in 2015 to satisfy Due Process.[7] But the revised procedures only apply to the subset of cases where the TSC Redress Office determines the individual is appropriately on the No Fly List. In that scenario, the traveler receives a letter indicating he is on the No Fly List, and is given the option to request additional information. *Id.* ¶ 9. The complainant receives a second letter if it is timely and properly requested. The second letter identifies specific criteria supporting placement on the No Fly List, and includes an unclassified summary of the justification of the placement to the extent possible considering

---

[7] The DHS TRIP regulations per the federal register are updated by incorporation, as they direct individuals to, *inter alia,* the website for further instructions and additional information. 49 C.F.R. § 1560.205(b) (<http://www.dhs.gov/trip>).

national security and law enforcement interests. Again, the second letter provides an option for US citizens and lawful permanent residents to seek additional review, inviting submission of information believed to be relevant to the no-fly status. If the person responds with supplemental information, DHS TRIP sends the whole case record back to TSC for careful and comprehensive review.

Importantly, once the TSC Redress Office completes this late-stage review, it sends a recommendation to the TSA Administrator rather than a determinative finding. The TSA Administrator reviews all relevant materials and then either remands the case to TSC for additional information or clarification, or issues a final order deciding whether the traveler remains on the No Fly List. If the final order maintains the traveler on the list, it will state the basis for that decision. [8] The final order also indicates the traveler's right to seek judicial review pursuant to 49 U.S.C. § 46110.

### B. Plaintiffs' Allegations [9]

Plaintiffs are all United States citizens and are all practicing Muslims. Each of the three plaintiffs has submitted a DHS TRIP inquiry, and Plaintiff Long is the only one who received

---

[8] All written disclosures are provided to the extent feasible without compromising national security or law enforcement interests.

[9] The Court declines to consider risk-based rules separately from implementation of the Watchlist. Any inclusion or targeting from risk-based rules programs in the Amended Complaint is a bare, unsupported assertion. Furthermore, all three plaintiffs allege inclusion in the TSDB, and it is implausible if not impossible to separate and identify government conduct or Plaintiffs' injuries attributable to allegedly parallel and simultaneous sources. What is more, "TSA has stated it has since 'curtailed' the Quiet Skies program," and "[i]t is [] unclear whether or to what degree Silent Partner has been curtailed." Am. Compl. ¶ 55. And a TSA document Plaintiffs include in the record states that individuals are only in the Quiet Skies Program, if at all, for a maximum of 90 days at a time. Dkt. 35-5. As to the alleged CBP risk-based targeting rules, Plaintiffs also acknowledge that the results of such rules are used as a predicate for nominating individuals to the TSDB. Am. Compl. ¶ 56. Separate analysis, if possible, would be futile.

confirmation of his status within the TSDB, on the No Fly List; all Plaintiffs maintain they are listed as KSTs and are included in the Watchlist in some capacity. Am. Compl. ¶ 177.

### 1. Plaintiff Long: Relevant Background

Plaintiff Long is confirmed to be on the No Fly List, and thus received a notification of said status in response to his DHS TRIP inquiry. His confirmation letter included an unclassified summary of the justification:

> You are on the U.S. Government's No Fly list because the U.S. Government has received information that you have participated in training that may make you a threat to U.S. national security. Additionally, your arrest in Gaziantep, Turkey (not far from the Syrian border) in November 2015 is of concern to the U.S. Government.

*Id.* ¶ 180. The DHS TRIP determination letter went on to conclude that "Mr. Long is properly placed on the No Fly List and no change in status is warranted." *Id.*

Plaintiff Long served in the United States Air Force from 1987 to 1998. He was stationed in Turkey, where he engaged with the local culture and converted to Islam. While in Turkey, he also changed his name from Paul Anderson to Saadiq Long. Due to his new Muslim faith, Long determined he could no longer support U.S. Air Force operations, and he applied for conscientious objector status. That was denied, and Plaintiff Long received an "Other than Honorable Discharge" shortly thereafter. *Id.* ¶ 203. Long moved to Egypt with his wife in 1999 before the family moved to Qatar in 2003. He taught English in both locations.

In approximately 2011, Plaintiff Long alleges that a friend in Kenya was held by authorities and questioned by FBI agents, ultimately involving Long "in a fictitious, terrorism-related plot." *Id.* ¶ 208. This is about the time the FBI allegedly reached out to both Plaintiff Long and his two brothers-in-law regarding a terrorism plot, leading Long to allow his Qatari tourist and work visas to expire in addition to his U.S. passport.

### 2. *Plaintiff Long's 2012 Trip to Oklahoma*

Plaintiff Long learned that his mother was critically ill in 2012, and decided to fly back to the United States, but had trouble renewing his passport online. He went to the Embassy and Consulate in Qatar to facilitate his travel, but Long allegedly refused to answer an FBI agent's questions, and was subsequently detained in a Qatari detention center. The detention, Long alleges, "was at the behest of Defendants' agents—a fact that was confirmed by the captain of the Qatari detention center." *Id.* ¶ 215. Plaintiff Long believed he was being deported to the United States per the FBI's request, but instead was released after a weekend in detention. He ultimately received a new passport to get home to see his mother.

One day prior to his flight, Plaintiff Long was allegedly contacted and informed he would not be permitted to fly to the United States because he was placed on the No Fly List. *Id.* ¶ 221. Provided with the website for DHS TRIP, Plaintiff filed through the program but heard nothing in response for several months. Plaintiff Long then obtained legal counsel and gave media interviews addressing his predicament. Plaintiff was eventually allowed to fly to see his mother in November 2012. He had an itinerary from Qatar to Oklahoma, with layovers in Amsterdam and Detroit. *Id.* ¶ 227-28. In Amsterdam, Dutch security agents subjected Plaintiff Long to an invasive search. Subsequent to this search, a DHS agent allegedly approached Long and demanded answers to questions before he boarded his flight to the United States. Plaintiff Long did board the flight after answering some of the agent's questions.

Upon arrival in Detroit for a second layover, CBP agents took Plaintiff Long into custody before allegedly handing him off to FBI agents. Again, Plaintiff Long boarded his next flight after answering some but not all of the agents' questions.

Back in Oklahoma, Plaintiff Long represents that in November or December 2012, he and his sister were followed by an unmarked vehicle; when more vehicles joined, Long and his sister were alarmed and drove to a police station. There, they were surrounded by five or six police cars and officers with guns drawn. *Id.* ¶¶ 231-32. An FBI agent emerged from the unmarked car and said he was just trying to get Plaintiff Long and his sister to stop the car so he could apologize for the inconvenience vis-à-vis the flight to Oklahoma. Also during his stay in Oklahoma, Plaintiff Long applied to purchase a gun and passed a background check in the process. Nevertheless, the sales attendant refused to sell the gun to Long because the so-called authorities said he was not authorized. *Id.* ¶ 234.

In February or March 2013, Plaintiff sought to return to Qatar but was unable to do so without further involvement with the FBI. Plaintiff Long and his lawyer met with FBI agents by mutual agreement at a hotel in Oklahoma City. Searching Plaintiff Long and scanning him with a metal-detecting wand, the FBI told Long his attempted gun purchase indicated a danger to them. The agents questioned Long about his time in the Air Force, his conversion to Islam, and his request for conscientious objector status. *Id.* ¶ 237. Plaintiff Long was unable to fly back to Qatar from the United States. As a result, he took a bus to Mexico and flew back from there.

### 3. All Plaintiffs' 2015 Trip to Turkey

In 2015, Plaintiffs traveled from Qatar to Turkey for vacation on tourist visas. Prior to the trip, Plaintiffs' passports were annotated, allegedly indicating a threat of violence. Plaintiffs allege Defendants shared information among themselves and with the Turkish government, disclosing Plaintiffs' claimed TSDB status and indicating they should be detained and interrogated. After traveling in Turkey for a period of time without incident, Plaintiffs were

detained upon arrival in Gaziantep. The Turkish government allegedly detained Plaintiffs over the weekend before holding a legal hearing and releasing Plaintiffs thereafter.

Turkish police allegedly "handcuffed and kidnapped" Plaintiffs immediately thereafter, upon release from the courthouse. *Id.* ¶ 245. Plaintiffs allege these police officers were acting as agents of the United States government and in accordance with US instruction. The detention that ensued lasted approximately two months, exposed Plaintiffs to brutal conditions, and included a hunger strike – Plaintiff Long led it, and the Daves Plaintiffs joined. There were also communications with the US embassy during this time, and Plaintiffs met resistance when they asked to return to Qatar. When Plaintiffs were released, FBI agents allegedly leaked false information to the media that Long's detention in Turkey was due to joining ISIS.

Plaintiffs claim that against Defendants' will, Turkish authorities allowed them to fly back to Qatar. At Doha International Airport, however, Plaintiffs' passports set off red lights and sirens – Plaintiffs were fingerprinted and subjected to retinal scans before being denied entry to Qatar. Plaintiffs then flew to United Arab Emirates, where they were met with the same response. A UAE official told Plaintiffs they were banned from all Gulf Cooperation Council ("GCC") countries. *Id.* ¶ 259. Nonetheless, UAE officials allowed Plaintiffs to stay in the GCC if they answered questions; three interrogations later, Plaintiffs allege they were rushed back to Doha, Qatar. There, a US Embassy official says a Qatari official offered to buy their tickets to the US, and Plaintiffs accepted.

Finally, Plaintiffs flew to the United States on January 20, 2016. The flight from Qatar landed at JFK International Airport in New York, where law enforcement accompanied them to the front of the customs line and treated them separately from other travelers. As part of their individual interrogation and search, Plaintiffs claim law enforcement demanded access to the

family's phone and passwords to their email accounts, promising to confiscate the phone if they did not cooperate. *Id.* ¶ 263. The next day, in an attempt to fly back to Oklahoma City, Plaintiff Long and Plaintiff Juanjang Daves each set off alarms when TSA screened their passports. Allegedly, a TSA agent said to his colleagues that they had two "house guests." *Id.* ¶ 264.

Approximately five days later, Plaintiffs were able to board a flight to Oklahoma City, subject to similarly onerous security processes. "Since the filing of this lawsuit, Plaintiff Long was again denied the purchase of a gun." *Id.* ¶ 266.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes a court to dismiss a claim for lack of subject matter jurisdiction. When challenging under Rule 12(b)(1), the "plaintiff[] bears the burden of proving that subject-matter jurisdiction exists." *The Piney Run Preservation Ass'n v. The Cty Com'rs of Carroll Cty., Md.*, 523 F.3d 453, 459 (4th Cir. 2008) (citing *Evans v. B.F. Perkins Co., a Div. of Standex Intern. Corp.*, 166 F.3d 642, 647 (4th Cir. 1999)).

"A defendant may challenge subject-matter jurisdiction in one of two ways: facially or factually." *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (citing *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). Facial challenges assert "that a complainant simply fails to allege facts upon which subject matter jurisdiction can be based." *Kerns*, 585 F.3d at 192. As the Court does under a Rule 12(b)(6) analysis, when there is a facial challenge to jurisdiction, "the facts alleged in the complaint are taken as true." *Id.* Considering a subject matter jurisdiction challenge that is factual, "the district court is to regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment." *Evans*, 166 F.3d at 647 (quoting *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991)).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007). A motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. While "detailed factual allegations" are not required, Rule 8 does demand that a plaintiff provide more than mere labels and conclusions stating that the plaintiff is entitled to relief. *Id.*

Beyond conclusory statements, Plaintiff is required to articulate facts that, when accepted as true, demonstrate plausible entitlement to relief.[10] *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009); *Virginia Transformer Corp. v. Ebbert*, 2019 WL 1415467, at *1 (W.D. Va. Mar. 28, 2019). The Court "need not accept legal conclusions couched as facts or 'unwarranted inferences, unreasonable conclusions, or arguments.'" *Virginia Transformer Corp.*, at *2 (quoting *Wag More Dogs, LLC v. Cozart*, 680 F.3d 359, 365 (4th Cir. 2012)).

---

[10] The Court is cognizant of potentially classified information underlying Plaintiffs' claims, and that Plaintiffs are not privy to certain information that would aid in their pleading. It is considered throughout the Court's review.

## III. JURISDICTION

### A. Jurisdiction Pursuant to 49 U.S.C. § 46110

#### *1. Background*

"Limits on subject-matter jurisdiction 'keep the federal courts within the bounds the Constitution and Congress have prescribed,' and those limits 'must be policed by the courts on their own initiative.'" *Watts v. S.E.C.*, 482 F.3d 501, 505 (D.C. Cir. 2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999)). Accordingly, the Court first evaluates its jurisdiction over the present claims.

Section 114 of Title 49 of the United States Code establishes the Transportation Security Administration under the Department of Homeland Security. 49 U.S.C. § 114(a). The statute also sets out various requirements as to the leadership and operation of the administration. More specifically, Section 44903 charges the TSA Administrator with "prescrib[ing] regulations to protect passengers and property on an aircraft operating in air transportation." 49 U.S.C. § 44903(b). Section 44903 also tasks the TSA Administrator with establishing and maintaining, *inter alia*, air transportation security programs at airports, secured area access control, airport perimeter security, and assessment and deployment of emerging security technologies and procedures, including the Secure Flight program. *Id.* at §44903(c),(g),(h),(j). Additionally, the Secretary of Homeland Security, pursuant to 49 U.S.C. § 44926, must provide "a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by the Transportation Security Administration, United States Customs and Border Protection, or any other office or component of the Department of Homeland Security." *Id.* at § 44926(a).

Having delineated TSA's role and regulatory framework within DHS, Title 49 further establishes jurisdiction for judicial review of "orders" of the Secretary of Transportation in "the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business." 49 U.S.C. § 46110(a).[11] The appropriate court of appeals "has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Administrator of the Transportation Security Administration, or Administrator of the Federal Aviation Administration to conduct further proceedings." *Id.* at § 46610(c).

Indeed, "where Congress has provided a statutory procedure for the review of an administrative order, such procedure is exclusive." *Oling v. Air Line Pilots Ass'n*, 346 F.2d 270, 276 (7th Cir. 1965) *cert. denied*, 382 U.S. 926 (1965). Despite potential practical and factfinding difficulties, courts "are bound by the plain language of the statute." *Kashem v. Barr*, 941 F.3d 358, 391 (9th Cir. 2019).

Congress' jurisdictional grant to the courts of appeals in § 46110 is not unique. It is settled that "Congress is free to choose the court in which judicial review of agency decisions may occur." *Watts v. S.E.C.*, 482 F.3d at 505 (internal quotation omitted). In *F.C.C. v. ITT World Commc'ns, Inc.*, 466 U.S. 463 (1984), the Supreme Court recognized the court of appeals' exclusive jurisdiction over final orders of the Federal Communications Commission. Indeed, the Court noted, "[l]itigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order." *Id.* at 468 (citing *Port of Boston Marine*

---

[11] The statute clarifies that the issuing entity or office of the Secretary of Transportation also refers to, "the Administrator of the Transportation Security Administration with respect to security duties and powers designated to be carried out by the Administrator of the Transportation Security Administration or the Administrator of the Federal Aviation Administration." *Id.* at § 46110(a).

*Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 69 (1970); *Whitney Nat'l Bank v. Bank of New Orleans*, 379 U.S. 411, 419-22 (1965)); *see also City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320, 336 (1958) (holding, where the Federal Power Act gave courts of appeals exclusive jurisdiction over administrative orders, "all objections . . . must be made in the Court of Appeals or not at all.").

Courts have also assessed whether these statutory grants of jurisdiction may envelop broader constitutional challenges to agency action. "Indeed, [the Fourth Circuit] [has] consistently affirmed the propriety of such statutes where statutory and constitutional claims can be meaningfully addressed in the courts of appeals." *Blitz v. Napolitano*, 700 F.3d 733, 741 (4th Cir. 2012) (collecting cases). Some litigants claimed that precluding plaintiffs from bringing broader challenges in the district courts might itself offend due process. In response, the *Blitz* Court cited the Fourth, Seventh, Eleventh, and D.C. Circuits to support the notion that appellate level review satisfies due process; this is primarily because of the court of appeals' "ample authority to remand if the agency record is found inadequate." *Id.* (citing 49 U.S.C. § 46110(c); *Virginia v. United States*, 74 F.3d 517, 525 (4th Cir. 1996)); *see also St. John's United Church of Christ v. City of Chicago*, 502 F.3d 616, 628-29 (7th Cir. 2007).

The Supreme Court, too, considered federal question jurisdiction outside of the district courts. In *Elgin v. Dept. of the Treasury*, 132 S. Ct. 2126, 2132 (2012), the Court explained that where a federal statute "intends to preclude judicial review of constitutional claims [,] its intent to do so must be clear." (quoting *Webster v. Doe*, 486 U.S. 592, 603 (1988)) (alteration original). But where there is no such clear intent, the court "ask[s] only whether Congress' intent to preclude district court jurisdiction was 'fairly discernible in the statutory scheme.'" *Id.* (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994)) (internal quotation omitted). The

"fairly discernible" standard considers the relevant statute's text, structure, and purpose. *Id.* at 2133. Regarding constitutional claims, the Supreme Court noted, "a jurisdictional rule based on the nature of an employee's constitutional claim would deprive the aggrieved employee, the [agency review board], and the district court of clear guidance about the proper forum for the employee's claims at the outset of the case." *Id.* at 2135. A categorical rule—as to which types of challenges must be brought where—is "hazy at best and incoherent at worst." *Id.*

Section 46110 conveys exclusive jurisdiction to the courts of appeals in plain, certain terms. The substance of that jurisdiction, however, requires a more thorough analysis.

### 2. Defining an "Order" Within § 46110

Jurisdiction under § 46110 hinges on what constitutes an "order" within the meaning of the Act. The statute does not define "order." "The APA provides that an 'order' is 'the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing.'" *Watts v. S.E.C.*, 482 F.3d at 505-06 (citing 5 U.S.C. § 551(6)). Indeed, "order" under § 46110, "'has been given expansive construction,' but to be reviewable the order must be final, and there must be an adequate record for judicial review." *Ligon v. LaHood*, 614 F.3d 150, 154 (5th Cir. 2010) (quoting *Atorie Air, Inc. v. Fed. Aviation Admin.*, 942 F.2d 954, 960 (5th Cir. 1991)).

The requirement that the order be final helps "[t]o avoid premature intervention in the administrative process." *CSI Aviation Servs., Inc. v. Dept. of Transp.*, 637 F.3d 408, 411 (D.C. Cir. 2011). "To be sufficiently final, the order 'need only be an agency decision which imposes an obligation, denies a right, or fixes some legal relationship.'" *Ligon v. LaHood*, 614 F.3d at 154 (quoting *Atorie Air,* 942 F.2d at 960). The Fourth Circuit said an "order" results when the agency action is the final disposition of the matter it addresses. *Blitz,* 700 F.3d at 740; *see also*

17

*Alexandria v. Helms*, 728 F.2d 643, 646 (4th Cir. 1984) ("The dispositive question is whether the agency action was the definitive statement on the subject matter it addressed.") (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149-51 (1967)).

Further, this Circuit rejects the argument that Circuit Court review only applies "to orders issued by the TSA Administrator after the completion of adjudicatory proceedings where affected persons have been accorded an opportunity to participate." *Blitz*, 700 F.3d at 740. Courts have, indeed, discussed the requirement of an adequate record for judicial review in the Courts of Appeals. As a general matter, the Fourth Circuit has held that an extensive administrative record is not a prerequisite under § 46110, and that even "constitutional claims can be meaningfully addressed in the courts of appeals." *Id.* at 741.

Courts have also interpreted a § 46110 "order" to encompass agency procedures and protocols. In *Blitz*, the Court considered whether the Checkpoint Screening Standard Operating Procedure ("Checkpoint Screening SOP") TSA revised and adopted on Oct. 29, 2010, was an order within the meaning of the Act. Ultimately, the Court held that, because TSA's implementation of Checkpoint Screening "conclusively settled the agency's position with respect to the use of AIT scanners and passenger pat-downs, *those procedures* represent the TSA's final disposition of the matter." 700 F.3d at 740 (emphasis added). As such, the Checkpoint Screening SOP, upon adoption, was an order within the meaning of § 46110. *See also Durso v. Napolitano*, 795 F. Supp. 2d 63, 67 (D.D.C. 2011) (concluding the same Checkpoint Screening SOP was a § 46110 "order," rejecting plaintiffs' argument that the SOP was not a *final* order because it could be revised as necessary); *Roberts v. Napolitano*, 798 F. Supp. 2d 7 (D.D.C. 2011) (same); *Amerijet Intn'l, Inc. v. U.S. Dept. of Homeland Security, et al*, 43 F. Supp. 3d 4, 13-14 (D.D.C. 2014) (finding a TSA Security Directive to be an "order" as the consummation of

18

the agency's decision-making process and the establishment of uniform standards and procedures); *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 598 (D.C. Cir. 2007) (finding the FAA's Advisory Circular 42F, setting certain torque-testing requirements, to be a final order under § 46110).

The court in *Durso v. Napolitano*, explained finality more fully in terms of the same TSA Checkpoint Screening SOP:

> Simply put, plaintiffs provide no authority for the proposition that an otherwise-authoritative order is not final for the purposes of § 46110 simply because it is subject to revision. The rule that an order is not final unless it marks the "consummation" of the agency's decisionmaking process does not mean that an order must be set in stone to be considered final; rather, it must have immediate effect. *See [City of] Dania Beach [v. FAA*, 485 F.3d 1181, 1188 (D.C. Cir. 2007)]; *Vill. of Bensenville v. FAA*, 457 F.3d 52, 69 (D.C. Cir. 2006) (holding that an FAA letter was not final because its adverse effect on the petitioners' rights was contingent on future administrative action).

795 F. Supp. 2d at 67.

Here, the Government argues that challenges to the adequacy of the procedures of DHS TRIP—not just the TSA Administrator's final determination—must be brought to the Court of Appeals. Defendants proffer that Congress directed TSA to establish redress procedures, and "to the extent a plaintiff 'challenges the adequacy of the redress process, his claims amount to a challenge to a TSA order.'" Mot. at 16 (quoting *Mokdad v. Lynch*, 804 F.3d 807, 811 (6th Cir. 2015)).

Plaintiffs maintain that their claims reach well beyond DHS TRIP. They contend the Fourth Circuit's reasoning in *Mohamed v. Holder*, No. 11-1924, 2013 U.S. App. LEXIS 26340 (4th Cir. May 28, 2013) (hereinafter "*Mohamed*") is still applicable, as Mohamed's claims are the same as Plaintiff Long's. Opp'n at 4. Regardless of the broader scope of Plaintiffs' claims, however, DHS TRIP remains an operative element in the Amended Complaint.

19

In fact, DHS TRIP procedures are highly relevant and specifically identified in the Amended Complaint. *See, e.g,* ¶¶ 154-165. Further, the revision to those procedures in 2015 was the "consummation" of agency review of those procedures that had "immediate effect." There are indeed several aspects of the 2015 DHS TRIP revision that align with what binding law in this Circuit has determined to be a final order within § 46110. Nevertheless, a closer look reveals that where procedures and directives were found to be final orders, they were neatly contained within the relevant agency's purview. *See, e.g., Blitz,* 700 F.3d at 740 (TSA Checkpoint Screening SOP as final order); *Amerijet Intn'l, Inc.,* 43 F. Supp. 3d at 14 (TSA Security Directive as final order). The complication at bar lies once again in interagency actions.

Procedures aside, the Court is unaware of any argument challenging the Courts of Appeals' jurisdiction over TSA's final No-Fly determination within the updated DHS TRIP. The 2015 revisions plainly addressed the agency actor issue by giving TSA the final say. Plus, with the benefit of the revised procedures, there is little doubt there will be an adequate record for review. Indeed, while "orders need not be accompanied by a comprehensive record to be reviewable under § 46110," *Roberts,* 798 F. Supp. 2d at 10, the revised procedures allow for a fuller and more extensive record to amass prior to the Court of Appeals' review.[12] *See* Griggs Decl., Moore Decl. (describing the new procedures and ability for the complainant to build a fuller record); *see also Kashem,* 941 F.3d at 391 ("The current DHS TRIP procedures generate an administrative record … and that record includes the DHS TRIP notification letter's unclassified summary of the reason for the complainant's inclusion on the No Fly List, the final TSA order setting forth the unclassified reasons for the decision to maintain the complainant on

---

[12] Of course, this is subject to limitations for sensitive and classified information.

the list, the government's in camera filings, and any material the complainant chose to submit in the administrative proceedings.").

As further established below, TSA's final No Fly List determination through DHS TRIP is an "order" within the meaning of § 46110.

### 3. *Agency Actor: Issues of Causation and Redressability*

"[T]he 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976).

Congress specified that, with select exceptions, the Secretary of Transportation must issue the challenged order. 49 U.S.C. § 46110(a) ("...an order issued by the Secretary of Transportation (or the Administrator of the [TSA] ... or the Administrator of the [FAA] ...)"). In 2013, the Fourth Circuit addressed claims borne out of the plaintiff's status on the No Fly List in an unpublished order *Mohamed v. Holder*, No. 11-1924, 2013 U.S. App. LEXIS 26340 (4th Cir. May 28, 2013). In *Mohamed*, the order cited to the *Blitz* case, where TSA had the exclusive ability to modify the Checkpoint Security SOP at issue. As such, the Court of Appeals had exclusive jurisdiction. The panel in *Mohamed* found: "[a]lthough 49 U.S.C. § 46110 gives us broad powers of review over orders of the TSA, it does not give us similar independent authority over the TSC . . . the efficacy of our review is limited by our inability to directly review the TSC's actions, direct the agency to develop necessary facts or evidence, or compel its compliance with any remedy we might fashion." *Id.* at *5-6 (citing *Elgin*, 132 S. Ct. at 2133-34 (2012)); *see also Ege v. United States Dept. of Homeland Sec.*, 784 F.3d 791 (D.C. Cir. 2015) ("Section 46110 gives us authority to review orders from the TSA, DHS and FAA ... 'the sole

entity with ... the authority to remove' names from the No-Fly List/TSDB, however, is the TSC." (citing *Latif v. Holder*, 686 F.3d 1122, 1129 (9th Cir. 2012)).

In sum, these § 46110 jurisdictional questions under Article III turn on the identity of the final decision maker. The update was, in large part, aligned with the District of Oregon decision, *Latif v. Holder*, 28 F. Supp. 3d 1134 (D. Or. 2014). *See Latif v. Sessions*, No. 3:10-cv-00750-BR, 2017 WL 1434648, at *2 (D. Or. April 21, 2017) ("Defendants revised the DHS TRIP procedures to address the deficiencies that the Court identified in its June 24, 2014, Opinion and Order.").[13] This change, as detailed above in Part I.A., removed TSC from the final stage of the review process and altered the interagency relationship. For those US citizens or lawful permanent residents on the No Fly List, TSC submits its *recommendation* to TSA after the TSC Redress Office review, but the TSA Administrator is the sole and final arbiter. The Ninth Circuit held, "[i]t is no longer the case, therefore, that any remedy must involve TSC."[14] *Kashem v. Barr*, 941 F.3d at 391. Indeed, within the Fourth Circuit, any reliance on *Mohamed* in evaluating the current scheme must consider TSA's modified role as the final arbiter for individuals on the No Fly List.

---

[13] The Court relies on government declarations explaining the updated procedures. By May 28, 2015, the Government filed the Declaration of G. Clayton Grigg, the Deputy Director for Operations at the TSC and a Special Agent for the FBI. Grigg Decl., *supra* at 2. The Grigg Declaration in the District of Oregon explained in much detail what a Notice in *Mohamed* summarized for the Eastern District of Virginia. Likewise in the instant case, Defendants submit, *inter alia*, the declaration of Deborah O. Moore detailing the updated procedures. Moore is Director, DHS TRIP & Branch Manager of the Civil Rights and Civil Liberties, Ombudsman and Traveler Engagement component at TSA, since 2013 (i.e. she held this position before and after the 2015 procedure update).

[14] This modification, the *Kashem* Court held, invokes 49 U.S.C. § 46110 and places the substantive due process claims challenging to No Fly List determinations within the exclusive jurisdiction of the courts of appeals. *Id.* In *Kashem*, facial challenges to the redress procedures remained with the District Court.

Nonetheless, to the best of the Court's knowledge there is no distinct, severable portion of the DHS TRIP procedures that is the consummation of TSA's independent action. The DHS TRIP revision was the result of litigation against multiple agencies. What is more, so long as TSC manages the TSDB, TSC must be involved as a key actor in any DHS TRIP procedures. "The TSC maintains the TSDB, of which the No Fly, Selectee, and Expanded Selectee Lists are subsets." Moore Decl. ¶ 6. Despite the Government's arguments to the contrary, there is little reason to believe that the courts evaluating these questions before the 2015 revision would answer them differently now. In *Ege v. U.S. Dept. of Homeland Sec.*, the court said, "[t]he problem, however, is that neither the TSA nor the [DHS] . . . has 'authority to decide whose name goes on the No-Fly List.'" 784 F.3d at 793 (quoting *Ibrahim v. DHS*, 538 F.3d 1250, 1254 n.6 (9th Cir. 2008)). The TSC, administered by the FBI, the *Ege* court continued, was 'the sole entity with both the classified intelligence information' Ege wants and 'the authority to remove' names from the No-Fly List/TSDB." *Id.* (quoting *Latif v. Holder*, 686 F.3d at 1129).

Aside from the removal of a name from the No Fly List, this is still true. Based on relevant government documents and declarations, the decision-making regime is largely unchanged after the 2015 revision. This is particularly so regarding initial inclusion in the TSDB.[15] TSC, alone, still receives and evaluates nominations, manages the classified intelligence information, and removes names from the TSDB. Notwithstanding TSA's No-Fly determination, TSC seemingly could put a name back on the No Fly List upon a new nomination

---

[15] The Moore Declaration explains that, in the late stages of the revised process, "DHS TRIP forwards the [traveler's] response and any enclosed information to the TSC Redress Office for careful consideration. Upon completion of TSC's comprehensive review of everything submitted to DHS TRIP and other available information, TSC provides DHS TRIP with a recommendation to the TSA Administrator as to whether the person should be removed from or remain on the No Fly List and the reasons for that recommendation." ¶ 11.

that met Watchlisting protocols. Even when plaintiffs' alleged injuries are travel-related, TSA can only offer partial relief to those seeking removal from the Watchlist as a whole. In other words, regarding an individual's inclusion or ongoing status in the TSDB, TSA's ultimate redress authority may prove fragile.

Fragility aside, TSA's ultimate redress authority is an "order" within the meaning of § 46110. "Under the new procedures, the TSA Administrator bears sole responsibility for issuing a final order maintaining or removing a traveler from the No Fly List and sole authority to remove a traveler from the list." *Kashem*, 941 F.3d at 365. Those individuals fighting their No-Fly status may seek *some* relief pursuant to § 46110, as—even if temporarily—TSA may remove an individual from the No Fly List without involving any other agency. As the Courts of Appeals have "broad powers of review over orders of the TSA," it can effectively exercise jurisdiction over these orders. *Mohamed*, 2013 U.S. App. LEXIS 26340, at *5-6.

The statute is clear that, in this instance, the Fourth Circuit "has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order…" 49 U.S.C. § 46110(c). And "[l]itigants may not evade these provisions by requesting the District Court to enjoin action that is the outcome of the agency's order." *F.C.C. v. ITT*, 466 U.S. at 468. Practicalities aside, this Court has no intent to frustrate Congress' statutory scheme nor to inhibit the Fourth Circuit's review.

### 4. Inescapable Intertwinement

Challenges to administrative proceedings may be "inescapably intertwined with a review of the procedure and merits surrounding their respective adjudications." *Ligon*, 614 F.3d at 155 (citation omitted). Indeed, there are instances when courts of appeals preside over claims in the first instance that would otherwise be heard in the district court, because "[s]pecific grants of

jurisdiction to the courts of appeals override general grants of jurisdiction to the district courts." *Id.* at 154 (collecting cases). When claims are intertwined with challenges to an agency's final order, "a plaintiff may not circumvent the exclusive jurisdiction of the court of appeals by collaterally attacking an administrative order in a federal district court." *Id.* at 155 (citing *Zephyr Aviation, L.L.C. v. Dailey*, 247 F.3d 565, 572 (5th Cir. 2001)). *See also Tur v. Fed. Aviation Admin.*, 104 F.3d 290, 292 (9th Cir. 1997); *Green v. Brantley*, 981 F.2d 514, 519-21 (11th Cir. 1993). The Supreme Court consistently has held that exclusive jurisdiction provisions such as that in § 46110 "bar litigants from 'requesting the District Court to enjoin action that is the outcome of the agency's order.'" *Kovac v. Wray*, 363 F. Supp. 3d 721, 741 (N.D. Tex. 2019) (quoting *FCC v. ITT*, 466 U.S. at 468); *see also City of Tacoma v. Taxpayers of Tacoma*, 357 U.S. 320 (1958) (same).

Courts have also relied on this doctrine when original jurisdiction is unclear. In *El Bey v. Hilton*, No. 15-cv-3188 (ENV) (VMS), 2017 WL 3842596, at *4 (E.D.N.Y. Sep. 1, 2017), the court considered § 46110 jurisdiction over checkpoint identification protocols. "At a minimum, El Bey's complaint is 'inextricably intertwined' with the SOP." *Id.* at *4 (citing *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 187 (2d Cir. 2001)).

There are, however, limits on those claims inescapably intertwined with a challenge to an agency order. The district court in *Amerijet Intn'l*, noted:

> Although the exact boundaries are somewhat murky, the breadth of the inescapable-intertwinement doctrine, as applied to § 46110(a), stops short of preventing a district court from reviewing "broad facial challenges" to a TSA order; it does prohibit, however, a district court from hearing "as-applied challenges" in which the plaintiff seeks review of the procedures and merits of an order.

43 F. Supp. 3d at 14-15 (citing *Gilmore v. Gonzales*, 435 F.3d 1125, 1133 n.9 (9th Cir. 2006); *Thomson v. Stone*, No. 05-CV-70825, 2006 WL 770449, at *4 (E.D. Mich. Mar. 27, 2006) ("If

the claim raises broad constitutional challenges which do not require a review of the procedures, then the district court has subject[ ] matter jurisdiction to consider the constitutional challenges." (citation and quotation omitted) (alteration original)).

The law regarding judicial review of post-2015 DHS TRIP determinations for individuals on the No-Fly List is in its infancy. *Kashem*, though, is on point. There, the Ninth Circuit affirmed the district court's exercise of jurisdiction over "the vagueness and procedural due process claims and dismiss[al of] the substantive due process claims for lack of jurisdiction under 49 U.S.C. § 46110." 941 F.3d at 364. Thus the procedural claims were not inescapably intertwined with the substantive in that case.

In *Mohamed*, the Fourth Circuit said, "the efficacy of our review is limited by our inability to directly review the TSC's actions, direct the agency to develop necessary facts or evidence, or compel its compliance with any remedy we might fashion." *Id.* at *6 (citing *Elgin*, 132 S. Ct. at 2138; *Nat'l Taxpayers Union v. U.S. Social Sec. Admin.*, 376 F.3d 239, 243-44 (4th Cir. 2004)). This was what distinguished Mohamed's claims from those in *Blitz*. Indeed, it was the intertwinement of the government actors, not the intertwinement of the claims, that was determinative.[16] This did not reject the inescapable intertwinement doctrine altogether, but rather placed the question of jurisdiction over agency actors ahead of it. The Court recognizes *Mohamed* as an unpublished opinion. But it follows that this analysis would apply to any claims requiring review of procedures or conduct outside TSA's orders; this includes those that cannot

---

[16] While the Fourth Circuit did not apply the inescapable intertwinement doctrine in *Mohamed*, it did not denounce it or voice disfavor. Rather, the Court determined that the initial "order" was beyond the intended scope of the statute, thus there was nothing within its jurisdiction with which to intertwine. *Mohamed*, 2013 U.S. App. LEXIS 26340 at *3-6.

be resolved by further proceedings under the Secretary of Transportation, Administrator of the TSA, or Administrator of the FAA. 49 U.S.C. § 46110(c).

"[T]he breadth of the inescapable-intertwinement doctrine . . . stops short of preventing a district court from reviewing broad facial challenges to a TSA order," and the doctrine cannot do such heavy lifting as to bring all of plaintiff's constitutional claims to the Courts of Appeals. *Amerijet Intn'l*, 43 F. Supp. 3d at 14-15 (internal quotations omitted). What is more, the § 46110 claims are entirely derivative of the TSDB – the subject of the broader claims.

The upshot is that Long's as-applied challenges to his redress proceedings and his ongoing Watchlist status, as determined through DHS TRIP, belong in Fourth Circuit. The inescapably intertwined doctrine does not deprive the court of appeals from its exclusive jurisdiction in this case, nor does the doctrine strip the district court of jurisdiction over those claims outside of § 46110. Consequently, Plaintiff's as-applied constitutional claims are beyond this Court's jurisdiction, and the balance of his claims remain.

### 5. Conclusion: § 46110 Jurisdiction

When challenging under Rule 12(b)(1), the "plaintiff[] bears the burden of proving that subject-matter jurisdiction exists," *Piney Run Preservation Ass'n*, 523 F.3d at 459, and Plaintiffs have not done so for all claims before the Court. Seeing as the DHS TRIP procedures themselves are not an order within § 46110, and the Daves Plaintiffs did not receive confirmation that they are on the No Fly List, their claims fall outside § 46110 jurisdiction.

Plaintiff Long's claims, on the other hand, do invoke § 46110. Based on the inter-agency power dynamic discussed herein, and pursuant to the clear congressional intent of § 46110 to establish exclusive jurisdiction in the Courts of Appeals, the Court defers to the Fourth Circuit's exclusive jurisdiction before reviewing several of Plaintiff Long's claims. Plaintiff Long asks

the Court to consider issues of, *inter alia*, TSDB nomination and inclusion, and TSC policies that determine the very existence and composition of the No Fly List. The Court declines to exercise simultaneous jurisdiction over claims that might nullify the Fourth Circuit's review, as such a divestment would be contrary to the clear intent of § 46110.

For these reasons and in the interests of justice, the Court severs Plaintiff Long's as-applied claims in Counts I, II, III, and V, and TRANSFERS them to the Fourth Circuit Court of Appeals pursuant to 28 U.S.C. § 1631. Should the Circuit Court reverse the TSA Administrator's final DHS TRIP order, Plaintiff Long's status in this case will materially change. Accordingly, the Court STAYS the remainder of Plaintiff Long's claims pending the Fourth Circuit's review.[17]

### B. Plaintiffs' Standing

The Court continues its analysis as it applies to the Daves Plaintiffs. Based on the current record, the Court assumes shared experiences for each member of the family during the 2015-16 travels unless indicated otherwise in the pleadings. The Court is cognizant of Plaintiffs' claim that "[t]he federal government utilizes guilt-by-association as a basis for watchlist inclusion." Am. Compl. ¶ 67. The Amended Complaint also alleges that "immediate relatives of listed persons can become TSDB Listees [or subject to rules-based 'terrorist' monitoring] without any derogatory information ... on the basis of family alone." *Id.* If the Daves Plaintiffs do, in fact, allege their harms as derivative of Plaintiff Long's, then all present claims should be stayed pending the Fourth Circuit's review.

---

[17] "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North Am. Co.*, 299 U.S. 248, 254 (1996).

Nevertheless, the Daves Plaintiffs were physically present for and personally involved in extended travel from Qatar to—ultimately—Oklahoma City from some time in 2015 to late January 2016. The Court finds sufficient information to consider the Daves Plaintiffs' injuries independent of Plaintiff Long's. Plaintiffs are incorrect, as explained below, to assert that "[a]s the Government concedes Long has standing, the Court can assume that the Daves Plaintiffs have standing as well." Opp'n at 7. Some discussion of Plaintiff Long herein is both unavoidable and instructive, but the ultimate analysis and conclusion pertains only to the Daves Plaintiffs.

As a threshold requirement, and to aid in identifying such "cases" and "controversies," pursuant to Article III, courts enlist the doctrine of standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("*Lujan*") ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."). The standing inquiry "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (citing *Barrows v. Jackson*, 346 U.S. 249, 255-56 (1953)). A rigorous evaluation of standing is warranted, as "[r]elaxation of standing requirements is directly related to the expansion of judicial power." *United States v. Richardson*, 418 U.S. 166, 188 (1974) (Powell, J., concurring).

This "standing requirement applies to each claim that a plaintiff seeks to press." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (citing *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). As the *Elhady v. Kable* Court stated, "a claim is justiciable if even a single plaintiff has standing to raise it." 391 F. Supp. 3d 562, 574 (E.D. Va. 2019) (citing *Bostic v. Schaefer*, 760 F.3d 352, 370-71 (4th Cir. 2014)). But justiciability and standing are not always coextensive as to plaintiffs, and, generally, the standing of one does not bear on the standing of

another. "[W]hen standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable." *Flast v. Cohen*, 392 U.S. 83, 98, 99-100 (1968).

Indeed, each "plaintiff invoking federal jurisdiction bears the burden to show that he has a 'personal stake' in the outcome of the suit." *L-3 Commc'ns Corp. v. Serco, Inc.*, 673 F. App'x 284, 288 (4th Cir. 2016) (quoting *Camreta v. Greene*, 563 U.S. 692, 701 (2011)). The plaintiff's burden to show standing is commensurate with the applicable standard of review at each stage of the litigation; "at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan v. Defs. of Wildlife*, 504 U.S. at 561 (quoting *Lujan v. National Wildlife Federation*, 497 U.S. 871, 889 (1990)). Notwithstanding that, "[a] federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas*, 495 U.S. 149, 155–56 (1990).

Standing, at its constitutional minimum, requires three elements. A plaintiff first must allege "an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560 (quoting *Whitmore v. Arkansas*, 495 U.S. at 155) (internal citations omitted). Second, standing requires a causal connection between the injury and the alleged conduct. *See id.* Finally, "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 561 (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)).

The Fourth Circuit regards the first element, injury in fact, as the primary and indispensable factor for standing. *See Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 653 (4th Cir. 2019) ("An injury in fact is an indispensable aspect of constitutional standing; no Case or Controvers[y] exists without injury. It is '[f]irst and foremost' of the three requirements of constitutional standing.") (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). *Lujan* confirmed that the injury must be *both* concrete *and* particularized. *Id.* at 561 (emphasis added). Courts must consider these aspects of the injury-in-fact requirement separately. *See Spokeo*, 136 S. Ct. at 1545. Notably, "[f]or an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560, n.1).

Furthermore, "when a party seeks injunctive relief ... there is the additional requirement of a 'real or immediate threat' that the party will suffer an injury in the future." *Griffin*, 912 F.3d 653 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)). "The allegations in the Complaint of past injuries 'do[ ] not in [themselves] show a present case or controversy ... if unaccompanied by any continuing, present adverse effects.'" *Nanni v. Aberdeen Marketplace, Inc.*, 878 F.3d 447, 454 (4th Cir. 2017) (quoting *Lujan*, 504 U.S. at 564) (quoting *City of Los Angeles*, 461 U.S. at 102)).

With these requirements in mind,[18] the Court examines Plaintiffs' standing.

### 1. Narrowing Plaintiffs' Alleged Injuries

Plaintiffs allege far-reaching injuries. They only plead some injuries, however, with any specificity to support a valid claim. What is more, the Court cannot discern from much of Plaintiffs' Amended Complaint which injuries are specific to Plaintiffs, and which apply to

---

[18] The discussion is focused on injury-in-fact, and the Court will consider causation and redressability as necessary to reach its conclusions.

individuals purportedly "similarly situated." There is no putative class before the Court, and any injury only affecting those "similarly situated" is not germane to this inquiry.

The Amended Complaint describes the entirety of the Government's terrorist screening system and its purported sprawling harms to society, and includes scores of paragraphs wholly unrelated to Plaintiffs' case. For instance, Plaintiffs represent that they are all United States citizens. Am. Compl. ¶¶ 16-18. Then, when enumerating injuries under Count II, Plaintiffs include, *inter alia*, "their citizenship applications [were] delayed indefinitely due to an 'FBI name check.'" *Id.* ¶ 305. This is a representative example of many more problematic claims. The Court cannot and will not consider such inconsistent and unsupported assertions.

Plaintiffs also state that the TSDB is "used as a basis to deny federal government employment, security clearances [for both public and private jobs], travel benefit programs like TSA PreCheck and Global Entry, and a wide variety of government licenses and credentials used in both public and private employment, including FAA licenses, Hazmat licenses, Transportation Worked Identity Credentials, and security credentials needed for critical infrastructure projects like power plants." *Id.* ¶ 87. However much of that is true, Plaintiffs did not allege denial of any of these things.[19] Once again, the Court is troubled by its inability to assign allegations to a party to this suit.

Continuing to whittle down the Amended Complaint in search of relevant, supported allegations, the Court notes a plethora of individualized injuries that are merely conclusory. The Court is not required to accept legal conclusions couched as factual allegations. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Indeed, the Court declines to consider a range of inadequately-

---

[19] Notably, Plaintiff Long alleges that he was prohibited from purchasing guns in the United States, had a bank account frozen, and lost his job as a truck driver because of his status. Even if these injuries were adequately pled, none of them are alleged to fall within these categories.

pled harms at bar. For instance, alleged injury is unsupported as it relates to dissemination of criminal information to law enforcement, including the use of "Handling Codes," targeting by license plate, or notations on criminal records. *See, e.g.*, Am. Compl. ¶¶ 45, 100, 107. It is not apparent from the Amended Complaint that any plaintiff has a criminal record or, by sharing of criminal or non-criminal information, was subjected to treatment traceable to law enforcement's use of the NCIC.[20] Furthermore, the Amended Complaint states, "[t]he practice of Islam of the Plaintiffs has been substantially burdened by Defendants." *Id.* ¶ 191. The Court cannot identify any individualized facts directly in support of this claim, and declines to consider it. As a final example, Plaintiffs include a conclusory statement regarding the alleged harms to their ability "to access and utilize the financial system." *Id.* ¶ 89. Plaintiffs assert: "[s]ince returning to the United States, Plaintiffs have had a bank account closed. Upon information and belief, the closure was due to Plaintiffs' TSDB status." *Id.* ¶ 270. This is not to conclude the TSDB has no relationship with financial institutions or other businesses, but rather it is inadequately pled. Plaintiffs' bare assertion is a far cry from allegations such as in *Elhady v. Piehota*, 303 F. Supp. 3d 453, 460 (E.D. Va. 2017), where a plaintiff was denied a test drive at a car dealership and a sales associate informed him that he was "not supposed to tell," but the dealership's system showed designation on the federal terror watchlist and he needed FBI clearance to test drive.[21]

Finally, Plaintiffs' allege Defendants are responsible for their treatment in foreign countries by foreign officials while abroad. These allegations are speculative and largely

---

[20] This finding includes consideration of Plaintiff Long. As the government proffered at the Feb. 7, 2020 hearing on this matter, Plaintiff Long alleges that when he and his sister were surrounded in their car by law enforcement – but this does not allege local law enforcement used information from the NCIC. Rather, "Defendant FBI's agent . . . enlisted the armed assistance of a local police department to help Defendant FBI detain Plaintiff Long and his sister…" Am. Compl. ¶ 231. This suggests the NCIC did not play a role.

[21] This is a representative, not comprehensive, discussion of relevant, conclusory claims.

unfounded. With no factual support, the Court cannot in good faith consider claims such as, "[t]he detention [in Gaziantep] was at the behest of Defendants' agents." *Id.* ¶ 243. In addition to speculative, this is too vague to identify which Defendant is at issue or how information may have been shared. During the entirety of the months and weeks Plaintiffs allege to have been in Turkey, Qatar, and the UAE, Plaintiffs indicate minimal US Government involvement in their physical treatment: "communicat[ions] with the US Embassy on a few occasions;" a message through a Turkish immigration official "that the United States was unhappy;"[22] and finally "a US Embassy official calls to inform Plaintiffs that a Qatari official offered to buy their plane tickets back to the United States, an offer Plaintiffs ultimately accept." *Id.* ¶¶ 248, 249, 261. Plaintiffs argue, generally, "their inability to return to their home in Qatar, their detention in Turkey, and their denial of entry to the United Arab Emirates were all caused by Defendants' decision to place them on the TSDB and disseminate it all over the world." Opp'n at 7. Again, this is the type of conclusory allegation the Court need not entertain.

Plaintiffs also contend that Defendants modified their passports: "Prior to Plaintiffs' entry and detention in Turkey in 2015, Defendants annotated Plaintiffs' passport records in a manner that disclosed to Turkey that the United States government believes Plaintiffs pose a threat of violence." Am. Compl. ¶ 241. However true, this claim suffers from the same speculation as most other allegations abroad. There are allegations the Plaintiffs' passports set off alarms and red lights in Qatar, the UAE, and the United States. Even so, only two of the three passports set

---

[22] The United States' displeasure would, theoretically, be due to an action over which it had no ultimate control. But there is not enough information alleged to determine that here.

off alarms in the United States – Plaintiffs did not make such a distinction in Qatar and the UAE.[23]

As a general matter, the Court does not have jurisdiction over these third-party, sovereign actors. Nor have Plaintiffs alleged facts to indicate the TSDB was the cause of the various governments' actions rather than alternative methods of communication and sources of information. Causation and redressability continue to be important elements of standing, and the Court narrows the scope of its inquiry accordingly.

Having identified some of the surplusage in the Amended Complaint, the Court continues its search for concrete and particularized injury, noting the Daves Plaintiffs' injuries "must affect [them] in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548 (quotation omitted).

The Court considers each pending count in turn.

### 2. *Counts I-II*

As a basis for the Substantive and Procedural Due Process claims, Plaintiffs allege injuries as they relate to the right to travel and to one's reputation.[24] The Substantive Due Process Claim is based on Plaintiffs' fundamental "right of movement," and the Procedural Due Process Claim relies on both the claimed "right of movement" and alleged "stigma-plus" harms.

---

[23] "Two of their three passports (Plaintiff Long and Plaintiff Juanjang Daves) cause[d] sirens and alarms to go off when a TSA screener scan[ned] them." Am. Compl. ¶ 264.

[24] Plaintiffs allege an inability to keep and bear arms as part of its Substantive Due Process claim. Plaintiffs voluntarily dismissed Count VII: Violation of the Second Amendment, and the Court, therefore, declines to consider a Second Amendment violation as part of this Amended Complaint. Plaintiffs also allege a "fundamental right to be free from searches and seizures." Am. Compl. ¶ 279. While there is some overlap in case law regarding the Fourth Amendment and the right to travel, Plaintiffs failed to assert a claim for a violation of the Fourth Amendment, and the Court declines to construe one on their behalf.

"When the Due Process Clause is invoked, the inquiry begins 'with a determination of the precise nature of the private interest that is threatened.'" *Elhady v. Piehota*, 303 F. Supp. 3d at 463 (quoting *Lehr v. Robertson*, 463 U.S. 248, 256 (1983)).

### a. The Right to Travel

"The right to travel within the United States is of course [] constitutionally protected." *Zemel v. Rusk*, 381 U.S. 1, 15 (1965) (citing *Edwards v. People of State of Cal.*, 314 U.S. 160, 179 (1941)). But "[t]he Court has made it plain that the *freedom* to travel outside the United States must be distinguished from the *right* to travel within the United States." *Haig v. Agee*, 453 U.S. 280, 306 (1981) (emphasis original). There is a "crucial difference . . . as 'the constitutional right of interstate travel is virtually unqualified.'" *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978) (quoting *United States v. Guest*, 383 U.S. 745, 757-58 (1966)). The Supreme Court clarified that there is some protection afforded to international travel, but "this 'right' . . . can be regulated within the bounds of due process." *Haig*, 453 U.S. at 307 (citing *Califano v. Torres*, 435 U.S. 1, 4 n.6 (1978)); *see also Kent v. Dulles*, 357 U.S. 116, 125 (1958) ("The right to travel is a part of the 'liberty' of which the citizen cannot be deprived without due process of law under the Fifth Amendment.").

"By enactment of the first travel control statute in 1918, Congress made clear its expectation that the Executive would curtail or prevent international travel by American citizens if it was contrary to the national security." *Haig*, 453 U.S. at 296-97 (internal footnote omitted). Indeed, Congress established that "[t]he Administrator shall be responsible for security in all modes of transportation." 49 U.S.C. § 114(d). And "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig*, 453 U.S. at 307 (quoting *Aptheker v. Sec. of State*, 378 U.S. 500, 509 (1964)).

Under constitutional review of incidental or indirect harms, laws infringing the freedom to travel abroad are not to be judged by the same standard as those that penalize the right of interstate travel, and "[u]nless the limitation imposed by Congress is wholly irrational, it is constitutional in spite of its incidental effect on international travel." *Califano v. Aznavorian*, 439 U.S. at 176-77 (citations omitted).

Courts have considered the proposition that there is a broader, constitutionally-protected right to free "movement." In *Kent v. Dulles*, the Court described "how deeply engrained in our history this freedom of movement is." 357 U.S. at 126. Further, "[t]ravel abroad, like travel within the country, may be necessary for a livelihood . . . Freedom of movement is basic in our scheme of values." *Id.* (citations omitted); *see also Elhady v. Kable*, 391 F. Supp. 3d at 578 ("As this Court stated in *Mohamed*, [i]t must be recognized that a meaningful right of travel in today's world cannot be understood as cleanly divided between interstate and international travel...") (internal quotation marks omitted). Others note that the Supreme Court clearly defines interstate and international travel as distinct interests, and that distinction is binding, so "we cannot and do not create a new, more expansive right to 'movement' as [the plaintiff] suggests." *Abdi v. Wray*, 942 F.3d 1019, 1029 (10th Cir. 2019).

Plaintiffs' Opposition asserts a violation of the Daves Plaintiffs' broad "movement-related liberty interests." Indeed, the Daves Plaintiffs claim to remain on the TSDB, and that they are "discouraged from traveling because of the anxiety, shame and humiliation attached to their designation as 'known or suspected terrorists.'" *Id.* ¶¶ 190, 192. Notably, Plaintiffs' Counsel confirmed in open court that the Daves Plaintiffs believe they were on the No Fly List during at least portions of the travel in this case, and that they were then down-graded to the Selectee List. Further clarification in the February 7, 2020, hearing established that the Daves

Plaintiffs do not intend to travel at all in the future—at least not across any international borders—because they are deterred by their past experiences. As injunctive relief has "the additional requirement of a 'real or immediate threat' that the party will suffer an injury in the future," the Court must determine the requisite future harms from past experience. *Griffin*, 912 F.3d 653 (quoting *City of Los Angeles v. Lyons*, 461 U.S. at 111). The logical inference, taking all representations as true, is that the Daves Plaintiffs face lesser harms going forward on the Selectee List than they faced while on the No Fly List.[25] The Daves Plaintiffs have set a high bar, as past injury is insufficient "if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. at 102 (quotation and citation omitted).

Constitutionally-protected rights to travel are implicated when government action "actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right." *Att'y Gen. of N.Y. v. Soto-Lopez*, 476 U.S. 898, 903 (1986) (plurality opinion) (internal quotations and citations omitted); *see also Kovac v. Wray*, 363 F. Supp. 3d 721 (quoting the same). Indeed, the Daves Plaintiffs claim they are "actually deter[red]" from traveling altogether. But this falls flat.

### i. Substantive Due Process

"A fundamental right will only be implicated by government action that, as a minimum, '*significantly* interferes with the exercise of a fundamental right.'" *Beydoun v. Sessions*, 871 F.3d 459, 467 (6th Cir. 2017) (quoting *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (emphasis in *Beydoun*)). The Daves Plaintiffs have not asserted individualized harms beyond air travel experiences, and, as in *Beydoun*, "they have not actually been prevented from flying altogether

---

[25] Looking to future injury, the relevant case law includes those plaintiffs that are *not* on the No Fly List.

or from traveling by means other than an airplane." 871 F.3d at 468; *see also Gilmore v. Gonzales*, 435 F.3d at 1137 (holding that a plaintiff does not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for him). The Daves Plaintiffs alleged interstate harm is related to a single flight from JFK to Oklahoma City. They vaguely allege invasive screening and onerous processes involved.

This one trip, standing alone, cannot support any due process claim. The Daves Plaintiffs have not alleged any actual denial to board a flight.[26] And there is no alleged pattern of injury for interstate travel as in comparable cases. *See, e.g. Elhady v. Kable*, 391 F. Supp. 3d at 571 (finding injury where, "Plaintiffs are *routinely* subjected to additional screening...") (emphasis added); *Kovac v. Wray*, 363 F. Supp. 3d at 752 (noting, even where no injury found, "[t]he Screening List Plaintiffs allege that they have been victims of *regular* secondary inspections, prolonged searches, interrogations, and restrictions traveling abroad") (emphasis added). Likewise, the Court cannot accurately extrapolate future harm based on one flight that the Plaintiffs were able to board after additional screening. The Daves Plaintiffs lack standing to bring a Substantive Due Process Claim.

### ii. Procedural Due Process

The Amended Complaint does not allege standing for travel-related interests with respect to procedural due process. Importantly, for treatment outside of the United States, Plaintiffs fail to allege facts in support of causation and redressability. Defendants' involvement in the Daves

---

[26] The Amended Complaint states that, upon arrival in New York from Qatar, they were "not able to board the [next] flight to Oklahoma City." ¶ 264. Immediately thereafter, it says, "[o]n January 26, 2016, Plaintiffs are able to board a flight to Oklahoma City, subject to the same kind of invasive screening and onerous processes they just experienced." ¶ 265. It is unclear why, subject to the same process, Plaintiffs could board one day but not the other. Regardless, one cannot conclude Defendants absolutely refused Plaintiffs.

Plaintiffs' injuries is largely speculative and likely beyond the jurisdiction of this Court until arrival at JFK, as explained above, Part III.B.1. Furthermore, it is particularly difficult for the Court to determine the cause of various denials of entry in Qatar and the UAE due to authority of foreign officials and injuries potentially specific to Plaintiff Long. Plaintiffs concede "the Daves Plaintiffs do not have quite the same history [as Long]," and discuss "severe harm Long in particular has suffered." Opp'n at 8, 9. This is why Plaintiffs' reliance on *Elhady v. Kable* rings hollow. The family traveled together in 2015-16, and Plaintiffs claim that at some point all three of them were on the No Fly List. Even if the Daves Plaintiffs were on the Selectee List, they had a shared experience with Long. This effectively nullifies the argument that "the wide-ranging consequences of an individual's Watchlist status render it more closely analogous to the No Fly List than to the types of regulations that courts have found to be reasonable..." *Elhady v. Kable*, 391 F. Supp. 3d at 578. Any traveler shadowing an individual on the No Fly List will have an analogous experience.

Accordingly, the Daves Plaintiffs' fail to allege standing. Arriving in the United States at JFK Airport, Plaintiffs claim to have had an undercover agent accompany them on the international flight from Qatar. They say they were both escorted by law enforcement through the customs line and segregated from other passengers. Plaintiffs also claim they were individually interrogated and searched, and that Defendants demanded access to "the family's phone" and passwords to their email accounts. Am. Compl. ¶ 263.

Moreover, these facts are not materially different from those in other Selectee List cases where no injury was found. *See Beydoun*, 871 F.3d at 462 (affirming that the plaintiffs' increased screening, excessive delays, missed flights, questioning, and a canceled trip did not amount to a constitutional injury); *Abdi v. Wray*, No. 2:17-cv-622-DB, 2018 U.S. Dist. LEXIS

68942, at *2-3 (D. Utah Apr. 23, 2018) (finding no implicated travel interest where the plaintiff was subject to repeated delays and screenings, had "SSSS" on his boarding pass, and missed multiple connecting flights due to screening processes).

Regarding the search at JFK, Plaintiffs arrived in New York from Qatar, thus the airport was a point of entry into the country. "[T]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border." *United States v. Flores-Montano*, 541 U.S. 149, 152 (2004). The Supreme Court "stated that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself ... are reasonable simply by virtue of the fact that they occur at the border.'" *Id.* at 152-53 (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)). Indeed, there is no allegation that a similar search occurred on the interstate flight. The Government has broad discretion over these screening procedures, and there is no basis on these facts that this is a pattern of conduct that will continue for the Daves Plaintiffs.

Furthermore, on this record, the Daves Plaintiffs have not attempted to board an international flight while in this country, and now decline to try.[27] This Court "is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Whitmore v. Arkansas*, 495 U.S. at 155–56. Neither due process claim based on the right to travel survives.

### b. The Stigma-Plus Test

"The Supreme Court has recognized a constitutionally protected interest in 'a person's good name, reputation, honor, or integrity.'" *Kovac*, 363 F. Supp. 3d at 753 (quoting *Wisc. v.*

---

[27] Leshauna Daves' passport did not trigger an alarm upon arrival at JFK airport in January 2016. There is no reason to believe her passport would cause that reaction now.

*Constantineau*, 400 U.S. 433, 437 (1971)). That said, "[o]ur Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law." *Daniels v. Williams*, 474 U.S. 327, 332 (1986). To avoid making the Fourteenth Amendment "a font of tort law," the Supreme Court implemented the two-part "stigma-plus" test in *Paul v. Davis*, 424 U.S. 693 (1976). The test helps identify a violation of "a variety of interests which are difficult of definition but are nevertheless comprehended within the meaning of either 'liberty' or 'property' as meant in the Due Process Clause." *Id.* at 711.

The "stigma-plus" test requires that a plaintiff: (1) suffered public stigma due to governmental action; and (2) experienced distinct alteration or extinguishment of "a right or status previously recognized by ... law." *Id.*; *see also Evans v. Chalmers*, 703 F.3d 636, 654 (4th Cir. 2012) ("[A] plaintiff bringing a 'stigma-plus' claim under *Paul* must allege both a stigmatic statement and a state action that distinctly altered or extinguished his legal status.") (internal quotation and citation omitted); *Abdi v. Wray*, 942 F.3d at 1032 ("(1) governmental defamation and (2) an alteration in legal status.") (citation omitted).

The stigmatic or defamatory statement is something "that might seriously damage [one's] standing and associations in his community." *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972). Without public disclosure of the allegedly stigmatizing statement or information, there is no cognizable harm to one's reputation. *See Bishop v. Wood*, 426 U.S. 341, 348-49 (1976) ("Since the former communication was not made public, it cannot properly form the basis for a claim [of injury to reputation].") (citing *Wisc. v. Constantineau*, 400 U.S. at 437). In *Johnson v. Martin*, where information was shared within the government, the court had "no problem determining that potentially stigmatizing information which . . . ha[d] not been disseminated beyond the

42

proper chain of command within the police department has not been made public." 943 F.2d 15, 17 (7th Cir. 1991).

Plaintiffs allege that Watchlist status gives the "stigmatizing label of 'known or suspected terrorists,' and widely disseminat[es] the stigmatizing label to numerous governmental and private partners." Am. Compl. ¶ 284; *see also id.* ¶ 302 ("Defendants have officially imposed . . . the stigmatizing label . . . without a constitutionally adequate legal mechanism for doing so."). Plaintiffs claim the Government makes public the fact that individuals on the Watchlist are reasonably suspected of being a known or suspected terrorist ("KST"). *Id.* ¶ 33. Indeed, Plaintiffs say KSTs are treated as dangerous threats. Plaintiffs allege that through the Watchlist, KSTs are made known to the nation's law enforcement agencies, the federal government, more than 60 foreign countries, international bodies, approximately 1400 private entities including airlines, universities, hospitals, private correctional facilities, and other third parties. *Id.* ¶¶ 6, 99. They say more than 18,000 law enforcement agencies and 100,000 law enforcement officers receive TSDB information. *Id.* ¶ 45.

Further, Plaintiffs state that extra and intrusive screening can be observed by members of the public, including family and colleagues. "Because travel is regularly done with family, friends, community acquaintances, and professional contacts, a person's watchlist status is revealed to travel companions." *Id.* at ¶ 111. In other words, Plaintiffs argue that frontline screeners disclose Watchlist status.

But these claims are not individualized to these Plaintiffs. Many of Plaintiffs' claimed reputational harms are based on claims of widespread dissemination. Whether the dissemination is as extensive as alleged is not germane to the determination of injury to these Plaintiffs. For instance, Plaintiffs state that "SSSS" stamped on a boarding pass is a way to indicate the traveler

is a KST, and that such a notation "has become commonplace in the Muslim community." *Id.* ¶ 49. Plaintiffs do not allege to have ever had this stamp on their travel documents. Plaintiffs also claim that the KST label can be on criminal records, which are accessible to the general public. *Id.* ¶ 107. Plaintiff Long denies ever being arrested in Turkey, and there is no indication that the Daves Plaintiffs have criminal records.

Specific to this case, Plaintiffs claim the dissemination of their Watchlist status reached TSA, CBP, and foreign governments, among other entities. In addition to Defendants' various and onerous screening procedures that may be public and observable, Plaintiffs allege that their passports caused red lights to flash and sirens to sound in both Doha and the UAE. Upon return to the United States in early 2016, Plaintiffs allege additional harms at JFK International Airport – as noted above, they were escorted by law enforcement and segregated from other passengers. When attempting to fly on to Oklahoma City from New York, "two of their three passports (Plaintiff Long and Plaintiff Juanjang Daves) cause[d] sirens to go off when a TSA screener scan[ned] them." *Id.* ¶ 264. Lastly, beyond being present with Plaintiff Long in Turkey, the Daves Plaintiffs had little to no involvement in or association with his media coverage. [28]

The Daves Plaintiffs fail to allege public stigmatization. The Court finds many parallels between the instant facts and allegations and those in *Kovac v. Wray*, where the court found the

---

[28] In 2012, Plaintiff Long seemingly sought out the media to amplify his status on the No Fly List when trying to get back to Oklahoma. He retained a lawyer and provided a media interview with The Guardian; "[i]n response to extensive media coverage and litigation threats," Plaintiffs allege, "Defendants allowed Plaintiff Long to fly from Qatar to Oklahoma in November 2012." Id. ¶ 227. In 2015, yet unidentified FBI agents allegedly provided false information to Patrick Poole, a virulently anti-Muslim blogger with Pajamas Media, saying Long was arrested as an ISIS fighter. Id. ¶ 251. News media later reported on the fabricated article as Long continued efforts to distance his name from the ISIS allegations. (articles available at https://pjmedia.com/homeland-security/2015/11/24/msnbcs-no-fly-list-is-islamophobia-poster-boy-arrested-in-turkey-as-part-of-isis-cell; https://theintercept.com/2016/01/25/u-s-air-force-veteran-saadiq-long-smeared-as-an-isis-fighter-just-returned-to-the-u-s/).

plaintiffs failed to plead public stigmatization.[29] In *Kovac v. Wray* the plaintiffs alleged substantially the same stigmatization due to the KST label and wide dissemination of that label and the TSDB information. Yet, "Plaintiffs have not alleged that the TSA has disclosed to the general public their purported placement on the watchlist, or that Defendants otherwise labeled them as individuals who are known or suspected to be terrorists, or otherwise associated with terrorist activity." *Id.* at363 F. Supp. 3d 753 (internal quotations omitted). It is similar here – a lay person would not know that Plaintiff Long could not buy a gun unless she read the instant complaint. The Daves Plaintiffs do not allege specific harms beyond those related to their travel efforts. Regardless, disseminating a status to various entities does not equate to a public posting.

Searches and screenings in airports are similarly unpersuasive to show material harm: "[certain] factors make airport screening procedures minimally intrusive in comparison to other kinds of searches." *United States v. Hartwell*, 436 F.3d 174, 180 (3d Cir. 2006). "[S]everal courts have correctly observed that '[s]ince every air passenger is subjected to a search, there is virtually no 'stigma attached to being subjected to search at a known, designated airport search point.'" *Kovac v. Wray*, 363 F. Supp. 3d at 754 (quoting *Hartwell*, 436 F.3d at 180) (discussing a search escalating from magnetometer to wanding to physical touching)). Even the absolute denial of boarding has been described as "incidental public disclosure" that failed to support a Stigma-Plus claim. *Latif v. Lynch*, 3:10-cv-00750-BR, 2016 WL 1239925, at *8 (D. Or. Mar. 28, 2016). Without public stigmatization, the Court need not reach the "plus" factor of the test.

As such, a procedural process claim is unsupported under Stigma-Plus. The totality of the Daves Plaintiffs' claims fail to allege standing for Counts I and II.

---

[29] The arguments are unsurprisingly on-point, as Plaintiffs are represented by the same Counsel.

### 3. Counts III-IV

To bring a claim under the Administrative Procedure Act, courts undertake "a prudential inquiry into whether the plaintiff has alleged an injury within the zone of interests protected by a statutory or constitutional provision." *Stahlman v. U.S.*, 995 F. Supp. 2d 446, 452 (D. Md. 2014) (citing *Assoc. of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 152 (1970)).

Like much of the Amended Complaint, Count III is a disorienting mix of assertions. The subtitle of the Count is "DHS TRIP," but the substance of the claim tries to distance itself from DHS TRIP. Paragraph 317 includes a quote that is credited to 49 U.S.C. § 114(h)(3), but that section of the statute does not include any of that language. The Court declines to further decipher these claims. The Court finds that the Daves Plaintiffs' APA claims rely on substantially the same injuries as discussed for Counts I-II. The analysis of the alleged injuries is the same. Furthermore, per the substance of Count III's allegations, it cannot be meaningfully separated from Count I. Accordingly, Count III lies outside the Court's jurisdiction.[30]

Count IV, alleging a violation of the APA as to the National Criminal Information Center, is not applicable to the Daves Plaintiffs. As discussed in Part IV.A, the Daves Plaintiffs are not connected to any action properly alleged to be a result of NCIC information—criminal or not—gleaned from or shared with the Watchlist. Count IV is inapposite to these Plaintiffs, thus there is no standing.

### 4. Count V

Turning to Count V, "in equal protection cases—such as this case—'[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a

---

[30] All of this aside, Plaintiffs contend their "APA claims should survive so long as any of its other constitutional claims (not just due process) survive." Opp'n at 27. At least for the Daves Plaintiffs, none of them do.

benefit than it is for members of another group, . . . . [t]he 'injury in fact' . . . is the denial of equal treatment resulting from the imposition of the barrier[.]'" *Bostic v. Schaefer*, 760 F.3d at 372 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). The TSDB as alleged, and inclusion therein, is arguably such a barrier.

An Equal Protection claim is not supported here. The claim not only relies on past injuries that are insufficient to allege future harm, but also hinges on allegations untethered to the Daves Plaintiffs. Indeed, they claim that their TSDB designation is based on a dizzying and speculative list of justifications, including "their familial relationship and association with each other and Plaintiff Long, based upon a hunch, and/or based upon their race, ethnicity, national origin, religious affiliation, guilt-by-association, or First Amendment protected activities." Am. Compl. ¶ 178. This list is unhelpful for purposes of review, and this kitchen-sink approach undermines an Equal Protection violation that is based on an identifiable motivation. To add to the complication, Plaintiffs allege that Defendants consider at least the following:

> [N]ational origination from Muslim-majority countries, ethnic origination as Arab or Middle Eastern, travel to Muslim-majority countries, travel on religious pilgrimages, learning Arabic, attending mosques, zakat donations to Muslim charities, the wearing of typical Muslim dress, the frequency of Muslim prayer, adherence to sharia law, affiliations with Muslim organizations, family relationships to other Muslims, and associations with other Muslims.

*Id.* ¶ 332; *see also* ¶ 134. For the lion's share of these factors, Plaintiffs failed to discuss them anywhere in the Amended Complaint. In the pleading, there is a section called, "Watchlist Practices Target and Disproportionately Harm American Muslims." This section—in some ways written like a brief—is instructive with respect to many things, but not the Plaintiffs. The Amended Complaint reveals that, in addition to being practicing Muslims, the Daves Plaintiffs are female U.S. citizens, and that they reside in Oklahoma when home in the United States. There is little, if anything, more to indicate how their Islamic faith is externally apparent, or how

47

they are connected to the above list, beyond "travel to Muslim-majority countries," and "family relationships to other Muslims."

Our Federal Rules of Civil Procedure require a "showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). However true it may be that the Government is using the TSDB as "an Islamic terrorism database," Opp'n at 32, the threshold requirements to show standing, causation, and redressability are yet unsatisfied.

### 5. Count VIII

Separation of powers principles dictate that, "in keeping with the purpose of this doctrine, '[o]ur standing inquiry has been especially rigorous when reaching the merits of the dispute would force us to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional.'" *Clapper v. Amnesty Intn'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)) (additional citation omitted). Indeed, a challenge pursuant to the Non-Delegation Doctrine of Article I of the United States Constitution requires "that 'threatened injury must be *certainly impending* to constitute injury in fact, and that allegations of *possible* future injury are not sufficient.'" *Clapper*, 568 U.S. at 409 (internal quotation marks omitted) (emphasis original) (collecting cases).

For the reasons already discussed, the Daves Plaintiffs fail to allege sufficient, certainly impending injury to support this claim.

## V. MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

The Court finds that the Daves Plaintiffs lack standing to bring the above claims, and, therefore, the motion is resolved under Rule 12(b)(1). A Rule 12(b)(6) discussion is unnecessary.

## VI. CONCLUSION

For these reasons, and upon due consideration of the record, the motions to dismiss

(Dkts. 44, 45) are hereby **GRANTED IN PART AND DENIED IN PART**, and the Court

**TRANSFERS** Plaintiff Long's as-applied claims in Counts I, II, III, and V to the Fourth

Circuit Court of Appeals pursuant to 28 U.S.C. § 1631;

**STAYS** the remainder of Plaintiff Long's claims pending the Fourth Circuit's review and

until further order of the Court; and

**DISMISSES** all claims as they pertain to the Daves Plaintiffs for the reasons stated

herein.

It is **SO ORDERED.**

April 2, 2020
Alexandria, Virginia

Liam O'Grady
United States District Judge